1  James Bopp, Jr. (Ind. State Bar No. 2838-84)*
Barry A. Bostrom (Ind. State Bar No.11912-84)*
2  Sarah E. Troupis (Wis. State Bar No. 1061515)*
Scott F. Bieniek (Ill. State Bar No. 6295901)*
3  Bopp, Coleson & Bostrom
1 South Sixth Street
4  Terre Haute, IN 47807-3510
Telephone:    (812) 232-2434
5  Facsimile:    (812) 235-3685
Counsel for All Plaintiffs
6
7  Timothy D. Chandler (Cal. State Bar No. 234325)**
Alliance Defense Fund
8  101 Parkshore Drive, Suite 100
Folsom, CA 95630
9  Telephone:    (916) 932-2850
Facsimile:    (916) 932-2851
Counsel for All Plaintiffs
10
11 * Pro Hac Vice Application Pending
** Designated Counsel for Service
12
13              **United States District Court**
              **Eastern District of California**
14                 **Sacramento Division**

15
16 | | Case No. 2:09-CV-00058-MCE-DAD |
17 | | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| **ProtectMarriage.com, et al.,** | |
18 | | |
| *Plaintiffs*, | Date:   TBD |
19 | *v.* | Time:   TBD |
| | Honorable Morrison C. England, Jr. |
20 | **Debra Bowen, et al.,** | |
| | Oral Argument Requested |
21 | *Defendants*. | |
22 | | Estimated Time Needed: One Hour |
23

24
25
26
27
28
**Plaintiffs' Memorandum in Support
of Motion for Preliminary Injunction**        1

# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.     Plaintiffs Are Likely to Succeed on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.     Plaintiffs have demonstrated a reasonable probability that compelled disclosure will result in threats, harassment, and reprisals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.     The Act's $100 disclosure threshold is unconstitutional because it violates Committee Plaintiffs' fundamental First Amendment rights... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            1.     *Buckley v. Valeo*, 424 U.S. 1 (1976), addressed compelled disclosure thresholds in the context of candidate elections. . . . . . . . . . 18

            2.     California's threshold for disclosure is subject to strict scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            3.     California's threshold for disclosure fails strict scrutiny because it is not narrowly tailored to serve a compelling state interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                  a.     The threshold is suspect, if not outright unconstitutional, because it is not indexed for inflation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                  b.     The threshold is not narrowly tailored to serve the State's Informational Interest . . . . . . . . . . . . . . . . . . . . . . . . . 23

      C.     California's post-election reporting provisions fail strict scrutiny because California lacks a sufficient state interest justifying the compelled disclosure of contributors and recipients of expenditures. . . . . . . . . . 29

II.     Plaintiffs Have Demonstrated Irreparable Harm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

III.     The Balance of Harms Tips Decidedly in Favor of Plaintiffs. . . . . . . . . . . . . . . . . . . . 31

IV.     Committee Plaintiffs May Assert the Rights of Their Major Donors . . . . . . . . . . . . . . . 32

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**Table of Authorities**

**United States Supreme Court Cases:**

*Brown v. Socialist Workers '74 Campaign Committee (Ohio)*,
    459 U.S. 87 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11 – 13

*Buckley v. Valeo*, 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999) . . . . . . . . . . . . . 14, 21, 28

*Davis v. F.E.C.*, 128 S.Ct. 2759 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 21, 30

*Elrod v. Burns*, 427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*F.E.C. v. Wisconsin Right to Life, Inc.*, 551 U.S. __, 127 S.Ct. 2652 (2007) . . . . . . . . . 14, 21, 22

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) . . . . . . . . . . . . . . 14, 19 – 21, 24, 30

*McConnell v. F.E.C.*, 540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*NAACP v. Alabama*, 357 U.S. 449 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12 – 14, 32

*NAACP v. Button*, 371 U.S. 415 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Powers v. Ohio*, 499 U.S. 400 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Randall v. Sorrell*, 548 U.S. 230 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 28

*Singleton v. Wulff*, 428 U.S. 106 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365 (2008) . . . . . . . . . . . . . . . . . . . . . . 11

**United States Court of Appeals Cases:**

*AFL-CIO v. F.E.C.*, 333 F.3d 168, 176 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003) . . . . . . . . . 19, 24, 29

*California Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172 (9th Cir. 2007) . . . 24 – 26, 28, 29

*Carver v. Nixon*, 72 F.3d 633 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Coal. of Clergy, Lawyers, and Professors v. Bush*, 310 F.3d 113 (9th Cir. 2002) . . . . . . . . . . 32

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) . . . . . . . . . . 31

*North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008) . . . . . . . . . . . . . . . 18

*Summum v. Pleasant Grove City*, 483 F.3d 1044 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 31

**United States District Court Cases:**

*McConnell v. F.E.C.*, 251 F. Supp. 2d 176 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Constitutions, Statutes and Administrative Regulations:**

Cal. Gov't Code § 81001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Cal. Gov't Code § 82013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Cal. Gov't Code § 84102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Cal. Gov't Code § 84106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Cal. Gov't Code § 84200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 26

Cal. Gov't Code § 84200.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Cal. Gov't Code § 84203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Cal. Gov't Code § 84211 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 17

Cal. Gov't Code § 84302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Cal. Gov't Code § 84503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Cal. Gov't Code § 84504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30

Cal. Code Regs. tit. 2, § 18401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Cal. Code Regs. tit. 2, § 18402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Legislative History Material:**

1980 Cal. Stat. 611, § 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Other Authorities:**

Bureau of Labor Statistics Consumer Price Index Inflation Calculator
 (*available at* http://www.bls.gov/data/inflation_calculator.htm) . . . . . . . . . . . . . . . . . . 23

Cal-Access, http://cal-access.sos.ca.gov/Campaign/Measures/
 Detail.aspx?id=1302602&session=2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Dick M. Carpenter II, *Disclosure Costs: Unintended Consequences of
 Campaign Finance Reform* (2007) (available at http://www.ij.org/
 publications/other/disclosurecosts.html) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

William McGeveran, *Mrs. McIntyre's Checkbook: Privacy Costs of
 Political Contribution Disclosure*, 6 U. Pa. J. Const. L. 1 (2003) . . . . . . . . . . . . . . . . . . 22

**Plaintiffs' Memorandum in Support
of Motion for Preliminary Injunction          4**

**Introduction**

Plaintiffs **ProtectMarriage.com - Yes on 8, a Project of California Renewal** ("**ProtectMarriage.com**"), **National Organization for Marriage - Yes on 8, Sponsored by National Organization for Marriage** ("**NOM-California**") (collectively "**Committee Plaintiffs**"), and **John Doe #1**, an individual, and as a representative of the **Class of Major Donors** (or "**Major Donors**") are committees under California law. Together, Plaintiffs ProtectMarriage.com, NOM-California, and the Class of Major Donors are referred to as "**Plaintiffs**." Plaintiffs seek a preliminary injunction to: (1) enjoin Defendants from enforcing California Government Code ("CGC") § 84200 ("Semi-Annual Report"); (2) enjoin Defendants from commencing any criminal or civil actions for failing to comply with CGC § 84200; and (3) enjoin Defendants from publishing or otherwise making available any prior reports or campaign statements filed by Plaintiffs under the Political Reform Act of 1974, CGC § 81000 *et seq.* (the "Act").

A preliminary injunction is required to protect Plaintiffs from harassment and further deprivations of their First Amendment rights as a result of California's compelled disclosure statute. As shall be shown below, Plaintiffs have suffered and will continue to suffer irreparable harm and are also likely to succeed on the merits because California's statutes are unconstitutional under the First Amendment.

