1   EDMUND G. BROWN JR., SBN: 37100
    Attorney General of California
2   CHRISTOPHER E. KRUEGER, SBN: 173288
    Senior Assistant Attorney General
3   DOUGLAS J. WOODS, SBN: 161531
    Supervising Deputy Attorney General
4   SETH E. GOLDSTEIN, SBN: 238228
    ZACKERY P. MORAZZINI, SBN: 204237
5   Deputy Attorneys General
      1300 I Street, Suite 125
6     P.O. Box 944255
      Sacramento, CA 94244-2550
7     Telephone: (916) 445-8226
      Fax: (916) 324-5567
8     E-mail: Zackery.Morazzini@doj.ca.gov
    *Attorneys for Defendants Debra Bowen, California*
9   *Secretary of State; Edmund G. Brown Jr., California*
    *Attorney General*

10  SCOTT HALLABRIN, General Counsel, SBN: 076662
11  LAWRENCE T. WOODLOCK, SBN: 137676
    Fair Political Practices Commission
12    428 J Street, Suite 800
      Sacramento, CA 95814
13    Telephone: (916) 322-5660
      Fax: (916) 327-2026
14    E-mail: lwoodlock@fppc.ca.gov
    *Attorneys for Defendants Members of the Fair*
15  *Political Practices Commission*

16                    IN THE UNITED STATES DISTRICT COURT

17                   FOR THE EASTERN DISTRICT OF CALIFORNIA

18

19

20

| | |
|---|---|
| **PROTECTMARRIAGE.COM, et al.,** | 2:09-cv-00058-MCE-DAD |
| Plaintiff, | **STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **DEBRA BOWEN, SECRETARY OF STATE FOR THE STATE OF CALIFORNIA, et al.,** | Date: January 29, 2009<br>Time: 11 a.m.<br>Courtroom: 7, 14th Floor<br>Judge Morrison C. England, Jr. |
| Defendants. | Trial Date: None Set<br>Action Filed: January 7, 2009 |

**TABLE OF CONTENTS**

Page

Introduction and summary of argument ......................................................................... 1

Argument ..................................................................................................................... 2

I. Plaintiffs' primary claim for a constitutional exemption from the state's campaign reporting requirements provides no basis for the requested preliminary injunction. ..................................................................................... 3

    A. No authority exists for extending the limited disclosure exception for historically persecuted minority parties and associations to apply to all contributors to the "yes on 8" campaign. ............................. 3

        1. The Buckley/Brown exception applies to disadvantaged minority groups. .................................................................................... 4

        2. The Limited Disclosure Exception does not apply to a large, well-financed group such as Plaintiffs. .......................................... 5

    B. Even if the disclosure exemption applied here, plaintiffs face a heavy evidentiary burden to justify the exemption. ................................. 6

        1. Plaintiffs Must Demonstrate a Reasonable Probability that Disclosure Will Subject Contributors to Serious Reprisal. ............. 8

        2. Plaintiffs Must Also Demonstrate That Fear of Reprisal Threatens Their Ability To Engage in Political Speech ................ 11

    C. Plaintiffs have failed to meet their evidentiary burden to enjoin the state's valid disclosure requirement. ........................................... 12

        1. Plaintiffs' Evidence Fails to Show a Reasonable Probability of Reprisal by Governmental or Private Entities. ........................ 12

        2. Plaintiffs' Evidence Fails to Show a Reasonable Probability that Fear of Reprisal Poses a Threat to Their Ability to Engage in Political Speech. ........................................................... 16

    D. An exemption is unwarranted because, on balance, the state's interest outweighs plaintiffs' limited burden. .................................... 17

II. Plaintiffs' additional claims challenging california's $100 threshold and post-election reporting requirements provide no basis for a preliminary injunction. ................................................................................................. 20

    A. The $100 itemized reporting threshold. .................................................. 24

    B. The $100 itemized disclosure threshold survives judicial review under any level of scrutiny. .................................................................... 29

    C. The post-election reporting requirement. ................................................ 32

    D. The post-election reporting requirement survives judicial review under any level of scrutiny. .................................................................... 34

III. Plaintiffs face no threat of irreparable harm. ...................................................... 35

IV. For purposes of a preliminary injunction, the balance of hardships weighs in favor of maintaining the status quo. ................................................................ 35

Conclusion ................................................................................................................ 36

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*American Civil Liberties Union of Nevada v. Heller,*
378 F.3d 979 (9th Cir. 2004) ............................................................ 22

*Brown v. Socialist Workers '74 Campaign Committee,*
459 U.S. 87 (1982) ................................................................... passim

*Buckley v. Valeo,*
424 U.S. 1 (1976) ..................................................................... passim

*California Pro-Life Council, Inc. v. Getman,*
328 F.3d 1088 (9th Cir. 2003) ("*CPLC I*") .................................. passim

*California Pro-Life Council v. Randolph,*
507 F.3d 1172 (9th Cir. 2007) ("*CPLC II*") ................................. passim

*Coalition for Economic Equity v. Wilson,*
122 F.3d 718 (9th Cir. 1997) .............................................................. 3

*Cupolo v. Bay Area Rapid Transit,*
5 F. Supp. 2d 1078 (N.D.Cal. 1997) .................................................. 3

*Emily's List v. Federal Election Commission,*
362 F. Supp. 2d 43 (D.D.C., 2005) ................................................... 35

*FEC v. Furgatch,*
807 F.2d 857 (9th Cir. 1987) ............................................................. 16

*Goland v. FEC,*
903 F.2d 1247 (9th Cir. 1990) ........................................................... 15

*In the Matter of Lucille Nelson, FPPC*
No. 95/464 .......................................................................................... 19

*In re Marriage Cases,*
43 Cal.4th 757 (2008) ........................................................................ 27

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ............................................................................. 2

ii

*Midgett v. Tri-County Metropolitan Transp. Dist. of Oregon*,
254 F.3d 846 (9th Cir. 2001) ................................................................ 2, 3

*Montana Right to Life v. Eddlemann*,
999 F. Supp. 1380 (D. Mont., 1998) ........................................................ 29

*NAACP v. Alabama*,
357 U.S. 449 (1958) ................................................................... passim

*NAACP v. Claiborne Hardware*,
458 U.S. 886 (1982) ................................................................... 14, 15

*Nixon v. Shrink Missouri*,
528 U.S. 377 (2000) ........................................................................ 20

*Oregon Socialist Workers 1974 Campaign Committee v. Paulus*,
432 F. Supp. 1255 (D.C. Or., 1977) ................................................ 9, 10, 11, 12

*Organization for a Better Austin v. Keefe*,
402 U.S. 415 (1971) ................................................................... 14, 15

*Randall v. Sorrell*,
548 U.S. 230 (2006) ........................................................................ 25

*Sammartano v. First Judicial District Court, in and for County of Carson City*,
303 F.3d 959 (9th Cir. 2002) ............................................................... 3

*Thomas v. County of Los Angeles*,
978 F.2d 504 (9th Cir. 1992) ............................................................... 2

*Winter v. Natural Resources Defense Council, Inc.*
_ U.S._, 129 S.Ct. 365 (2008) .............................................................. 2

**STATUTES**

2 U.S.C. Section 434(b) ...................................................................... 22

2 U.S.C. §441e ............................................................................... 28

Cal. Gov't Code § 84100 et seq. ............................................................... 1

Cal. Gov't Code §§ 84104 and 84211(f) and (k) ................................................ 22

Cal. Gov't Code §§ 84200.5, 84200.7 ......................................................... 28

Cal. Gov't Code § 84211 ...................................................................... 5

iii

Cal. Gov't Code § 84211 (f) ................................................................ 24, 32

Cal. Gov't Code § 85320 ................................................................ 28

**OTHER AUTHORITIES**

11 C.F.R. 110.4(a)(1) ................................................................ 28

11 CFR § 102.9(a)(1) ................................................................ 22

11 CFR § 104.3 ................................................................ 22

C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, 129-30 (2d ed.1995) ................................................................ 2

California Constitution ................................................................ 28

Governmental Studies, Democracy by Initiative: Shaping California's Fourth Branch of Government ................................................................ 27

Harry Kalven, Jr., *The Negro and the First Amendment* (1965) ................................................................ 6

iv

**INTRODUCTION AND SUMMARY OF ARGUMENT**

ProtectMarriage.com – Yes on 8, a Project of Renewal, National Organization for Marriage – Yes on 8, Sponsored by National Organization for Marriage, and John Doe #1 (representative of the Class of Major Donors) (collectively, "Plaintiffs") seek a preliminary injunction to enjoin the State Defendants (the Secretary of State, Attorney General, and Fair Political Practices Commission), among others, from enforcing California's campaign finance disclosure laws. As explained below, a preliminary injunction is unwarranted.

California law requires that committees primarily formed for or against a ballot measure are subject to periodic reporting requirements under California's Political Reform Act ("the Act"). *See* Cal. Gov't Code § 84100 et seq. Political Committees must report contributions received of $100 or more, listing the donor name, the date, and amount received. Nearly every other state has similar laws with similar disclosure levels. The federal election system has a similar law with a similar disclosure system; a system challenged in *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court's seminal case on campaign finance law, wherein the Court held that the "rational basis" test applied to disclosure thresholds and upheld the federal $100 reporting threshold.

In the context of ballot measure elections specifically, the Ninth Circuit has held that such disclosure requirements serve state interests of the highest order, because it is there that voters act as legislators. Given the complexity of ballot measures and the challenges faced by much of the electorate in independently studying the propriety of individual ballot measures, the Ninth Circuit held that being able to evaluate who is funding ballot measures is of great importance. *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1105 (9th Cir. 2003) ("*CPLC I*").

Casting the State's interests aside, Plaintiffs, representing a successful coalition of Proposition 8 supporters with markedly divergent political views, ask this Court to preliminarily issue a blanket exemption, enjoining the State from enforcing its valid campaign finance disclosure laws. But the exemption to which Plaintiffs seek to avail themselves is simply inapplicable to them as a group. Instead, the exemption is reserved for historically persecuted minority parties that are uniquely susceptible to suffering a fall-off in contributions. According to the Supreme Court, when such minority groups can demonstrate that disclosure of their

1

1 membership ranks will subject them to threats of reprisal so serious that the ability of the group to
2 engage in political speech is put at risk, the First Amendment requires an exemption to otherwise
3 valid disclosure requirements. Plaintiffs simply do not fit this bill.

