1   EDMUND G. BROWN JR., SBN: 37100
    Attorney General of California
2   CHRISTOPHER E. KRUEGER, SBN: 173288
    Senior Assistant Attorney General
3   DOUGLAS J. WOODS, SBN: 161531
    Supervising Deputy Attorney General
4   SETH E. GOLDSTEIN, SBN: 238228
    ZACKERY P. MORAZZINI, SBN: 204237
5   Deputies Attorney General
    1300 I Street, Suite 125
6   P.O. Box 944255
    Sacramento, CA 94244-2550
7   Telephone: (916) 445-8226
    Fax: (916) 324-5567
8   E-mail: Zackery.Morazzini@doj.ca.gov
    *Attorneys for Defendants Debra Bowen, California*
9   *Secretary of State; Edmund G. Brown Jr., California*
    *Attorney General*
10
    SCOTT HALLABRIN, General Counsel, SBN: 076662
11  LAWRENCE T. WOODLOCK, SBN: 137676
    Fair Political Practices Commission
12  428 J Street, Suite 800
    Sacramento, CA 95814
13  Telephone: (916) 322-5660
    Fax: (916) 327-2026
14  E-mail: lwoodlock@fppc.ca.gov
    *Attorneys for Defendants Members of the Fair*
15  *Political Practices Commission*

16

17                IN THE UNITED STATES DISTRICT COURT

18              FOR THE EASTERN DISTRICT OF CALIFORNIA

19

| | |
|---|---|
| 20  **PROTECTMARRIAGE.COM, ET AL.,** | 2:09-cv-00058-MCE-DAD |
| 21                          Plaintiffs, | **DECLARATION OF LAWRENCE T.** |
| 22           v. | **WOODLOCK IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR** |
| 23 | **PRELIMINARY INJUNCTION** |
| 24  **DEBRA BOWEN, SECRETARY OF STATE FOR THE STATE OF CALIFORNIA, ET AL.,** | Date: January 29, 2009 |
| 25                          Defendants. | Time: 11 a.m. Courtroom: 7 |
| 26 | Judge Morrison C. England, Jr. Trial Date: None Set |
| 27 | Action Filed: January 7, 2009 |

28

1

I, Lawrence T. Woodlock, declare as follows:

1. I am an attorney at law licensed to practice by the state of California, and am admitted to practice before this Court. I am employed by the California Fair Political Practices Commission. I have personal knowledge of the matters set forth below and if called to testify as to these matters, I could competently do so.

2. Attached to this Declaration as Exhibit A is a true and accurate copy of a document entitled *The Campaign Disclosure Law Database*, published by the Campaign Disclosure Project, which is supported by the UCLA School of Law, the Center for Governmental Studies, and the California Voter Foundation, with support by the Pew Charitable Trusts. This document contains a summary of the laws requiring public disclosure of the name of persons who make political contributions at or above a specified amount, as required by the law of 50 states, the District of Columbia, and of the United States. It is available online at:

http://disclosure.law.ucla.edu/

3. Attached to this Declaration as Exhibit B is a true and accurate copy of Table 8.1, illustrating the growth of total spending on initiatives in California from the years 1976 through 2006, reproduced from Chapter 8 of a book published by the Center for Governmental Studies entitled <u>Democracy by Initiative: Shaping California's Fourth Branch of Government</u>, 2d Edition, 2008. The book is available for review in its entirety online at:

http://www.cgs.org/index.php?option=com_content&view=article&id=164:PUBLICATIONS&catid=39:all_pubs&Itemid=72.

4. Attached to this Declaration as Exhibit C is a true and accurate copy of the Order Denying Plaintiffs Motion for Summary Judgment, filed January 8, 2009 in *Human Life of Washington, Inc. v. Brumsickle, et al.*, Case No. C08-0590 in the District Court for the Western District of Washington at Seattle. I received a copy of this Order as a .pdf attachment to an email message sent to me by the Washington Public Disclosure Commission on January 9, 2009.

2

1       I declare under the laws of the United States that the foregoing is true of my own

2  knowledge, and that this declaration was executed in Sacramento, California on January 22, 2009.

3

4

5  By: _Lawrence L. Woodlock_

6         Lawrence T. Woodlock

7         Senior Counsel, Fair Political Practices Commission

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Declaration of Lawrence T. Woodlock in Support of State Defendants'
Opposition to Plaintiffs' Motion for Preliminary Injunction

# EXHIBIT A



THE
CAMPAIGN DISCLOSURE
Bringing sunlight                            PROJECT
to political money in the fifty states

A project of the UCLA School of Law, the Center for Governmental Studies, and the California
Voter Foundation, supported by The Pew Charitable Trusts

# The Campaign Disclosure Law Database

Start over          « Back

**52 state(s) have laws in this category**

### Alabama
**Contributor Information: Are committees required to report the contributor's name?**
**AL ST § 17-5-8**

AL ST § 17-5-8 (c) (2)

(c) Each report under this section shall disclose:
(2) The identification of each person who has made contributions to such committee or candidate within the calendar year in an aggregate amount greater than one hundred dollars ($100), together with the amount and date of all such contributions; provided, however, in the case of a political action committee identification shall mean the name and city of residence of each person who has made contributions within the calendar year in an aggregate amount greater than one hundred dollars ($100).

### Alaska
**Contributor Information: Are committees required to report the contributor's name?**
**AS 15.13.040**

AS 15.13.040 (a)

(a) Except as provided in (g) and (l) of this section, each candidate shall make a full report, upon a form prescribed by the commission,
(1) listing
(A) the date and amount of all expenditures made by the candidate;
(B) the total amount of all contributions, including all funds contributed by the candidate;
(C) the name, address, date, and amount contributed by each contributor; and
(D) for contributions in excess of $250 in the aggregate during a calendar year, the principal occupation and employer of the contributor; and

### Arizona
**Contributor Information: Are committees required to report the contributor's name?**
**A.R.S. § 16-915; A.R.S. § 16-901**

A.R.S. § 16-915 (A) (3) (a)

A. Each campaign finance report required by § 16-913 shall set forth all of the following:

3. The identification of each:
(a) Individual who makes any contribution during the period covered by the report whose total contribution or contributions for that election have an aggregate amount exceeding twenty-five dollars together with the date and amount of the contributions, except as provided in subsection E of this section. Contributions of twenty-five dollars or less may be aggregated.

A.R.S. § 16-901 (12)

12. "Identification" means:
(a) For an individual, his name and mailing address, his occupation and the name of his employer.
(b) For any other person, including a political committee, the full name and mailing address of the person. For a political committee, identification includes the identification number issued on the filing of a statement of organization pursuant to § 16-902.

**Arkansas**
**Contributor Information: Are committees required to report the contributor's name?**
**AR ST § 7-6-207**

AR ST § 7-6-207 (b)(1)(B)

(1) The contribution and expenditure reports required by subsection (a) of this section shall indicate:
(B) The name and address of each person, including the candidate, who made a contribution or contributions which, in the aggregate, exceed fifty dollars ($50.00), the contributor's place of business, employer, occupation, and date of the contribution and the amount contributed;

**California**
**Contributor Information: Are committees required to report the contributor's name?**
**CA GOVT § 84211**

CA GOVT § 84211 (f)

Each campaign statement required by this article shall contain all of the following information:
...
(f) If the cumulative amount of contributions (including loans) received from a person is one hundred dollars ($100) or more and a contribution or loan has been received from that person during the period covered by the campaign statement, all of the following:
(1) His or her full name.
(2) His or her street address.
(3) His or her occupation.
(4) The name of his or her employer, or if self-employed, the name of the business.
(5) The date and amount received for each contribution received during the period covered by the campaign statement and if the contribution is a loan, the interest rate for the loan.
(6) The cumulative amount of contributions.

**Colorado**
**Contributor Information: Are committees required to report the contributor's name?**
**CO ST § 1-45-108**

CO ST § 1-45-108 (1)(a)(I)

(1)(a)(I) All candidate committees, political committees, issue committees, small donor committees, and political parties shall report to the appropriate officer their contributions received, including the name and address of each person who has contributed twenty dollars or more; expenditures made, and obligations entered into by the committee or party.

**Connecticut**
**Contributor Information: Are committees required to report the contributor's name?**
**CT ST § 9-608**

CT ST § 9-608 (c)(1)(A)

(c) (1) Each statement filed under subsection (a), (e) or (f) of this section shall include, but not be limited to: (A) An itemized accounting of each contribution, if any, including the full name and complete address of each contributor and the amount of the contribution;

**Delaware**
**Contributor Information: Are committees required to report the contributor's name?**
**DE ST TI 15 § 8030**

DE ST TI 15 § 8030 (d) (2)

(d) Each report under this section shall disclose all of the following information, for the entire reporting period:

(2) Full name and mailing address of each person who has made contributions to such political committee (including the purchase of tickets for events such as dinners, luncheons, rallies and similar fund-raising events, whether or not the tickets were used by the person who paid for them) during the election period in an aggregate amount or value in excess of $100, the total of all contributions from such person during the election period, and the amount and date of all contributions from such person during the reporting period;

**District of Columbia**
**Contributor Information: Are committees required to report the contributor's name?**
**DC ST § 1-1102.06**

DC ST § 1-1102.06 (b) (2)

(b) Each report under this section shall disclose:

(2) The full name and mailing address (including the occupation and the principal place of business, if any) of each person who has made 1 or more contributions to or for such committee or candidate (including the purchase of tickets for events such as dinners, luncheons, rallies, and similar fundraising events) within the calendar year in an aggregate amount or value in excess of $50 or more, together with the amount and date of such contributions;

**Florida**
**Contributor Information: Are committees required to report the contributor's name?**
**FL ST § 106.07**

FL ST § 106.07 (4)(a)(1)

(4)(a) Each report required by this section shall contain:
1. The full name, address, and occupation, if any of each person who has made one or more contributions to or for such committee or candidate within the reporting period, together with the amount and date of such contributions. For corporations, the report must provide as clear a description as practicable of the principal type of business conducted by the corporation. However, if the contribution is $100 or less or is from a relative, as defined in s. 112.312, provided that the relationship is reported, the occupation of the contributor or the principal type of business need not be listed.

**Georgia**
**Contributor Information: Are committees required to report the contributor's name?**
**GA ST § 21-5-34**

GA ST § 21-5-34 (b) (1) (A)

(b)(1) All reports shall list the following:
(A) As to any contributions of $101.00 or more, its amount and date of receipt, the election for which the contribution has been accepted and allocated, along with the name and mailing address of the contributor, and, if the contributor is an individual, that individual's occupation and the name of his or her employer. Such contributions shall include, but shall not be limited to, the purchase of tickets for events such as dinners, luncheons, rallies, and similar fundraising events coordinated for the purpose of raising campaign contributions for the reporting person;

**Hawaii**
**Contributor Information: Are committees required to report the contributor's name?**
**HI ST § 11-212**

HI ST § 11-212 (a)(2)(B)

(2) Each report shall be certified pursuant to section 11-195 and shall contain the following information which shall be current through June 30 prior to the filing of the report filed on the thirty-first of July and fifth calendar day prior to the filing of other preliminary reports:
...
(B) The amount and date of deposit of the contribution and the name and address of each donor who contributes an aggregate of more than $100 during an election period, which has not previously been reported; provided that if all the information is not on file, the contribution shall be returned to the donor within thirty days of deposit;

**Idaho**
**Contributor Information: Are committees required to report the contributor's name?**
**ID ST § 67-6612**

ID ST § 67-6612 (a) (1)

(a) A statement filed under sections 67-6607, 67-6608 or 67-6610, Idaho Code, shall set forth:
(1) Under contributions, a list of all the contributions received, including funds or property of the candidate used to cover expenditures. The statement shall list the full name and complete address of each person who contributed an aggregate amount of more than fifty dollars ($50.00), and the amount contributed by that person. The statement may list as a single item the total amount of contributions of fifty dollars ($50.00) or less each obtained in similar fashion.

**Illinois**
**Contributor Information: Are committees required to report the contributor's name?**
**10 ILCS 5/9-12**

10 ILCS 5/9-12 (3)

§ 9-12. Each report of campaign contributions required by Section 9-10 of this Article to be filed with the Board or the Board and the county clerk shall be verified, dated, and signed by either the treasurer of the political committee making the report or the candidate on whose behalf the report is made, and shall contain substantially the following:
...
(3) the full name and mailing address of each person who has made one or more contributions to or for the committee within the reporting period in an aggregate amount or value in excess of $150, together with the amount and date of such contributions, and if a contributor is an individual who contributed more than $500, the occupation and employer of each

contributor or, if the occupation and employer of the contributor are unknown, a statement that the committee has made a good faith effort to ascertain this information:


**Indiana**
**Contributor Information: Are committees required to report the contributor's name?**
**IN ST 3-9-5-14**


IN ST 3-9-5-14 (b) (3)

(b) The report of each committee's treasurer must disclose the following:
...
(3) The following information regarding each person who has made one (1) or more contributions within the year, in an aggregate amount that exceeds the threshold contribution amount in actual value to or for the committee, including the purchase of tickets for events such as dinners, luncheons, rallies, and similar fundraising events:
(A) The full name of the person.
(B) The full mailing address of the person making the contribution.
(C) The person's occupation, if the person is an individual who has made contributions to the committee of at least one thousand dollars ($1,000) during the calendar year.
(D) The date and amount of each contribution.


**Iowa**
**Contributor Information: Are committees required to report the contributor's name?**
**IA ST § 68A.402A**


IA ST § 68A.402A (1) (b)

1. Each report filed under section 68A.402 shall disclose:
b. The name and mailing address of each person who has made one or more contributions of money to the committee when the aggregate amount in a calendar year exceeds the amount specified in the following schedule:
(1) For any candidate for school or other political subdivision
office: ............................................................. $ 25
(2) For any candidate for city office: .............................. $ 25
(3) For any candidate for county office: ........................... $ 25
(4) For any candidate for the general assembly: ..................... $ 25
(5) For any candidate for statewide office: ......................... $ 25
(6) For any state statutory political committee: .................... $200
(7) For any county statutory political committee: ................... $ 50
(8) For any political committee: .................................... $ 25


**Kansas**
**Contributor Information: Are committees required to report the contributor's name?**
**KS ST § 25-4148**


KS ST § 25-4148 (b) (2)

(b) Each report required by this section shall state:
...
(2) the name and address of each person who has made one or more contributions in an aggregate amount or value in excess of $50 during the election period together with the amount and date of such contributions, including the name and address of every lender, guarantor and endorser when a contribution is in the form of an advance or loan;

**Kentucky**
Contributor Information: Are committees required to report the contributor's name?
KY ST § 121.180

KY ST § 121.180 (3) (a) (2)

2. For each contribution in excess of one hundred dollars ($100) made to a candidate or slate of candidates for a statewide-elected state office, or to a campaign committee for a candidate or slate of candidates for a statewide- elected state office, the date, name, address, occupation, and employer of each contributor and the spouse of the contributor or, if the contributor or spouse of the contributor is self-employed, the name under which he is doing business, and the amount contributed by each contributor; and

**Louisiana**
Contributor Information: Are committees required to report the contributor's name?
LA R.S. 18:1495.5

LA R.S. 18:1495.5 (B) (4) (a)

(4) Contribution(s) received during the reporting period for which the report is being completed shall be reported, and the same shall be reported irrespective of the amount thereof as follows.
(a) The full name and address of each person who has made one or more contributions to and which have been received and accepted by the candidate during the reporting period; the aggregate amount of such contributions, except in-kind contributions, from each person, and the date and amount of each such contribution; and a brief description of each in-kind contribution from each person, the valuation thereof made by the candidate and the campaign treasurer, and the date(s) of the in-kind contribution.