Plaintiffs have three primary arguments in support of their motion for preliminary injunction. First, under the Supreme Court's landmark decision in *Buckley v. Valeo*, 424 U.S. 1 (1976), Committee Plaintiffs and the Class of Major Donors are entitled to an as-applied blanket exemption from California's compelled disclosure provisions because Plaintiffs have demonstrated a reasonable probability that compelled disclosure will result in threats, harassment, and reprisals because of their support for Proposition 8. Furthermore, Plaintiffs have demonstrated that the continued availability of reports already filed and made available to the public will result in further harassment.

Second, California's threshold for compelled disclosure of contributors is not narrowly tailored to serve a compelling government interest in violation of the First Amendment to the United States Constitution. California requires committees to disclose the names and other personal information of any person that contributes one hundred dollars ($100) or more to a committee. The value is not indexed for inflation, a fact that makes the threshold suspect, if not unconstitutional *per se*, under existing Supreme Court precedent. Furthermore, ballot measure campaigns have become incredibly expensive (proponents and opponents of Proposition 8 raised and spent more than $60 million on Proposition 8), and thresholds at such low levels cannot be narrowly tailored to serve the state's only legitimate interest, namely, providing the electorate with the information necessary to determine who is really behind a ballot measure campaign, individuals sometimes referred to as veiled political actors.

Finally, any ballot measure regulation that requires compelled disclosure regarding ballot measure activity after the election has occurred is unconstitutional because it cannot logically be related to a compelling state interest. Under existing Supreme Court precedent, the only state interest sufficient to justify compelled disclosure in the context of ballot measures is that of providing the electorate with information as to where money comes from and how it is spent in order to assist voters in determining *whether to support or oppose a particular ballot measure*. Once the final vote is cast for or against the measure, the interest in assisting voters in determining whether to support or oppose the measure disappears. Furthermore, the facts of this case make clear the social costs associated with compelled disclosure *after* an election: opponents of Proposition 8, unsuccessful at the ballot box, are using data obtained from campaign reports to harass individuals and organizations that supported the measure. Thus, California lacks a compelling state interest sufficient to justify post-election reporting of ballot measure activity or the continued maintenance of any reports after the election.

**Facts**

The facts are set out in detail in the Complaint, at ¶¶ 22 – 46, so an abbreviated version is offered here. This case involves the campaign in support of Proposition 8, a ballot measure adopted by the citizens of California on November 4, 2008, that defines marriage as "between a man and a woman." Plaintiffs ProtectMarriage.com and NOM-California were formed to support Proposition 8 and are primarily formed ballot committees under the Act. Members of the Class of Major Donors are also committees under the Act because they contributed ten thousand dollars ($10,000) or more to committees that supported Proposition 8. Under the Act, Plaintiffs must comply with numerous administrative burdens including recordkeeping, registration, and disclosure requirements related to their support of Proposition 8. *See* CGC § 84100 *et seq*; *Complaint* ¶¶ 47 – 62.

The campaign surrounding Proposition 8 was controversial. Proponents and opponents poured over sixty million dollars into the campaign. *See generally*, Cal-Access, http://cal-access.sos.ca.gov/Campaign/Measures/Detail.aspx?id=1302602&session=2007. Furthermore, the fight is not over. Despite the fact that voters overwhelmingly adopted the measure on November 4, 2008, opponents of Proposition 8 have turned to the courts in an attempt to overturn the will of the people of California. *See Strauss v. Horton*, No. S168047 (Cal. S. Ct., filed Nov. 6, 2008), *available at* http://www.courtinfo.ca.gov/courts/supreme /highprofile/prop8.htm (several other challenges have been filed, including one by the City and County of San Francisco). Opponents have also vowed to submit their own constitutional amendment in 2010. *See* John Wildermuth, *Gay-Rights Activists Protest Prop. 8 at Capitol*, San Francisco Chronicle, Nov. 23, 2008, *available at* http://www.sfgate.com/cgi-bin/articles.cgi?f= /c/a/2008/11/10/MN4E141B3P.DTL&type=printable. Thus, while the campaign regarding Proposition 8 may have ended on November 4, the debate regarding the definition of marriage continues and may be more contentious than ever.

While the supporters of Proposition 8 may have been successful at the polls, the victory did not come without a price. Supporters of Proposition 8 have been the subject of death threats.

*See* Decl. of Sarah E. Troupis, Ex. E (describing death threat against Fresno Mayor Alan Autry and Pastor Jim Franklin that read in part: "Consider yourself lucky. If I had a gun I would have gunned you down along with each and every other supporter."). Others have been subject to physical violence and threats of physical violence. *See* Decl. of Sarah E. Troupis, Ex. F (describing physical assault against Proposition 8 supporter); Ex. G (same); Ex. H (same); Ex. P ("I'm having a hard enough time fighting the urge to put on my construction boots, hop on a plane and kick some right-wing ass!"); Decl. of John Doe #1 (received numerous threatening and harassing phone calls). Two organizations that supported Proposition 8 received envelopes containing a white powdery substance, an act that can be described as an act of domestic terrorism. *See* Decl. of Sarah E. Troupis, Ex. J (reporting that two Church of Latter Day Saints temples and a Knights of Colombus facility received envelopes containing a white powdery substance).

Reports of vandalism directed at the personal property of supporters was widespread. *See generally* Decl. of Sarah E. Troupis, Ex. O - Ex. AC (discussing reports of graffiti on the garages of Proposition 8 supporters, other acts of vandalism, and widespread reports of sign theft). Several churches reported having windows broken. Decl. of John Doe #3 (window of church that supported Proposition 8 broken with "Yes on 8" sign); Decl. of Sarah E. Troupis, Ex. O (same).

Furthermore, the attacks became quite personal. One supporter had a flyer circulated in his neighborhood calling him a "Bigot" and listing his employer and the amount of his contribution to a committee that supported Proposition 8. Decl. of John Doe #2. Others received harassing emails at work because of their support. *See* Decl. of John Doe #4 (protests outside gated community during fundraiser; harassing emails at work, including one that read, "hello propagators & litagators [sic] burn in hell," and another that read, "congratulations. for your support of prop 8, you have won our tampon of the year award."); Decl. of Sarah E. Troupis, Ex. O (supporters targeted after their pictures appeared in newspapers after it was announced that Proposition 8 had passed). Others have had their businesses targeted as a result

of their personal support of the measure. *See*, *e.g.*, Decl. of John Doe #1 (organized protests outside his business and several reports of organized boycotts); Decl. of John Doe #5 (company boycotted because of a one hundred dollar donation in support of Proposition 8). *See generally* Decl. of Sarah E. Troupis, Ex. AD - BE (discussing numerous reports of blacklisting and boycotts of businesses listed on the public disclosure reports). Indeed, one supporter received a postcard chastising her merely for exercising her First Amendment right to participate in the political process. Decl. of John Doe #6. Others have been forced to resign from their jobs because of their support of Proposition 8. *See* Decl. of Sarah E. Troupis, Ex. AH (director of Los Angeles Film Festival forced to resign); Ex. AI (artistic director of California Musical Theatre forced to resign); and Ex. AD (discussing how a restaurant manager was forced to resign because of a one hundred dollar donation in support of Proposition 8).