4     Moreover, neither the evidence nor the law supports the relief Plaintiffs seek. Plaintiffs
5 flatly ignore countervailing First Amendment interests and distort what case law they discuss.
6 When the law and the facts before this Court are critically examined, Plaintiffs' claims collapse
7 into a transparent attempt to utilize a not-untypical California ballot measure contest to overturn
8 campaign disclosure laws that that have stood for more than thirty years.

9     Further, the relief Plaintiffs request in the form of a mandatory injunction cannot be
10 effectively granted by this Court. Even if the Secretary of State were to remove the information
11 previously posted online, as Plaintiffs explain, several other websites have captured the
12 information and have independently posted it. Finally, Plaintiffs overstate the amount of
13 disclosure required of them on February 2, 2009, which is limited to identification of new
14 contributors who gave between $100 and $999 in the last 16 days before the election and those
15 who gave between $100 and $4,999 post-election. All others have already been reported.

16 **ARGUMENT**

17     "'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be
18 granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v.*
19 *Armstrong,* 520 U.S. 968, 972 (1997), quoting 11A C. Wright, A. Miller, & M. Kane, *Federal*
20 *Practice and Procedure* § 2948, 129-30 (2d ed.1995) (emphasis in original). "A plaintiff seeking
21 a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely
22 to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in
23 his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense*
24 *Council, Inc.* _ U.S._, 129 S.Ct. 365, 374 (2008).

25     A Plaintiffs' evidentiary burden in seeking provisional relief in advance of trial is more
26 rigorous when the plaintiff seeks to enjoin governmental action taken in the public interest
27 pursuant to statutory provisions. *Midgett v. Tri-County Metropolitan Transp. Dist. of Oregon*,
28 254 F.3d 846, 851 (9th Cir. 2001); *see also Thomas v. County of Los Angeles*, 978 F.2d 504, 508

2

(9th Cir. 1992). Thus, "[a] strong factual record is therefore necessary before a federal district court may enjoin a State agency." *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1085 (N.D.Cal. 1997), citing *Thomas*, 978 F.3d at 508. This rigorous burden is required in cases such as this because "[t]he Supreme Court and the Ninth Circuit have stressed that district courts must be sensitive to concerns of equity, federalism, and comity when considering injunctive relief against State agencies." *Id.* Moreover, "it is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997). Thus, "a federal court must exercise restraint when a plaintiff seeks to enjoin any non-federal government agency, be it local or state." *Midgett*, 254 F.3d at 851.

The State Defendants recognize that "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial District Court, in and for County of Carson City*, 303 F.3d 959, 973 (9th Cir. 2002). But nevertheless, the significant public interest in protecting First Amendment privileges may be "overcome by a strong showing of other competing public interests, especially where the First Amendment activities of the public are only limited, rather than entirely eliminated." *Id.*

## I. PLAINTIFFS' PRIMARY CLAIM FOR A CONSTITUTIONAL EXEMPTION FROM THE STATE'S CAMPAIGN REPORTING REQUIREMENTS PROVIDES NO BASIS FOR THE REQUESTED PRELIMINARY INJUNCTION.

### A. No Authority Exists For Extending The Limited Disclosure Exception For Historically Persecuted Minority Parties and Associations To Apply To All Contributors to the "Yes on 8" Campaign.

Plaintiffs seek to avail themselves, along with tens of thousands of contributors to the Yes on Proposition 8 campaigns, to a limited exemption from valid campaign finance disclosure requirements developed by the Supreme Court to protect the ability of discrete, historically persecuted minority parties to engage in political speech. The exception applies, according to the Supreme Court, where a minority party can demonstrate that "the threat to the exercise of First Amendment rights is so serious and the state interest furthered by disclosure so insubstantial that the [disclosure] requirements cannot be constitutionally applied." *Buckley, supra*, 424 U.S. at 71.

3

This "threat," according to the *Buckley* Court, is a serious concern for minority political parties given their relatively small size, demonstrated lack of political success, and comparative lack of resources, because legitimate fears of reprisal "may deter contributions to the point where the movement cannot survive. The public interest suffers if that result comes to pass, for there is a consequent reduction in the free circulation of ideas both within and without the political arena." *Id.*

But in the context of a well-financed association of tens of thousands of individuals promoting a politically popular viewpoint such as the promotion of the traditional definition of marriage, the disclosure exception is simply inapplicable. None of the concerns expressed by the Supreme Court are raised when those seeking an exemption represent the political views of over seven million voters, with contributions of nearly $30 million, on a ballot measure that passed with over 52% of the vote.[1]

### 1. The *Buckley*/Brown exception applies to disadvantaged minority groups.

In *Brown v. Socialist Workers '74 Campaign Committee,* 459 U.S. 87, 88 (1982), the Supreme Court, applying the *Buckley* exception, held that a political committee representing the Socialist Workers Party in an Ohio Election did not have to identify its contributors as required under Ohio's campaign disclosure laws. The Socialist Workers Party had challenged the state's disclosure laws because the disclosure resulted in harassment, threats, and economic reprisals. *Id.* at 88[2]. Applying the test initially established in *Buckley*, 424 U.S. at 74, the *Brown* Court found that the disclosure requirements could not be constitutionally applied to this minor political party that had historically been the object of harassment by both Government officials

---

[1] *See* Declaration of Lynda Cassady in Support of Defendants' Opposition to Motion for Preliminary Injunction at ¶ 7, Exhibit A ("Cassady Decl."); *see also* Secretary of State Election Results, available at: http://www.sos.ca.gov/elections/sov/2008_general/7_votes_for_against.pdf.
[2] The Socialist Workers Party offered evidence of several years of harassment, economic reprisals, threats, and gunshots, as well as a coordinated effort of harassments by the government. *Brown*, 459 U.S. at 98-98. Much of their evidence was presented by way of an official Final Report from the Special Master, District Court Judge Breitel, in *Socialist Workers Party, et al v. The Attorney General of the United States*, 73 Civ. 3160 (TPG) (SDNY February 4, 1980), "detailing the United States Government's admissions concerning the existence and nature of the Government surveillance of the SWP." *Id.* at n.17.

and private parties. Because disclosure subjected plaintiffs to threats, harassments, and reprisals, and in light of "substantial evidence" of past and present hostility against the Socialist Workers Party, the disclosure requirements were held unconstitutional as applied. *Id*. at 101-02.

The Socialist Workers Party in Ohio had approximately 60 members at the time it brought suit, an annual budget of approximately $15,000, and its members frequently ran for public office with little success. *Id*. at 88-89. In fact, the party's 1980 candidate for state senate garnered less than 1.9% of the popular vote. *Id*. The Supreme Court emphasized time and again throughout its opinion that this group was a *minor political party*. *See passim* (using the term "minor party" or some variation thereof no less than 37 times in the majority opinion).

The Court in *Brown* applied a very limited exception to the general rule of disclosure of state campaign reporting for a minority political group that had a history of harassment by the government and private parties. The Constitution protects against such disclosure when privacy is "indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id*. at 91 (quoting *NAACP v. Alabama*, 357 U.S. 449, 462 (1958)). The exception was intended to protect politically unpopular groups who preached against the majority to create social change. Indeed, it does not appear that the courts have since applied the exception to anything but disadvantaged minority groups.

### 2. The Limited Disclosure Exception does not apply to a large, well-financed group such as Plaintiffs.

Plaintiffs are a large, well-financed, politically successful group that could not be more different than the group at issue in *Brown*. Plaintiffs, including the several committees that raised money in support of Proposition 8, received over 36,000 individual contributions of $100 or more before the election.[3] (*See* Cassady Decl. at ¶ 7 and Ex. A thereto.) This is not a small, discrete group working together to achieve a societal change with virtually no chance of success as in *Brown*. In California, the political viewpoint represented by these groups was shared by over seven million people, many of whom individually contributed to the nearly $30 million raised by

---

[3] While committees must keep records of smaller contributions, they need not itemize contributions under $100, and thus those records are not available here. Cal. Gov't Code § 84211.

the various ballot committees.  (*Id.*, *see* also Secretary of State Election Results, available at:

http://www.sos.ca.gov/elections/sov/2008_general/7_votes_for_against.pdf.)

In *Brown*, by contrast, the Socialist Workers Party demonstrated that it had a limited budget (averaging $15,000/year)[4] and that it tended to lose any race in which they entered a candidate. *Brown*, 459 U.S. at 88-89.  The Court commented that its limited resources and unsuccessful bids for office contradicted the idea that this money would be used for corrupt purposes, partly because even if some of the funds were funneled to illegal activities, the amount would not have a substantial impact.  *Id.* at 95, n.11.  Contrast Plaintiffs, who amassed nearly $30 million for one ballot initiative and were successful.  In short, Plaintiffs are not an unfunded, unpopular minority party such as that at issue in Brown.  They are a successful, well-funded group with significant influence in the arena of public debate.

Plaintiffs also compare their experiences with those of the NAACP in *NAACP v. Alabama*, 357 U.S. 449 (1958).  But the history of invidious governmental and private entity discrimination perpetrated against African-Americans in Alabama during this period is certainly well documented,[5] does not bear repeating here, and is by no means similar to the allegations presented in this case.  Simply put, this Court should not apply the rationale behind *Brown* (protecting the minority against historic and continuing government and private persecution and harassment), to a group as large, diverse, well-funded, and *successful* as Plaintiffs.

**B.**    **Even If the Disclosure Exemption Applied Here, Plaintiffs Face A Heavy Evidentiary Burden To Justify The Exemption.**

Even assuming the *Buckley/Brown* disclosure exemption test applied in this case, which it does not, Plaintiffs cannot meet their evidentiary burden.  To support the drastic remedy of an injunction against application of the State's disclosure requirements, Plaintiffs must demonstrate that, viewing their organization as a whole, "the threat to the exercise of First Amendment rights

---

[4] Adjusted for inflation, that figure would be approximately $40,000 in 2008.

[5] For an excellent discussion of the circumstances surrounding *NAACP v. Alabama*, see Harry Kalven, Jr., *The Negro and the First Amendment* (1965).  Interestingly, Professor Kalven suggests that the reason the Alabama Attorney General requested the membership list was the state's desire to deter the NAACP from operating in the state given the impending threat of member harassment should the list be made public.

1    is so serious and the state interest furthered by disclosure so insubstantial that the [disclosure]

2    requirements cannot be constitutionally applied." *Buckley*, 424 U.S. at 71.