**Maine**
Contributor Information: Are committees required to report the contributor's name?
21-A M.R.S.A. § 1017

21-A M.R.S.A. § 1017 (5)

5. Content. A report required under this section must contain the itemized accounts of contributions received during that report filing period, including the date a contribution was received, and the name, address, occupation, principal place of business, if any, and the amount of the contribution of each person who has made a contribution or contributions aggregating in excess of $50. The report must contain the itemized expenditures made or authorized during the report filing period, the date and purpose of each expenditure and the name of each payee and creditor. Total contributions with respect to an election of less than $500 and total expenditures of less than $500 need not be itemized. The report must contain a statement of any loan to a candidate by a financial institution in connection with that candidate's candidacy that is made during the period covered by the report, whether or not the loan is defined as a contribution under section 1012, subsection 2, paragraph A. Until December 31, 1992, the candidate is responsible for the timely and accurate filing of each required report. Beginning January 1, 1993, the candidate and the treasurer are jointly responsible for the timely and accurate filing of each required report.

**Maryland**
Contributor Information: Are committees required to report the contributor's name?
MD ELEC LAW § 13-304; http://www.elections.state.md.us/pdf/summary_guide/s1.pdf (last checked 11/01/07)

MD ELEC LAW § 13-304

Content
(b) A campaign finance report filed by a campaign finance entity under subsection (a) of this section shall include the information required by the State Board with respect to all contributions received and all expenditures made by or on behalf of

the campaign finance entity during the designated reporting period.

Note: The statute does not explicitly enumerate the contents of reports, but leaves it to the State Board. The above-cited disclosure form asks for the name of the contributor to be disclosed.


**Massachusetts**
**Contributor Information: Are committees required to report the contributor's name?**
**MA ST 55 § 18**


MA ST 55 § 18 (h) (2)

Each report required to be filed under the provisions of this section by a candidate or political committee shall disclose:

(2) the full name and residential address, listed alphabetically, of each person who has made a contribution, except for those contributions identified in clauses (4), (5) and (6) and which shall be reported therein, in an amount or value in excess of fifty dollars in the reporting period, and such information for each contribution of less than or equal to the sum of fifty dollars, if the aggregate of all contributions received from such contributor within said reporting period is in excess of fifty dollars, as the case may be, and the amount or value and date of the contribution and the total of all contributions listed;


**Michigan**
**Contributor Information: Are committees required to report the contributor's name?**
**MI ST 169.226**


MI ST 169.226 (1) (e)

(1) A campaign statement of a committee, other than a political party committee, required by this act shall contain all of the following information:

(e) The full name of each individual from whom contributions are received during the period covered by the campaign statement, together with the individual's street address, the amount contributed, the date on which each contribution was received, and the cumulative amount contributed by that individual. The occupation, employer, and principal place of business shall be stated if the individual's cumulative contributions are more than $100.00.


**Minnesota**
**Contributor Information: Are committees required to report the contributor's name?**
**MN ST § 10A.20**


MN ST § 10A.20 (Subd. 3) (b)

(b) The report must disclose the name, address, and employer, or occupation if self-employed, of each individual or association that has made one or more contributions to the reporting entity, including the purchase of tickets for a fund-raising effort, that in aggregate within the year exceed $100 for legislative or statewide candidates or ballot questions, together with the amount and date of each contribution, and the aggregate amount of contributions within the year from each source so disclosed. A donation in kind must be disclosed at its fair market value. An approved expenditure must be listed as a donation in kind. A donation in kind is considered consumed in the reporting period in which it is received. The names of contributors must be listed in alphabetical order. Contributions from the same contributor must be listed under the same name. When a contribution received from a contributor in a reporting period is added to previously reported unitemized contributions from the same contributor and the aggregate exceeds the disclosure threshold of this paragraph, the name, address, and employer, or occupation if self-employed, of the contributor must then be listed on the report.


**Mississippi**

**Contributor Information: Are committees required to report the contributor's name?**
MS ST § 23-15-807

MS ST § 23-15-807 (d) (ii)

(d) Contents of reports. Each report under this article shall disclose:

(ii) The identification of:
1. Each person or political committee who makes a contribution to the reporting candidate or political committee during the reporting period, whose contribution or contributions within the calendar year have an aggregate amount or value in excess of Two Hundred Dollars ($200.00) together with the date and amount of any such contribution;

**Missouri**
**Contributor Information: Are committees required to report the contributor's name?**
MO ST 130.041

MO ST 130.041 (1) (3) (a, e)

1. Except as provided in subsection 5 of section 130.016, the candidate, if applicable, treasurer or deputy treasurer of every committee which is required to file a statement of organization, shall file a legibly printed or typed disclosure report of receipts and expenditures. The reports shall be filed with the appropriate officer designated in section 130.026 at the times and for the periods prescribed in section 130.046. Except as provided in sections 130.049 and 130.050, each report shall set forth:

(3) Receipts for the period, including:

(a) Total amount of all monetary contributions received which can be identified in the committee's records by name and address of each contributor. In addition, the candidate committee shall make a reasonable effort to obtain and report the employer, or occupation if self-employed or notation of retirement, of each person from whom the committee received one or more contributions which in the aggregate total in excess of one hundred dollars and shall make a reasonable effort to obtain and report a description of any contractual relationship over five hundred dollars between the contributor and the state if the candidate is seeking election to a state office or between the contributor and any political subdivision of the state if the candidate is seeking election to another political subdivision of the state;

(e) A separate listing by name and address and employer, or occupation if self-employed or notation of retirement, of each person from whom the committee received contributions, in money or any other thing of value, aggregating more than one hundred dollars, together with the date and amount of each such contribution;

**Montana**
**Contributor Information: Are committees required to report the contributor's name?**
MT ST 13-37-229

MT ST 13-37-229 (2)

Each report required by this chapter shall disclose the following information:

(2) the full name, mailing address, occupation, and employer, if any, of each person who has made aggregate contributions, other than loans, of $35 or more to a candidate or political committee, including the purchase of tickets and other items for events, such as dinners, luncheons, rallies, and similar fundraising events;

**Nebraska**
**Contributor Information: Are committees required to report the contributor's name?**
NE ST § 49-1455

NE ST § 49-1455 (1) (d)

(1) The campaign statement of a committee, other than a political party committee, shall contain the following information:

(d) The full name of each individual from whom contributions totaling more than two hundred fifty dollars are received during the period covered by the report, together with the individual's street address, the amount contributed, the date on which each contribution was received, and the cumulative amount contributed by that individual for the election period;

**Nevada**
**Contributor Information: Are committees required to report the contributor's name?**
**NV ST 294A.120**

NV ST 294A.120 (8)

8. The name and address of the contributor and the date on which the contribution was received must be included on the report for each contribution in excess of $100 and contributions which a contributor has made cumulatively in excess of that amount since the beginning of the current reporting period.

**New Hampshire**
**Contributor Information: Are committees required to report the contributor's name?**
**NH ST § 664:6 NH ST § 664:7**

NH ST § 664:6 (I-II)
I. Any political committee whose receipts or expenditures in support of a candidate, measure, or political party exceed $500 except, for the purposes of this paragraph only, the political committee of a political party or the political committee of a candidate, shall file with the secretary of state an itemized statement, signed by its chairman and treasurer showing each of its receipts exceeding $25 with the full name and home post office address of the contributor in alphabetical order and the amount of the contribution, the date it was received, and the aggregate total for each election for each contributor of over $100. The statement shall be filed not later than the Wednesday 12 weeks immediately preceding a primary election, before 5 o'clock in the afternoon, and shall cover the period from the day of the committee registration up to and including the Monday before the statement is due. All receipts of $25 or under shall appear on the statements as unitemized receipts. Any listing which exceeds an individual's aggregate total of $100 for each election shall be accompanied by the contributor's occupation including official job title, the name of the contributor's employer, and the city or town of the contributor's principal place of business, if any. The statement shall also show each committee expenditure with the full name and city or town of persons, corporations, committees, or to whomever paid or to be paid, the date paid, and the election for which the expenditure was made, with the specific nature and amount of each expenditure since the date of the registration.

II. A political committee shall file an itemized statement in the same form as in paragraph I with the secretary of state not later than the Wednesday 3 weeks immediately preceding a primary and a general election, before 5 o'clock in the afternoon. The statement shall summarize the period under paragraph I if a statement is filed and shall itemize all receipts and expenditures since the cutoff of that statement up until the Monday preceding the filing of the statement under this paragraph.

NH ST § 664:7
Each candidate at the primary or general election for governor, councilor, state senator, representative to general court, or county officer, who has expenditures exceeding $500, shall file statements before and after an election in like manner and detail as prescribed in RSA 664:6, II, II-a, III, IV, and V, excepting, however, the expenditures of political committees of the party to which the candidate belongs in elections other than primaries.

**New Jersey**
**Contributor Information: Are committees required to report the contributor's name?**
**NJ ST 19:44A-16**

NJ ST 19:44A-16 (a)

a. The campaign treasurer of each candidate committee and joint candidates committee shall make a full cumulative report, upon a form prescribed by the Election Law Enforcement Commission, of all contributions in the form of moneys, loans, paid personal services or other things of value, made to him or to the deputy campaign treasurers of the candidate committee or joint candidates committee, and all expenditures paid out of the election fund of the candidate or candidates, during the period ending with the second day preceding the date of the cumulative report and beginning on the date of the first of those contributions, the date of the first of those expenditures, or the date of the appointment of the campaign treasurer, whichever occurred first. The report shall also contain the name and mailing address of each person or group from whom moneys, loans, paid personal services or other things of value were contributed after the second day preceding the date of the previous cumulative report and the amount contributed by each person or group, and where an individual has made such contributions, the report shall indicate the occupation of the individual and the name and mailing address of the individual's employer. In the case of any loan reported pursuant to this section, the report shall further contain the name and mailing address of each person who cosigns such loan, the occupation of the person and the name and mailing address of the person's employer. If no moneys, loans, paid personal services or other things of value were contributed, the report shall so indicate, and if no expenditures were paid or incurred, the report shall likewise so indicate. The campaign treasurer and the candidate or several candidates shall certify the correctness of the report.

**New Mexico**
**Contributor Information: Are committees required to report the contributor's name?**
**NM ST § 1-19-31**

NM ST § 1-19-31 (A)

A. Each required report of expenditures and contributions shall be typed or printed legibly, or on a computer disc or format approved by the secretary of state, and shall include:
(1) the name and address of the person or entity to whom an expenditure was made or from whom a contribution was received, except as provided for anonymous contributions or contributions received from special events as provided in Section 1-19-34 NMSA 1978; provided that for contributors, the name of the entity or the first and last names of any individual shall be the full name of the entity or individual, and initials only shall not constitute a full name unless that is the complete legal name;
(2) the occupation or type of business of any person or entity making contributions of two hundred fifty dollars ($ 250) or more in the aggregate per election;
(3) the amount of the expenditure or contribution or value thereof;
(4) the purpose of the expenditure; and
(5) the date the expenditure was made or the contribution was received.

**New York**
**Contributor Information: Are committees required to report the contributor's name?**
**NY ELEC § 14-102**

NY ELEC § 14-102 (1)

1. The treasurer of every political committee which, or any officer, member or agent of any such committee who, in connection with any election, receives or expends any money or other valuable thing or incurs any liability to pay money or its equivalent shall file statements sworn, or subscribed and bearing a form notice that false statements made therein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law, at the times prescribed by this article setting forth all the receipts, contributions to and the expenditures by and liabilities of the committee, and of its officers, members and agents in its behalf. Such statements shall include the dollar amount of any receipt, contribution or transfer, or the fair market value of any receipt, contribution or transfer, which is other than of money, the name and address of the transferor, contributor or person from whom received, and if the transferor, contributor or person is a political committee; the name of and the political unit represented by the committee, the date of its receipt, the dollar amount of every expenditure, the name and address of the person to whom it was made or the name of and the political unit represented by the committee to which it was made and the date thereof, and shall state clearly the purpose of such expenditure. Any statement reporting a loan shall have attached to it a copy of the evidence of indebtedness. Expenditures in sums under fifty dollars need not be specifically accounted for by separate items in said statements, and receipts and contributions aggregating not more than ninety-nine dollars, from any one contributor need not be specifically accounted for by separate items in said statements, provided however, that such

expenditures, receipts and contributions shall be subject to the other provisions of section 14-118 of this article.

**North Carolina**
**Contributor Information: Are committees required to report the contributor's name?**
**NC ST § 163-278.11**

NC ST § 163-278.11 (a) (1)

(a) Statements filed pursuant to provisions of this Article shall set forth the following:
(1) Contributions. -- Except as provided in subsection (a1) of this section, a list of all contributions received by or on behalf of a candidate, political committee, or referendum committee. The statement shall list the name and complete mailing address of each contributor, the amount contributed, the principal occupation of the contributor, and the date such contribution was received. The total sum of all contributions to date shall be plainly exhibited. Forms for required reports shall be prescribed by the Board. As used in this section, "principal occupation of the contributor" means the contributor's:
a. Job title or profession; and
b. Employer's name or employer's specific field of business activity.

**North Dakota**
**Contributor Information: Are committees required to report the contributor's name?**
**ND ST 16.1-08.1-02**

ND ST 16.1-08.1-02 (2)

2. The candidate committee, or candidate for statewide office who does not have a candidate committee, and any candidate for legislative office shall include in the statement the name and mailing address of all contributors who contributed in excess of two hundred dollars in the aggregate during the reporting period to the candidate committee, or candidate for statewide office who does not have a candidate committee, and any candidate for legislative office, the aggregated amount of the reportable contributions from each contributor and the date the last reportable contribution from each contributor was received.

**Ohio**
**Contributor Information: Are committees required to report the contributor's name?**
**OH ST § 3517.10**

OH ST § 3517.10 (B) (4) (b)

(B) Except as otherwise provided in division (C)(7) of this section, each statement required by division (A) of this section shall contain the following information:

(4) A statement of contributions received, which shall include the following information:
(a) The month, day, and year of the contribution;
(b)(i) The full name and address of each person, political party, campaign committee, legislative campaign fund, political action committee, or political contributing entity from whom contributions are received and the registration number assigned to the political action committee under division (D)(1) of this section. The requirement of filing the full address does not apply to any statement filed by a state or local committee of a political party, to a finance committee of such committee, or to a committee recognized by a state or local committee as its fund-raising auxiliary. Notwithstanding division (F) of this section, the requirement of filing the full address shall be considered as being met if the address filed is the same address the contributor provided under division (E)(1) of this section.
(ii) If a political action committee, political contributing entity, legislative campaign fund, or political party that is required to file campaign finance statements by electronic means of transmission under section 3517.106 of the Revised Code or a campaign committee of a statewide candidate or candidate for the office of member of the general assembly receives a contribution from an individual that exceeds one hundred dollars, the name of the individual's current employer, if any, or, if the individual is self-employed, the individual's occupation and the name of the individual's business, if any;
(iii) If a campaign committee of a statewide candidate or candidate for the office of member of the general assembly receives a contribution transmitted pursuant to section 3599.031 of the Revised Code from amounts deducted from the wages and salaries

of two or more employees that exceeds in the aggregate one hundred dollars during any one filing period under division (A)(1), (2), (3), or (4) of this section, the full name of the employees' employer and the full name of the labor organization of which the employees are members, if any.