The threats and harassment set forth above are enabled in part by the Act's compelled disclosure provisions. *See generally* Decl. of Sarah E. Troupis, Ex. AD- Ex. BE (consisting of a number of news stories regarding how public reports are being used by opponents of Proposition 8). Committee Plaintiffs are required to file reports that include the name, address, occupation, and employer for all individuals who contributed one hundred dollars or more to their respective committees. CGC § 84211. Members of the Class of Major Donors are also required to file reports that contain their name, address, occupation, and employer. CGC § 84211. All of this information is made available to the public on the Secretary of State's website and at various governmental offices throughout the state. The availability of the reports has given opponents of Proposition 8 the information necessary to personally threaten and harass supporters of Proposition 8. *See* Decl. of John Doe #6 (indicating that her only support of Proposition 8 consisted of monetary contributions to a committee, supporting the theory that her name and address were obtained from the public reports). Furthermore, web sites such as www.californiansagainsthate.com have reproduced the information available in the public reports along with additional information such as home or business telephone numbers. The website

claims that its purpose is to "identify and take action against those who want to deny us our equal protection rights."

On January 31, 2009, Committee Plaintiffs must file campaign statements that will include the names of individual contributors who have not been disclosed on a prior campaign statement. Any individual that contributed less than one thousand dollars ($1,000) during the period beginning on October 19, 2008, and ending on December 31, 2008, has not been disclosed on a prior report of Committee Plaintiffs. Committee Plaintiffs believe there is a reasonable probability that the disclosure of these individuals will subject these supporters of Proposition 8 to the same types of threats and harassment directed against other supporters of Proposition 8. Committee Plaintiffs also believe that the continued availability of reports previously filed will lead to further animosity and violence directed at those individuals and organizations listed therein.

On January 31, 2009, any member of the Class of Major Donors who contributed ten thousand dollars or more to Committee Plaintiffs after June 30, 2008, must also file a campaign statement. Plaintiffs believe there is a reasonable probability that the disclosure of these individuals will subject these Major Donors to the same types of threats and harassment directed against other supporters of Proposition 8. The Class of Major Donors also believe that the continued availability of Major Donor reports already filed will lead to further animosity and violence directed at these individuals and organizations.

Lastly, several individuals have indicated that they will be reluctant to contribute to any political campaign in the future if it means that they could be targeted for a donation of as little as one hundred dollars. *See*, *e.g.*, Decl. of John Doe #1 (reluctant to contribute to a campaign in the future if it will result in threats and harassment directed at him and his employees); Decl. of John Doe #2 (stating that he is less likely to donate to a similar cause in the future because a flyer was circulated in his neighborhood calling him a "Bigot" and listing his employer and the amount of his contribution); Decl. of John Doe #5 ("I feel threatened and uneasy knowing that my company and I could be targeted simply for participating in the democratic process.").

Plaintiffs also believe that the hostility directed at Proposition 8 supporters also discouraged some individuals from contributing to the campaign.

## Argument

Plaintiffs ProtectMarriage.com, NOM-California, and the Class of Major Donors satisfy the requirements for a preliminary injunction. A plaintiff seeking a preliminary injunction must establish that he is (1) likely to succeed on the merits; (2) likely to suffer irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008) (rejecting Ninth Circuit's "possibility" standard). A preliminary injunction is warranted in this case because Plaintiffs have demonstrated that they are likely to succeed on the merits, that they will suffer irreparable harm if injunctive relief is not granted, that the equitable balance tips in their favor, and that an injunction is in the public interest.

## I. Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs have a high likelihood of success on the merits because they have demonstrated they are entitled to a blanket as-applied exemption from California's reporting requirements under *Buckley* and its progeny; California's compelled disclosure threshold violates Committee Plaintiffs' First Amendment rights; and California does not have an interest in public disclosure or the maintenance of reports regarding ballot measures after the election has occurred.

**A. Plaintiffs have demonstrated a reasonable probability that compelled disclosure will result in threats, harassment, and reprisals.**

Plaintiffs' first count involves an as-applied challenge to California's campaign finance and disclosure regulations. The compelled disclosure required by the Act violates Plaintiffs' First Amendment rights of freedom of expression and association because compelled disclosure has subjected, or will subject, Committee Plaintiffs and their contributors, including Major Donors, to threats, harassment, and reprisals because of their support for Proposition 8. Through their Complaint and declarations in support of this memorandum, Plaintiffs have set forth examples of the high level of animosity directed at supporters of Proposition 8. Under *Brown v.*

*Socialist Workers '74 Campaign Committee (Ohio)*, 459 U.S. 87 (1982), this evidence is sufficient to meet the requirements for the issuance of a preliminary injunction.

The Supreme Court recently reaffirmed that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Davis v. F.E.C.*, 128 S. Ct. 2759, 2774-75 (2008) (quoting *Buckley*, 424 U.S. at 64). While the Supreme Court has concluded that the compelled disclosure of campaign contributors may be constitutional, the Court has cautioned that in some instances, the threat to First Amendment rights resulting from compelled disclosure may be so severe that an exception from reporting requirements is warranted. *Buckley*, 424 U.S. at 71. Leaving open the possibility of an as-applied challenge, the Supreme Court noted, "[t]here could well be a case, similar to those before the Court in *NAACP v. Alabama*[, 357 U.S. 449 (1958)] and *Bates* [*v. State Bar of Arizona*, 433 U.S. 350 (1977)], where the threat to the exercise of First Amendment rights is so serious and the state interest furthered by disclosure so insubstantial that the Act's requirements cannot be constitutionally applied." *Id.*

The *Buckley* court provided useful standards for future courts to consider in the context of such an as-applied challenge. First, the party need only demonstrate that there is a "reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from *either* Government officials or private parties." *Id.* at 74 (emphasis added). Second, because an organization subjected to such hostility for exercising its First Amendment rights might find it difficult to find witnesses willing to testify for fear of further repercussions, the organization must be allowed "sufficient flexibility in the proof of injury." *Id.* Thus, the Supreme Court suggested that the proof might include not only evidence of past or present harassment directed at members of the organization itself, but also evidence of animosity directed against other individuals or organizations holding similar views. *Id.*

In *Brown*, the Supreme Court had occasion to consider such an as-applied challenge to a compelled disclosure statute. *Brown*, 459 U.S. at 87. The case involved the Socialist Workers Party, a minor political party which historically had been the subject of harassment by

government officials and private parties. *Id.* at 88. The Court began its analysis by restating the standard set forth in *Buckley* that "the First Amendment prohibits the government from compelling disclosures by a minor political party that can show a '*reasonable probability*' that the compelled disclosures will subject those identified to 'threats, harassment, or reprisals.'" *Brown*, 459 U.S. at 88 (citing *Buckley*, 424 U.S. at 74) (emphasis added).

In *Brown*, as in *Buckley*, the Supreme Court cautioned that plaintiffs must be given sufficient flexibility in the proof of their claim. *Id.* at 93; *Buckley*, 424 U.S. at 74. Acceptable evidence includes not only specific evidence of past or present harassment of members due to their associational ties, or harassment directed at the organization itself, but also evidence of reprisals and threats directed against individuals or organizations holding similar views. *Brown*, 459 U.S. at 94-95. Thus, the "reasonable probability" standard does not require Plaintiffs to establish a causal link between their own prior disclosure and the threats and harassment suffered by Plaintiffs and their members.

The *Brown* Court ultimately concluded that the district court had properly applied the *Buckley* test, noting that the organization had demonstrated a reasonable probability that compelled disclosure would result in harassment by offering evidence of threatening phone calls, hate mail, destruction of members' property, police harassment, burning of organizational literature, and the firing of shots into an organizational office. *Id.* at 99.

While *Buckley* and *Brown* make references to "minor parties," nothing in *NAACP v. Alabama*, 357 U.S. 449 (1958), the opinion on which the exception is premised, suggests that the exception is so limited. The "minor party" language in *Buckley* results from the parties' argument for a "blanket exemption" from the disclosure requirements for minor parties without having to demonstrate the requisite level of harm under *NAACP v. Alabama*. *See Buckley*, 424 U.S. at 68-74. As the *NAACP v. Alabama* Court put it, compelled disclosure is just as "likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of

their beliefs shown through their associations and of the consequences of this exposure."