3    Plaintiffs present the Court with a compilation of newspaper articles depicting a few

4    instances of illegal conduct directed at a few of the over seven million supporters of Proposition

5    8, along with a handful of anonymous declarations describing various levels of unwelcomed

6    communications and property damage. Although some of the conduct described is certainly

7    deplorable if true, it simply does not rise to the level accepted by the Supreme Court to justify a

8    blanket disclosure exemption. If this were the evidentiary standard, one could hardly imagine a

9    ballot measure election in California wherein both sides of a controversial measure would not be

10   entitled to keep their contributors' identities hidden from the voting public. Plaintiffs' attempt to

11   lower the evidentiary standard is unsupportable, and would be completely unworkable in any

12   state wherein the people have the right to exercise direct democracy at the ballot box.

13   Instead, in order to meet their evidentiary burden, Plaintiffs must demonstrate both a

14   reasonable probability that disclosure will subject contributors to serious reprisal, as specified

15   below, and that fear of such reprisal poses a threat to their ability, as a group, to engage in

16   political speech. Both prongs must be met, as the tests developed by the Supreme Court have

17   only been applied to minority parties that have demonstrated a unique susceptibility to falloff in

18   membership if their members' identities are disclosed. The Supreme Court has been especially

19   sensitive to the fact that fear of reprisal can reduce membership and, concomitantly, monetary

20   contributions to an extent that could remove the political views they espouse from the political

21   arena. When such political views wither on the vine, the public itself is harmed. Thus, the

22   *Buckley* Court was "not unmindful that the damage done by disclosure to the associational

23   interests of the minor parties and their members" could be uniquely significant because such

24   associations "are less likely to have a sound financial base and thus are more vulnerable to

25   falloffs in contributions." *Buckley*, 424 U.S. at 71. Indeed, the Court's primary concern was that

26   "fears of reprisal may deter contributions to the point where the movement cannot survive. The

27   public interest also suffers if that result comes to pass, for there is a consequent reduction in the

28   free circulation of ideas both within and without the political arena." *Id.*

7

Moreover, in *NAACP v. Alabama*, relied upon by the *Buckley* Court in developing the standard in the campaign disclosure context, the Supreme Court held that to justify exemption, the compelled disclosure must be "likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." 357 U.S. 449, 462-63 (1958).

Thus, in the instant case, Plaintiffs – representing organizations that collectively received nearly $30 million from over 36,000 individual contributions in support of a ballot measure that passed receiving over seven million votes [6] – must demonstrate both a reasonable probability that disclosure will subject contributors to serious reprisal, and that fear of such reprisal poses a threat to their organizations' abilities to engage in political speech. Otherwise, it would seem that every time an initiative appears on the ballot in California dealing with same sex marriage, abortion, or any number of civil rights or immigration matters, the campaign committees on either side could avail themselves to a "narrow" exception to mandatory disclosure carved out by the Supreme Court and hide their contributors' identities from the voting public – a result the Supreme Court never could have intended.

Should plaintiffs overcome these evidentiary hurdles, the Court must go on to balance the Plaintiffs' burden against the government's interest in the disclosure. Again, an exemption from disclosure is only proper where "the threat to the exercise of First Amendment rights is so serious and the state interest furthered by disclosure so insubstantial that the [disclosure] requirements cannot be constitutionally applied." *Buckley*, 424 U.S. at 71.

      **1.**    **Plaintiffs Must Demonstrate a Reasonable Probability that Disclosure Will Subject Contributors to Serious Reprisal.**

---

[6] In fact, ProtectMarriage.com has so far reported over $1.5 million in contributions under $100, and these contributors' names are not required to be publicly disclosed; http://www.sos.ca.gov/elections/sov/2008_general/7_votes_for_against.pdf. Assuming each of these contributors gave up to $99, Plaintiffs have another 15,000 contributors in addition to this 36,000 for an approximate total of 51,000.

To meet their initial evidentiary burden, Plaintiffs must demonstrate:

> [A] reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties. The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient. New parties that have no history upon which to draw may be able to offer evidence of reprisals and threats directed against individuals or organizations holding similar views. [¶] Where it exists the type of chill and harassment identified in *NAACP v. Alabama* can be shown.

*Buckley*, *supra*, 424 U.S. at 74. Although *Buckley* held that the level of proof required of minority party plaintiffs is flexible, a showing of reasonable probability still must be made. *Id*. Thus, the Court held that evidence of "clearly articulated fears of individuals, well experienced in the political process" will not suffice, even where the testimony offered is from "several minor-party officials that one or two persons refused to make contributions because of the possibility of disclosure." *Id*. at 73.

The *Buckley* Court also held that the exemption is not appropriate where "any serious infringement on First Amendment rights brought about by the compelled disclosure of contributors is highly speculative." *Id*. at 69-70. Instead, Plaintiffs must tender "record evidence of the sort proffered in *NAACP v. Alabama*." *Id*. at 71. There, of course, petitioners were the National Association for the Advancement of Colored People doing business in the State of Alabama in the mid 1950's.

Lower federal courts have since applied this test. In the wake of *Buckley*, the Oregon District Court had an opportunity to apply the evidentiary test to its local Socialist Party. In *Oregon Socialist Workers 1974 Campaign Committee v. Paulus*, 432 F. Supp. 1255 (D.C. Or., 1977), a three-judge panel of the district court found that the minor party plaintiffs had failed to meet their evidentiary burden in seeking a similar campaign finance disclosure exemption. There, the minor party plaintiffs alleged that its members had been subjected to: "sweeping and systematic government harassment" for almost thirty years, including wiretapping and break-ins, and "private 'manifestations of hostility by certain segments of the public,' including economic reprisals, loss of employment, and acts of threats of physical coercion and violence." *Id*. at 1257

9

(quotation omitted).  Plaintiffs further alleged that disclosure "will 'deter and intimidate persons from associating with, contributing to and supporting' the plaintiff committees and candidates." *Id*.  Lastly, plaintiffs alleged that disclosure "would result in pressure being brought to bear on commercial establishments to deter them from providing necessary services (such as printing) to plaintiffs."  *Id*.  Plaintiffs' evidence was presented by way of affidavits, some of which were anonymous.  *Id*. at 1259.

However, the court found by a preponderance of the evidence that plaintiffs had failed to establish a "reasonable probability" that disclosure of the names of its contributors would result in official or unofficial harassment.  *Id*.  The court held that each "instance of alleged harassment set out in plaintiffs' affidavits is insufficient by itself to justify the conclusion that the valid governmental interests in disclosure are outweighed by the First Amendment rights of potential SWP supporters."  *Id*. The court went on to specifically weigh plaintiffs' evidence:

> A review of the evidence fails to reveal, moreover, any pattern of prior conduct, either public or private, of sufficient severity to meet the standard of proof of *Buckley*.  The evidence shows, at most, a few isolated cases of the receipt of highly critical and negative phone calls and letters.  Most of these calls and letters have not been shown to be the result of SWP support as such, but are at least as likely to be the product of other political activities of the affiants.

> *Id.*

In *Brown*, by contrast, the plaintiffs presented proof of both governmental and private hostility toward, and continual harassment of, the minor party itself and its members.  *Brown*, 459 U.S. at 98-99.  Along with threatening phone calls and hate mail, plaintiffs submitted proof of "the burning of SWP literature, the destruction of SWP members' property, police harassment of a party candidate, and the firing of shots at an SWP office."  *Id*. at 99.  Plaintiffs further showed, through the official Final Report of a Special Master appointed to investigate governmental harassment, "a past history of government harassment of the SWP.  FBI surveillance of the SWP was 'massive' and continued until at least 1976.  The FBI also conducted a counterintelligence program against the SWP and the Young Socialist Alliance (YSA), the SWP's youth organization."  *Id*. at 99-100, n.17.  Plaintiffs proved that the FBI maintained a program that included "disclosing to the press the criminal records of SWP candidates, and sending anonymous

10

letters to SWP members, supporters, spouses, and employers." *Id.* According to the Court, "the evidence suggests that hostility toward the SWP is ingrained and likely to continue." *Id.* at 101.

Therefore, Plaintiffs must come forward with competent evidence demonstrating, at a minimum, a reasonable probability of threats, harassment, and reprisals of the quality and quantity of the evidence found sufficient in *NAACP v. Alabama and Brown.* No other level of proof has been accepted by the courts. Again, the disclosure exception only applies where there is a *serious* threat to the exercise of First Amendment rights. *Buckley*, 424 U.S. at 71.

### 2. Plaintiffs Must Also Demonstrate That Fear of Reprisal Threatens Their Ability To Engage in Political Speech.

Even if the initial evidentiary showing is made regarding fear of reprisal, Plaintiffs must also demonstrate that such fear by its supporters poses a threat to their ability to engage in political speech as a group. That is, the analysis must then focus on the impact of the fear of reprisal on the group's ability to engage in political speech, here – as in *Buckley, Brown,* and *NAACP v. Alabama* – Plaintiffs' ability to raise monetary contributions to effectively communicate their political message. The evidence must demonstrate that disclosure will "affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *NAACP v. Alabama*, 357 U.S. at 462-63. Anything less is insufficient to justify an exemption, and an injunction would be unwarranted.

For example, in *Oregon Socialist Workers 1974 Campaign Committee,* after rejecting plaintiffs' evidence of fear of reprisal, the court also held that plaintiffs failed to meet their burden of establishing that disclosure would deter potential supporters from contributing. Plaintiffs presented two anonymous declarations stating that SWP contributors are being deterred from supporting the party due to Oregon's disclosure requirements. The court held that such evidence was entirely insufficient:

> We recognize that these affiants are in a difficult position. If they come forward and identify themselves before this court, they run the risk of subjecting themselves to the harassment they allegedly fear. While we have some sympathy for these affiants, our system of justice does not contemplate the judicial resolution of disputes based on secret testimony. Basic concepts of Due Process require, moreover, that defendant have the opportunity to rebut this testimony.

*Oregon Socialist Workers*, 432 F. Supp. at 1257.

In the instant case, Plaintiffs must submit competent, admissible evidence that fear of reprisal by its supporters poses a threat to their ability to engage in political speech as a group through a significant falloff in monetary contributions. Otherwise, there is simply no risk to Plaintiffs' ability to pursue their collective effort to foster their beliefs "because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure" as required by the Supreme Court. *NAACP v. Alabama*, 357 U.S. at 462-63.