**Oklahoma**
**Contributor Information: Are committees required to report the contributor's name?**
**OK ST Ethics Commission 257:10-1-14**

OK ST Ethics Commission 257:10-1-14 (a)(3)(D)

(a) Basic reporting form. The campaign contributions and expenditures report shall include:

(3) the following information about monetary contributions, including loans, accepted from a person other than a committee:

(D) for other than out-of-state or federal committees, the name and address, occupation and employer, or principal business activity, of each contributor contributing in excess of fifty dollars ($ 50) in the aggregate during the reporting period; the date accepted, amount and nature (cash or written instrument) of each contribution by the contributor during the reporting period; and the total contributions of the contributor to the campaign-to-date for candidate committees and year-to-date for other committees;

**Oregon**
**Contributor Information: Are committees required to report the contributor's name?**
**OR ST § 260.083**

OR ST § 260.083 (1) (a) (A)

(1) A statement filed under ORS 260.057, 260.076 or 260.118 shall list:
(a) Except as provided in ORS 260.085, for a contribution:
(A) The name, occupation and address of each person, and the name and address of each political committee, that contributed an aggregate amount of more than $100 in a calendar year on behalf of a candidate or to a political committee and the total amount contributed by that person or political committee; and

**Pennsylvania**
**Contributor Information: Are committees required to report the contributor's name?**
**PA ST 25 P.S. § 3246**

PA ST 25 P.S. § 3246 (b) (2)

(b) Each report shall include the following information:

(2) The full name and mailing address of each person who has made one or more contributions to or for such committee or candidate within the reporting period in an aggregate amount or value in excess of fifty dollars ($50), together with the amount and date of such contributions. The accuracy of the information furnished by the contributor shall be the responsibility of the contributor.

**Rhode Island**
**Contributor Information: Are committees required to report the contributor's name?**
**RI ST § 17-25-11**

RI ST § 17-25-11 (a) (3)

(a) (3) A final report on the twenty-eighth (28th) day following the election. The report shall contain:
(i) The name and address and place of employment of each person from whom contributions in excess of a total of one hundred dollars ($100) within a calendar year were received;
(ii) The amount contributed by each person;
(iii) The name and address of each person to whom expenditures in excess of one hundred dollars ($100) were made; and
(iv) The amount and purpose of each expenditure.


**South Carolina**
**Contributor Information: Are committees required to report the contributor's name?**
**SC ST § 8-13-1308**


SC ST § 8-13-1308 (F) (2)

(F) Certified campaign reports detailing campaign contributions and expenditures must contain:
(2) the name and address of each person making a contribution of more than one hundred dollars and the amount and date of receipt of each contribution;


**South Dakota**
**Contributor Information: Are committees required to report the contributor's name?**
**SD ST § 12-27-24**


SD ST § 12-27-24 (14)

A campaign finance disclosure statement shall include the following information:

(14) The name, residence address, city, and state of each person contributing a contribution of more than one hundred dollars in the aggregate during the reporting period and the amount of the contribution. Any contribution from any political committee or political party shall be itemized. Any contribution from a federal political committee or political committee organized outside this state shall also include the name and internet website address of the filing office where campaign finance disclosure statements are regularly filed for the committee. If all of the information required is not on file, the political committee or political party may not deposit the contribution;


**Tennessee**
**Contributor Information: Are committees required to report the contributor's name?**
**TN ST § 2-10-107**


TN ST § 2-10-107 (a) (2) (A) (i)

(a) A statement filed under § 2-10-105 or § 2-10-106 shall consist of either:
(2)(A)(i) A statement setting forth, under contributions, a list of all the contributions received, including the full name, complete address, occupation, and employer of each person who contributed a total amount of more than one hundred dollars ($100) during the period for which the statement is submitted, and the amount contributed by that person;


**Texas**
**Contributor Information: Are committees required to report the contributor's name?**
**TX ELECTION § 254.031**


TX ELECTION § 254.031 (a) (1)

(a) Except as otherwise provided by this chapter, each report filed under this chapter must include:
(1) the amount of political contributions from each person that in the aggregate exceed $50 and that are accepted during the reporting period by the person or committee required to file a report under this chapter, the full name and address of the person making the contributions, and the dates of the contributions;

**United States**
**Contributor Information: Are committees required to report the contributor's name?**
**2 USCA § 434**

2 USCA § 434 (b) (3) (A)

(b) Contents of reports
Each report under this section shall disclose--

(3) the identification of each--
(A) person (other than a political committee) who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), or in any lesser amount if the reporting committee should so elect, together with the date and amount of any such contribution;

**Utah**
**Contributor Information: Are committees required to report the contributor's name?**
**UT ST § 20A-11-204 UT ST § 20A-11-101**

UT ST § 20A-11-204 (2) (d)

(2) Each interim report shall include the following information:

(d) a detailed listing of each contribution and public service assistance received since the last summary report that has not been reported in detail on a prior interim report;

UT ST § 20A-11-101 (8) (a)

(8) "Detailed listing" means:
(a) for each contribution or public service assistance:
(i) the name and address of the individual or source making the contribution or public service assistance;
(ii) the amount or value of the contribution or public service assistance; and
(iii) the date the contribution or public service assistance was made; and

**Vermont**
**Contributor Information: Are committees required to report the contributor's name?**
**VT ST T. 17 § 2803**

VT ST T. 17 § 2803 (a) (1)

(a) The secretary of state shall prescribe and provide a uniform reporting form for all campaign finance reports. The reporting form shall be designed to show the following information:
(1) the full name, town of residence and mailing address of each contributor who contributes an amount in excess of $100.00, the date of the contribution, and the amount contributed;

**Virginia**
Contributor Information: Are committees required to report the contributor's name?
**VA ST § 24.2-947.4**


VA ST § 24.2-947.4 (B) (2) (a)

B. The report of receipts shall include:

2. For each contributor who has contributed an aggregate of more than $100, including cash and in-kind contributions, as of the ending date of the report, the campaign committee shall itemize each contributor on the report and list the following information:

a. the name of the contributor, listed alphabetically,


**Washington**
Contributor Information: Are committees required to report the contributor's name?
**WA ST 42.17.090**


WA ST 42.17.090 (1) (b)

(1) Each report required under RCW 42.17.080 (1) and (2) shall disclose the following:

(b) The name and address of each person who has made one or more contributions during the period, together with the money value and date of such contributions and the aggregate value of all contributions received from each such person during the campaign or in the case of a continuing political committee, the current calendar year: PROVIDED, That pledges in the aggregate of less than one hundred dollars from any one person need not be reported: PROVIDED FURTHER, That the income which results from a fund-raising activity conducted in accordance with RCW 42.17.067 may be reported as one lump sum, with the exception of that portion of such income which was received from persons whose names and addresses are required to be included in the report required by RCW 42.17.067: PROVIDED FURTHER, That contributions of no more than twenty-five dollars in the aggregate from any one person during the election campaign may be reported as one lump sum so long as the campaign treasurer maintains a separate and private list of the name, address, and amount of each such contributor: PROVIDED FURTHER, That the money value of contributions of postage shall be the face value of such postage;


**West Virginia**
Contributor Information: Are committees required to report the contributor's name?
**WV ST § 3-8-5a**


WV ST § 3-8-5a (a)(3)

(a) Each financial statement required by the provisions of this article, other than a disclosure of electioneering communications pursuant to section two-b of this article, shall contain only the following information:

(3) The name of any person making a contribution and the amount of the contribution. If the total contributions of any one person in any one election cycle amount to more than two hundred fifty dollars, the residence and mailing address of the contributor and, if the contributor is an individual, his or her major business affiliation and occupation shall also be reported. A contribution totaling more than fifty dollars of currency of the United States or currency of any foreign country by any one contributor is prohibited and a violation of section five-d of this article. The statement on which contributions are required to be reported by this subdivision may not distinguish between contributions made by individuals and contributions made by partnerships, firms, associations, committees, organizations or groups.


**Wisconsin**
Contributor Information: Are committees required to report the contributor's name?
**WI ST 11.06**

WI ST 11.06 (1) (a)

(1) Contents of report. Except as provided in subs. (2), (3) and (3m) and ss. 11.05(2r) and 11.19(2), each registrant under s. 11.05 shall make full reports, upon a form prescribed by the board and signed by the appropriate individual under sub. (5), of all contributions received, contributions or disbursements made, and obligations incurred. Each report shall contain the following information, covering the period since the last date covered on the previous report, unless otherwise provided:

(a) An itemized statement giving the date, full name and street address of each contributor who has made a contribution in excess of $20, or whose contribution if $20 or less aggregates more than $20 for the calendar year, together with the amount of the contribution and the cumulative total contributions made by that contributor for the calendar year.

**Wyoming**
**Contributor Information: Are committees required to report the contributor's name?**
**WY ST § 22-25-106**

WY ST § 22-25-106 (a) (iv)

(iv) Statements under this subsection shall set forth the full and complete record of receipts including cash, goods or services and except for statements of receipts required under paragraph (i) of this subsection, of actual and promised expenditures, including all identifiable expenses as set forth in W.S. 22-25-103. For purposes of this section, a receipt is reportable when it is known and in the possession of, or the service has been furnished to, the person or organization required to submit a statement of receipts or a statement of receipts and expenditures. The date of each receipt of twenty-five dollars ($25.00) or more, any expenditure or obligation, the name of the person from whom received or to whom paid and the purpose of each expenditure or obligation shall be listed. All receipts under twenty-five dollars ($25.00) shall be reported but need not be itemized. Should the accumulation of receipts from an individual exceed the twenty-five dollar ($25.00) threshold, all receipts from that individual shall be itemized. Receipts, expenditures and obligations itemized in a statement filed by a political action committee, a candidate's campaign committee or by a political party central committee need not be itemized in a candidate's statement except by total with a reference to the statement;

**Start over**          **◄ Back**

# EXHIBIT B

**TABLE 8.1**  Total Spending in California Ballot Initiative Campaigns, 1976–2006



*Source:* A complete description of the methodology for compiling this data are available on file with the Center for Governmental Studies.

**TABLE 8.2**  Median Spending per Measure (Yes and No Combined) in California Ballot Initiative Campaigns, 1976–2006



*Source:* A complete description of the methodology for compiling this data are available on file with the Center for Governmental Studies.

# EXHIBIT C

The Honorable John C. Coughenour

1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

11   HUMAN LIFE OF WASHINGTON, INC.,        Case No. C08-0590-JCC

12              Plaintiff,

13        v.                                 ORDER DENYING
                                             PLAINTIFF'S MOTION FOR
14   CHAIR BILL BRUMSICKLE, VICE CHAIR       SUMMARY JUDGMENT
15   KEN SCHELLBERG, SECRETARY DAVE
     SEABROOK, JANE NOLAND, AND JIM
16   CLEMENTS, in their official capacities as
     officers and members of the Washington State
17   Public Disclosure Commission, ROB
     MCKENNA, in his official capacity as
18   Washington Attorney General, and DAN
     SATTERBERG, in his official capacity as
19   King County Prosecuting Attorney,
20
                Defendants.
21

22        This matter comes before the Court on Plaintiff's Motion for Summary Judgment (Dkt.

23   Nos. 66, 67), the State Defendants' Response (Dkt. No. 70), and Plaintiff's Reply (Dkt. No.

24   78). Having considered the parties' briefing and supporting documentation, the Court has

25   determined that oral argument is unnecessary and hereby finds and rules as follows.

26

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 1

1   I.      **BACKGROUND**

2           A.      **Washington State Disclosure Requirements**

3           In 1972, Washington voters passed Initiative Measure No. 276, which established the

4   state's Public Disclosure Commission ("PDC") and laid the framework for Washington's

5   campaign finance laws. Washington Revised Code § 42.17.010 states the public policy behind

6   the statutory framework, including:

7           (1) That political campaign . . . contributions and expenditures be fully
            disclosed to the public and that secrecy is to be avoided.
8
9           . . . .
10          (10) That the public's right to know of the financing of political campaigns . . .
            far outweighs any right that these matters remain secret and private.

11  *Id.* The policy declaration directs that the measure's provisions "be liberally construed to

12  promote complete disclosure of all information respecting the financing of political campaigns

13  . . . so as to assure continuing public confidence of fairness of elections . . . and so as to assure

14  that the public interest will be fully protected." *Id.*

15          The state's current statutory framework contains special registration and disclosure

16  requirements for "political committees." A "political committee" is defined as "any person

17  (except a candidate or an individual dealing with his or her own funds or property) having the

18  expectation of receiving contributions or making expenditures in support of, or opposition to,

19  any candidate or any ballot proposition." WASH. REV. CODE § 42.17.020(39). This definition

20  contains two alternative prongs: an organization can qualify based on an expectation of

21  "receiving contributions" or an expectation of "making expenditures." *Evergreen Freedom*

22  *Found. v. Wash. Educ. Ass'n (EFF)*, 49 P.3d 894, 902–03 (Wash. Ct. App. 2002). However,

23  each of these prongs has been substantially narrowed through judicial construction.

24  Washington state courts have held that an organization will only qualify as a "political

25  committee" based on an expectation of *receiving* political *contributions* if its contributors have

26  "actual or constructive knowledge" that their funds will be used for electoral political activity.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 2

*See id.* at 905.[1] To qualify as a "political committee" based on an expectation of *making*

political *expenditures*, an organization must have as "its primary or one of its primary

purposes" to support or oppose political campaigns. *See id.* at 903 (internal quotation omitted).

If a group qualifies as a "political committee," it must appoint a treasurer and establish

a bank account in the state, WASH. REV. CODE § 42.17.050, .060, and must file a "statement of

organization" with the PDC disclosing the names of its officers and any related or affiliated

committees or persons, the candidate or ballot proposition that the committee is supporting or

opposing, and other information regarding the committee's structure, *id.* § 42.17.040. If the

committee intends to raise and spend more than $5,000 in a calendar year or if it intends to

raise more than $500 from any one contributor (*see* Rippie Decl. ¶ 43 (Dkt No. 47 at 22)), that

committee must make regular reports disclosing, among other things, (1) its funds on hand; (2)

the value of any contributions received and the names and addresses of the contributors; and

(3) the amounts of any expenditures, the recipients of those expenditures, and the intended

purpose. WASH. REV. CODE § 42.17.080, 42.17.090.

Groups that do not qualify as "political committees" must still disclose certain political

expenditures. Washington Revised Code § 42.17.100 defines an "independent expenditure" as

"any expenditure that is made in support of or in opposition to any candidate or ballot

proposition" and is not already required to be disclosed under the rules governing political

committees. *Id.* § 42.17.100(1). If any entity incurs more than one hundred dollars of

"independent expenditures" in a single campaign or makes an independent expenditure whose

value cannot reasonably be estimated, the entity must report the values and recipients of the

---

[1] For example, an organization becomes a "political committee" under this prong if it solicits contributions for a political purpose, if it segregates funds for political purposes, if its organizational documents indicate that it expects to receive political contributions and it has taken steps to implement that expectation, or if it self-identifies to the PDC as a "political committee." (Rippie Decl. ¶ 35 (Dkt. No. 47 at 18).)

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 3

1     expenditures to the PDC within five days and must thereafter report any additional independent

2     expenditures for the remainder of the campaign in question. *See id.* § 42.17.100(2)–(4).

3          Washington's statutory framework also contains special requirements for "political

4     advertising," defined to include "any advertising displays, newspaper ads, billboards, signs,

5     brochures, articles, tabloids, flyers, letters, radio or television presentations, or other means of

6     mass communication, used for the purpose of appealing, directly or indirectly, for votes or for

7     financial or other support or opposition in any election campaign." *Id.* § 42.17.020(38). All

8     radio and television political advertising must include its sponsor's name; all written political

9     advertising must include its sponsor's name and address; and all political advertising that

10    constitutes an independent expenditure must explain that it was not authorized by a candidate

11    and, if sponsored by an organization, must identify the organization's top five contributors. *Id.*

12    § 42.17.510; *see also* WASH. ADMIN. CODE § 390-18-010. If political advertising "supporting

13    or opposing a candidate or ballot initiative" is presented to the public within twenty-one days

14    of the election and costs more than one thousand dollars, its sponsor must report the

15    expenditure to the PDC within twenty-four hours of the presentation. *Id.* § 42.17.103.

16         Finally, Washington Administrative Code § 390-16-206 explains when a "rating,

17    evaluation, endorsement or recommendation for or against a candidate or ballot proposition"

18    must be treated as a reportable expenditure. News media items, features, commentaries,

19    editorials, letters to the editor, and replies thereto, are *not* considered expenditures and need not

20    be reported as such. WASH. ADMIN. CODE § 390-16-206(1), 390-16-313(2)(b), 390-05-290;

21    WASH. REV. CODE § 42.17.020(15)(b)(iv), (21)(c). In all other cases, if and only if an entity

22    makes a "measurable expenditure of funds to communicate" a rating, evaluation, endorsement,

23    or recommendation, the entity must report it as an expenditure according to the general

24    reporting provisions of Washington Revised Code chapter 42.17 outlined above. WASH.