*NAACP v. Alabama*, 357 U.S. at 462-63. "[T]he First Amendment does not 'belong' to any definable category of persons or entitites: It belongs to all who exercise its freedoms." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 802 (1978) (Burger, J., concurring). Here, Plaintiffs, like the parties in *NAACP v. Alabama* and *Brown*, are being subjected to harassment for exercising their fundamental rights of freedom of speech and association. Plaintiffs' fundamental First Amendment rights outweigh the state's interest in compelled disclosure and an exception is warranted.[1]

Furthermore, it makes little difference if the threats are from government officials or private parties. *Buckley*, 424 U.S. at 74. Exacting scrutiny is required "even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure."[2] *Id.* at 65; *see also*, *NAACP v. Alabama*, 357 U.S. at 463 ("The crucial factor is the interplay of governmental and private action, for it is only after the initial exertion of state power represented by the production order that private action takes hold.").

Supporters of Proposition 8 have been subject to the sorts of threats, harassment, and reprisals that the *Brown* Court previously found adequate to defeat compelled disclosure. Donors to Proposition 8 have been subject to threatening phone calls, e-mails, and postcards.

---

[1] *See* Parts I.B. and I.C., *infra* (discussing states' interest in compelled disclosure, particularly at such low levels, and after the election has occured).

[2] For purposes of Plaintiffs' request for a blanket exemption, the level of scrutiny is unimportant and so it is not discussed in great detail here. Nevertheless, in *Buckley*, the Supreme Court used the phrase "exacting scrutiny." *Buckley*, 424 U.S. at 62. "We have also insisted that there be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Id.* Later courts have disagreed over what the Court meant by "exacting scrutiny." *See F.E.C. v. Wisconsin Right to Life, Inc.*, 551 U.S. __, 127 S. Ct. 2652, 2664 (2007) ("*WRTL II*") (burdens on political speech are subject to strict scrutiny); *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 206-09 (1999) ("*Buckley II*") (applying intermediate scrutiny) (Thomas, J., concurring) (discussing the Court's general approach to the level of scrutiny in cases involving campaign regulations and arguing that any time political speech is involved, strict scrutiny will apply).

**Plaintiffs' Memorandum in Support**
**of Motion for Preliminary Injunction** 14

*See, e.g.*, Decl. of John Doe #1 (numerous threatening phone calls); Decl. of John Doe #2 (flyer circulated in his neighborhood, calling him a "Bigot" and listing his occupation, employer, and the amount of his contribution); Decl. of John Doe #4 (received multiple emails at his business address including one that read, "hello propagators & litagators [sic] burn in hell," and another that read, "congratulations. For your support of prop 8, you have won our tampon of the year award."); Decl. of John Doe #5 (received an email at his business threatening a boycott for a one hundred dollar donation in support of Proposition 8); Decl. of John Doe #6 (received a postcard chastising her for her support of Proposition 8).

In some instances, such phone calls and emails were accompanied by death threats, a threat made all the more plausible by the compelled disclosure of the addresses of the donors. *See* Decl. of Sarah E. Troupis, Ex. E (received an email death threat that reads in part, "If I had a gun I would have gunned you down along with each and every other supporter. . . . I've also got a little surprise for Pasor [sic] Franklin and his congregation of lowlife's in the coming future. He will be meeting his maker sooner than expected. . . . If you thought 9/11 was bad, you haven't seen anything yet.").

In some instances, the threats to supporters of Proposition 8 go beyond mere words. Churches that supported Proposition 8 have been subject to vandalism, including spray painting and broken windows. *See* Decl. of John Doe #3 (church window broken using "Yes on 8" yard sign); Decl. Of Sarah E. Troupis, Ex. O (discussing vandalism directed at churches that supported Proposition 8). Two churches and an organization that supported Proposition 8 received envelopes containing a white powdery substance shortly after the passage of Proposition 8. *See* Decl. of Sarah E. Troupis, Ex. J (reporting that two Church of Latter Day Saints temples and a Knights of Colombus facility received envelopes containing a white powdery substance). Even individual donors to Proposition 8 have seen their homes vandalized, and their cars spray painted and keyed. *See generally* Decl. of Sarah E. Troupis, Ex. Q - Ex. AC (discussing reports of vandalism, including graffiti of garages, broken windows, and widespread theft of signs).

Such threats, harassment, and reprisals extend to the work lives of the supporters of Proposition 8. Supporters of Proposition 8 have been forced to resign their positions at work. Decl. of Sarah E. Troupis, Ex. AD (restaurant manager forced to resign over one hundred dollar donation); Ex. AH (director of Los Angeles Film Festival forced to resign over $1,500 donation); Ex. AI (theater director forced to resign for $1,000 donation). Businesses have been blacklisted because people who worked at those businesses supported Proposition 8. *See, e.g.*, Decl. of John Doe #1 (organized protest at his business and numerous reports of organized boycotts); Decl. of John Doe #5 (received email suggesting that his business would suffer as a result of his one hundred dollar donation in support of Proposition 8); Decl. of John Doe #4 (received an email stating that, "I AM BOYCOTTING YOUR ORGANIZATION AS A RESULT OF YOUR SUPPORT OF PROP 8"). *See generally* Decl. of Sarah E. Troupis, Ex. AD - BE (discussing how donor lists are being used to blacklist and boycott businesses that supported Proposition 8). Indeed, there is even evidence that a student who voiced his support of Proposition 8 in his classroom was subject to harassment by his own teacher. *See* Decl. of Sarah E. Troupis, Ex. AF.

There is significant evidence that the disclosure of the names of donors to groups supporting the passage of Proposition 8 led directly to those donors being singled out for threats, harassment, and reprisals. *See* Decl. of John Doe #2 (flyer circulated in his neighborhood that specifically referenced the amount of his donation); Decl. of John Doe #4 (received an email that referenced both his contribution and short term loan to an organization that supported Proposition 8); Decl. of John Doe #5 (received an email that referenced his one hundred dollar donation to an organization that supported Proposition 8); Decl. of John Doe #6 (declarant's only support of Proposition 8 consisted of a financial contribution that resulted in a postcard chastising her for her financial contribution). Several web sites have surfaced that combine information available in the public reports with other publicly available information, enabling opponents of Proposition 8 to harass these individuals at home and at work. *See, e.g.*, http://www.californiansagainsthate.com/; *see also*, Decl. of Sarah E. Troupis, Ex. P (opponents of Proposition 8 reported that they had harassed individuals featured in a photograph celebrating

the passage of Proposition 8 at work and at home: "I just left a message. . . . Hi, [REDACTED], I just wanted to call and let you know what a great picture that was of you and the other Nazi's in the newspaper. It's nice to see you getting out and supporting discrimination. Don't worry though, we have plans for you and your friends. When you have one of your basic rights taken away from you, you'lll [sic] know how it feels to be discriminated against. I hope you rot in hell, you fckuing [sic] c**t."). Even though such causal evidence is not required for this court to make a finding that compelled disclosure of these donors is a violation of their First Amendment rights, this evidence makes an even stronger case that donors to Proposition 8 are being singled out for threats, harassment, and reprisals because of the compelled disclosure of their donations.

Supporters of Proposition 8 have been subject to the sort of threats, harassment, and reprisals that the Supreme Court has previously found warrants preventing compelled disclosure of donors; indeed, for some of them, these threats, harassment, and reprisals only arose because of California's compelled disclosure rules. Thus, Plaintiffs, including the Class of Major Donors, have demonstrated that there is a reasonable probability that compelled disclosure will result in such threats, harassment, and reprisals going forward, unless this Court prevents further compelled disclosure of donors to groups that supported the passage of Proposition 8. Therefore, Plaintiffs are entitled to a blanket exemption from all disclosure and reporting requirements under the Act and have demonstrated a likelihood of success on the merits.