### C. Plaintiffs Have Failed to Meet Their Evidentiary Burden to Enjoin the State's Valid Disclosure Requirement.

#### 1. Plaintiffs' Evidence Fails to Show a Reasonable Probability of Reprisal by Governmental or Private Entities.

A critical analysis of Plaintiffs' evidence reveals that it simply does not demonstrate a reasonable probability that compelled disclosure will subject its members to threats, harassment, or reprisals from either government officials or private parties in any way comparable to that at issue in *NAACP v. Alabama or Brown*. As discussed below, much of the conduct complained of in Plaintiffs' declarations constitutes protected speech. Of course, some of the conduct described in the newspaper articles improperly relied upon by Plaintiffs is unlawful, and certainly regrettable if true. But these few instances Plaintiffs identified simply do not satisfy their evidentiary burden when seeking to exempt tens of thousands of individuals, representing tens of millions of dollars received through contributions, from public disclosure on a ballot election in which they prevailed.

First, of the over 36,000 individual contributions to the Yes on Proposition 8 campaign, Plaintiffs submit only nine anonymous declarations to support their motion. And the majority of the conduct described appears itself to be protected speech. For example, John Doe #1 states that his store had been targeted for boycotting with fliers being placed upon cars in the parking lot and

12

a sponsored Google link directing viewers to an unidentified website, he received negative reviews on the Internet, and his store was picketed.  He does not indicate whether his store suffered economic losses from any of the actions, other than the cost of additional security cameras he chose to install.  The State Defendants do not wish to downplay the impact these events have had on John Doe # 1, but Plaintiffs here are seeking to avail themselves of a First Amendment exception to a valid state disclosure law that the Supreme Court developed for minor parties with well-documented histories of pervasive governmental and private entity discrimination.  The allegations set forth in these anonymous declarations simply do not rise to the level considered sufficient by any court.

Second, Plaintiffs submit nearly 200 pages of newspaper articles and video descriptions alleging activities ranging from individuals leaving their jobs (characterized by plaintiffs as being "forced to resign," though apparently not fired [Plaintiffs Memorandum in Support of their Motion for Preliminary Injunction, at 17:1-5 ("Motion for Prelim. Injunc.")]), to businesses losing customers (according to plaintiffs, "boycotted" or "blacklisted," though no evidence of economic loss has been presented [id. at 17:5-14]), to individuals receiving politically-charged emails and letters, to individuals receiving death threats.[7]  Notably, many of these articles describe the same set of events and do not represent separate, individual occurrences of the events described therein.  For example, twenty-eight of the fifty-eight exhibits discuss the same set of events concerning mostly the same businesses alleging boycotting.[8]  These articles and videos reveal a total of twenty separate, individual occurrences across the state.  But these newspaper articles are simply unverified hearsay – indeed multiple hearsay – and they simply do not suffice to satisfy Plaintiffs' evidentiary burden of proof in seeking a preliminary injunction.[9]

---

[7] Of course, the articles show that the heated behavior was not confined to one side of the debate.  They also describe allegations of supporters of Proposition 8 engaging in civil disobedience.  (*See, e.g.,* Troupis Decl. in Support of Plaintiffs' Mot. for Prelim. Inj. at Ex. L (describing over 2,000 Prop. 8 supporters allegedly blocking traffic on Sunset Blvd).)   This was no doubt an emotionally-charged.

[8] *See* Troupis Decl., Exs. A, B, N, O, P, AD, AE, AG, AH, AI, AK, AL, AM, AN, AO, AP, AQ, AR, AS, AT, AU, AV, BA, BB, BC, BD, BE, BF.

[9] *See* State Defendants Evidentiary Objections to the Troupis Declaration and accompanying exhibits, submitted concurrently herewith and incorporated herein by this reference.

Importantly, the bulk of the conduct described in the declarations and newspaper clippings constitutes protected speech and conduct. The First Amendment provides a right to contribute or to withhold funds in the marketplace. The Supreme Court found in *NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982), that economic boycotts are a form of speech entitled to protection under the First and Fourteenth Amendments. *Id*. at 907. According to the Court, it is in the collective voice that comes with organizing to induce customers or potential customers to avoid a particular vendor or service that a message can be heard. *Id*. at 907-09. In Claiborne, a minority group, the NAACP, attempting to overturn generations of instilled racism, organized boycotts of several merchants in a Mississippi city. *Id*. at 907. In some cases, threats and violence ensued. *Id*. at 897. Nevertheless, the Court held that the unlawful actions of a few, not condoned by the group, did not downgrade the protected character of the boycott. *Id*. at 933. Instead, because "[n]onparticipants repeatedly were urged to join the common cause, both through public address and through personal solicitation," the Court held that "[t]hese elements of the boycott involve speech in its most direct form." *Id*. at 907.

The offending actions of which Plaintiffs complain include boycotting or so-called blacklisting businesses,[10] unwelcomed communications via electronic mail or phone calls, stolen yard signs, protests, distributing pamphlets, and people who were "forced to resign from their jobs."[11] But again, the boycotts in *Claiborne* were similarly supported by speeches, picketing, soliciting others to join the boycott, and reading the names of violators at the First Baptist Church and publishing them in a local newspaper. *Claiborne*, 458 U.S. at 907-09. And, in *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971), the Supreme Court explained that peaceful pamphleteering is protected, First Amendment speech. *Id*. at 418. In that case, petitioners were "engaged openly and vigorously in making the public aware of respondent's [discriminatory] real

---

[10] Plaintiffs present no evidence of governmental or official involvement in any "blacklisting" and, as noted above, such activities by private parties is protected speech.
[11] Plaintiffs also blame disclosure for the white powdery substances that were sent to two churches, but by their own evidence, neither the churches nor the FBI placed the blame on opponents of Proposition 8. (*See* Memo ISO of PI at 8-9, see also Troupis decl, Ex J.)

estate practices." Id. at 419. The Court recognized in both *Claiborne* and *Keefe* that "offensive" and "coercive" speech is also protected speech. *Claiborne*, 458 U.S. at 910.

According to Plaintiffs' evidence, virtually all of the declarants engaged in some form of public support for Proposition 8. Only one declarant merely contributed to the Yes on 8 campaign with no other public activity. (*See* Doe #6.) John Doe #6's complaint is that he was listed on the website "Californians Against Hate" and he received a postcard wherein he was "personally insulted." (*Id.*) All others took additional *public* action in support of the measure, either through yard signs, bumper stickers, or attending rallies. These Doe declarants either did not contribute to the campaign and therefore were not disclosed as contributors on the Secretary of State's website, or engaged in some other public act or First Amendment activity, which, by their admission, was the causal connection to the alleged "reprisal." Doe #8 contributed less than $1,000, had a Yes on 8 bumper sticker on his car, posted Yes on 8 yard signs, spoke at several churches, went to rallies and press conferences, and had his photo published in the newspaper. Only after a newspaper published his photograph did he receive "harassing" messages. Similarly, Doe #9 did not contribute to the campaign, but received an unwelcome message on his answering machine after his photo appeared in a newspaper. Nothing indicates these actions were due to reporting requirements.

Plaintiffs complain that Proposition 8 opponents engaged in activity that is solidly protected First Amendment speech and then, based on that protected speech, Plaintiffs attempt to establish special treatment for themselves. Plaintiffs' theory turns First Amendment doctrine on its head. The First Amendment supports disclosure of contributors even to socially contentious ballot measures because the disclosure results in more speech, not less. Those on one side of the campaign express themselves through contributions, public speaking, etc., and those on the other express themselves through boycotts, rallies, and personal communications.[12] *See Goland v. FEC*, 903 F.2d 1247, 1261 (9th Cir. 1990) ("Rather than impinging on First Amendment values,

---

[12] As the Supreme Court stated in *Claiborne*, "The taint of violence colored the conduct of some of the petitioners. They, of course, may be held liable for the consequences of their violent deeds." *Claiborne*, 458 U.S. at 933.

the disclosure requirement actually further them. . . .").  To allow the marketplace of ideas to suffer for the alleged actions of a few would be contrary to the First Amendment.[13]  California's civil and criminal justice systems are the proper place to seek relief from the few instances of unprotected, illegal conduct, not the federal judiciary.

In the end, Plaintiffs' evidence reflects the fact that Proposition 8 was a controversial, polarizing measure.  People on both sides of the issue engaged in protected speech and activity in an attempt to sway the voting public.  A few instances of alleged illegal conduct occurred during the public debate, and that is regrettable.  But the evidence Plaintiffs presented is simply not of the quantity and quality found sufficient by the Courts in *NAACP v. Alabama or Brown*.

## 2. Plaintiffs' Evidence Fails to Show a Reasonable Probability that Fear of Reprisal Poses a Threat to Their Ability to Engage in Political Speech.

Plaintiffs submit virtually no evidence whatsoever demonstrating that fear of reprisal has or will threaten their ability to engage in political speech on any future political activities regarding the legality of same sex marriage in California.  The majority of Plaintiffs' declarations are more notable for what they don't say than what they do say.  Of the nine, only one declarant states that he would not donate or support a similar cause in the future in the same manner.  (*See* Declaration of John Doe # 1, ¶ 27 (hereafter "Doe Decl.") ("I would support a measure like Proposition 8 more discretely and would not donate like this again").  The remainder are either silent on the issue or state they would be "hindered" or "less likely" to donate, or "would think carefully" before donating.  (*See* Doe Decls.: John Doe # 2, ¶ 7 ("less likely"); John Doe # 3 (silent); John Doe # 4 (silent); John Doe # 5 (silent); John Doe # 6 (silent); John Doe # 7 (silent); John Doe # 8, ¶ ("less likely");  John Doe # 9, ¶ 12 (would "think[] carefully about possible consequences").)

[13] The Ninth Circuit captured this idea in *FEC v. Furgatch,* 807 F.2d 857, 862 (9th Cir. 1987), when it said:
> "The vision of a free and open market place of ideas is based on the assumption that the people should be exposed to speech on all sides, so that they may freely evaluate and choose from among competing points of view. One goal of the First Amendment, then, is to ensure that the individual citizen has available all the information necessary to allow him to properly evaluate speech. . . . The allowance of free expression loses considerable value if expression is only partial. Therefore, disclosure requirements, which may at times inhibit the free speech that is so dearly protected by the First Amendment, are indispensable to the proper and effective exercise of First Amendment rights."