25    ADMIN. CODE § 390-16-206(1).

26

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 4

1

**B.     Human Life of Washington and Initiative I-1000**

2      Human Life of Washington ("Plaintiff" or "HLW") is a nonprofit organization

3  incorporated in Washington State. (Compl. ¶ 13 (Dkt. No. 1 at 4).) HLW's "mission is to

4  reestablish throughout our culture, the recognition that all beings of human origin are persons

5  endowed with intrinsic dignity and the inalienable right to life from conception to natural

6  death." (*Id.*) In 1980, HLW created the Human Life Political Action Committee ("HLPAC"),

7  "a political committee connected to Human Life" that would "participate directly in the

8  endorsement of and assistance to, both financially and through campaign involvement,

9  individual candidates running for office." (Krier Decl. Exh. A-1 (Dkt. No. 74 at 6).) HLPAC

10  has, at various times, registered with the PDC as a "political committee," (Parker Decl. ¶ 11

11  (Dkt. No. 53 at 9:4)), and has filed required disclosure reports with the PDC, (*id.* ¶ 7).

12      In 1991, Washington voters considered Initiative 119, which would have amended the

13  state constitution to legalize physician-assisted suicide. (Compl. ¶ 18 (Dkt. No. 1 at 5–6).) In

14  that campaign, HLPAC appears to have made numerous direct expenditures to oppose the

15  Initiative, and HLW itself also made contributions to several other political committees in

16  opposition. (Parker Decl. ¶ 8 (Dkt. No. 53 at 4–5).) The Initiative was ultimately defeated.

17      In 2008, Washington voters considered a similar ballot initiative, I-1000, which

18  proposed to "permit terminally ill, competent, adult Washington residents medically predicted

19  to die within six months, to request and self-administer lethal medication prescribed by a

20  physician." (Compl. ¶ 20 (Dkt. No. 1 at 6–7).) HLPAC explicitly opposed I-1000. *See* Press

21  Release, Human Life PAC, HL PAC Endorsements (July 2008), *available at*

22  http://humanlife.net/view_reports.htm?rpid=31 (last visited Oct. 24, 2008). The initiative

23  appeared on the November 4, 2008 ballot and was passed.

24      HLW brought this lawsuit in April 2008, before I-1000 had officially qualified for the

25  ballot, against the five members of the PDC, Washington State's attorney general, and King

26  County's prosecuting attorney. (Compl. 1 (Dkt. No. 1).) In the complaint, HLW alleged that it

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 5

1  wished to engage in "issue advocacy" concerning physician-assisted suicide. (*Id.* ¶ 1.)

2  "Because Physician-assisted suicide is now especially in the public awareness and debate [in

3  light of I-1000], people will be particularly receptive to arguments about the physician-assisted

4  suicide issue, making 2008 an important time for HLW to advocate concerning prolife issues."

5  (*Id.* ¶ 21.) Although the timing of HLW's advocacy was meant to coincide with the I-1000

6  campaign, it allegedly would not explicitly oppose the initiative. (*Id.* ¶¶ 27–29.)

7     In the complaint, HLW proposed three specific avenues of advocacy that it intended to

8  pursue. (*Id.* ¶¶ 22–25.) First, the complaint attached an "issue-advocacy fundraising letter" that

9  HLW intended to post on its website and mail or e-mail to a list of potential donors. (*Id.* ¶ 22.)

10  The letter provides:

11     The assisted suicide issue just won't go away. But neither will we. We are here
      to argue the prolife side on your behalf. However, as this grisly issue heats up
12     again in 2008, Human Life of Washington needs your help to pay for some
      radio ads to educate the public.
13
   (Fundraising Letter at 1 (Dkt. No. 1 at 22).) The letter explicitly references Initiative 119
14
   before stating that "[n]ow, while their minds are focused on the issue, is the opportune time to
15
   educate [the people of Washington] on the dangers of assisted suicide—and on the value of
16
   every life." (*Id.*) The letter alleges several statistics and anecdotes about Oregon's use of
17
   physician-assisted suicide and then states that "The public needs to receive this sort of
18
   information as assisted suicide advocates once again offer biased, inaccurate, and rosy
19
   depictions of this grisly practice." (*Id.*) Finally, the letter requests that donors send funds to
20
   help support HLW's advocacy efforts. (*Id.*)
21
      Second, the complaint describes a "telephone fundraising script" that HLW intended to
22
   use to solicit donors over the phone. (Compl. ¶ 23 (Dkt. No. 1 at 7).) After introducing
23
   themselves as a representative from HLW, the caller would state:
24
25     Right now we are trying to reach every pro-life household in Washington with
      an urgent update. As you've probably heard, former Governor Booth Gardner is
26     trying to get an initiative on the ballot this fall that would legalize physician-
      assisted suicide in the State of Washington. We fear that many Washingtonians

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 6

1    do not know the grisly facts about physician-assisted suicide and its devastating
     effect on the culture of life.

2    We need your help at this critical time to get the truth out. . . .

3        . . . .

4    We must protect the most vulnerable citizens of our state and we must ensure
     that patients can trust physicians. Physicians are to be care givers, not life
5    takers. That is why we're pleading for your help.

6    (Telephone Script (Dkt No. 1 at 24).)

7        Third, the complaint includes the scripts of four hypothetical radio ads that HLW

8    intended to broadcast. (Compl. ¶ 24 (Dkt. No. 1 at 7).) One of the ads is entitled "Settled," and

9    is a dialogue between a male and a female speaker:

10       M:      Assisted suicide is back in the news!
         F:      Didn't we settle that issue?
11       M:      We *rejected* a ballot measure.
         F:      Has anything changed?
12       M:      We know more about the dangers.
         F:      Such as?
13       M:      A new study said one doctor did 23 of the 28 assisted suicides at an
                 Oregon hospice.
14       F:      Sounds like a Kevorkian!
         M:      And it said one man seemed rushed into it . . . then took hours to die
15               after the drugs. Wife left . . . couldn't take it . . . so depressed that *she*
                 attempted suicide.
16       F:      All reasons *not* to reconsider the issue.
         Narrator:      Paid for by Human Life of Washington.
17

18   (HLW Ads (Dkt. No. 1 at 25) (emphasis in original).) Another ad is entitled "Trust":

19       F:      Whatever happened to the Hippocratic Oath?
         M:      You mean the part that says, "I will neither give a deadly drug to
20               anybody who asked for it, nor will I make a suggestion to this effect?"
         F:      Exactly. It was a quantum leap in medicine when you knew that you
21               could always trust your doctor. Before that, who knew whether he'd
                 been hired by a family member to hurry up the inheritance?
22       M:      That trust is the foundation of medicine.
         F:      Assisted suicide removes it . . . turns doctors into killers. That's
23               dangerous.
         Narrator:      Paid for by Human Life of Washington.
24

25   (*Id.*)

26

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 7

1        The specific examples provided in the complaint were not intended to be exclusive;

2    rather, HLW allegedly intended to do "these and substantially-similar fundraising and public

3    communications in support of its Physician-assisted suicide issue advocacy in 2008." (Compl.

4    ¶ 25 (Dkt. No. 1 at 7–8).) The complaint explained that the "substantially similar" fundraising

5    and communications had not yet been created and would vary as the public debate on the issue

6    evolved. (*Id.*)

7        HLW argues that it has a constitutional right to engage in this sort of "issue advocacy"

8    without submitting to Washington State's disclosure requirements. (*Id.* ¶ 38.) HLW claims to

9    reasonably fear that the PDC would consider HLW to be a "political committee" under

10    Washington Revised Code § 42.17.020(39) if it undertook its proposed actions, or would

11    consider the individual actions themselves to be "independent expenditures" under Washington

12    Revised Code § 42.17.100, "political advertising" under § 42.17.020(38), or "rating[s],

13    evaluation[s], endorsement[s], or recommendation[s] for or against . . . a ballot measure" under

14    Washington Administrative Code § 390-16-206. (*Id.* ¶¶ 34–37.) Because any such

15    determinations by the PDC would subject HLW to disclosure requirements under Washington

16    State law and civil penalties for noncompliance, HLW claims that it is chilled from engaging in

17    protected First Amendment activities as a result of the State's campaign finance laws. (*Id.*

18    ¶ 38.)

19        On April 18, 2008, HLW moved for a preliminary injunction to prohibit enforcement of

20    Washington State's reporting and disclosure requirements, both facially and as applied to

21    Plaintiff and its proposed "issue advocacy." (Dkt. No. 8.) The Court held that HLW had

22    standing to bring its claims (Prelim. Inj. Order at 3–5 (Dkt. No. 59)); however, it ultimately

23    denied the motion, finding that Plaintiff had failed to establish a probable likelihood of success

24    on the merits and that the interests of the State and the public outweighed the potential harm to

25    HLW, (*id.* at 5–9).

26

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 8

1    HLW now moves for summary judgment, claiming that "[t]here are no material facts in

2    dispute[1] and HLW is entitled to judgment as a matter of law." (Mot. 1 (Dkt. No. 67).)

3    **II.    DISCUSSION**

4        **A.    Legal Standard**

5        Under Federal Rule of Civil Procedure 56(c), the Court shall grant summary judgment

6    "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that

7    there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

8    matter of law." FED. R. CIV. 56(c). "In determining whether summary judgment is

9    appropriate, we view the facts in the light most favorable to the non-moving party and draw

10   reasonable inferences in favor of that party." *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781,

11   784 (9th Cir. 2007).

12       **B.    Justiciability**

13           **1.    Ripeness and Standing**

14       Defendants first argue that "HLW has failed to state facts of sufficient specificity to

15   demonstrate an actual controversy," (Response 12 (Dkt. No. 70)), as required under the

16   constitutional doctrines of ripeness and standing. *See Thomas v. Anchorage Equal Rights*

17   *Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) ("Whether the question is viewed as one of

18   standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there

19   exist a constitutional 'case or controversy,' that the issues presented are definite and concrete,

20

21   ——————————————

22       [1] HLW's motion provides only cursory facts and instead sets forth its factual
     allegations in a separately-filed Statement of Material Undisputed Facts. (Dkt. No. 68).
     Defendants argue that the Statement of Material Undisputed Facts should be struck "[b]ecause
     this pleading is not among those authorized by Fed. R. Civ. P. 7 and Local Rule 7, and because
23   this Court's July 15 Minute Order (Dkt. No. 65) did not allow any overlength briefs."
     (Response 2 (Dkt. No. 70).) The Court agrees, and hereby STRIKES Plaintiff's Statement of
24   Material Undisputed Facts. However, because the facts contained in this document were, for
     the most part, all presented in Plaintiff's Verified Complaint, (Reply 1 (Dkt. No. 78) (noting
25   that the Statement of Material Undisputed Facts merely "stat[es] in convenient form the facts
     from the *Verified Complaint.*")), the Court's summary judgment analysis is unaffected.
26

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 9

1    not hypothetical or abstract." (internal quotation omitted)). Defendants claim that HLW has not

2    specified with sufficient certainty the advocacy actions that it intended to take. (Response 11–

3    12 (Dkt. No. 70).) They note that the Complaint, after describing specific fundraising and

4    advertising scripts, states only that "HLW intends to do these *and substantially-similar*

5    fundraising and public communications." (Compl. ¶ 25 (Dkt. No. 1 at 7–8) (emphasis added).)

6    They point to deposition testimony by HLW's CEO that the organization was "not tied to those

7    four specific [advertising] scripts." (Kennedy Dep.. 92:3–5 (Dkt. No. 71 at 31).) Finally,

8    Defendants note that the text of HLW's proposed radio scripts were prepared "in discussion

9    with attorneys" (*id.* at 101), suggesting that the language was concocted specifically for this

10   legal challenge, (Response 12 (Dkt. No. 70).)

11        The Court rejected a similar justiciability argument when ruling on HLW's motion for

12   preliminary injunction. (Prelim. Inj. Order 3–5 (Dkt. No. 59).) The Ninth Circuit has

13   recognized that in First Amendment challenges, "the Supreme Court has dispensed with rigid

14   standing requirements." *Cal. Pro-Life Council, Inc. v. Getman (CPLC I)*, 328 F.3d 1088, 1094

15   (9th Cir. 2003). In such a case, "self-censorship" will constitute a "constitutionally sufficient

16   injury," *id.* at 1093, if Plaintiff has established "an actual and well-founded fear" that the

17   challenged statute will be enforced against it, *id.* at 1095. A well-founded fear of prosecution

18   exists whenever the "intended speech arguably falls within the statute's reach." *Id.*

19        As the Court has already recognized, HLW's proposed actions all "arguably" fall

20   within the reach of the challenged Washington disclosure statutes. (Prelim. Inj. Order 4–5

21   (Dkt. No. 59).) HLW intended to run advertisements opposing physician-assisted suicide just

22   as Washington voters were debating the legalization of that very conduct; as a result, HLW's

23   actions were at least arguably made "in . . . opposition to" the I-1000 ballot initiative. If so,

24   HLW arguably would have qualified as a "political committee" under state law, *see* WASH.

25   REV. CODE § 42.17.020(39) (defining a "political committee" as "any person (except a

26   candidate or an individual dealing with his or her own funds or property) having the

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 10

1   expectation of receiving contributions or making expenditures in support of, or opposition to,

2   any candidate or any ballot proposition"), and its intended advertising expenditures might have

3   qualified as "independent expenditures," *see id.* § 42.17.100(1) ("[T]he term 'independent

4   expenditure' means any expenditure that is made in support of or in opposition to any

5   candidate or ballot proposition and is not otherwise required to be reported . . . ."), or as

6   "political advertising," *see id.* § 42.17.020(38) ("'Political advertising' includes any

7   advertising . . . used for the purpose of appealing, directly or indirectly, for votes or for

8   financial or other support or opposition in any election campaign."). Finally, although more of

9   a stretch, at least one of HLW's proposed advertisements could arguably be considered a

10  "rating, evaluation, endorsement or recommendation" against I-1000 subject to Washington

11  Administrative Code § 390-16-206. (*See, e.g.,* HLW "Settled" Ad (Dkt. No. 1 at 25) (noting

12  that "[a]ssisted suicide is back in the news" after Washington voters previously "*rejected a*

13  ballot measure" and providing several reasons "*not* to reconsider the issue" (emphasis in

14  original)).)

15        Plaintiff's proposed actions are sufficiently concrete to render the case justiciable.

16  HLW produced (1) a written fundraising letter, (2) a telephone fundraising script, and (3) four

17  broadcast radio scripts. (Compl. ¶ 22–24 (Dkt. No. 1 at 7).) That HLW intended to engage in

18  "these *and* substantially-similar fundraising and public communications" (*id.* ¶ 25 (emphasis

19  added)) did not render the specific proposed actions any less concrete. Similarly, the Court

20  finds the case justiciable, even if HLW was "not tied to those four specific scripts." (Kennedy

21  Dep.. 92:3–5 (Dkt. No. 71 at 31).) Plaintiff desired to engage in a broad debate with

22  Washington voters, but self-censored itself out of fear of government regulation. (Compl. ¶¶

23  19, 34–37 (Dkt. No. 1).) To establish standing, Plaintiff need not predict every last expressive

24  position that it would have taken in the debate; that would set an impossibly high bar for

25  Plaintiffs, given the fluid nature of political and philosophical discourse. (*See id.* ¶ 25 ("[I]t is

26  in the nature of issue advocacy that the need to convey information and educate varies as

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 11

1   public debate on an issues varies, so . . . it is impossible to predict [exactly] what future issue-

2   advocacy might be required . . . .") (internal quotation omitted).) To raise a justiciable claim,

3   Plaintiff need only provide a "concrete plan" of action that would implicate the government's

4   regulatory scheme. *See CPLC I*, 328 F.3d at 1094. The Complaint maintained that all of

5   HLW's issue advocacy would be "substantially similar" to the specifically proposed actions,

6   and nothing in the record suggests that any of HLW's actions would have materially differed

7   from the scripts it provided. (Compl. ¶ 25 (Dkt. No. 1).) Therefore, the Court finds that HLW's

8   proposed actions constituted a sufficiently "concrete plan" to bless Plaintiff with standing.