**B.      The Act's $100 disclosure threshold is unconstitutional because it violates Committee Plaintiffs' fundamental First Amendment rights.**

Plaintiffs ProtectMarriage.com and NOM-California are also highly likely to succeed on their challenge to California's compelled disclosure threshold for reporting contributors. Irrespective of the threats and harassment set forth above, the challenged provisions impermissibly burden their First Amendment rights. Specifically, CGC § 84211(f), which requires Committee Plaintiffs to report the name, address, occupation, and employer of all contributors of one hundred dollars ($100) or more is unconstitutional under the First Amendment because it cannot be justified by a sufficient state interest.

**1.    *Buckley v. Valeo*, 424 U.S. 1 (1976), addressed compelled disclosure thresholds in the context of candidate elections**.

The analysis of the Act's disclosure thresholds, like virtually any analysis of the constitutionality of campaign finance regulation, must begin with the Supreme Court's landmark decision in *Buckley*. In that case, the Supreme Court considered numerous challenges to the Federal Election Campaign Act of 1971 ("FECA"), "by far the most comprehensive reform legislation [ever] passed by Congress concerning the election of the President, Vice-President, and members of Congress." *Buckley*, 424 U.S. at 7 (internal citations omitted). The intricate statutory scheme adopted by Congress included contribution limits, expenditure limits, compelled disclosure provisions, and a system for public financing of federal campaigns. *Id.* at 7, 12.

The *Buckley* Court began by confirming that it is well established that the legislature has the power to regulate elections. *Id.* at 13. However, the Court recognized that campaign finance regulations implicate fundamental First Amendment interests. *Id.* at 14 ("[C]ontribution and expenditure limits operate in an area of the most fundamental First Amendment activities."). The First Amendment, and its guarantees of freedom of speech and association, has "its fullest and most urgent application precisely to the conduct of campaigns for political office." *Id.* at 15. Realizing the need to "assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people," the court stressed the need to draw a distinction between regulable election-related activity and constitutionally protected speech. *Id.* at 14, 80. Thus, in order to ensure that the government's power to regulate elections does not violate fundamental First Amendment rights, the Supreme Court has mandated that the first question regarding any election regulation must be whether the regulation is unambiguously campaign related. *Id.* at 80. To date, the Supreme Court has recognized only two categories of activity that are unambiguously campaign related. *See North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274, 281 (4th Cir. 2008) (discussing the two categories of activity).[3]

---

[3] Plaintiffs assume for the purposes of this argument that California's compelled disclosure provision is unambiguously campaign related. A further discussion of the two

1    However, recognizing that the "discussion of public issues and debate on the

2    qualifications of candidates are integral to the operation of the system of government established

3    by our Constitution," the Supreme Court has held that a regulation that touches upon core

4    political speech must be not only unambiguously campaign related; it must also survive

5    "exacting scrutiny." *Buckley*, 424 U.S. at 64. Thus, while discussing FECA's compelled

6    disclosure provisions, *Buckley* said there must be a "'substantial relation' between the

7    governmental interest and the information required to be disclosed." *Id.*

8    To date, the Supreme Court has identified only three interests of the state that may justify

9    campaign finance regulations.[4] First, disclosure provides the "electorate with information as to

10   where political campaign money comes from and how it is spent by the candidate in order to aid

11   the voters in evaluating those who seek federal office." *Id.* at 66-67 (the "Informational

12   Interest"). Second, disclosure requirements "deter actual corruption and avoid the appearance of

13   corruption by exposing large contributions and expenditures to the light of publicity." *Id.* at 67

14   (the "Corruption Interest"). Third, because the regulations at issue included a comprehensive

15   system of contribution limits, disclosure requirements provide an "essential means of gathering

16   the data necessary to detect violations of the contribution limitations." *Id.* at 68 (the

17   "Enforcement Interest").

18   After examining the above interests, the *Buckley* Court concluded, as a general matter,

19   that recordkeeping and disclosure provisions of FECA directly served substantial governmental

20   interests. *Id.* at 68. The Court also reluctantly concluded that the one hundred dollar reporting

21

22

23   categories is omitted.

24      [4] Because *Buckley* involved the regulation of elections for candidates, later courts have
25   since clarified that the Corruption Interest and Enforcement Interest are inapplicable with respect
     to ballot measures. *See Bellotti*, 435 U.S. at 790 ("The risk of corruption perceived in cases
26   involving candidate elections simply is not present in a popular vote on a public issue.");
     *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1105 n. 23 (9th Cir. 2003) ("*CPLC*
27   *I*") ("The interest in collecting data to detect violations also does not apply, since there is no cap
28   on ballot-measure contributions or expenditures in California.").

and twenty-five dollar recordkeeping thresholds survived the requisite tailoring analysis. *Id.* ("We cannot say, on this bare record . . .").

While the analysis of compelled disclosure thresholds contained is *Buckley* is controlling, its ultimate conclusion that reporting may be required for all contributions of one hundred dollars or more is not. *Buckley* involved a regulatory scheme that involved only candidate elections. *Id.* at 7. As discussed above, *supra* n. 4, the state possesses several interests in the context of candidate elections that are simply inapplicable to a popular vote on a ballot measure. Furthermore, the statute at issue in *Buckley* involved a complex system of contribution limits, and the Court's discussion regarding the recordkeeping and disclosure provisions focused almost exclusively on how detailed recordkeeping and disclosure provisions play a vital role in enforcing contribution limits. *Buckley*, 424 U.S. at 66-68 ("A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors. . . ."). Because the state cannot enact ballot measure contribution limits or outright prohibitions, a major justification for the recordkeeping and disclosure provisions upheld in *Buckley* is lacking with respect to similar provisions pertaining to ballot measures. *See Bellotti*, 435 U.S. at 776 (finding state prohibition on corporate ballot measure contributions to be unconstitutional).

Furthermore, the *Buckley* court noted that "there is little in the legislative history to indicate that Congress focused carefully on the appropriate level at which to require recording and disclosure." *Buckley*, 424 U.S. at 83. The Court added, "We cannot say, on this bare record, that the limits designated are wholly without rationality." *Id*. Thus, it appears that the court left open the possibility of a challenge to the recordkeeping and disclosure requirements on a more developed record in a later case.

Given the more developed record in this case and the fact that "contributors of relatively small amounts are likely to be especially sensitive to recordings or disclosure of their political preferences," *id*. at 83, it is appropriate for this Court to address the question of whether

California's disclosure thresholds can survive the requisite level of scrutiny. As discussed in more detail below, California does not have an interest sufficient to justify such a low threshold.

**2.  California's threshold for disclosure is subject to strict scrutiny.**

The Supreme Court recently reaffirmed that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Davis*, 128 S. Ct. at 2774-75 (2008) (quoting *Buckley*, 424 U.S. at 64 ("[C]ompelled disclosure . . . cannot be justified by a mere showing of some legitimate government interest. . . . [It] must survive exacting scrutiny.")).