In reality, the combined Yes on Proposition 8 campaigns received over 36,000 individual contributions totaling nearly $30 million. (*See* Cassady Decl. at ¶7, Ex. A.) Under circumstances such as these, it is simply implausible to believe that Plaintiffs, or those holding similar political views on the issue of marriage, would suffer any significant falloff in contributions should the issue of same sex marriage arise again in the future in California.

To be sure, these circumstances are a far cry from those presented in *Brown*. There, the SWP was "a small political party with approximately sixty members in the State of Ohio." Brown, 459 U.S. at 88. In fact, plaintiffs'' "[c]ampaign contributions and expenditures in Ohio have averaged about $15,000 annually since 1974." *Id*. at 88-89. Thus, the Court found that compelled disclosure could "cripple a minor party's ability to operate effectively and thereby reduce 'the free circulation of ideas both within and without the political arena.'" *Id*. at 97, quoting *Buckley, supra*, 424 U.S. at 71. The circumstances of this case could not be more different. Plaintiffs have presented no evidence that they will be measurably hampered in the circulation of their political views in the future due to financial falloff.

### D. An Exemption is Unwarranted Because, On Balance, the State's Interest Outweighs Plaintiffs' Limited Burden.

Even were Plaintiffs to overcome the evidentiary hurdles noted above, which they have not, the Court must still balance the State's interest in disclosure of the over 36,000 contributions of nearly $30 million to a ballot measure that passed receiving 7,001,084 votes, against the limited burden imposed upon Plaintiffs. Again, an exemption from disclosure is only proper where "the threat to the exercise of First Amendment rights is so serious and the state interest furthered by disclosure so insubstantial that the [disclosure] requirements cannot be constitutionally applied." *Buckley*, 424 U.S. at 71. As explained below, the balance plainly tips in favor of the State.

Plaintiffs are flatly incorrect in arguing that the State's only interest in disclosure is the informational interest in the ballot measure context. (*See* Motion for Prelim. Injunc. at 21:3-7; n.4.) The State indisputably has a compelling interest in the enforcement of State and federal campaign finance laws and regulations, which can only be accomplished if the State and the public are provided with the donor or contributor information of those individuals contributing

17

$100 or more. Absent disclosure, the State would be unable to detect if, for example, would-be large contributors are seeking to hide their identity by funneling smaller contributions through employees, friends, family members, or others. Without disclosure, neither the State nor private parties would be able to bring to light the information to which the voting public has a right.

First, it is beyond argument that the State's interest in providing the electorate with information regarding the sources of funding in elections is of the highest order. In *Buckley*, the Supreme Court held that providing the electorate with information as to where political campaign money comes from and how it is spent in order to aid the voters in evaluating those who seek federal office advances substantial governmental interests. 424 U.S. at 66. The Court held that such information "allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and facilitate predictions of future performance in office." *Id.* at 66-67.

Importantly, the Ninth Circuit has held that the State's interest in disclosure is even more substantial in the context of ballot measure elections:

> Though the Buckley Court discussed the value of disclosure for candidate elections, the same considerations apply just as forcefully, if not more so, for voter-decided ballot measures. "Even more than candidate elections, initiative campaigns have become a money game, where average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their self-interest." David S. Broder, Democracy Derailed: Initiative Campaigns and the Power of Money at 18 (2000). Knowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown. At least by knowing who backs or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation.

*CPLC I, supra*, 328 F.3d at 1105. The court there was specifically concerned with the unique influence money has on ballot measure elections in California because, as the court explained:

> Voters act as legislators in the ballot-measure context, and interest groups and individuals advocating a measure's defeat or passage act as lobbyists; both groups aim at pressuring the public to pass or defeat legislation. We think Californians, as lawmakers, have an interest in knowing who is lobbying for their vote, just as members of Congress may require lobbyists to disclose who is paying for the lobbyists' services and how much.

*Id.* Moreover, the court noted, "[a]ll this money produces a cacophony of political communications through which California voters must pick out meaningful and accurate messages. Given the complexity of the issues and the unwillingness of much of the electorate to independently study the propriety of individual ballot measures, we think being able to evaluate who is doing the talking is of great importance." *Id.*

Thus, in California especially, the State's interest in providing the electorate with the information necessary to competently legislate when faced with the often complex morass of initiatives at the ballot box can most effectively be advanced through its disclosure requirements. This interest cannot so easily be cast aside as Plaintiffs would have the Court do.

Second, it is only through the disclosure requirement that the State and private parties can try to detect whether disclosure is being circumvented. Large contributors are no doubt aware that knowledge of their support of a ballot measure can often sway public perception of any given ballot initiative. Such contributors can seek to hide their support, however, by funneling smaller contributions through intermediaries in violation of the disclosure requirements. [14] This circumvention deprives the electorate of information necessary to make truly informed decisions when voting on measures. Oddly, Plaintiffs rightly argue that the State's ban on contributions through intermediaries is a narrowly tailored means of ensuring the electorate is properly informed. (Motion for Prelim. Injunc. at 26:24-28, 27:1-6.) Yet Plaintiffs fail to explain how the State or private parties could detect violations absent disclosure.

While these two interests go hand-in-hand, they are each compelling in their own right. The electorate has a right to know who is funding ballot measures, and such information is only useful to the extent it is accurate. Thus, disclosure ensures not only that the information is

---

[14] Indeed, Defendant Fair Political Practices Commission has, over the years, imposed major fines in cases involving "money laundering" where large contributors in ballot measure campaigns sought to hide their identities through non-disclosure. (See *In the Matter of Cedar Valley Holding Company*, FPPC No. 94/022. (Fine amount: $96,900.) *FPPC vs. Caroline Getty, Wild Rose, LLC* (Civil Matter, 2004). (Fine amount: $135,000.) *In the Matter of San Francisco Construction Management, Inc.*, FPPC No. 96/519. (Fine amount: $40,800.) *In the Matter of GH Palmer and Associates,* FPPC No. 89/033. (Fine amount: $30,000.) *In the Matter of Lucille Nelson, FPPC No.* 95/464. (Fine amount: $2,000.) *FPPC vs. AGOLD Corp.* 93/483. (Fine amount: $23,000.) *In re the Matter of De Anza College*. (Fine amount: $4,000.))

1  provided, but also that the information provided represents a complete picture of the sources of
2  contributions.
3      By comparison, the only burden Plaintiffs assert is the alleged risk of reprisal from
4  disclosure, a risk supported by only a few anecdotes.  While any violent reprisals are
5  unacceptable, Plaintiffs evidence simply does not rise to the level necessary to support
6  concealment of the persons funding this ballot measure.  Plaintiffs offer no other evidence of any
7  burden sufficient to overcome the State's interest and justify a blanket exemption from
8  California's disclosure requirement for its tens of thousands of members.  Therefore, on balance,
9  the State's significant interest in requiring disclosure significantly outweighs the unsubstantiated
10  burden alleged by Plaintiffs.

**II.  PLAINTIFFS' ADDITIONAL CLAIMS CHALLENGING CALIFORNIA'S $100 THRESHOLD AND POST-ELECTION REPORTING REQUIREMENTS PROVIDE NO BASIS FOR A PRELIMINARY INJUNCTION.**

13      Plaintiffs are unlikely to succeed on their challenges to these provisions regardless of the
14  level of judicial review applied.  Although the level of review applicable to the $100 threshold
15  and post-election reporting requirements may be subject to debate, the State's compelling
16  interests outweigh any burden imposed upon Plaintiffs, and such interests cannot be effectively
17  furthered in their absence.
18      In *Nixon v. Shrink Missouri,* 528 U.S. 377, 386 (2000), the Supreme Court surveyed its
19  campaign finance jurisprudence and, of special interest here, summarized the standards of review
20  applied in such cases since *Buckley,* noting that "[p]recision as to the relative rigor of the standard
21  to review contribution limits was not a pretense of the Buckley per curiam opinion."  The Nixon
22  Court explained, however, that ever since *Buckley* it has employed an intermediate level of
23  "exacting scrutiny" to review contribution limits, compared to the more severe "strict scrutiny"
24  applied to review expenditure limitations.
25      In their Memorandum of Points and Authorities filed in support of the motion for
26  preliminary injunction, at 22:25-26, Plaintiffs assert that in this case "strict scrutiny is required,"
27  because "compelled disclosure imposes significant societal costs."  And yet, on the page
28  immediately preceding this assertion, they quote a sentence from *Buckley* that concludes a

20

paragraph discussing contribution reporting and disclosure thresholds under rational basis. The full paragraph is of such import in the present matter that it merits quotation in full:

> The $10 and $100 thresholds are indeed low. Contributors of relatively small amounts are likely to be especially sensitive to recording or disclosure of their political preferences. These strict requirements may well discourage participation by some citizens in the political process, a result that Congress hardly could have intended. Indeed, there is little in the legislative history to indicate that Congress focused carefully on the appropriate level at which to require recording and disclosure. Rather, it seems merely to have adopted the thresholds existing in similar disclosure laws since 1910. But we cannot require Congress to establish that it has chosen the highest reasonable threshold. The line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion. We cannot say, on this bare record, that the limits designated are wholly without rationality.

*Buckley*, 424 U.S. at 83.

The Supreme Court thus upheld the precise federal counterparts of the disclosure threshold statutes at issue in this litigation on a "rational basis" standard, deferring to congressional judgment. Plaintiffs' assertion that Supreme Court precedent requires the *highest* standard of review on all matters before this Court is refuted by *Buckley's* deferential approach to reporting and disclosure thresholds.