9           Finally, the Court finds it unremarkable that HLW's advertising scripts were drafted in

10  "discussion with attorneys." (Kennedy Dep. 101 (Dkt. No. 71 at 33).) This is a nuanced area of

11  the law, where the state has a well established power to regulate speech, *see Buckley v. Valeo*,

12  424 U.S. 1, 13 (1976) (per curiam), and where the state's power sometimes turns on fine

13  distinctions in the content of the regulated speech, *see, e.g., FEC v. Furgatch*, 807 F.2d 857,

14  863–64 (9th Cir. 1987). Given the legal ramifications of HLW's proposed phrasing, Plaintiff's

15  discussion with its attorneys in drafting the language of its ads does not raise any suggestion of

16  bad faith.

17          **2.    Mootness**

18          Although the November 4, 2008, election has come and gone, HLW's claim is not

19  moot. *See Ala. Right to Life Comm. v. Miles (ARTLC)*, 441 F.3d 773, 779–80 (9th Cir. 2006);

20  *CPLC I*, 328 F.3d at 1095 n.4; *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003). "[E]lection

21  cases often fall within the 'capable of repetition, yet evading review' exception to the mootness

22  doctrine . . . ." *ARTLC*, 441 F.3d at 779 (internal quotation omitted). That exception applies

23  where "(1) the challenged action was too short in duration to be fully litigated prior to its

24  cessation or expiration; and (2) there is a reasonable expectation that the same complaining

25  party will be subjected to the same action again." *Porter*, 319 F.3d at 489–90. The Ninth

26  Circuit has repeatedly noted that "the inherently brief duration of an election is almost

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 12

1    invariably too short to enable full litigation on the merits." *Id.* at 490; *CPLC I*, 328 F.3d at

2    1095 n.4 (*quoting Porter*, 319 F.3d at 490); *ARTLC*, 441 F.3d 779 (*quoting CPLC I*, 328 F.3d

3    at 1095 n.4). Moreover, HLW has asserted its continuing intention to advocate for an

4    "inalienable right to life from conception to natural death" "as it has in the past." (Compl. ¶¶ 1,

5    13 (Dkt. No. 1).) The Court finds a reasonable expectation that HLW may, at some point, again

6    desire to advocate on the topic of a future Washington State ballot initiative in a manner

7    arguably covered by the State's disclosure requirements. *See ARTLC*, 441 F.3d at 779–80.

8    Therefore, the instant action is not moot.

9    **C.     Merits**

10        Political speech is at the core of the First Amendment. A functioning democracy relies

11   on passionate advocacy, and a robust "marketplace of ideas" requires free and open debate

12   concerning issues of political concern. "Discussion of public issues and debate on the

13   qualifications of candidates are integral to the operation of the system of government

14   established by our Constitution," and hence is afforded "the broadest protection" under the

15   First Amendment. *Buckley*, 424 U.S. at 14.

16        First Amendment protection, however, is not absolute. *Id.* at 25. The government may

17   regulate protected speech, so long as the restrictions are justified, meaning that they survive

18   judicial scrutiny under the applicable standard of review. "[T]he severity of the burden the

19   election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the

20   court." *Ala. Independence Party v. Alaska*, 545 F.3d 1173, 1177 (9th Cir. 2008) (internal

21   quotation omitted). "Severe" burdens on protected speech are reviewed under strict scrutiny—

22   they must be narrowly tailored to serve a compelling state interest. *Id.* Lesser burdens on

23   protected speech have been reviewed under less rigorous scrutiny. *See, e.g., McConnell v.*

24   *FEC*, 540 U.S. 93, 136 (2003) (holding that contribution limits need only satisfy "the lesser

25   demand of being 'closely drawn' to match a 'sufficiently important interest'" (internal

26   quotations omitted)); *Buckley*, 424 U.S. at 64 (subjecting disclosure requirements to "exacting

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 13

1    scrutiny," whereby there must exist a "relevant correlation" or "substantial relation" between

2    the governmental interest and the burden imposed). Although courts have often treated these as

3    distinct standards, they are somewhat fluid in practice. Each standard considers the *degree* of

4    burden imposed on the speaker—the more significant the burden, the more compelling the

5    state interest needed to justify that burden. *See, e.g., ARTLC*, 441 F.3d at 791 (applying strict

6    scrutiny to reporting and disclosure requirements, but upholding the provisions in part because

7    the burdens were "not particularly onerous").

8           Restrictions on speech must also not be unconstitutionally vague. Vagueness challenges

9    can take either of two forms. First, a statute's phrasing might simply be "so indefinite [that it]

10   fails to clearly mark the boundary between permissible and impermissible speech." *Buckley*,

11   424 U.S. at 41 (holding that the prohibition on certain expenditures "relative to" a candidate

12   was vague in this manner). These sorts of vagueness challenges are generally limited to

13   criminal statutes, *see id.* at 40–41; Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100

14   Yale L. J. 853, 903–04 (1991) ("Vagueness doctrine, in its most familiar form, holds that

15   criminal prohibitions, at least, may not be enforced when they are so unclear that people of

16   ordinary intelligence would need to guess at whether their conduct was or was not

17   forbidden."), and may be resolved through narrowing constructions, *see, e.g., Buckley*, 424

18   U.S. at 42 (reading "the phrase 'relative to' a candidate . . . to mean 'advocating the election or

19   defeat of' a candidate"). The second type of vagueness challenge is often described as a subset

20   of the related First Amendment overbreadth doctrine. *See Fallon, supra*, at 904; *Kolender v.

21   Lawson*, 461 U.S. 352, 358 n.8 (1983) ("[W]e have traditionally viewed vagueness and

22   overbreadth as logically related and similar doctrines."). Under this theory, a statute is deemed

23   unconstitutional on its face if it "chills" a "substantial amount of legitimate speech." *Cal.

24   Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1152 (9th Cir. 2001) ("A statute's

25   vagueness exceeds constitutional limits if its deterrent effect on legitimate expression is both

26   real and substantial, and if the statute is not readily subject to a narrowing construction by the

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 14

1    state courts." (internal quotation omitted)); *see also Buckley*, 424 U.S. at 42–44 (further

2    narrowing the definition of "advocating the election or defeat of" a candidate to include only

3    *express* advocacy because the broader definition could substantially chill the general

4    discussion of public issues).

5         HLW challenges Washington's reporting requirements for "political committees,"

6    disclosure requirements for "independent expenditures" and "political advertising," and its

7    treatment of "ratings, evaluations, endorsements, and recommendations." The Court considers

8    each of these four challenges in turn.

9         **1.    Reporting Requirements for "Political Committees"**

10        HLW focuses its challenge primarily on Washington's requirements for "political

11   committees," which it refers to as "PAC-style" reporting and disclosure. (Mot. 4 (Dkt. No.

12   67).)[2] Washington requires "political committees" to appoint a treasurer, establish a bank

13   account in the state, and register with the PDC by filing a "statement of organization," which

14   must be updated as material facts change. WASH. REV. CODE § 42.17.040, .050, .060. For many

15   organizations—those that raise and spend less than $5,000 per year and that do not accept more

16   than $500 from any single contributor—these are the only requirements that attach from

17   "political committee" status. (Rippie Decl. ¶ 26 (Dkt. No. 47 at 14) (noting that such

18   organizations qualify for "mini reporting").) All other, more active "political committees" must

19   file regular reports with the PDC to disclose their contributions, expenditures, and funds on

20   hand. WASH. REV. CODE § 42.17.080, .090.

21        To qualify as a "political committee," an organization must satisfy either of two prongs.

22   First, an organization is a "political committee" if it has an "expectation of *receiving*

23   *contributions* . . . in support of, or opposition to, any candidate or any ballot proposition."

24   WASH. REV. CODE § 42.17.020(39). To qualify under this prong, the organization must have

25

26        [2] "PAC" stands for "political action committee."

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 15

taken some step to give its contributors "actual or constructive knowledge" that donated funds will be used for electoral political activity. *EFF*, 49 P.3d at 905. Second, an organization is a "political committee" if it has "an expectation of . . . *making expenditures* in support of, or opposition to, any candidate or any ballot proposition." WASH. REV. CODE § 42.17.020(39). To qualify under this second prong, the organization must have as "one of its primary purposes" to support or oppose political campaigns. *EFF*, 49 P.3d at 903.

HLW argues that Washington's PAC-style requirements do not survive strict scrutiny and that the state's definition of "political committee" is vague and overbroad.

### (a) "Strict Scrutiny" vs. "Exacting Scrutiny"

As an initial matter, the parties disagree as to which standard the Court should employ in considering whether Washington's "political committee" requirements are justified. HLW argues that the imposition of PAC-style requirements must satisfy "strict scrutiny," i.e., it must be "narrowly tailored" to achieve a "compelling" government interest. *FEC v. Wis. Right to Life, Inc. (WRTL)*, 127 S. Ct. 2652, 2664 (2007). In contrast, Defendants argue that it need only meet "exacting scrutiny," which requires a "substantial relation . . . between the governmental interest and the information required to be disclosed." *ARTLC*, 441 F.3d at 787 (internal quotation omitted).

The Ninth Circuit has recognized that "the Supreme Court has been less than clear as to the proper level of scrutiny" for PAC-style requirements, *CPLC I*, 328 F.3d at 1101 n.16; *see also ARTLC*, 441 F.3d at 787 (noting again that the "degree of scrutiny . . . is somewhat unclear"); however, it has resolved that ambiguity in favor of strict scrutiny. In *CPLC I*, the Court held that California's PAC-style requirements on ballot-initiative political committees should be subjected to strict scrutiny and remanded to the district court to conduct the analysis in the first instance. 328 F.3d at 1101 n.16, 1104. Later, in *ARTLC*, another Ninth Circuit panel suggested that *McConnell* might have relaxed the degree of scrutiny since *CPLC I*, but the Court nonetheless "assume[d] without deciding that strict scrutiny applie[d]." 441 F.3d 787–

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 16

1    88. Finally, in *Cal. Pro-Life Council, Inc. v. Randolph (CPLC II)*, 507 F.3d 1172 (9th Cir.

2    2007), when the district court's application of strict scrutiny was back to the Ninth Circuit on

3    appeal, the Court explicitly held that strict scrutiny should still apply. *Id.* at 1177–78. In a

4    footnote, the Court noted that it was "bound by the 'law of the case' to apply strict scrutiny,"

5    *id.* at 1177 n.5, but the opinion's text also makes clear that *CPLC I* is still binding precedent.

6    *Id.* at 1178 ("Because . . . the *McConnell* decision [did not] call[] into question the analysis [of

7    the cases relied upon in *CPLC I*], we are not compelled to abandon the standard adopted in

8    [*CPLC I*]."). As a result, the Court finds that it is bound by *CPLC I* and *CPLC II* to apply strict

9    scrutiny to Washington's PAC-style requirements.

10                        **(b)    Strict Scrutiny Applied: Burdens and Interests**

11           Although *CPLC I* and *II* make clear that strict scrutiny should apply to PAC-style

12    requirements, the cases do not explicitly demonstrate how to apply such scrutiny in practice. In

13    *CPLC I*, the Court remanded to the district court to apply strict scrutiny after further

14    development of the factual record. 328 F.3d at 1105, 1107. On remand, however, rather than

15    develop a factual record to support its regulations, the State of California simply argued that it

16    could impose its requirements on CPLC as a matter of law, pointing to federal campaign

17    finance laws that required "all groups organized in corporate form, including non-profit

18    corporations, to channel express campaign advocacy through PACs." *See CPLC II*, 507 F.3d at

19    1187. On appeal, the Ninth Circuit acknowledged that courts had upheld broad imposition of

20    PAC-style requirements on corporate campaign speech, but noted that each of those cases

21    applied to *candidate elections* and explained that "it is not at all certain that the Supreme Court

22    would apply the same criteria to ballot measure advocacy." *Id.* at 1187–88. Because this was

23    California's sole argument, the Court found that the state had "not satisfied its burden" of

24    demonstrating that its PAC-style requirements were narrowly tailored to its compelling

25    informational interest. *Id.* at 1187. The Court made clear that one cannot "ignore the distinction

26    between candidate and ballot measure elections." *Id.* at 1187. However, in holding California

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 17

1    to its failed burden, the Court never actually analyzed whether the state's compelling interest

2    *could* have justified its PAC-style requirements in the ballot initiative context.

3    The Ninth Circuit did apply strict scrutiny to PAC-style requirements in *ARTLC*. 441

4    F.3d 773. Unlike *CPLC I* and *CPLC II*, that case did not involve ballot initiatives, but its

5    analysis is informative nonetheless. In *ARTLC*, the Court reviewed reporting and disclosure

6    requirements that applied to certain nonprofit, ideological corporations that wished to influence

7    the outcome of an election. *Id.* at 779. The State of Alaska required these corporations to

8    (1) register with the state's election commission and make regular reports, (2) report all

9    expenditures and contributions, (3) notify contributors and potential contributors that

10   contributions may be used to influence an election, and (4) disclose the source of their

11   expenditures within the relevant communications. *Id.* at 789–91. In applying strict scrutiny, the

12   Court "'look[ed] to the extent of the burden . . . place[d] on individual rights,'" *id.* at 791

13   (*quoting Buckley*, 424 U.S. at 68), and found that the burdens imposed under Alaska's statute

14   were "not particularly onerous," *id.* In upholding Alaska's PAC-style requirements, the Court

15   emphasized that they did not impose any limits on the organization's ability to solicit funds,

16   nor did they require broad structural changes like the use of "segregated funds" for political

17   activity. *Id.* at 791 (distinguishing Alaska's requirements from those struck down by the

18   Supreme Court in *FEC v. Mass. Citizens for Life (MCFL)*, 479 U.S. 238 (1986)).

19   *ARTLC* applied to candidate elections, so this Court is sensitive to not apply that

20   holding directly to ballot measures, where the state has somewhat different interests. *See CPLC*

21   *II*, 507 F.3d at 1188. That said, the *burden* of PAC-style requirements are the same regardless

22   of whether the organization's advocacy relates to a candidate election or a ballot initiative.

23   Therefore, this Court gives great weight to the Ninth Circuit's finding in *ARTLC* that PAC-

24   style requirements are "not particularly onerous." 441 F.3d at 791. Washington's "political

25   committee" requirements are similar to those upheld in *ARTLC* and contain neither of the more

26   severe burdens on solicitation or segregation of funds that the courts flagged in that case. *See*

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 18

1    *id.* The only notable difference between the Washington and Alaska provisions is that

2    Washington also requires "political committees" to (1) designate a treasurer (i.e., someone at

3    the committee who will be "responsible for . . . complying with the disclosure requirements"

4    (Response 15 (Dkt. No. 70))) and (2) maintain an in-state bank account. Defendants

5    convincingly argue that these minor burdens are necessary for enforcement and "nothing more

6    than the basic administrative infrastructure necessary to implement the disclosure

7    requirements." (*Id.* at 18.)