There is some debate over what *Buckley* meant by "exacting scrutiny." Later courts have suggested that the level of scrutiny depends on the extent of the burden imposed. *Davis*, 128 S.Ct. at 2775. If the burden on First Amendment rights is severe, strict scrutiny applies and the regulation must be "narrowly tailored" to serve a "compelling interest." *Buckley II*, 525 U.S. at 206 (Thomas, J., concurring). However, later courts have suggested that regulations that "entail only a marginal restriction upon [First Amendment rights]" are subject only to "closely drawn scrutiny." *See McConnell v. F.E.C.*, 540 U.S. 93, 137 (2003) (discussing contribution limits and how such limits still permit individuals to exercise their First Amendment speech and associational rights). Such regulations need only be "closely drawn" to a "sufficiently important interest." *Id.*

Other courts have suggested that "exacting scrutiny" is "strict scrutiny." *Buckley* required "exacting scrutiny" of FECA's compelled disclosure provisions, 424 U.S. at 64, which it referred to as the "strict test," *id.* at 66, and by which it meant "strict scrutiny." *See WRTL II*, 127 S. Ct. at 2669 n.7 (*Buckley*'s use of "exacting scrutiny," 424 U.S. at 44, was "strict scrutiny."); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (*citing Bellotti*, 435 U.S. at 786, as equating "exacting" scrutiny with "strict" scrutiny).

However, whichever approach this Court takes, strict scrutiny is required. Compelled disclosure imposes significant societal costs. *Buckley* recognized that "contributions to candidates and political parties will deter some individuals who otherwise might contribute."

*Buckley*, 424 U.S. at 68, 237 (Burger, C.J., concurring in part and dissenting in part) (discussing the social costs of compelled disclosure and a $100 dollar threshold that he called "irrational").[5] One need look no further than the record of this case to realize just how fundamentally at odds compelled disclosure and the First Amendment really are. Because of California's compelled disclosure provisions, supporters of Proposition 8 have been subject to death threats, acts of domestic terrorism, physical violence, threats of physical violence, vandalism of personal property, harassing telephone calls, harassing emails, blacklisting, and boycotts.

In applying strict scrutiny, California has the burden of proving that the disclosure thresholds are narrowly tailored to serve a compelling interest. *See WRTL II*, 127 S. Ct. at 2664 (stating scrutiny standard).

3. **California's threshold for disclosure fails strict scrutiny because it is not narrowly tailored to serve a compelling state interest.**

   a. **The threshold is suspect, if not outright unconstitutional, because it is not indexed for inflation.**

Plaintiffs will assume for the purposes of this argument that the California legislature, unlike Congress with respect to the thresholds in FECA, *Buckley*, 424 U.S. at 83, had a meaningful discussion as to what disclosure threshold is necessary to serve the state's Informational Interest. *Supra*, n. 4 (only the state's Informational Interest may justify compelled disclosure). California's current threshold for reporting was set in 1980, when the legislature

---

[5] Evidence of the social costs associated with compelled disclosure was in the record in *McConnell*. *McConnell v. F.E.C.*, 251 F. Supp. 2d 176, 227-229 (D.D.C. 2003) (per curiam). The evidence ranged from large numbers of contributions at just below the disclosure trigger amount, to vandalism after disclosure, to non-contribution because of concerns about a group's ability to retain confidentiality, to concerns about employers, neighbors, other business entities, and others knowing of support that are not popular everywhere and the results of such disclosure. *Id. See also*, *AFL-CIO v. F.E.C.*, 333 F.3d 168, 176, 179 (D.C. Cir. 2003) (recognizing that releasing names of volunteers, employees, and members would make it hard to recruit personnel, applying strict scrutiny, and striking down an FEC rule requiring public release of all investigation materials upon conclusion of an investigation); William McGeveran, *Mrs. McIntyre's Checkbook: Privacy Costs of Political Contribution Disclosure*, 6 U. Pa. J. Const. L. 1 (2003); Dick M. Carpenter II, *Disclosure Costs: Unintended Consequences of Campaign Finance Reform* (2007) (available at http://www.ij.org/publications/other/disclosurecosts.html).

increased the reporting threshold from fifty to one hundred dollars. 1980 Cal. Stat. 611, § 31. That is, if the California legislature actually had a meaningful discussion as to the appropriate level of the threshold, it last occurred in 1980, and one would have to assume that the legislature concluded that one hundred dollars was sufficient to serve the state's Informational Interest.

However, as the Supreme Court pointed out in *Randall v. Sorrell*, 548 U.S. 230, 261 (2006), limits that are not adjusted for inflation decline in real value each year. For example, if California's current thresholds are converted to 1980 dollars, Committee Plaintiffs are effectively required to disclose contributors and recipients of expenditures of $38.79. Bureau of Labor Statistics Consumer Price Index Inflation Calculator (*available at* http://www.bls.gov/data/inflation_calculator.htm). Conversely, if the 1980 value set by the legislature is adjusted for inflation, reporting would begin at $257.80.[6]

Even if the California legislature debated the propriety of the one hundred dollar threshold in 1980, that determination is no longer sufficient to justify the current threshold because reporting now begins at nearly one-third the value the legislature determined sufficient to serve the state's informational interest. *See Carver v. Nixon*, 72 F.3d 633, 643 (8th Cir. 1995) (discussing the state's burden in producing evidence when it lowers a preexisting limit that adequately served the state's interest). Therefore, California's threshold for reporting contribution limits is suspect, if not *per se* unconstitutional, because it is not indexed for inflation. Under the Ninth Circuit's standard for a preliminary injunction, this fact, coupled with the significant social costs associated with compelled disclosure, is sufficient to warrant the imposition of a preliminary injunction pending a full resolution of this case on the merits.

**b.    The threshold is not narrowly tailored to serve the State's Informational Interest.**

As set forth above, the only state interest sufficient to justify compelled disclosure with respect to ballot measures is providing the electorate with information as to "where political

---

[6] The one hundred dollar ($100) disclosure threshold approved by the Supreme Court in *Buckley*, when adjusted for inflation, is approximately $380, in 2008 dollars.

**Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction          24**

campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office." *Buckley*, 424 U.S. at 66-67; *see also*, *Bellotti*, 435 U.S. at 790; *CPLC I*, 328 F.3d at 1105 n. 23. "Given the complexity of the issues and the unwillingness of much of the electorate to independently study the propriety of individual ballot measures, we think being able to evaluate who is doing the talking is of great importance." *CPLC I*, 328 F.3d at 1105.

In determining whether the threshold for disclosure is narrowly tailored to serve this interest, it is helpful to begin with the Act itself, which contains several provisions that highlight the state interest sought to be served by compelled disclosure. Section 81001 provides, in relevant part:

> The people find and declare as follows:
>
> (d) The *influence of large campaign contributions* is increased because existing laws for disclosure of campaign receipts and expenditures have proved to be inadequate;
>
> (g) The *influence of large campaign contributors* in ballot measure elections is increased because the ballot pamphlet mailed to the voters by the state is difficult to read and almost impossible for a layman to understand. (emphasis added).

Given these findings and the "unwillingness of much of the electorate to independently study the propriety of individual ballot measures," *CPLC I*, 328 F.3d at 1105, it appears that the electorate has little interest in learning how every nickel and dime is raised or spent by a ballot measure committee. Indeed, as the court noted in *CPLC I*, ballot measure campaigns have become extremely expensive and well organized campaigns – over $200 million was spent on twelve ballot measures on California's 1998 ballot and nearly $92 million on one measure alone. *Id.* For an electorate already looking to shortcut their independent evaluation of the ballot measure, it is hard to imagine how a list of contributors that have given one hundred dollars can meaningfully assist voters in evaluating a ballot measure with total contributions exceeding $92 million.

As the court said in *California Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172 (9th Cir. 2007) ("*CPLC II*"), the voters are primarily interested in knowing "who [is] *really* behind

[a] proposition." *Id.* at 1179 (emphasis added). These individuals are generally referred to as "veiled political actors." *Id.* at 1179. To this end, the statute contains numerous provisions that enable voters to quickly and efficiently identify the major supporters and opponents of a particular ballot measure.