The State Defendants do not suggest that there is no complexity in choosing the proper standard of review for challenges to campaign disclosure rules generally. To the contrary, this question is far more complex than Plaintiffs represent. The dichotomy between "strict scrutiny" and "exacting scrutiny" for evaluating expenditure limits and contribution limits, respectively, is arguably Buckley's best known and most stable legacy, but it has led to much confusion. This is because limits on campaign expenditures and contributions can take relatively few forms, while disclosure rules are a more complex class of laws, which can assume many forms. When thinking about the levels of scrutiny applied to contribution and expenditure limits, however, the dichotomy between "strict" and "exacting" scrutiny is an academic point for present purposes because the Buckley court reviewed the federal recordkeeping and reporting provisions mentioned above, under what can only be termed a "rational basis" test. [15]

---

[15] The federal recordkeeping and itemized disclosure thresholds at issue in *Buckley* are not distinguishable from the California thresholds challenged by Plaintiffs in the present action. The

(continued…)

Courts have experienced difficulty in determining how to evaluate constitutional challenges to *other* forms of recordkeeping and disclosure statutes. In August 2000, the Indiana law firm representing Plaintiffs in the present action filed a large and complex lawsuit in this district against many of the individual and class defendants named in the current lawsuit. This was a challenge to California's committee registration and disclosure rules affecting a multi-purpose 501(c)(3) entity, the California ProLife Council ("CPLC"), which argued that it could not constitutionally be compelled to publicly disclose the names of its contributors simply because CPLC spent some of its donated funds to support or oppose California ballot measures. After losing a round in this court, plaintiffs appealed, giving rise to the Ninth Circuit decision entitled *California Pro-Life Council v. Getman*, 328 F.3d 1088 (9th Cir. 2003) ("CPLC I"). The Ninth Circuit instructed this Court to evaluate plaintiffs' claims, on a fuller record, using strict scrutiny.

This Court then granted defendants' cross-motion for summary judgment, and denied CPLC's motion, giving rise to a second appeal decided under the name *California Pro-Life Council v. Randolph*, 507 F.3d 1172 (9th Cir. 2007) ("CPLC II"). Defendants urged the Ninth Circuit to review plaintiffs' claims under exacting scrutiny, on the strength of an intervening Ninth Circuit decision, *American Civil Liberties Union of Nevada v. Heller,* 378 F.3d 979 (9th Cir. 2004). The Ninth Circuit found: "We need not resolve any potential conflict because we are bound by the 'law of the case' to apply strict scrutiny." (*Id.* at 1177.) Applying strict scrutiny, the court nonetheless found that plaintiff could constitutionally be required to disclose its contributors' names pursuant to California law. The court required only that the Fair Political

(…continued)
parallel federal and state laws even share a subsequent history. In 1979, Congress doubled the federal thresholds discussed in *Buckley*, and the California Legislature did the same for its corresponding provisions in the following year. Presently, federal committee treasurers must keep a record, including the contributor's name and address, for all contributions of more than $50. 11 CFR § 102.9(a)(1). Federal committees are required to report itemized contributions of $200 or more. 2 U.S.C. Section 434(b) and 11 CFR § 104.3 – Contents of Reports. Corresponding California thresholds (Cal. Gov't Code §§ 84104 and 84211(f) and (k), respectively) were and remain half the size of their federal counterparts, because they apply to small local contests as well as to larger, statewide elections which themselves, of course, are more modest campaigns than presidential contests governed by the corresponding federal laws. Neither Congress nor the California Legislature has found it necessary to increase their campaign recordkeeping and disclosure statutes after 1980 and, to defendants' knowledge, they have not been challenged, certainly not successfully challenged, throughout this period.

Practices Commission simplify the process for reporting this information, to reduce the administrative burden on small multi-purpose groups like CPLC.

It thus remains unclear whether the proper standard of review for that lawsuit would have been "exacting scrutiny" or "strict scrutiny." In any event, California's disclosure rules were upheld in CPLC II under "strict scrutiny," but *this* Court is left with the preliminary task of determining the appropriate standard of review for the case at bar. Neither side can truthfully claim that this vexed question has been conclusively resolved. [16] Where rational basis is not the applicable level of scrutiny, the difference amounts to this: under "exacting scrutiny," the Court must ask whether the State Defendants can establish that a challenged rule is "closely drawn" to a "sufficiently important" state interest, while under "strict scrutiny," the Court must decide whether the State Defendants can show that a law is "narrowly tailored" to a "compelling state interest."

The imprecision and subjectivity built into these two standards has thus far been tolerated by the Supreme Court, but their practical utility is compromised to some extent. Plaintiffs' counsel recently lost the first round in another attack on a campaign disclosure laws, this time in the State of Washington. The District Court's thoughtful comments on the standard are worth quoting. Having first introduced "exacting scrutiny" and "strict scrutiny," the court observed:

> Although courts have often treated these as distinct standards, they are somewhat fluid in practice. Each standard considers the degree of burden imposed on the speaker – the more significant the burden, the more compelling the state interest needed to justify that burden. [17]

Plaintiffs have prepared the ground for their claims in the instant case by overstating burdens imposed by California's disclosure rules, while ignoring the First Amendment interests the rules promote. The State Defendants believe that this Court will find that Plaintiffs'

---

[16] Indeed, in *CPLC I* the Ninth Circuit itself observed in a lengthy footnote that its own views on the proper standard has varied due to mixed signals sent by the Supreme Court: "We recognize that the Supreme Court has been less than clear as to the proper level of judicial scrutiny we must apply in deciding the constitutionality of disclosure regulations such as those in the PRA." *CPLC I, supra*, n. 16.

[17] *Human Life of Washington, Inc. v. Brumsickle, et al.*, Order (at 14:2-5), January 8, 2009 denying Plaintiff's Motion for Summary Judgment. *See* Woodlock Decl. at ¶ 4, Ex. C.

challenges fail once the Court examines the evidence presented, and recognizes the havoc Plaintiffs would wreak on California's democratic institutions.  The case presented to this Court is properly subject to the critique leveled by the Supreme Court in *McConnell v. Federal Election Commission*:

> Plaintiffs' argument for striking down BCRA's disclosure provisions does not reinforce the precious First Amendment values that Plaintiffs argue are trampled by BCRA, but ignores the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace.

540 U.S. 93, 197 (2003).

Plaintiffs' comments on the standard of review applicable in this case are no less flawed than the evidence on which they base their prayers for relief.

**A.     The $100 Itemized Reporting Threshold.**

Plaintiffs bring facial and as-applied challenges to the $100 threshold triggering the State's disclosure requirement (Cal. Gov't Code § 84211 (f)).  Plaintiffs do not challenge the State's disclosure requirement generally.  Motion for Prelim. Injunc. at 18-30.  Instead, Plaintiffs attack the amount of the "itemized disclosure threshold" (the point at which the names of individual contributors are disclosed on campaign reports, currently set at $100 [Cal. Gov't Code § 84211(f), Cal. Code. Regs. Tit. 2, §18110(b)]) and the absence of a periodic adjustment in this figure to account for inflation, as grounds for concluding that these provisions are unconstitutional. The argument in a nutshell is that if the disclosure threshold were higher, fewer small donors would be identified on campaign reports, possibly reducing suppression of speech through intimidation.

As noted above, the *Buckley* court reviewed the federal $100 disclosure threshold under a deferential "rational basis" test.  424 U.S. at 82-84.  Indeed, the whole of section II. D. of the Supreme Court's opinion is dedicated to the threshold analysis.  In the end, the Court held that "[t]he $100 threshold was found to be within the 'reasonable latitude' given the legislature 'as to where to draw the line'." *Id*. at 83.

As it happens, almost all states have laws requiring disclosure of contributions at similar thresholds for the same purpose; most disclose at $100, and none more than $200.  *See The Campaign Disclosure Law Database*, Declaration of Lawrence Woodlock in Support of

24

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Woodlock Decl."), at ¶3, Ex. B. Plaintiffs have found no reported decision from any jurisdiction invalidating such a law, and the Supreme Court has never overruled or called into question *Buckley*'s deferential review of the parallel federal law.

With no law on point, Plaintiffs point to *Randall v. Sorrell*, 548 U.S. 230 (2006), in support of their contention that "California's threshold for reporting contribution limits is suspect, if not per se unconstitutional, because it is not indexed for inflation." Motion for Prelim. Injunc. at 24:17-19. The *Randall* court, however, was not discussing disclosure thresholds, but contribution limits: specifically, Vermont's contribution limits, which the Court noted were both the lowest in the nation and dramatically lower than any contribution limit the Court had ever approved. *Id.* at 253. The Court explained its conclusion as follows:

> Our examination of the record convinces us that, from a constitutional perspective, Act 64's contribution limits are too restrictive. We reach this conclusion based not merely on the low dollar amounts of the limits themselves, but also on the statute's effect on political parties and on volunteer activity in Vermont elections. *Taken together*, Act 64's substantial restrictions on the ability of candidates to raise the funds necessary to run a competitive election, on the ability of political parties to help their candidates get elected, and on the ability of individual citizens to volunteer their time to campaigns show that the Act is not closely drawn to meet its objectives.

*Id.*, emphasis in original.

The Court observed that: "A failure to index limits means that limits which are already suspiciously low…will almost inevitably become too low over time." *Id.* at 261. Throughout its analysis, the *Randall Court* explained that *contribution* limits fall below constitutional standards when they are too low to permit candidates to amass the funds necessary to run a competitive election. The lack of an inflation adjustment simply exacerbated a flaw that was already fatal to Vermont's contribution limits – they were too low to permit a typical candidate to fund a competitive race.

The existence of contribution limits will always pose a disadvantage to some candidates – those with poor fundraising skills, for instance, who have one or two patrons who could bankroll a winning campaign if permitted to contribute unlimited sums. The First Amendment is

1   implicated only when typical candidates cannot amass the funds to mount competitive campaigns,

2   just as campaign disclosure provisions may be questioned when "applied" to a group whose

3   ability "to pursue their collective effort to foster beliefs which they admittedly have the right to

4   advocate" is jeopardized by exposure to a hostile society.  *NAACP*, 357 U.S. at 462-463; *Buckley*,

5   424 U.S. at 71.

6       By contrast, a disclosure threshold has no direct effect on a candidate's ability to fund a

7   competitive campaign; *Randall's* discussion of contribution limits is not pertinent to a case where

8   plaintiffs complain of injuries arising out of disclosure thresholds in ballot measure elections.

9   Here, according to Plaintiffs, the problem is that a disclosure threshold set too low, or that has

10  become too low over time, may discourage citizens from contributing to election campaigns and,

11  in particular, to campaigns supporting a traditional definition of "marriage."  But apart from

12  submitting declarations from a number of persons who indicate that the prospect of public

13  identification with this issue may or will deter them from contributing to such contests in the

14  future, Plaintiffs have presented *no* evidence that California's itemized disclosure threshold stifles

15  participation in California ballot measure contests, whether in this instance or at any time in its

16  history.  If inflation were a factor, as Plaintiffs claim, they would be able to show that

17  contributions to ballot measure committees have declined by 300 percent since 1980.