8           Washington has also significantly narrowed its reporting and disclosure requirements to

9    focus only on the most active political committees. First, to qualify as a political committee

10   under the "maker of expenditures" prong, the organization "must have as its primary or one of

11   the primary purposes to affect, directly or indirectly, governmental decision making by

12   supporting or opposing candidates or ballot propositions." *EFF*, 49 P.3d at 903. To qualify

13   under the "receiver of contributions" prong, an organization must have taken some affirmative

14   step to give its contributors "actual or constructive knowledge that the organization is setting

15   aside funds to support or oppose a candidate or ballot proposition." *Id.* at 904–05.[3] Finally,

16   many of the organizations that technically qualify as "political committees" are exempted from

17   the regular reporting requirements and need only file the initial registration. (Rippie. Decl. ¶ 26

18   (Dkt. No. 47 at 14).) The full reporting requirements are limited to those committees that

19   expect to raise or spend more than $5000 or receive more than $500 from a single contributor.

20   (*Id.*) By imposing the more burdensome reporting requirements—which are still "not

21   particularly onerous," *ARTLC*, 441 F.3d at 791—only on the most active political committees,

22   the state avoids unduly burdening the smaller or less active organizations that might be more

23   likely to self-censor their speech rather than comply with the state's requirements.

24   _____

25       [3] HLW argues that Washington must go further and limit PAC-status to organizations whose *single* major purpose is campaign advocacy (Mot. 10 (Dkt. No. 67)) or who have

26   received contributions that are *explicitly earmarked* for political advocacy (*Id.* at 18.) The Court addresses, and rejects, these arguments in sections II.C.1(d) and II.C.1(e), respectively.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 19

1    Having determined that Washington's PAC-style requirements impose only relatively

2    minor burdens and focus those burdens on the political committees most able and willing to

3    comply, the Court must consider whether these burdens are justified by compelling state

4    interests. In *Buckley*, the Supreme Court identified three compelling rationales for requiring

5    disclosure of "campaign speech" in candidate elections. "First, disclosure provides the

6    electorate with information as to where political campaign money comes from and how it is

7    spent by the candidate, in order to aid voters in evaluating those who seek federal office." 424

8    U.S. at 66–67 (internal quotation omitted). "Second, disclosure requirements deter actual

9    corruption and avoid the appearance of corruption by exposing large contributions and

10   expenditures to the light of publicity." *Id.* at 67. "Third, and not least significant,

11   recordkeeping, reporting, and disclosure requirements are an essential means of gathering the

12   data necessary to detect violations of . . . contribution limitations . . . ." *Id.* at 67–68. In

13   *ARTLC*, the Ninth Circuit cited these same three interests in upholding Alaska's PAC-style

14   requirements. *See* 441 F.3d at 792 (holding that Alaska's minor registration and reporting

15   burdens were narrowly tailored to the state's interest in "'providing the electorate with

16   information, deterring actual corruption and avoiding any appearance thereof, and gathering

17   the data necessary to enforce more substantive electioneering restrictions.'" (*quoting*

18   *McConnell*, 540 U.S. at 196)).

19        In *CPLC I*, the Ninth Circuit noted that *Buckley*'s second and third rationales generally

20   do not apply in ballot initiative elections, where there is little threat of corruption and typically

21   no limit on contributions or expenditures. 328 F.3d at 1105 n.23 (9th Cir. 2003). However, the

22   Court held that the first "informational" interest "appl[ies] just as forcefully, if not more so, for

23   voter-decided ballot measures." *Id.* at 1105. The Court explained:

24        "Even more than candidate elections, initiative campaigns have become a
          money game, where average citizens are subjected to advertising blitzes of
25        distortion and half-truths and are left to figure out for themselves which interest
          groups pose the greatest threat to their self-interest." David S. Broder,
26        *Democracy Derailed: Initiative Campaigns and the Power of Money* at 18

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 20

1
2
3

(2000). Knowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown. At least by knowing who backs or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation.

4

. . . .

5
6
7

Voters act as legislators in the ballot-measure context, and interest groups and individuals advocating a measure's defeat or passage act as lobbyists; both groups aim at pressuring the public to pass or defeat legislation. [The voters], as lawmakers, have an interest in knowing who is lobbying for their vote, just as members of Congress may require lobbyists to disclose who is paying for the lobbyists' services and how much.

8   *Id.* at 1105–06. The state's interest in informing the electorate about "where political campaign

9   money comes from and how it is spent," *Buckley*, 424 U.S. at 66 (internal quotation omitted),

10  is only amplified in the ballot initiative context as more and more money is poured into ballot

11  measures nationwide. *See CPLC II*, 328 F.3d at 1105; *cf.* Lisa Leff, *California Gay Marriage*

12  *Ban a $73 Million Race*, THE MERCURY NEWS, Nov. 3, 2008, *available at*

13  http://www.mercurynews.com/news/ci_10889066 (noting that California's Proposition 8 was

14  "the costliest election this year outside the race for the White House"). The state therefore

15  retains an extremely compelling interest in "following the money" in ballot initiative elections

16  so that the electorate's decision may be an informed one.

17       Defendants also raise a compelling interest in protecting the *contributors* of funds used

18  to advocate in support of or in opposition to a ballot initiative. (Rippie Decl. ¶ 29 (Dkt. No. 47

19  at 16).) Those contributors are entitled to verify that their funds were actually used for their

20  intended purpose. (*See id.* (describing a "high profile enforcement case . . . where the public's

21  contributions to the ballot measure committee were unlawfully used by an officer for his

22  personal expenses for activities unrelated to the campaign, and those facts had been concealed

23  from the public by the treasurer and the committee").) In this respect, the requirements that

24  Washington imposes on "political committees" serve the same goals as the registration and

25  disclosure requirements that most states impose on charities. (*Id.*) The Supreme Court has

26  "repeatedly recognized the legitimacy of government efforts to enable donors to make

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 21

1   informed choices about their charitable contributions." *Illinois v. Telemarketing Assocs., Inc.*,

2   538 U.S. 600, 623 (2003). The Court has also suggested that reporting and disclosure

3   provisions are among the "more benign and narrowly tailored options" available to address

4   these concerns. *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 800 (1988); *see also*

5   *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 638 (1980) (suggesting that

6   "disclosure of the finances of charitable organizations" could prevent fraud "by informing the

7   public of the ways in which their contributions will be employed"). "In accord with [these

8   cases], . . . in almost all of the states and many localities, charities and professional fundraisers

9   must register and file regular reports on activities, particularly fundraising costs." *See*

10  *Telemarketing Assocs.*, 528 U.S. at 623 (internal quotation omitted) (noting that "[t]hese

11  reports are generally available to the public"). The state's interest in preventing fraudulent

12  misuse of contributed funds appears just as compelling when applied to an organization like

13  HLW as when applied to the charitable organizations discussed in *Telemarketing Associates*.

14          The Court holds that these two compelling interests—informing the public about the

15  source of political expenditures and protecting contributors from fraudulent misuse of

16  donations—more than justify the general imposition of PAC-style reporting and disclosure

17  requirements on organizations engaged in ballot measure advocacy. However, the Court must

18  still address several aspects of Washington's specific framework that HLW argues are vague or

19  overbroad.

20                          **(c)     "in support of, or opposition to"**

21          Under Washington's statute, an organization becomes a "political committee" if it

22  expects to receive contributions or make expenditures "in support of, or opposition to, any

23  candidate or any ballot proposition." WASH. REV. CODE. § 42.17.020(39). HLW first argues

24  that the "political committee" definition is unconstitutionally vague because the words

25  "support" and "opposition" are so indefinite that they do not "give the person of ordinary

26  intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of*

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 22

1   *Rockford*, 408 U.S. 104, 108 (1972). HLW also argues that the provision is unconstitutionally

2   broad because it could be read to include expenditures that do not "expressly" advocate for a

3   ballot initiative, but instead merely advocate as to an underlying "issue." (Mot. 11–17 (Dkt.

4   No. 67).)

5        As to the ambiguity of the words themselves, there are several features of Washington's

6   framework that partially alleviate any vagueness concerns. First, in addressing this sort of

7   vagueness argument, "[c]lose examination of the specificity of the statutory limitation is

8   required where . . . the legislation imposes *criminal* penalties." *Buckley*, 424 U.S. at 40–41

9   (emphasis added). HLW concedes that, unlike the federal statute at issue in *Buckley*,

10  Washington's PAC-style requirements do *not* carry criminal penalties. (Mot. 12 n.2 (Dkt. No.

11  67).) Second, Washington provides various ways to obtain advice or guidance from the PDC:

12  one can call a toll-free phone number, request an informal advisory opinion, request a formal

13  declaratory order, WASH. ADMIN. CODE § 390-12-250, request an interpretative statement,

14  WASH. REV. CODE § 34.05.230(1), or petition for formal rulemaking, WASH. ADMIN. CODE §

15  390-12-255. (Rippie Decl. ¶ 21–22 (Dkt. No. 47 at 11–12).) In *Buckley*, the Court suggested

16  that the wide availability of advisory opinions would alleviate many vagueness problems;

17  however, it did not apply in that case "because the vast majority of individuals and groups

18  subject to [the] criminal sanctions . . . do not have a right to obtain an advisory opinion from

19  the [FEC]." 424 U.S. at 40 n.47. In contrast, Washington's framework appears to provide

20  ample opportunity to obtain a pre-enforcement interpretation from the PDC.

21        Furthermore, HLW's vagueness argument would fail even without these considerations

22  because the Supreme Court has explicitly held that the words "support" and "oppose" are not

23  unconstitutionally vague. In *McConnell*, the Court considered certain limitations on

24  contributions and expenditures for "public communications" that "'refer[] to a clearly

25  identified candidate for Federal office' and 'promote[],' 'support[],' 'attack[],' or 'oppose[]' a

26

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 23

1   candidate for that office." 540 U.S. at 162. The Court rejected an argument that these

2   limitations were unconstitutionally vague, holding:

3           The words "promote," "oppose," "attack," and "support" clearly set forth the
            confines within which potential party speakers must act in order to avoid
4           triggering the provision. These words "provide explicit standards for those who
            apply them" and "give the person of ordinary intelligence a reasonable
5           opportunity to know what is prohibited."

6   *Id.* at 170 n.64 (*quoting Grayned*, 408 U.S. at 108–09); *see also id.* at 184–85 (rejecting the

7   same vagueness argument for a provision that did not involve party speakers). In light of

8   *McConnell*, this Court holds that the mere use of the terms "support" and "opposition" does not

9   render Washington's definition of "political committee" unconstitutionally vague. *See United*

10  *States v. Williams*, 128 S. Ct. 1830, 1845 (2008) ("[P]erfect clarity and precise guidance have

11  never been required even of regulations that restrict expressive activity." (internal quotation

12  omitted)).

13         HLW's overbreadth argument, however, raises a closer question and requires more

14  extensive analysis. Essentially, Plaintiff argues that "issue advocacy"—political speech that

15  does not expressly advocate the election or defeat of a candidate or ballot initiative—can never

16  be regulated under the First Amendment. (Mot. 14 (Dkt. No. 67).) Under this theory,

17  Washington's definition of "political committee" is unconstitutional because it could be read to

18  include expenditures for communications that do not *expressly* support or oppose the ballot

19  initiative in question.

20         The distinction between "express advocacy" and "issue advocacy" was first established

21  in *Buckley*. In that case, the Court considered the constitutionality of the Federal Election

22  Campaign Act of 1971 (FECA). *Buckley*, 424 U.S. at 6. In particular, the Court examined

23  provisions that (1) limited individual *contributions* to $1000 for any single candidate per

24  election; (2) limited individual or group *expenditures* "relative to a clearly identified

25  candidate" to $1000 per year; and (3) required *disclosure* and reporting of contributions and

26  expenditures above certain threshold levels. *Id.* at 7. The Court upheld the contribution limits,

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 24

1   finding they had only a "limited effect upon First Amendment freedoms" and that these effects

2   were justified by "weighty interests." 424 U.S. at 29. The expenditure ceiling, however,

3   "impose[d] significantly more severe restrictions on protected freedoms," operating as an

4   outright prohibition of speech subject to criminal penalties. *Id.* at 19–20, 23. The Court initially

5   interpreted the indefinite phrase "relative to a candidate" to mean "advocating the election or

6   defeat of a candidate," *id.* at 42 (internal quotation marks omitted); however, this narrowed

7   definition still raised First Amendment concerns. "Candidates, especially incumbents, are

8   intimately tied to public issues involving legislative proposals and governmental actions." *Id.*

9   The only way to determine whether public discussion of these issues advocated for or against

10  the candidate would be to measure either the subjective intent of the speaker or the predicted

11  effect on the listener. *Id.* at 43. Because neither intent nor effect can be measured with any

12  certainty, the expenditure limits could chill speech on a huge range of issues. *Id.* Therefore, to

13  avoid vagueness and overbreadth concerns, the Court further narrowed the definition of

14  "expenditure" to cover only "communications that in *express terms* advocate the election or

15  defeat of a clearly defined candidate." *Id.* at 44 (emphasis added). So narrowed, the Court

16  found the expenditure limits utterly ineffective, since groups and individuals could still

17  advocate for or against a candidate so long as they "eschew[ed] expenditures that [did so] in

18  express terms." *Id.* at 45 ("The exacting interpretation of the statutory language necessary to

19  avoid unconstitutional vagueness thus undermines the limitation's effectiveness . . . .").

20  Because the expenditure ceiling did not effectively further the state's interest, it did not survive

21  strict scrutiny. *Id.* at 50. Finally, in order to avoid similar overbreadth concerns, the Court

22  applied this same narrow definition of "expenditure" to the FECA's disclosure requirements,

23  which it upheld. *Id.* at 80.

24          Since *Buckley*, the distinction between "express advocacy" and "issue advocacy" has

25  proved problematic. In *McConnell*, the Supreme Court considered a challenge to the Bipartisan

26  Campaign Reform Act of 2002 (BCRA), which was passed in part to address the proliferation

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 25

1   of "campaign advertising masquerading as issue ads." 540 U.S. at 132 (internal quotation

2   omitted). To address this problem, the BCRA defined an "electioneering communication" as

3   any "broadcast, cable, or satellite communication" that "refers to a clearly identified

4   candidate;" is made within a certain period of time before an election, primary, or convention;

5   and, for regional candidates, is "targeted to the relevant electorate." *Id.* at 189–90. The statute

6   required disclosure of "electioneering communications" and also prohibited corporations and

7   labor unions from financing such communications through their treasury funds. *Id.* at 190. The

8   challengers noted that this definition went far beyond the "express advocacy" approved in

9   *Buckley* and argued that the BCRA's provisions therefore constituted impermissible regulation

10  of issue advocacy. *Id.* The Court rejected the notion that "*Buckley* drew a constitutionally

11  mandated line between express advocacy and so-called issue advocacy," instead characterizing

12  the *Buckley* holding as a matter of statutory, rather than constitutional, interpretation. *Id.* at

13  190. The Court upheld the disclosure requirements, noting that they "do not prevent anyone

14  from speaking" and serve "an important function in informing the public about various

15  candidates' supporters *before* election day." *Id.* at 201 (emphasis in original) (internal

16  quotation omitted). The Court also upheld the prohibition for corporations and unions, holding

17  that the justifications for restricting such speech extended at least to all speech that was the

18  "functional equivalent of express advocacy," which included for the "vast majority" of issue

19  ads. *Id.* at 206.

20      Four years later, however, the Supreme Court considered an as-applied challenge to the

21  same BCRA prohibition on corporate and union speech that it had facially upheld in

22  *McConnell*. *WRTL*, 127 S. Ct. at 2659. In the Court's primary opinion, Chief Justice Roberts,

23  joined by Justice Alito, noted that *McConnell* had only explicitly upheld the prohibition for

24  communications that were the "functional equivalent of express advocacy." *Id.* Whereas the

25  Court in *McConnell* appeared to take a broad view of this term, *see McConnell*, 540 U.S. at

26  126 ("While the distinction between 'issue' and express advocacy seemed neat in theory, the

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 26

1   two categories of advertisements proved *functionally identical* in important respects."