For example, California addresses the problem of "ambiguous or misleading" committee names, *CLPC II*, 507 F.3d at 1179 (identifying misleading campaign names as a reason for providing voters with information), through several more narrowly tailored provisions. First, the committee name must indicate whether the committee supports or opposes the ballot measure. CGC § 84102(d). Second, the committee is required to identify any sponsoring organization in the committee name. CGC § 84106. Third, the committee name must include a name or phrase that clearly "identifies the economic or other special interest of its major donors of fifty thousand dollars ($50,000) or more." CGC § 84504; Cal. Code Regs. tit. 2, § 18402(c)(3)(A). Fourth, if any of the Major Donors share a common employer, the identity of the employer must also be included in the committee name. Cal. Code Reg. tit. 2, § 18402(c)(3)(B). Unlike the one hundred dollar reporting threshold, these provisions more narrowly address the electorate's desire to know who is really behind a particular ballot measure.

Section 84503, one of the most narrowly tailored provisions of the Act, provides voters with timely and pertinent information by requiring a committee to include a disclaimer on *every* advertisement which, in addition to disclosing information about the committee, must also identify the two highest donors who have contributed $50,000 or more to committee. This information, in addition to the fact that it is more likely to reach voters, is also more narrowly tailored to serve the state's interest of providing voters with information necessary to determine who is *really* behind a measure.

The Act also bans contributions by intermediaries - an individual who collects contributions on behalf of another, who then makes a contribution to a committee without disclosing the name of the original donor - unless the intermediary discloses all required information (name, address, occupation, employer, date, and amount) for himself and the

original contributor.  CGC § 84302.  To the extent the state is worried about enforcing this provision, or those set forth above, the Act also contains detailed recordkeeping requirements that require each committee to keep track of individual contributions or expenditures of twenty-five dollars or more.  Cal. Code Regs. tit. 2, § 18401.  The committee is required to maintain this information for a period of four years from the date the campaign statement to which the records relate is filed.  *Id.*

Finally, and perhaps most importantly, the Act includes within the definition of committee, any person (which includes corporations and other entities) that makes contributions totaling $10,000 or more in a calendar year to a committee.  CGC § 82013(c).  Pursuant to section 84200(b), these persons have their own filing requirements, which provide the electorate with the information necessary to determine the major supporters and opponents behind a ballot measure.  Given the electorate's desire to know "who [is] really behind [a] proposition." *CPLC II*, 507 F.3d at 1179, it seems more likely that voters want to know who the major donors are than whether a particular individual gave one hundred dollars.

Moreover, the state's approach to late contributions suggests that it is concerned only with contributions of one thousand dollars ($1,000) or more.  Under the Act, contributors who donate one hundred dollars ($100) or more, but less than one thousand dollars ($1,000) and who make their contributions during the sixteen day period preceding the election, *go unreported until after the election*.[7]  *See* CGC § 84200.7 (final pre-election report due twelve days before an election, for the period ending seventeen days before the election).  If the state had a legitimate interest in the disclosure of these individuals, one would expect the state to require reporting to continue during this critical period.  Instead, during the sixteen days preceding the election, California requires reports within twenty-four hours only for those contributors that have given one thousand dollars or more.  CGC § 84203.  A ballot measure committee could receive an

---

[7] Contributors who donate one hundred dollars ($100) or more but less than one thousand dollars ($1,000) during the sixteen days preceding the election are reported on the semi-annual report due on January 31.  CGC § 84200.  See the discussion in Part C, *infra*, regarding the state's interest in disclosure *after* an election.

**Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction** 27

unlimited number of $999.99 contributions during this time frame and the public would have no idea where the money came from.  This fact alone suggests that California's interest is in providing voters with information is limited to contributors and recipients of expenditures of one thousand dollars ($1,000) or more.

The Supreme Court has said that precision must be the touchstone of any regulation that implicates our most precious fundamental freedoms. *Buckley*, 424 U.S. at 41.  "Because First Amendment freedoms need breathing space to survive, government may regulate only in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).  California bears a considerable burden.  California must prove not only that it has a compelling state interest in the disclosure of contributors to ballot committees, but also that disclosure beginning at one hundred dollars is necessary to serve that interest.  It is simply not enough to present evidence that the public has a general want of knowledge because that is not one of the valid interests sanctioned by the Supreme Court in *Buckley*, 424 U.S. at 66-68.

Furthermore, there is ample evidence that the public has used the information not to make an informed choice as to whether to support or oppose the measure, but for other non-sanctioned purposes.  *See* Decl. of Sarah E. Troupis, Ex. AD - BE (reports being used to blacklist and boycott donors and their businesses).  And while a boycott may be an acceptable method for exacting social change, the Supreme Court did not list providing the electorate with the information necessary to boycott supporters of a political position as an acceptable justification for compelled disclosure.

However, even if the state can present evidence that the public is clamoring for the knowledge of the name, address, occupation, and employer of every person who contributed one hundred dollars or more to a ballot measure, the regulation may still fail strict scrutiny if the burden on First Amendment rights is too severe.  Compelled disclosure carries with it tremendous social costs.  *See supra* n. 5.  The Court must consider these costs in determining whether the First Amendment can tolerate such irrational thresholds.  "The public right to know ought not be absolute when its exercise reveals private political convictions." *Buckley*, 424 U.S.

at 237 (Burger, C.J., concurring in part and dissenting in part). The rationale behind public disclosure cannot mean "the more information, the better." *See Randall*, 548 U.S. at 248 (rejecting the notion that lower contribution limits are always permissible because they are more efficient at ferreting out corruption). As Chief Justice Burger said in *Buckley*, the secret ballot, "one of the great political reforms," is essentially meaningless if the state can require the disclosure of the names of individuals that have contributed small amounts in support of a ballot measure. *See Buckley*, at 237-38. Here, all the world knows how thousands of California citizens voted on Proposition 8 simply by virtue of the fact that they gave one hundred dollars in support or opposition to Proposition 8.

It is not enough to say that *Brown* provides adequate relief. Plaintiffs have suffered very real personal costs for exercising their First Amendment rights as a result of California's extremely low threshold requirement. The First Amendment cannot contemplate a system that requires individuals to suffer this type of harm before they are even given the key to the courthouse. Thus, while the Supreme Court has conceded that it has "no scalpel to probe," it has also clearly indicated that there comes a point where the threshold is "too low and too strict to survive First Amendment scrutiny." *Randall*, 548 U.S. at 248 (discussing contribution limits). "At some point the constitutional risks to the democratic electoral process become too great." *Id.*

California's threshold for reporting the name, address, occupation, and employer for all individuals that contribute one hundred dollars ($100) or more in support or opposition to a ballot measure is simply "too low and too strict to survive First Amendment scrutiny." *Id.* It is not indexed for inflation, which means that it is decreasing in value while the burden on Plaintiffs' First Amendment rights is increasing. It also requires the reporting of information that is not necessary to serve the state's legitimate Informational Interest. *See Buckley II*, 525 U.S. at 202 ("the importance of disclosure as a control or check on domination of the initiative process by affluent special interest groups"). The public is concerned about veiled political actors; they want to know what monied interests are behind increasingly expensive ballot

measures. *CPLC II*, 507 F.3d at 1179. A one hundred dollar threshold cannot logically serve this interest, not even under a lesser "closely drawn scrutiny" analysis. Therefore, Plaintiffs have demonstrated a likelihood of success on the merits and a preliminary injunction is warranted.

**C.** **California's post-election reporting provisions fail strict scrutiny because California lacks a sufficient state interest justifying the compelled disclosure of contributors and recipients of expenditures.**

Once again, the analysis begins with *Buckley*'s mandate that campaign finance laws must be "unambiguously campaign related" and narrowly tailored to serve a compelling government interest. *Buckley*, 424 U.S. at 64, 80. "Significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest." *Id.* at 64. "California must have a compelling interest, and the regulations imposed must be narrowly tailored to advance the relevant interest." *CPLC I*, 328 F.3d at 1101.