18      In reality, contributions to ballot measure committees (as measured by the money they

19  actually spent) have risen dramatically since 1980.  Total expenditures on ballot measures in 1980

20  (the year introducing the $100 itemized disclosure threshold) was approximately $30 million.  *See*

21  Woodlock Decl. at ¶3, Ex. B.  From 1976 through 1986, expenditures experienced a steady

22  growth that was obviously *not* affected in any detectible way by the 1980 change in the disclosure

23  threshold.  In 2006, the last election cycle for which complete data are available, there was a

24  record-setting $330 million raised in ballot measure activity.  During the period when Plaintiffs'

25  argument would suggest a decline fueled by voters increasingly unwilling to see their identities

26  published as the inflation-adjusted value of the disclosure threshold declined, spending on ballot

27  measures actually increased by more than 1,000%.

28

The absolute growth of spending on ballot measures cannot be simply attributed to recruitment of more numerous contributors.[18]  *See* Woodlock Decl. at ¶3.  There is no doubt that part of the increase in ballot measure spending over the past decade is attributable to the proliferation of large institutional donors.  The rate of increase in total spending therefore does not equal the rate of increase in the number of donors.

But large donors have *not* supplanted the smaller contributors, whose numbers have grown throughout the period under study.  The information compiled from the Secretary of State's office on expenditures by the opposing sides in the Proposition 8 campaign reflects a typical pattern.  Cassady Decl., ¶8 and Ex. B thereto.  The "Yes" side raised nearly $30 million from 36,292 individual donors identified on campaign reports.  More than half (19,099, or 52.6%) of these contributors were "small" donors, who gave amounts ranging from $100 to $499.

There is certainly data available to quantify the participation of relatively small donors in ballot measure campaigns over the past thirty years, and this is how Plaintiffs would have to proceed in order to demonstrate that a low disclosure threshold (or any other factor) suppressed participation in ballot measure campaigns.  But the data on participation levels cannot in any way be interpreted to show a decline in reportable small donor contributions.  The trend for thirty years has been upward (*see* Woodlock Decl. at ¶3, Exhibit B), and there is no sign whatever that a doubling of the disclosure threshold in 1980, with subsequent inflation, had the effects on the spending curve that Plaintiffs' inaccurately predict.  Moreover, the number of disclosed contributions to ballot measure committees supporting Proposition 8 exceeds by nearly three times the number of disclosed contributions to committees supporting a nearly-identical California ballot measure passed in 2000.  That measure, Proposition 22 (California Primary Election, March 7, 2000), added almost identical language [19] to the California Family Code as

---

[18] The graph employed to illustrate the growth of spending is from Chapter 8 of a work published by the Center for Governmental Studies, <u>Democracy by Initiative: Shaping California's Fourth Branch of Government</u>, 2d Edition.  This chapter may be viewed online at <u>http://www.cgs.org/images/publications/cgs_dbi_chapter_8.pdf</u>.

Independent studies of this kind, whose purpose is to monitor the health of California's democratic institutions, rely on public campaign finance information to identify emerging problems, and to make recommendations to strengthen the state's democracy.

[19] This language was found to be unconstitutional in *In re Marriage Cases*, 43 Cal.4th 757

(continued…)

Proposition 8 did to the California Constitution.  There were 10,832 contributions of $100 or more to the pro-Proposition 22 committees, committees that also raised over $5 million.  Eight years later, on the same issue, and with the same $100 reporting threshold in place, there were over 36,000 contributions to the ballot measure's proponents and almost $30 million in total contributions.  *See* Cassady Decl. at ¶ 7, and Ex. A.

Without disclosure of identifying information on contributors at relatively modest levels, California cannot enforce the law and determine whether these contributions comply with the most basic campaign laws.  Federal law, for example, prohibits foreign nationals (including governments, political parties, and corporations) from making contributions or expenditures in connection with any United States election (federal, state, or local), either directly or through another person.  *See* 2 U.S.C. §441e; 11 C.F.R. 110.4(a)(1).  The State Defendants have an enforcement interest in policing contributions for this reason.  *See* Cal. Gov't Code § 85320 (prohibiting foreign nationals from contributing to ballot measures).  This law applies to state and local elections, and is equally applicable to candidate and ballot measure elections.

In considering the likelihood of further injury to Plaintiff in this case, it is important to note that the vast majority of the $100 contributors will have been disclosed already.  The Act's reporting rules require that a second pre-election report be filed 12 days before the election.  Cal. Gov't Code §§ 84200.5, 84200.7.  All $100 contributors who reached this threshold before the closing date of this second pre-election report have *already* been disclosed. [20]

The relatively short time period between the last pre-election report and Election Day is referred to the "late reporting period."  During this 16-day late period, special reports must be filed within 24 hours for contributions received or independent expenditures made of $1,000 dollars or more.  *Id.* at §§84203, 84204.   The only $100 contributors who will be disclosed on February 2, 2009 are (1) those who gave up to $999 during the 16-day late period, and (2) those

_____

(…continued)
(2008). [20]  The closing date for transactions included in this report is 16 days before the election, allowing time to prepare the report for filing on October 23, twelve days before last year's election on November 4.

who gave up to $4,999 after the date of the election. New contributors of $100 or more during this period are inevitably a small fraction of all itemized contributors and, in a contest that excited such interest, the number of previously unidentified contributors is likely to be especially low on the February 2, 2009 report.

Plaintiffs pay homage to traditional recitals of First Amendment values, such as this quotation (First Amend. Compl., ¶¶ 64, 85, 93, 109), taken from *Montana Right to Life v. Eddlemann*, 999 F. Supp. 1380, 1384 (D. Mont., 1998): "The First Amendment is the pillar of a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open." The gravamen of their entire Complaint, however, is that the debate over Proposition 8 was *too* uninhibited and wide open, to the point that individual citizens may be deterred, by fear of hostile reaction, from supporting one side of the debate through contributions. Plaintiffs do not suggest that any particular increase would cure the infirmity, and Plaintiffs' evidence does not establish that a $100 itemized disclosure threshold has had any measurable effect on participation in ballot measure campaigns in any jurisdiction in the country.

**B.    The $100 Itemized Disclosure Threshold Survives Judicial Review Under Any Level of Scrutiny.**

The Supreme Court's *per curiam* opinion in *Buckley* provides the best possible guidance on the appropriate standard of review for California's $100 disclosure threshold. The State Defendants have quoted the Supreme Court's 1976 comments, revealing that the high court was certainly suspicious of the federal threshold, but nonetheless deferred to congressional judgment in the matter after concluding that: "We cannot say, on this bare record, that the limits designated are wholly without rationality." *Id*. 424 U.S. at 83.

The record before this Court on Plaintiffs' hurried motion is likewise sparse. Plaintiffs rely on individual declarations to suggest, albeit not directly, that California's disclosure thresholds are too low. Plaintiffs do not propose any threshold that they believe would be adequate, but rely on discussion of inapposite case law finding that Vermont's contribution limits, already too low to permit a typical candidate to fund a competitive challenge, would be further eroded by inflation. The implication drawn from this spurious argument, that California's disclosure

29

1  threshold has become too low to satisfy First Amendment requirements, is unsupported either by

2  an argument that the analysis appropriate to contribution limits is applicable to disclosure

3  thresholds, or by evidence that California's campaign disclosure provisions have reduced speech

4  in ballot measure campaigns.  Spending on ballot measures in California has actually *increased*

5  over the years, not decreased as Plaintiffs' strained argument would predict.

6       California is smaller than the United States as a whole, and so are its election campaigns.  It

7  is therefore understandable that California's disclosure threshold, like those of most other states,

8  is lower than the federal benchmark.  Even statewide election campaigns in California are smaller

9  than presidential elections, and the law Plaintiffs challenged in this action governs not only

10  statewide campaigns, but also smaller, more local contests.  This Court may take judicial notice

11  of the fact that elections in California include local elections and ballot measure contests in 58

12  counties and hundreds of smaller cities and towns.  Some of these counties have voting-age

13  populations of fewer than 10,000, and some of their cities and towns can marshal only a few

14  hundred voters.  The disclosure threshold at issue in this case is the same for all of these

15  jurisdictions, because a series of graduated thresholds for ever-smaller jurisdictions would make it

16  burdensome for committees to keep track of the varying disclosure requirements in all the

17  California jurisdictions where a committee might want to raise and spend campaign funds.

18       Plaintiffs have made no attempt to show that there is a funding "crisis" of the sort that

19  might actually support their claims in this lawsuit – that financial contributions to ballot measure

20  contests have declined (in time-adjusted funding) from a golden age prior to the introduction of

21  campaign disclosure laws. Plaintiffs likewise neglect to consider the obvious role that disclosure

22  thresholds play in providing information necessary for monitoring compliance with state and

23  federal law, and the role played in promoting First Amendment interests in speech and

24  association. These First Amendment benefits pervade case law discussion of campaign reporting

25  and disclosure rules, to the point that only in quite rare circumstances have courts held that

26  individuals or groups may be exempted from such disclosure provisions.

27       If this Court were to move beyond the "rational basis" scrutiny applied in *Buckley* to review

28  the federal disclosure threshold in 1976, the provisions at bar would survive even "strict"

scrutiny.  The Ninth Circuit held that California has a "compelling" interest "in providing the electorate with information related to election and ballot issues."  (*See* especially the extended discussion in *CPLC II*, especially at footnotes 8 and 9.)

As to the second half of the "strict scrutiny" standard, *CPLC II* teaches as follows:

> In determining whether legislation is narrowly tailored, we consider whether the restriction "(1) promotes a substantial government interest that would be achieved less effectively absent the regulation, and (2) [does] not burden substantially more speech than is necessary to further the government's legitimate interests."

*CPLC II*, 507 F.3d at 1183.[21]

The State Defendants have advanced a number of "substantial" state interests in public identification of contributors to ballot measure campaigns, including the necessity of such information to monitor compliance with state and federal law. Plaintiffs have made no showing of how the disclosure threshold might be *more* "narrowly tailored."  Because of the preliminary stage of this proceeding, this Court cannot even determine how high the disclosure threshold would have to be adjusted simply to ensure that all of Plaintiffs' declarants might remain anonymous.