2   (emphasis added)); *id.* at 206 (finding that the "vast majority" of issue ads had an

3   "electioneering purpose" and hence were the functional equivalent of express advocacy), the

4   Chief Justice read the term far more narrowly. Expressing the same overbreadth concerns that

5   had troubled the Court in *Buckley*, he held that "an ad is the functional equivalent of express

6   advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to

7   vote for or against a specific candidate." *WRTL*, 127 S. Ct. at 2667. He found that the interests

8   that justified the regulation of campaign speech did not, in that case, justify the regulation of all

9   genuine issue advertising. *Id.* at 2673.

10        Although *WRTL* suggests a renewed concern for the chilling effect of campaign finance

11   laws on the discussion of public issues, the breadth of its holding remains unclear. *McConnell*

12   limited the definition of "electioneering communication" to the "functional equivalent of

13   express advocacy" only as far as it applied to the *prohibition* on corporate and union speech,

14   540 U.S. at 206, and apparently not as it applied to the BCRA's *disclosure* requirements, *see*

15   *id.* at 201 (stating, without reservation, that the BCRA's "disclosure requirements are

16   constitutional"). Because *WRTL*'s as-applied challenge was limited to the BCRA's corporate

17   speech prohibition, it is unclear whether the opinion's logic extends to lesser burdens on non-

18   express advocacy.

19        More importantly, nothing in *Buckley*, *McConnell*, or *WRTL* suggests that "issue

20   advocacy" is *fundamentally* entitled to greater First Amendment protection than express

21   political advocacy. Indeed, in *Buckley*, the Court repeatedly emphasized that that the protection

22   of campaign speech was at the core of the First Amendment and it merited the same protection

23   as any speech regarding issues of public concern. 424 U.S. at 15 ("[I]t can hardly be doubted

24   that the [First Amendment] guarantee has its fullest and most urgent application precisely to

25   the conduct of campaigns for public office." (internal quotation omitted)); *id.* at 48 ("Advocacy

26   of the election or defeat of candidates . . . is no less entitled to protection under the First

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 27

1    Amendment than the discussion of political policy . . . ."). The Supreme Court has protected

2    "issue advocacy" from the federal campaign finance laws not because that speech is sacred, but

3    simply because the rationales proffered for those laws have not justified imposing broad

4    burdens on public discourse. *See WRTL*, 127 S. Ct. at 2673 (finding the BCRA's prohibition on

5    corporate speech unconstitutional as applied because "appellants identify no interest

6    sufficiently compelling to justify burdening WRTL's speech").

7        *Buckley*, *McConnell*, and *WRTL* each dealt with federal campaign finance laws that

8    were limited to the election of *candidates*, but *ballot initiative* elections present strikingly

9    different considerations. Indeed, the entire concept of "issue advocacy" takes on a different

10   meaning in ballot measure elections. In candidate elections, "campaign speech" and "issue

11   advocacy" are often difficult to distinguish in practice, but they are at least distinct in theory.

12   *McConnell*, 540 U.S. at 126. In that context, campaign speech is intended to influence the

13   listener to vote for or against a candidate, whereas issue advocacy is intended simply to

14   influence the voter's opinion on an issue of public concern. The problem, of course, is that the

15   speaker's "intent" is impossible to determine, so pure issue advocacy on any number of issues

16   might be mistaken for campaign speech. *Buckley*, 424 U.S. at 42. Any speaker stating a

17   position on an issue that happens to coincide with a candidate's position could be deemed to be

18   "supporting" the candidate; similarly, any disagreement with a candidate's position could be

19   misinterpreted as "opposition" to the candidate. Therefore, broad regulation of campaign

20   speech in a candidate election could potentially chill vast amounts of issue advocacy on a wide

21   range of public issues—indeed, *any* issue on which *any* candidate has taken a position.

22       In the ballot initiative context, however, there is little, if any, meaningful distinction

23   between issue and express advocacy. Ballot initiatives present a single *issue* for public

24   referendum. *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978) ("Referenda

25   are held on *issues* . . . ." (emphasis added)). "Campaign speech," in this context, is speech

26   intended to influence the voter's opinion as to the merits of this single issue—in other words, it

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 28

is "issue advocacy," plain and simple. When an issue is presented to the public for referendum in this manner, the legitimate state interest in determining and reporting "where [the] money comes from," *Buckley*, 424 U.S. at 66 (internal quotation omitted), extends to all public debate on that issue. For example, I-1000 asks voters to decide *a single, specific issue*—namely, whether Washington should allow physician-assisted suicide. In the lead up to the election, voters are entitled to know who is lobbying to influence their opinion on that issue, and whether the speaker has a vested interest in the outcome of ballot initiative.[4] Similarly, when HLW telephones pro-life households with "an urgent update" informing them of I-1000 and "pleading for [their] help" "at this critical time to get the truth out" about physician-assisted suicide, contributors have an interest in ensuring that HLW actually spends the donated funds on the intended advocacy, whether that advocacy "expressly" mentions I-1000 or not. In short, from the perspective of the state's compelling interests, there is simply no difference between speech that advocates for or against physician-assisted suicide and speech that advocates for or against I-1000.

Regulation of ballot initiative campaign speech, defined broadly, will therefore necessarily impose a burden on "issue advocacy"; however, it is a much more targeted and limited burden than that which troubled the Court in *Buckley* and *WRTL*. Broad, ambiguous regulation of campaign speech in a candidate election risks burdening issue advocacy that is only peripherally related to the election. Moreover, it threatens to burden debate on a *broad*

---

[4] Ballot initiatives also often concern proposed public works projects, where some private parties are almost certain to have a financial stake in the outcome. For example, consider any of the several ballot initiatives concerning the construction of a citywide monorail in Seattle—several parties (construction firms, owners of homes on the proposed line, etc.) have a financial interest in the outcome of such an election. The voters' compelling interest in "knowing who is lobbying for their vote," *CPLC I*, 328 F.3d at 1106, clearly justifies regulating an organization that publicly advocates passing the initiative, but it likewise justifies regulating an organization advocating for the "general" idea that Seattle should have a citywide monorail. The latter issue is fundamental to the ultimate question being put before the voters and implicates the same governmental interest in tracking and disclosing the sources of public expenditures.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 29

1  *range* of issues—indeed, any issue that is arguably "pertinent" to the election. *See WRTL*, 127

2  S. Ct. at 2669. In contrast, regulating campaign speech in a ballot measure election will burden

3  issue advocacy only as to the *single* issue put before the public, and only because such

4  campaign speech and issue advocacy are, both in practice and in theory, one and the same. In

5  that scenario, the disclosure of issue advocacy is not an unfortunate byproduct of the campaign

6  disclosure laws; it is its central and intended purpose.

7      Accordingly, the Court rejects HLW's contention that there is a bright-line rule

8  prohibiting the regulation of "issue advocacy" and holds that the state's compelling interests in

9  informing the electorate and protecting contributors justify requiring "political committees" to

10 report on and disclose all expenditures made "in support of, or opposition to . . . a ballot

11 proposition." This holds even when "expenditure" is defined to include some advocacy as to

12 the "issue" underlying the proposition, as long as such regulations are limited to the specific

13 issue on which the public's vote is being sought.

14                    **(d)    "one of its primary purposes"**

15     HLW also argues that the state's definition of "political committee" is overbroad

16 because the "maker of expenditures" prong applies to any organization that has as "its 'primary

17 *or one of the primary purposes* to affect, directly or indirectly, governmental decision making

18 by supporting or opposing candidates or ballot propositions.'" *EFF*, 49 P.3d at 903 (emphasis

19 added) (*quoting State v. Dan Evans Campaign Comm.*, 509 P.2d 75, 79 (Wash. 1976)). HLW

20 claims that the State can only impose "PAC-style" reporting and disclosure requirements on

21 organizations whose *single* "major purpose" is the election or defeat of candidates or ballot

22 initiatives.

23     In *Buckley*, the Supreme Court considered the FECA's disclosure requirements as they

24 applied to both "political committees" (who had to "register with the [FEC] and to keep

25 detailed records of both contributions and expenditures") and individuals (who had to disclose

26 contributions or expenditures of over $100 per year, excluding contributions to a candidate or

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 30

1    political committee). 424 U.S. at 63–64. The Court raised the same overbreadth concerns that

2    had led it to strike down the FECA's expenditure ceilings, noting that the requirements for

3    "political committees" "could raise similar vagueness problems" because the term "could be

4    interpreted to reach groups engaged purely in issue advocacy." *Id.* at 79. However, the Court

5    noted that several lower courts had construed the FECA "to apply only to committees soliciting

6    contributions or making expenditures the major purpose of which is the nomination or election

7    of candidates." *United States v. Nat'l Comm. for Impeachment*, 469 F.2d 1135, 1141 (2d Cir.

8    1972). The Supreme Court adopted this narrowing construction, noting that "[t]o fulfill the

9    purposes of the Act they need only encompass organizations that are under the control of a

10   candidate or the major purpose of which is the nomination or election of a candidate." *Buckley*,

11   424 U.S. at 79. The Court found that the definition, so narrowed, no longer raised overbreadth

12   concerns; however, it never suggested that this was the *only* legitimate narrowing construction

13   that it could have adopted.

14           Subsequent Supreme Court opinions make clear that there is no "bright line"

15   requirement that PAC-style requirements only be imposed on organizations whose single

16   "major purpose" is campaign advocacy. One line of cases involved a provision in the FECA

17   that prohibited *any* corporation "from using treasury funds to make an expenditure 'in

18   connection with' any federal election . . . ." *MCFL*, 479 U.S. at 241. To make political

19   expenditures under the statute, a corporation needed to "administer[] a segregated political

20   fund," "appoint a treasurer for its segregated fund, keep records for all contributions, file a

21   statement of organization containing information about the fund, and update that statement

22   periodically," *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 657 (1990)—in other

23   words, the FECA essentially imposed "PAC-style" requirements on *all* corporations, regardless

24   of their major purposes. In *MCFL*, the Supreme Court considered an as-applied challenge to

25   this provision by a small, nonprofit, ideological corporation, 479 U.S. at 241–42, and noted

26   that the corporation faced "more extensive requirements and more stringent restrictions than it

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 31

1   would be if it were not incorporated." *Id.* at 254. The Court suggested that there generally were

2   compelling state interests in regulating the campaign speech of corporations, who received

3   artificial, state-created advantages and whose ability to amass large sums of wealth might lead

4   to an unfair advantage in the political marketplace. *Id.* at 257. However, the Court found that

5   those interests did not apply in this narrow case because MCFL (1) "was formed for the

6   express purpose of promoting political ideas and cannot engage in business activities," (2)

7   "ha[d] no shareholders or other persons affiliated so as to have a claim on its assets or

8   earnings," and (3) "was not established by a business corporation or a labor union, and . . . [had

9   a] policy not to accept contributions from such entities." *Id.* at 264 (noting that these "three

10  features [are] essential to our holding"). Later, in *Austin*, the Court reiterated that the *MCFL*

11  exception was narrow and applied only to corporations that "share[] these crucial features."

12  494 U.S. at 662. *Austin* makes perfectly clear that PAC-style requirements (extremely similar

13  to those at issue in this case) may be imposed on non-*MCFL*-like corporations who partake in

14  campaign activity even if it is not their single "major purpose." *See id.*[5]

15       The Ninth Circuit has upheld the imposition of PAC-style requirements without regard

16  to a corporation's "major purpose," even when that corporation fits within *MCFL*'s narrow

17  exception. In *ARTLC*, the Court considered an Alaska campaign law that required *MCFL*-type

18  corporations to register and file regular reports with the state's election commission. 441 F.3d

19  at 789–91. The Court upheld these PAC-style requirements, noting that they were "not

20  particularly onerous" and justified by the standard interests in disclosure that the Supreme

21  Court recognized in *Buckley* and *McConnell. Id.* at 791–92.[6]

22  _____

23       [5] HLW does not claim to fit within the exception set forth in *MCFL*. HLW appears to
    satisfy the first two elements of the test (*see* Compl. ¶ 13 (Dkt. No. 1) ("HLW is a nonstock,

24  ideological . . . corporation . . . .")); however, the record does not indicate whether HLW
    "accepts contributions from" "business corporation[s] or labor union[s]," *see MCFL*, 479 U.S.

25  at 264.

26       [6] HLW suggests that *ARTLC* was incorrectly decided. (*See* Mot. 9 (Dkt. No. 67)
    (arguing that *ARTLC* "ignores *MCFL*'s lengthy discussion of the organizational and conduct

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 32

1    HLW claims, somewhat disingenuously, that the Ninth Circuit held in *CPLC II* that
2    "PAC status may not be imposed on 'multi-purpose organizations.'" (Mot. 7 (Dkt. No. 67).) In
3    fact, the Court in that case explicitly *rejected* CPLC's argument that "because its major
4    purpose is not campaign advocacy, it was improper for California to 'treat [CPLC] like a
5    PAC.'" 507 F.3d at 1180 n.11. The Court cited *ARTLC* for the proposition that "*irrespective of*
6    *the major purpose of an organization*, disclosure requirements may be imposed" and found
7    "CPLC's argument to the contrary . . . unpersuasive." *Id.* (emphasis added).
8         HLW's only support comes from a nonbinding case from the Fourth Circuit. *N.C. Right*
9    *to Life, Inc. v. Leake (NCRTL)*, 525 F.3d 274 (4th Cir. 2008). That case involved North
10   Carolina's campaign finance law, which defined a "political committee" to cover any
11   organization that has "*a major purpose to support or oppose*" a candidate for election. *Id.* at
12   286 (emphasis added). The majority held that *Buckley* had created a hard-and-fast rule: "an
13   entity must have '*the* major purpose' of supporting or opposing a candidate to be designated a
14   political committee." *Id.* at 288 (emphasis in original). It found the state statute overbroad,
15   because it would regulate too much "protected speech unrelated to elections." *Id.* at 289. The
16   majority also found the statute unconstitutionally vague, because it did not expressly define
17   when a "purpose" became a "major purpose." *Id.* at 290.
18        This Court respectfully disagrees with the Fourth Circuit's analysis. Nothing in *Buckley*
19   or *MCFL* suggests a bright-line requirement that PAC-style requirements be reserved for
20   organizations whose single "major purpose" is election-related; indeed, *Austin* specifically
21   upheld similar requirements on a multi-purpose corporation. 494 U.S. at 662. The phrase "*a*
22   major purpose" is no more vague than "*the* major purpose." *See NCRTL*, 525 F.3d at 328
23   (Michael, J., dissenting). Moreover, the Washington statute in this case creates only civil
24   penalties, and parties can request prior interpretations from the PDC (Rippie Decl. ¶ 21–22
25   _____
26   burdens of PAC status").) The Court disagrees, but notes that it would, of course, be bound to
     follow *ARTLC* even if it disagreed with the Ninth Circuit's analysis.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 33

1   (Dkt. No. 47 at 11–12)), so there is little fear that any remaining ambiguity in the test will chill

2   protected speech.

3        Finally, there are compelling state justifications for extending PAC-style reporting to

4   multi-purpose organizations. First, *Buckley*'s "*the* major purpose" test "encourages advocacy

5   groups to circumvent the law by *not* creating political action committees and instead to hide

6   their electoral advocacy from view by pulling it into the fold of their larger organizational

7   structure." *NCRTL*, 525 F.3d at 332 (Michael, J., dissenting) (emphasis in original). Second,

8   basing "political committee" status on an organization's single "major purpose" discriminates

9   against small organizations, because advocacy that would constitute a small organization's

10  major purpose might only be considered one of several primary purposes at a larger entity. By

11  considering the *absolute* amount of campaign activity as opposed to the *relative* amount of

12  such activity, the state can fairly treat like political expenditures alike, regardless of their

13  source.

14       Therefore, the Court holds that Washington's definition of "political committee" is not

15  rendered overbroad simply by including organizations that make supporting or opposing an

16  election "one of [their] primary purposes." The state has a compelling interest in regulating all

17  such organizations rather than simply those whose *single* major purpose is campaign activity.

18  There are advantages and disadvantages to both approaches, and neither is constitutionally

19  required.