As previously noted, the only state interest sufficient to justify compelled disclosure with respect to ballot measures is that of providing the public with "information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those that seek federal office." *Buckley*, 424 U.S. at 66-67. In a popular vote on a public issue, information about contributions and expenditures provides voters with the necessary information to determine what interests are supporting and opposing the ballot measure. It helps voters "make up their mind[s] on how to vote on ballot measures." *CLPC II*, 507 F.3d at 1172.

Thus, the state's interest is limited to providing voters with the information necessary to determine whether to support or oppose a particular ballot measure. Once the last voter has cast his vote for or against the measure, the state's interest in providing such information disappears. This is the critical difference between an election for a ballot measure and a candidate. The public continues to have an interest in knowing who supported a *candidate* after an election. This is the essence of the corruption interest discussed in *Buckley*: a "public armed with information about a *candidate's* most generous supporters is better able to detect any post-

election special favors that may be given in return." *Buckley*, 424 U.S. at 67 (emphasis added).

However, such an interest is simply inapplicable to a vote on a public issue. *Bellotti*, 435 U.S. at 790.

California imposes significant reporting requirements long after the last vote has been cast on a ballot measure. Because "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment," *Davis*, 128 S. Ct. At 2774-75 (quoting *Buckley*, 424 U.S. at 64), California must demonstrate that its disclosure requirements are narrowly tailored to serve a compelling government interest. *Id.* The only constitutionally permissible interest is providing voters with the information necessary to determine whether to support or oppose a particular ballot measure. Because disclosure *after* the election cannot serve this interest, Plaintiffs have demonstrated that they are likely to succeed on their constitutional challenge with respect to the post-election reporting requirements. To the extent that California is concerned about pre-election compliance, that interest is adequately served by the Act's detailed recordkeeping provisions.

Furthermore, the facts of this case demonstrate the dangers of post-election reporting. Individuals, dissatisfied with the outcome of the election, can, have, and will turn to the state's compelled disclosure lists to lash out at individuals who may have disagreed with them on the particular issue. The state's compelled disclosure system must be cognizant of this fact, especially with respect to controversial issues like Proposition 8. California's current compelled disclosure system does not contain a mechanism for purging reports after an election. To the extent that California has an interest in ensuring compliance with its laws, that interest is more than adequately served by the statute's recordkeeping requirement, which requires detailed records to be kept by the committees for all contributions and expenditures of twenty-five dollars or more. Cal. Code Regs. tit. 2, § 18401. However, there is simply no sufficient interest to make this information available to the public *after* the election and Plaintiffs are entitled to a preliminary injunction.

## II. Plaintiffs Have Demonstrated Irreparable Harm.

"Deprivations of speech rights presumptively constitute irreparable harm for purposes of a preliminary injunction: 'The loss of First Amendment freedoms, even for minimal periods of time, constitute[s] irreparable injury.'" *Summum v. Pleasant Grove City*, 483 F.3d 1044 (10th Cir. 2007) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976); s*ee also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) ("Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed.").

Furthermore, the facts of this case make it painfully clear how a campaign finance system such as California's can infringe on the fundamental rights this nation was founded upon. Plaintiffs' Complaint and the many declarations filed in support of this memorandum contain examples of the types of harm that can result if fundamental First Amendment rights are not protected. Several contributors have indicated that they are unlikely to contribute to *any* campaign in the future because they feel the risk of being harassed simply outweighs their interest in exercising their rights of freedom of speech and association. *See*, *e.g.*, Decl. of John Doe #1 (will not contribute in the future if it means that he and his employees will be the subject of threats and harassment); Decl. of John Doe #2; Decl. of John Doe #5. Others have been subject to death threats, physical violence, vandalism directed at their personal property, and harassment both at home and at work. The stories of these individuals make it clear just how important it is for the courts to vigilantly protect the First Amendment.

## III. The Balance of Harms Tips Decidedly in Favor of Plaintiffs.

Lastly, the balance of harms tips decidedly in favor of Plaintiffs. As set forth above, California, and the public generally, have little interest in the compelled disclosure of contributors and recipients of expenditures after the election on a ballot measure occurred. To the extent that California is concerned about enforcing those provisions of the Act not challenged herein, that interest is adequately served by detailed recordkeeping provisions. However, the

potential harm to Plaintiffs that would result from compelled disclosure is great given the evidence of harassment directed at supporters of Proposition 8.

### IV. Committee Plaintiffs May Assert the Rights of Their Major Donors

While members of the Class of Major Donors are represented by John Doe #1, Committee Plaintiffs may also assert the rights of all such donors. Under existing Supreme Court precedent, Committee Plaintiffs may assert the rights of their Major Donors. *See Singleton v. Wulff*, 428 U.S. 106, 114-16 (1976). In determining whether a litigant may assert the rights of a third party, the court considers (1) whether the litigant has suffered an "'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute," (2) the closeness of the relationship between the litigant and the third party, and (3) whether there is some "hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (*citing Singleton*, 428 U.S. at 112-16); *see also Coal. of Clergy, Lawyers, & Professors v. Bush*, 310 F.3d 1153, 1163 (9th Cir. 2002).

Plaintiffs ProtectMarriage.com and NOM-California may assert the rights of their Major Donors. As the Supreme Court said in *NAACP v. Alabama*, 357 U.S. at 459, "[t]o require that [the rights] be claimed by the members themselves would result in nullification of the right at the very moment of its assertion." "If petitioner's rank-and-file members are constitutionally entitled to withhold their connection with the Association . . . it is manifest that this right is properly assertable by the Association." *Id.*

Like the petitioner in *NAACP v. Alabama*, Committee Plaintiffs' First Amendment rights and the First Amendment rights of their Major Donors "are in every practical sense identical." *Id.* Committee Plaintiffs and the Major Donors share a common interest: to obtain a blanket exemption because of the threats and harassment directed at supporters of Proposition 8 and to protect their fundamental rights of freedom of speech and association. Furthermore, as set forth in the Decl. of Sarah E.Troupis, donors have expressed reservations about coming forward for fear of being harassed. Thus, Committee Plaintiffs may assert the rights of their Major Donors, and it is appropriate for this Court to enter a preliminary injunction to protect Major Donors.

**Conclusion**

For the foregoing reasons a preliminary injunction should issue and no security should be required, or it should be nominal, because Defendants have no monetary stake in the outcome of this litigation.


Respectfully submitted,


___/S/_Timothy D. Chandler_____
Timothy D. Chandler (Cal. Bar No. 234325)
ALLIANCE DEFENSE FUND
101 Parkshore Drive, Suite 100
Folsom, CA 95630
Counsel for All Plaintiffs
Designated Counsel for Service

James Bopp, Jr. (Ind. Bar No. 2838-84)*
Barry A. Bostrom (Ind. Bar No.11912-84)*
Sarah E. Troupis (Wis. Bar No. 1061515)*
Scott F. Bieniek (Ill. Bar No. 6295901)*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
Counsel for All Plaintiffs
*Pro Hac Vice Application Pending

**PROOF OF SERVICE**

I, Timothy D. Chandler, am over the age of 18 years and not a party to the within action. My business address is 101 Parkshore Drive, Suite 100; Folsom, California 95630.

On January 9, 2009, I electronically filed the foregoing document described as Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction, which will be served on all Defendants along with the Summons and Amended Complaint.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on January 9, 2009 at Folsom, California.

<u>s/Timothy D. Chandler</u>
Timothy D. Chandler (CA Bar No. 234325)
Attorney for Plaintiff