But the fact is that Plaintiffs have completely failed to adduce any evidence that the disclosure threshold is too low to pass constitutional muster.  Even under the strictest scrutiny, Plaintiff cannot show a likelihood of success on the merits of Count Two.  It is important to note in this regard that, to pass even "strict scrutiny" a statute need not be the "least restrictive alternative."  As the *Buckley* court observed in its discussion of *contribution limits*: "[A] court has no scalpel to probe whether, say, a $2,000 ceiling might serve as well as $1,000.  *Buckley, supra*, 424 U.S. at 30.  Thus even under strict scrutiny, this Court should be reluctant to issue an injunction to second-guess a limit or threshold that Plaintiffs think should be increased by a factor of two or three.  When the unquestioned federal disclosure threshold requires committees to identify contributors of $200 or more, California's threshold of $100 represents a legislative

_____

[21] The Ninth Circuit also observed within its analysis that: "To be narrowly tailored, a statute need not be the least restrictive means of furthering the government's interests, but the restriction may not burden substantially more speech than necessary to further the interests."  *Id.* at 1186.

1 judgment that the courts should not disturb, particularly in the absence of any evidence of

2 constitutionally cognizable injury.

3      Under the Act as passed in 1974, committees are required to disclose the following

4 information for contributions of more than $100:  the contributor's name, street address,

5 occupation and employer, the date and amount received, and the cumulative amount from that

6 contributor.  Cal. Gov't Code § 84211(f).  When the Online Disclosure Act was passed in 1997,

7 amending the Act, the Legislature made important judgments about what contributor information

8 should be made publicly available on the Internet.  The Online Disclosure Act specifically

9 provides with respect to campaign contributor information, that "[t]he data made available on the

10 Internet shall not contain the street name and building number of the persons or entity

11 representatives listed on the electronically filed forms or any bank account number required to be

12 disclosed pursuant to this title."  *Id*. at § 84602(d).  After careful consideration by the legislature,

13 the Act now directs the Secretary of State not to make contributor addresses available online.

14 Thus, under any level of judicial scrutiny, the State's $100 threshold survives Plaintiffs'

15 challenge.

16

17     **C.    The Post-Election Reporting Requirement.**

18      Count Three, which challenges the constitutionality of post-election campaign reporting,

19 stakes out a fallback position.  If Plaintiffs are otherwise unable to establish that California's

20 campaign reporting rules violate the First Amendment, Plaintiffs argue that, at the least, post-

21 election reporting exposes newly-identified donors without any corresponding state interest.  As

22 Plaintiffs put it, "[t]o the extent that the state's Informational Interest is a valid compelling

23 interest justifying compelled disclosure, that interest ceases to exist the moment the last ballot is

24 cast for the measure." First Amend. Compl., ¶ 105.

25      True, California waits nearly three months after the election before the final reports are due,

26 and for good reason.  If it were possible to obtain complete and accurate real-time information

27 from campaign committees in the period immediately preceding an election, California would do

28 so.  But it is not possible. That is why California, like every other sizeable jurisdiction in the

country, gives committees the time they need to assemble and report this information accurately, some of which (such as invoices from providers of goods and services) does not reach the committees until well after Election Day. Indeed, many committees continue to incur expenses for weeks or months after the election, whether in winding down their operations, paying off vendors and staff, or engaging in election contests or recounts.

Plaintiffs do not and cannot allege that the State seeks information different in nature from the information sought *prior* to the election; it seeks only information unavailable at the time a committee submitted its final pre-election report. Nor do Plaintiffs allege any First Amendment burden different in character or extent from the burdens they allege in the other Counts. As Plaintiffs recognize, this Court will reach Count 3 only if it concludes that the State Defendants have not violated the Constitution as alleged in their other counts. What Plaintiffs assert in Count 3 is simply that information legitimately required before the election can no longer be justified after the polls close.

This contention overlooks an obvious fact. The information provided by virtually any campaign committee will be incomplete until the committee has wound up its affairs. If a committee's accounts show remaining funds on Election Day, it would not be possible to know what became of that money thereafter, unless the committee accounted for all income and expenditures at some time after the election. California, and its voters, properly require such an accounting to prevent peculation, kickbacks and other improper uses of campaign funds which, if widespread, would undermine the confidence of voters in their most fundamental democratic institution, the election process.

Ballot measure committees are required, in short, to balance their books and render full account to the public of their funding, the sources thereof, their disbursements, and the recipients thereof – something that cannot be done until after the election is over.

There are other, less obvious concerns, for example *sub rosa* arrangements to hide major (often unpopular) donors that become apparent when funds pour in during the final weeks from persons who work for a common employer who wishes to "launder" a large contribution by

1  routing the money through a series of smaller contributions from employees, only to later be
2  reimbursed.

3      Knowledge of the identity of campaign contributors, both large and small, furthers First
4  Amendment interests in speech and assembly, a fact familiar to any voter who has ever donated
5  money to a political candidate or cause.  Shared donor information has always been an important
6  means of connecting and energizing like-minded people to speak out still more on the candidates
7  and issues they support or oppose.  By contrast, the use of such information to compile an
8  "enemies list" is not well documented as a widespread problem, even in Plaintiffs' evidence.  To
9  the extent that private persons access donor databases, there is no evidence that other goals
10  predominate over fundraising and networking.

11      First Amendment interests are *not* advanced by a proposal to eliminate a source of
12  information that promotes grassroots, neighbor-to-neighbor networking, from a fear that in rare
13  cases unscrupulous individuals may use the information to violate civil or criminal law.  As the
14  recent campaign by President Obama vividly illustrates, a candidate or measure can prosper when
15  able to advertise the backing of an abundance of small, non-institutional donors.  When available,
16  information on those who contribute to or support an issue (i.e., the woman down the street, the
17  couple next door, your doctor, etc.) is a significant "intangible" that encourages other voters to
18  join in.

19      **D.    The Post-Election Reporting Requirement Survives Judicial
             Review Under Any Level of Scrutiny.**
20

21      If this Court follows the Ninth Circuit in concluding that "the government's interest in
22  providing the electorate with information related to election and ballot issues is well established"
23  (*CPLC II*, 507 F.3d at 1179, n.8), it goes without saying that a requirement that this information
24  be accurate and complete "furthers a substantial government interest that would be achieved less
25  effectively absent the regulation." *Id*. at 1183.  California's requirement that committees render
26  an accounting after the election is over, when the committee is able, *for the first time*, to give a
27  complete account of its financial activities through to Election Day and beyond (when it is paying
28  its last campaign-related bills and/or winding down its affairs), cannot be said to "burden

34

1    substantially more speech than is necessary to further the government's legitimate interests." *Id*.

2    In fact, a requirement that committees render a full and accurate accounting of their financial

3    affairs during a campaign by a post-election report is the "least restrictive means" to vindicate

4    California's informational interest.

5           Thus if the Court concludes that California has a constitutionally sufficient interest in the

6    identification of donors to Plaintiffs' committees, the requirement of a post-election campaign

7    report satisfies the most rigorous standard of review that a court can apply.  Post-election

8    reporting is the *only* way to establish that a committee's books actually balance out and

9    demonstrate compliance with state and federal law.

10   **III.    PLAINTIFFS FACE NO THREAT OF IRREPARABLE HARM.**

11          Plaintiffs argue that this Court should presume they will suffer irreparable harm should

12   their motion be denied because they allege First Amendment violations.  Memo ISO of PI at 33.

13   However, as the district court held in *Emily's List v. Federal Election Commission*, 362 F. Supp.

14   2d 43, 57-58 (D.D.C., 2005), even in cases challenging campaign finance regulations under the

15   First Amendment, a litigant must do more than merely allege the violation of First Amendment

16   rights.  Instead, the alleged harm be "actual and not theoretical," and "of such *imminence* that

17   there is a clear and present need for equitable relief to prevent irreparable harm."  *Ibid.* (internal

18   quotations omitted; emphasis in original).  Here, as the court found in *Emily's List,* the challenged

19   campaign finance laws "do not in fact prevent Plaintiff from engaging in whatever political

20   speech it seeks to undertake."  *Ibid*.  Plaintiffs have submitted no competent evidence

21   demonstrating otherwise.  Thus, Plaintiffs cannot plausibly argue that compliance with

22   California's disclosure laws will imminently prohibit them from engaging in their desired

23   political speech.

24   **IV.    FOR PURPOSES OF A PRELIMINARY INJUNCTION, THE BALANCE OF HARDSHIPS
         WEIGHS IN FAVOR OF MAINTAINING THE STATUS QUO.**
25

26          As explained above, it is well established that a state's interest in disclosure of campaign

27   contributors of $100 or more is of the highest order, especially in the context of ballot measure

28   elections.  *CPLC I*, 328 F.3d at 1105.  As the Ninth Circuit recognized, "[a]t least by knowing

                                                35

who backs or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation." *Id.* The State's interest in providing the electorate with the information necessary to competently legislate at the ballot box when faced with an often complex morass of initiatives can be most effectively advanced through its disclosure requirements. And the State's interest does not abruptly end at the closing of the polls. The public is entitled to a complete an accurate picture of the political playing field – a picture that can only be provided to them by post-election reporting requirements. These requirements are the least restrictive means of achieving the State's compelling interests.

For the same reasons described above in Section I. D., Plaintiffs have failed to demonstrate any measurable burden imposed by the campaign finance disclosure requirements they challenge, and certainly no risk of irreparable harm. Even assuming the *Buckley/Brown* disclosure exemption were to apply in this case, Plaintiffs' evidence fails to demonstrate a reasonable probability that any alleged fear of reprisal and any resulting impact on their ability to engage in political speech rises to the level that the Supreme Court has found justifies an exemption. Thus, maintaining the status quo will simply require Plaintiffs to keep doing what they had been doing throughout the election. The minimal burden placed on Plaintiffs, as with all other ballot measure committees in California, is strongly outweighed by the State's interest in disclosure.

## CONCLUSION

For all of the foregoing reasons, the State Defendants respectfully request that the Court deny the motion for preliminary injunction in its entirety.

| | |
|---|---|
| 1 | Dated: January 22, 2009 |

Respectfully Submitted,

EDMUND G. BROWN JR.
Attorney General of California
DOUGLAS J. WOODS
Supervising Deputy Attorney General

/s/ Zackery P. Morazzini
ZACKERY P. MORAZZINI
Deputy Attorney General
*Attorneys for Defendants*

*Fair Political Practices Commission*
SCOTT HALLABRIN, *General Counsel*
LAWRENCE T. WOODLOCK

/s/ Lawrence T. Woodlock
*LAWRENCE T. WOODLOCK Attorneys for*
*Defendants Members of the Fair Political*
*Practices Commission*

SA2009307359
Document in ProLaw