20           **(e)**    **"actual or constructive knowledge"**

21       HLW also challenges the "political committee" definition based on its "receiver of

22  contributions" prong, which it likewise claims is overbroad. (Mot. 18 (Dkt. No. 67).) In

23  *Buckley*, the Supreme Court interpreted the FECA's definition of "contribution" to only

24  include funds that were "earmarked for political purposes." 424 U.S. at 23 n.24. HLW argues

25  that this limiting construction is constitutionally required, and that Washington's definition is

26

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 34

1    overbroad because it applies whenever a contributor *knows or reasonably should know* that the

2    funds will be used for political purposes. *EFF*, 49 P.3d at 905.

3        Nothing suggests that states may only regulate contributions that are expressly made for

4    political purposes. In *Buckley*, the Supreme Court considered regulations that applied to

5    various transfers of funds made "for the purpose of influencing" a federal election or primary.

6    424 U.S. at 23. The statute did not define this phrase, so the Court relied on its "general

7    understanding of what constitutes a political contribution," which included all funds provided

8    directly or indirectly to a candidate, political party, or campaign committee, and all funds

9    transferred to another person or organization "earmarked for political purposes." *Id.* at 23 n.24.

10   Viewed in this light, the Court held that the FECA's definition of "contribution" was not

11   unconstitutionally vague, *see id.* at 23 n.24, 78; however, it never suggested that states could

12   *only* regulate "earmarked" political contributions.

13       In fact, the Ninth Circuit has already rejected HLW's argument. In *CPLC II*, the Court

14   considered California's definition of "contribution," which included any payment made when

15   "the donor *knows or has reason to know* that" the payment will be used to make other political

16   contributions or expenditures. 507 F.3d at 1181 (emphasis in original). CPLC argued that the

17   state could only regulate contributions "expressly made for political purposes," but the Court

18   disagreed. *Id.* at 1183 (internal quotation omitted). The state explained why *Buckley*'s narrow

19   definition was insufficient to further its compelling informational interests: "By simply

20   discouraging donors from earmarking their donations . . . , any multi-purpose group could

21   escape classification as a [political committee] and thereby avoid the duty to disclose its

22   contributors . . . ." *Id.* at 1183 (internal quotation omitted). The Court held that California's

23   definition of contribution was narrowly tailored to support its compelling government interest.

24   *Id.* at 1184.

25       Likewise, Washington's "receiver of contributions" test does not render its PAC-style

26   requirements overbroad. The state's compelling interest in informing the electorate about the

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 35

1    source of political advocacy easily extends to contributions made with the *knowledge* that the

2    contributed funds will be used for political ends. Moreover, a contributor is only deemed to

3    have "constructive knowledge" of an organization's political intentions if that organization has

4    taken some explicit action to make those intentions clear, such as (1) soliciting contributions

5    for political advocacy, (2) segregating funds for political purposes, (3) registering as a

6    "political committee" with the PDC, or (4) indicating in the organization's bylaws that it

7    intends to receive political contributions. (Rippie Decl. ¶ 35 (Dkt. No. 47 at 18).) As a result,

8    Washington's treatment of "contributions" is far less vague than that in the FECA, which

9    turned on the hard-to-discern "purpose" of the contribution. *See Buckley*, 424 U.S. at 23 n.24.

10   Therefore, by limiting its regulations to contributions made with "actual or constructive

11   knowledge that the organization is setting aside funds to support or oppose a candidate or

12   ballot proposition," *EFF*, 49 P.3d at 904, the state has narrowly tailored its PAC-style

13   requirements while avoiding the ambiguities that the Court was concerned with in *Buckley*. *See*

14   *CPLC II*, 507 F.3d at 1183 ("The fact that California has more explicitly defined 'contribution'

15   does not weaken its legislation.").

16                              **(f)     "expectation"**

17          Finally, HLW notes that Washington defines "political committees" based on an

18   "expectation" of receiving contributions or making expenditures, and it argues that the term

19   "expectation" is unconstitutionally vague. (Mot. 17 (Dkt. No. 67) ("Is it a hope?—promise?—

20   understanding?—agreement?—contract?").) The Court agrees that the term is ambiguous and

21   that, without guidance from the state courts, it might be difficult for a person of normal

22   intelligence to know at what point an organization "expected" to receive contributions or make

23   expenditures. However, as has already been made clear, the state courts and agencies have

24   significantly narrowed each of the definition's prongs and, in the process, have stripped the

25   definition of ambiguity.

26

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 36

1   As described above, to qualify as a "receiver of contributions," an organization must
2   have taken an affirmative step to give potential contributors "actual or constructive knowledge
3   that the organization is setting aside funds to support or oppose a candidate or ballot
4   proposition." *EFF*, 49 P.3d at 904. After any of the specific triggering actions takes place, the
5   organization can "expect" to receive political contributions because its potential contributors
6   will "know or should know" that their contributions will be used for political activity. (Rippie
7   Decl. ¶ 35 (Dkt. No. 47 at 18–19).)

8   The definition of "political committee" has been similarly narrowed under the "maker
9   of expenditures" prong by requiring that the organization "have as its primary or one of the
10  primary purposes" to support or oppose ballot propositions. *EFF*, 49 P.3d at 903 (internal
11  quotation omitted). Once the organization has made electoral political activity "one of its
12  primary purposes," there is no doubt that it will "expect" to make expenditures in support of
13  that purpose.

14  These narrowing interpretations of the definition's two prongs impose "political
15  committee" status only after concrete, discernible criteria have been met. In so narrowing the
16  definition, the state courts and agencies have eliminated any ambiguity initially presented by
17  the term "expectation."

18  ### (g) Narrow Tailoring

19  In sum, the Court finds that Washington's PAC-style disclosure and reporting
20  requirements are narrowly tailored to serve the state's compelling interests. Washington's
21  "political committee" requirements are "not particularly onerous." *ARTLC*, 441 F.3d at 791.
22  When Washington voters are asked to vote on an issue of public concern, they are entitled to
23  know who is lobbying to influence their opinion on that issue. Similarly, when Washington
24  residents contribute funds to an organization claiming to support or oppose a ballot initiative,
25  those contributors are entitled to verify that their funds were used for their intended purpose.
26  *See Riley*, 487 U.S. at 800 (explaining that compelling disclosure of contributions and

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 37

1   expenditures is one of the "more benign and narrowly tailored" means to ensure that

2   organizations are appropriately using the public's contributions). The State is justified in

3   extending these disclosure and reporting requirements to organizations that make campaign

4   advocacy "their primary or one of their primary purposes" and to organizations that give their

5   contributors "actual or constructive knowledge" that the donated funds will be used for

6   electoral political activity. Finally, by reserving its reporting requirements for the most active

7   political committees (*see* Rippie Decl. ¶ 26 (Dkt. No. 47 at 14)), the state has narrowly tailored

8   the provisions to avoids unduly chilling the speech of smaller or more reticent political

9   advocates.

10      Democracy depends on "uninhibited, robust, and wide-open" speech, which cannot

11  occur "when organizations hide themselves from the scrutiny of the voting public."

12  *McConnell*, 540 U.S. at 197 (internal quotation omitted). The requirements that Washington

13  imposes on "political committees" enforce the disclosure necessary to maintain a well-

14  functioning political process, and no more. Therefore, the PAC-style requirements survive

15  strict scrutiny.

16          **2.    Disclosure Requirements for "Independent Expenditures"**

17      Any entity, regardless of whether it qualifies as a "political committee" under

18  Washington law, must disclose its "independent expenditures" to the PDC if the value of such

19  expenditures totals more than one hundred dollars or cannot reasonably be estimated. WASH.

20  REV. CODE § 42.17.100(2)–(4). An "independent expenditure" is defined as "any expenditure

21  that is made in support of or in opposition to any candidate or ballot proposition" and is not

22  already required to be disclosed under the rules governing political committees. *Id.* §

23  42.17.100(1). HLW challenges these disclosure requirements for the same reasons it challenges

24  the PAC-style reporting requirements: it argues that "support" and "opposition" are

25  unconstitutionally vague and that the definition as a whole is overbroad because it is not

26  limited to "express advocacy" as applied in *Buckley*. (Mot. 19–21 (Dkt. No. 67).)

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 38

1    The Court has already rejected both of these arguments. Moreover, HLW's challenge is

2    particularly unpersuasive when directed at simple disclosure requirements, which are reviewed

3    under "exacting scrutiny." *See Davis v. FEC*, 128 S. Ct. 2759, 2775 (2008); *Buckley*, 424 U.S.

4    at 64. The Court finds it evident that requiring disclosure of independent expenditures is

5    "substantially related" to Washington's compelling interests; indeed, simple disclosure is one

6    of the least restrictive means of furthering the state's interests. *See McConnell*, 540 U.S. at 201

7    (noting that disclosure requirements "do not prevent anyone from speaking" (internal quotation

8    omitted)).

9    ### 3.    Disclosure Requirements for "Political Advertising"

10       Washington also imposes special requirements on "political advertising," and HLW

11   argues that the state's definition of this term is vague and overbroad. (*See* Mot. 21–22 (Dkt.

12   No. 67).) "Political advertising" is defined to include "any advertising displays, newspaper ads,

13   billboards, signs, brochures, articles, tabloids, flyers, letters, radio or television presentations,

14   or other means of mass communication, used for the purpose of appealing, directly or

15   indirectly, for votes or for financial or other support or opposition in any election campaign."

16   WASH. REV. CODE § 42.17.020(38).

17       First, HLW again claims that the terms "support" and "opposition" are vague and

18   overbroad because they could chill "issue advocacy." (Mot. 21–22 (Dkt. No. 67).) This

19   argument is no more persuasive when applied to the definition of "political advertising" than

20   when applied to the definitions of "political committee" or "independent expenditure."

21       Second, HLW argues that the phrase "directly or indirectly" is vague and overbroad.

22   (*Id.* at 21.) In *ARTLC*, however, the Ninth Circuit had "little trouble" upholding a statute that

23   contained this same term. 441 F.3d at 782–83. In that case, the Court considered Alaska's

24   definition of "electioneering communication," which resembled the federal definition except

25   that it applied when a communication "directly or indirectly identifies a candidate" whereas the

26   federal definition required that a candidate be "clearly" identified. *Id.* The Court explained:

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 39

1
2
3

> The federal definition specifies no method of identification. The Alaska definition specifies that the method may be direct or indirect; however, since the words "direct and indirect" together describe the complete universe of possible methods of identification, the Alaska statute has the actual effect of requiring no specific methods of identification, just like the federal definition.

4  *Id.* at 783. As in *ARTLC*, the phrase "direct and indirect" neither expands nor contracts the

5  scope of Washington's definition of "political advertising"—instead, it simply "describe[s] the

6  complete universe of possible" appeals. *Id.* Because the phrase does not change the definition's

7  meaning, it cannot, by itself, render the definition vague or overbroad.

8         Finally, HLW notes, and the state concedes, that the statute does not define the term

9  "mass communication." (Mot. 22 (Dkt. No. 67); Rippie Decl. ¶ 46 (Dkt. No. 47).) The Court

10  acknowledges that the term contains some ambiguity, but this ambiguity provides insufficient

11  grounds to find the definition of "political advertising" unconstitutional. HLW proposes to

12  solicit fundraising through letters and telephone calls and to issue "radio ads." (Compl. ¶ 22–

13  24 (Dkt. No. 1).) The "political advertising" definition explicitly covers "letters" and "radio

14  and television presentations," so the only relevant question to HLW's as-applied challenge is

15  whether its proposed telemarketing solicitation would be considered "any . . . other means of

16  mass communication." WASH. REV. CODE § 42.17.020(38). The Court finds that telemarketing

17  fits squarely within any reasonable definition of "mass communication," especially now that

18  telephones are increasingly used both for fundraising and direct political advertising. *See, e.g.*,

19  Carol Costello, *Robocalls flood phone lines in battleground states*, CNN, Oct. 23, 2008,

20  *available at* http://www.cnn.com/2008/POLITICS/10/23/robo.calls/. Moreover, HLW cannot

21  bring a facial challenge on overbreadth grounds unless it demonstrates that the ambiguity in the

22  definition will chill "substantial" amounts of protected speech. *See Virginia v. Hicks*, 539 U.S.

23  113, 119–20 (2003). HLW makes no attempt to prove that *any* speakers would self-censor their

24  protected speech out of fear that their method of communication might impermissibly be

25  deemed an "other means of mass communication," much less than such a chilling effect would

26  be "substantial . . . relative to the scope of the law's plainly legitimate applications." *Id.*

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 40

1  Accordingly, the Court finds that HLW has failed to carry its "heavy burden" of proving that

2  the potentially ambiguous "mass communication" term renders the definition of "political

3  advertising" overbroad. *See McConnell*, 540 U.S. at 207.

4      **4.    "Ratings, Evaluations, Endorsements and Recommendations"**

5      Finally, HLW challenges the treatment of ratings and endorsements under Washington

6  Administrative Code § 390-16-206, which provides:

7      (1) Any person making a measurable expenditure of funds to communicate a
8      rating, evaluation, endorsement or recommendation for or against a
       candidate or ballot proposition shall report such expenditure including all
9      costs of preparation and distribution in accordance with [Washington
       Revised Code] chapter 42.17. However, rating, endorsement or
10     recommendation expenditures governed by the following provisions are not
       reportable: The news media exemptions provided in [Washington Revised
11     Code §] 42.17.020(15)(b)(iv) and (21)(c), and [Washington Administrative
       Code §] 390-16-313(2)(b), and the political advertising exemption in
12     [Washington Administrative Code §] 390-05-290.

13     (2) A candidate or sponsor of a ballot proposition who, or a political committee
       which, is the subject of the rating, evaluation, endorsement or
14     recommendation shall not be required to report such expenditure as a
       contribution unless the candidate, sponsor, committee or an agent thereof
15     advises, counsels or otherwise encourages the person to make the
       expenditure.

16  *Id.* The record makes clear that this provision was not intended to create new reporting

17  requirements, but rather to clarify that certain "ratings, evaluations, endorsements, and

18  recommendations" would *not* need to be disclosed to the PDC or reported as contributions by

19  candidates or initiatives being endorsed. (*See* Rippie Decl. ¶ 50 (Dkt. No. 47 at 26).) In

20  particular, ratings and endorsements made without "a measurable expenditure of funds" or

21  made in the form of a news media item, commentary, editorial, etc., need not be disclosed as

22  expenditures or reported as contributions. (*Id.*)

23      HLW argues that § 390-16-206 is unconstitutional because it "relies on a vague

24  for/against test" and "regulat[es] a vast swath of protected issue advocacy." (Mot. 22–23 (Dkt.

25  No. 67).) Again, the Court notes that "issue advocacy" is not entitled to absolute protection

26  under the First Amendment and can be regulated if the circumstances so justify. Moreover, the

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 41

1  provision at issue in this challenge does not create new reporting requirements; instead, it

2  carves out an exception to the existing disclosure requirements in order to preserve the

3  traditional function of the news media and to allow non-journalistic individuals and

4  organizations "to evaluate and rank candidates and ballot measures without reporting so long

5  as they are not paying for advertisements or otherwise spending funds to communicate" the

6  ranking or evaluation. (Rippie Decl. ¶ 50 (Dkt. No. 47).) In carving out this commendable

7  exception, the state employs language no more vague than the "support" and "oppose"

8  language approved by the Supreme Court in *McConnell*. 540 U.S. at 170 n.64. In sum, the

9  Court holds that § 390-16-206 does not violate the First Amendment; instead, it is a laudable

10  attempt to *protect* traditional First Amendment interests within Washington State's campaign

11  finance framework.

12  **III.    CONCLUSION**

13          For the foregoing reasons, Plaintiff's Motion for a Summary Judgment (Dkt. No. 67) is

14  DENIED.

15          SO ORDERED this 8th day of January, 2009.

16

17

18

19                                        John C. Coughenour
                                          United States District Judge

20

21

22

23

24

25

26

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 42