1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11  PROTECTMARRIAGE.COM, et al.,          No. 2:09-cv-00058-MCE-DAD

12          Plaintiffs,

13      v.                          **MEMORANDUM AND ORDER**

14  DEBRA BOWEN, et al.,

15          Defendants.

16                          ----oo0oo----

17

18      ProtectMarriage.com - Yes on 8, a Project of California

19  Renewal ("ProtectMarriage.com"), National Organization for

20  Marriage, - Yes on 8, Sponsored by National Organization for

21  Marriage ("NOM-California"), and John Doe #1, an individual, and

22  as representative of the Class of Major Donors ("Major Donors")

23  (collectively "Plaintiffs"), each committees under California

24  election law, filed the current action challenging California's

25  statutory requirement that they disclose the names and other

26  personal information of those contributors of $100 or more.

27  Presently before the Court are Plaintiffs' Motions for

28  Preliminary Injunction and Protective Order.

                                 1

Plaintiffs ask that this Court: 1) enjoin Defendants from enforcing the semiannual reporting requirements under California Government Code § 84200; 2) enjoin Defendants from commencing criminal or civil actions for failing to comply with those reporting requirements; and 3) enjoin Defendants from both publishing reports or making available prior reports or campaign statements filed by Plaintiffs pursuant to California's Political Reform Act of 1974, Cal. Gov. Code § 81000 et seq. ("PRA"). Hearing on the matter was held on January 29, 2009, with representatives for all parties present.  For the following reasons, Plaintiffs' Motion for Preliminary Injunction is denied and the Protective Order already in place is extended.

**BACKGROUND**

On November 4, 2008, the citizens of California adopted a ballot measure, Proposition 8, that changed the California Constitution such that marriage would only thereafter exist "between a man and a woman."  Plaintiffs are primarily formed ballot committees under the PRA and were established specifically to support the passage of Proposition 8.

The PRA requires committees such as Plaintiffs to report detailed information regarding their contributors.  Specifically, Plaintiffs are required to file semiannual reports including the name, street address, occupation, name of employer, or if self-employed, the name of the business, the date and amount received during the period covered by the statement and the cumulative amount of contributions.  Cal. Gov. Code §§ 84200, 84211(f).

2

This information is then available, inter alia, on the website of the Secretary of State. Additionally, opponents of Proposition 8 have reproduced such information on a variety of their own websites and have also included other publicly-available personal information such as telephone numbers. At least one such website provides contributor information via an interactive map detailing the contributors' address, occupation, and contribution amount. See Declaration of Sarah E. Troupis (Second) ("Second Troupis Decl."), 2:6-9.[1]

Plaintiffs allege that, as a consequence of their support of Proposition 8, their contributors have been subject to threats, reprisals, and harassment. Plaintiffs submitted numerous articles elaborating various death threats, physical violence, and threats of violence directed against Proposition 8 supporters, as well as acts of vandalism, protests, and boycotts. See Declaration of Sarah E. Troupis ("First Troupis Decl.").

Specifically, Plaintiffs provided evidence that Fresno Mayor Alan Autry and Pastor Jim Franklin, of Fresno's Cornerstone Church, both supporters of Proposition 8, received a death threat. Id., Exh. C. That threat stated in part:

> Hey Bubba,
>
> You really acted like a real idiot at the Yes of [sic] Prop 8 rally this past weekend. Consider yourself lucky. If I had a gun I would have gunned you down along with each and every other supporter. It's a blessing that you won't be our Mayor for much longer.

---

[1] The Court is aware that Defendants have raised numerous challenges to Plaintiffs' evidence. Defendants' objections are noted and, in light of the Court's disposition of this case, are overruled as moot.

1

...

2   Anybody who has a YES ON PROP 8 sign or banner in fron
    [sic] of their house or bumper sticker on the car in
3   Fresno is in danger of being shot or firebombed.
    Fresno is not safe for anyone who supports Prop 8.
4   I've also got a little surprise for Pasor [sic]
    Franklin and his congregation of lowlife's [sic] in the
5   coming future.  Keep letting him preach hate and he'll
    be sorry.  He will be meeting his maker sooner than
6   expected.  Take this as a warning or anyway you want,
    but believe it.  If you thought 9/11 was bad, you
7   haven't seen anything yet. [Expletive] Fresno and the
    homophobic idiots who live there.  Mark my words.

8

9   Id., Exh. E.  Pastor Franklin's home, church and church office

10  were also "egged."  Id.

11      Additionally, Plaintiffs provided several articles stating

12  that, in November, a small group of evangelical Christians, known

13  to frequent San Francisco's Castro District on a weekly basis to

14  pray, sing hymns, and attempt to convert homosexuals to a

15  "straight lifestyle," were the subject of backlash from opponents

16  of Proposition 8.  Id., Exh. F, G.  One of the articles further

17  reported that opponents of the measure interrupted church

18  services in Michigan and that two Mormon temples and one Knights

19  of Columbus headquarters received envelopes containing white

20  powder.  Id., Exhs. F, I.

21      In early November, fifteen people were arrested while

22  attending a protest against Proposition 8 in Long Beach.  Id.,

23  Exh. K.  Despite police statements that the event was a "great

24  success considering the number of people who attended," at the

25  end of the event approximately 100 individuals blocked traffic,

26  refused to leave and then allegedly attempted to incite a riot.

27  Id.  Plaintiffs documented additional protests and boycotts as

28  well.  Id., Exhs., L-N.

4

Furthermore, several individuals have allegedly been forced to resign from their jobs amidst criticism over their monetary support of the ballot measure. See id., Exh. N (artistic director for the California Musical Theatre donated $1,000 to the "Yes on 8" campaign and subsequently resigned), AD (manager of El Coyote restaurant took a voluntary leave of absence after reports of her $100 donation to support Proposition 8 led to boycotts and protestors at the establishment owned by her mother), AH (director of Los Angeles Film Festival resigned in the wake of criticism over the $1500 he contributed to Proposition 8).

There have also been scattered reports of the theft of "Yes on 8" signs, vandalism of both residential and commercial buildings, and vandalism of church property, including one instance in which opponents of Proposition 8 apparently arranged "Yes on 8" signs in the form of a swastika on church grounds. Id., Exhs. H, Q, S-Z.

Finally, Plaintiffs filed anonymous declarations from several individuals who allege to have suffered personal repercussions because of their support of Proposition 8:

Declaration of John Doe #1

John Doe #1 donated funds to ProtectMarriage.com, placed a yard sign in front of his home, and made phone calls supporting Proposition 8 on behalf of a church group. He was required to list the name of his business when he contributed to ProtectMarriage.com, and, consequently, in October, someone papered the cars in his parking lot with flyers referencing his support for Proposition 8 and the amount of his contribution. His business has since been targeted by numerous boycotts, several orchestrated through Facebook. At one point, someone paid for a sponsored link on Google so that a search for John Doe #1's store resulted in a website referencing his support for Proposition 8 and urging a boycott.

5

Additionally, several negative reviews of his business were posted on Yelp.com referencing his donation to Plaintiff. Other websites have posted similar reviews.

John Doe #1's business has twice been picketed and, in November, opponents of Proposition 8 allegedly orchestrated a march intended to culminate in further picketing of John Doe #1's business.

According to John Doe #1, the protesters have become quite aggressive and he has received numerous letters and hundreds of emails condemning his support of the Proposition. Approximately 30-40 people have frequented his business to express their displeasure with his support of the ballot initiative. John Doe #1 eventually became concerned that opponents of Proposition 8 would tamper with his products so he installed sixteen additional security cameras. John Doe #1 contends that he will not contribute in the future and does not believe his business should suffer repercussions because of his personal donation.

Declaration of John Doe #2

John Doe #2 made two donations to ProtectMarriage.com and posted a "Yes on 8" bumper-sticker on his car. Subsequently, in November, someone distributed a flyer, in the town of his residence, labeling him a bigot. Additionally, the flyer listed his religious affiliation and the dollar amount of his contributions. According to John Doe #2, no one but his family was aware of his financial contribution, so he believes the information must have derived from public disclosure by the State. John Doe #2 also claims that he will be unlikely to contribute to similar causes in the future.

Declaration of John Doe #3

John Doe #3 is a pastor at a Lutheran Church. Prior to the passage of Proposition 8, he informed his congregation that the Bible supports marriage between one man and one woman. He further stated that the congregation should vote accordingly.

Also prior to the passage of Proposition 8, an individual placed a "Yes on 8" sign on church property. In November, someone used the sign and a heavy object to break a large window in the church building.

Declaration of John Doe #4

John Doe #4, an attorney who is the sole shareholder in his firm, donated funds to NOM-California.

In support of Proposition 8, John Doe #4 wrote articles
supporting Proposition 8 and conducted lectures to
local groups in support of the initiative.

He also held a fundraiser at his home to support
the ProtectMarriage.com - Yes on 8 campaign.  A group
of protesters conducted a demonstration at the entrance
to his community and attempted to hand flyers to guests
as they passed through the gate to the neighborhood.

Over the course of November 13-16, John Doe #4
received approximately 15-20 harassing emails.  One
email stated, "hello propogators & litigators burn in
hell."  Exh. B.  Another stated, "Congratulations. For
your support of prop 8, you have won our tampon of the
year award.  Please contact us if you would like to
pick up your prize."  Id.  At least one message
referenced the amount of John Doe #4's contributions
and the amount of an additional short-term loan John
Doe #4 had provided to ProtectMarriage.com.

Finally, John Doe #4's name, business and the
amount he donated were posted on the website
www.californiansagainsthate.org.

Declaration of John Doe #5

John Doe #5 contributed funds to
ProtectMarriage.com.  In November, John Doe #5 received
an email suggesting that his company's image would be
damaged as a result of his support of Proposition 8.
John Doe #5 now feels threatened and uneasy knowing
that his company could be targeted.

Declaration of John Doe #6

John Doe #6 donated funds to ProtectMarriage.com.
He did not engage in any other public support of the
initiative.  His name and the amount of his donation
was listed on www.californiansagainsthate.com.  At the
end of November, he received a postcard allegedly
insulting him for supporting the ballot measure.
The postcard was typed and stated in part, "We
just hope you are proud of your participation in this
Great Crusade.  Just think of how you have contributed
to the economy with the money you donated!  It doesn't
matter that there are thousands of worthwhile charities
that could have used those funds to feed starving
people, clothe the homeless, and find cures for cancer
and other life-threatening diseases.  You must be so
proud!"

///

///

Declaration of John Doe #7

John Doe #7 is the senior pastor of a church and donated funds to ProtectMarriage.com. His family members displayed bumper stickers on their cars and displayed yard signs in front of their house. John Doe #7's church served as a distribution center for the petitions initially circulated in support of the Proposition. The church also distributed yard signs and bumper stickers. Additionally, members of the church telephoned approximately 275 people on behalf of ProtectMarriage.com.

John Doe #7 received one phone call at the church stating that if he was against gay marriage, he should equally be against divorce. Twice, the "Yes on 8" bumper stickers were ripped off of his wife's car at her place of employment. One of these times, an anti-Proposition 8 note was left on the windshield. The typed note stated, "Why would you want to deprive others of fundamental human rights? What if a close friend, family member or co-worker was gay and wanted to get married? Wouldn't you want to support the love they have for their partner and want them to have the same rights as you and others? Please re-think your position. There are so many more important issues in this world that need our attention rather than gay marriage. We need to learn tolerance, acceptance and love of each other. PLEASE VOTE NO ON PROP. 8." Exh. A. Thereafter, he placed bumper stickers inside of the car windows with tape so that they could not be removed.

John Doe #8

John Doe #8 contributed funds to ProtectMarriage.com, displayed a bumper sticker on his car, and placed a yard sign in his front yard. John Doe #8 also attended numerous rallies, three press conferences, and spoke at a number of churches in Los Angeles, Orange County, and San Diego in support of Proposition 8. Additionally, he participated in panel discussions involving same-sex marriage. Finally, John Doe #8 attended an election night gathering at which he was photographed. That photograph was published in at least one periodical and possibly in numerous others.

John Doe #8's yard sign was twice stolen and destroyed. After his photograph was published, he began receiving harassing letters, e-mails and at least one phone call at his workplace. One such message stated, "Jesus doesn't love you! He will punish you in hell for voting to deny a minority the same equal rights the rest of us have.

8

You're as bad as the racist white people who used to
enjoy banning black people the same rights as them.
The rest of the world is disgusted by your actions.
Best start rethinking your position NOW!" Exh. B.   He
has also received harassing messages on his MySpace and
Facebook accounts.

As a result, John Doe #8 will be reluctant to
contribute to similar causes in the future.

John Doe #9

John Doe #9 attended an election night gathering
for supporters of Proposition 8.   A photograph taken of
him that night was published in at least one periodical
and may have appeared in numerous others.

Since publication of this picture, John Doe #9
began receiving harassing messages on his MySpace and
Facebook accounts.   Many of these contained profanity
and one threatened him with assault.

In November, John Doe #9 arrived home to a
harassing message on his answering machine.   A man, in
a mocking tone, stated that the people in the picture
with him were "Nazis" and against human rights.
Additionally, he stated, "I certainly hope that someday
somebody takes away something from you and then you'll
realize what a [expletive] [expletive] you are."

John Doe #9 also received several harassing emails
and phone calls at work.   Some of the messages stated
that the individuals knew where he worked and that they
were going to attempt to have him fired.   Additionally,
other departments and employees received an email
stating that he came "from a long line of bigots and
racists."

In November, in response to the above incidents,
John Doe #9 filed a police report, began coordinating
with security to ensure his safety at work, and changed
his home phone number.

As a result, John Doe #9 would think carefully
about the possible consequences of donating to or
publicly supporting a similar cause in the future.

///

///

///

///

9

Plaintiffs initiated this action because they are
statutorily required to again file semiannual reports on
January 31, 2009.[2]  Plaintiffs contend that their contributors
and the Major Donors will suffer irreparable harm in the form of
threats, harassment and reprisals if Plaintiffs are required to
adhere to the PRA's mandates.

Accordingly, Plaintiffs seek injunctive relief arguing first
that they are "entitled to an as-applied blanket exemption from
California's compelled disclosure provisions because Plaintiffs
have demonstrated a reasonable probability that compelled
disclosure will result in threats, harassment, and reprisals
because of their support for Proposition 8."  Plaintiffs'
Memorandum in Support of Motion for Temporary Restraining Order
("Motion"), 5:21-24.  Additionally, Plaintiffs contend that
"California's threshold for compelled disclosure of contributors
is not narrowly tailored to serve a compelling government
interest in violation of the First Amendment to the United States
Constitution."  Id., 6:1-3.  Namely, Plaintiffs challenge the
$100 threshold after which individual contributors must be
disclosed.  Finally, according to Plaintiffs, "any ballot measure
regulation that requires compelled disclosure regarding ballot
measure activity after the election has occurred in
unconstitutional because it cannot logically be related to a
compelling state interest."  Id., 6:12-14.

---

[2] Since the thirty-first falls on a Saturday, and since
Plaintiffs can file electronically, they are not technically
required to file until Monday, February 2, 2009.  Cal. Code Regs.
tit. 2, § 18116; Cal. Gov. Code § 84600 et seq.

**STANDARD**

A preliminary injunction is an extraordinary remedy, and Plaintiffs have the burden of proving the propriety of such a remedy by clear and convincing evidence. See Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 442 (1974). In order to warrant issuance of such relief, Plaintiffs must demonstrate either: 1) a combination of probable success on the merits and a likelihood of irreparable injury; or 2) that serious questions are raised and the balance of hardships tips sharply in favor of granting the requested injunction. Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839-40 (9th Cir. 2001); Winter v. Natural Resources Defense Council, 129 S. Ct. 365, 375 (2008). (likelihood rather than possibility of success on the merits required for issuance of preliminary injunctive relief).

These two alternatives represent two points on a sliding scale, pursuant to which the required degree of irreparable harm increases or decreases in inverse correlation to the probability of success on the merits. Roe v. Anderson, 134 F.3d 1400, 1402 (9th Cir. 1998); United States v. Nutri-cology, Inc., 982 F.2d 394, 396 (9th Cir. 1992). Under either formulation of the test for granting injunctive relief, however, Plaintiffs must demonstrate a significant threat of irreparable injury. Oakland Tribune, Inc. v. Chronicle Publ. Co., 762 F.2d 1374 (9th Cir. 1985).

///

///

///

**ANALYSIS**

**I.    PRELIMINARY INJUNCTION**

**A.    Likelihood of Success on the Merits**

The debate over the merits of Proposition 8 has proved divisive, both locally and nationally.  The issue of whether homosexuals have the same right to marry as do their heterosexual counterparts has garnered both passionate support and opposition, gripping the attention of communities across the country.

However, this case is not about gay marriage.  This case is not about whether that right to marry exists and from where that right might derive, nor is it about the content of a California referendum already appropriately before the California Supreme Court.

This case is about the First Amendment.

Before this Court is the narrow issue of whether California's compelled disclosure law violates the guarantees afforded the citizens of the United States under the First Amendment.  Thus, the Court must consider the State's power to regulate its own electoral process, and the tension between that governmental power and the free, uninhibited, and robust discourse necessary to the American way of life.  It must evaluate a challenge to the PRA, itself a law enacted directly by the people and in place for over thirty years, a law that has never before been attacked on the specific grounds currently before this Court.

///

///

1    Specifically, at issue is whether compelled disclosure of
2    the names of Plaintiffs' contributors will result in a threat of
3    harm so substantial as to warrant an exemption from California's
4    disclosure requirements, an exemption historically reserved for
5    small groups promoting ideas almost unanimously rejected.  At
6    issue are the harms alleged to await Plaintiffs because those who
7    disagree with Plaintiffs' beliefs have engaged in repugnant and
8    despicable acts that, rather than justify in their own right the
9    protections afforded by the shield of First Amendment, are being
10   wielded as a sword to improperly attack Plaintiffs' contributors.
11   Consequently, the issues before this Court are decidedly
12   narrow:  1) Whether Plaintiffs are entitled to an as-applied
13   blanket exemption from California's compelled disclosure
14   requirements because there is a reasonable probability that
15   disclosure will result in threats, harassment, and reprisals to
16   their contributors; 2) whether California's $100 compelled
17   disclosure threshold is unconstitutionally low because such a low
18   figure is not appropriately related to a proper government
19   interest; and 3) whether California's post-election reporting
20   requirement is unconstitutional for the same reason.
21   Accordingly, the only question this Court can and will answer is
22   whether a preliminary injunction is necessary to rectify the
23   alleged infringement of Plaintiffs' First Amendment rights.  Any
24   other discussion, despite its potential relevance to the
25   marketplace of ideas, is simply not before the Court.
26   ///
27   ///
28   ///

13

The First Amendment to the United States Constitution states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."[3]  U.S. Const. amend. I.

It cannot be denied that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is...enhanced by group association."  National Association for the Advancement of Colored People v. Alabama, 357 U.S. 449, 460 (1958) ("NAACP v. Alabama").  State-mandated compelled disclosure of contributors to committees such as Plaintiffs indisputably impinges on those vital freedoms of belief and assembly.  See Buckley v. Valeo, 424 U.S. 1, 64 (1976).

Thus, the Supreme Court has stated that "significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate government interest...[T]he subordinating interests of the State must survive exacting scrutiny...[T]here must be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed.

///

///

///

---

[3] The First Amendment is applicable to the states through the Fourteenth Amendment.  Stromberg v. People of the State of California, 283 U.S. 359, 368 (1931).

1  This type of scrutiny is necessary even if any deterrent effect

2  on the exercise of First Amendment rights arises, not through

3  direct government action, but indirectly as an unintended but

4  inevitable result of the government's conduct in requiring

5  disclosure."  Buckley at 64-65 (internal citations omitted).[4]

6      Plaintiffs therefore contend that Buckley and its progeny

7  require the Court to apply strict scrutiny in evaluating

8  California's current compelled disclosure regime.  However, such

9  a conclusion is not as easily reached as Plaintiffs imply.

10     Supreme Court precedent regarding the appropriate standard

11 of review is not a model of clarity.  The Court has repeatedly

12 relied on Buckley's ambiguous "exacting scrutiny" test to

13 evaluate campaign finance regulations.  See Davis v. Federal

14 Election Commission, 128 S. Ct. 2759, 2765 (2008)

15     The Ninth Circuit, on the other hand, has expressly applied

16 strict scrutiny in a case similar to the one before this Court,

17 stating, "Although the First Amendment tolerates some regulation

18 of express ballot-measure advocacy, it does not necessarily

19 follow that the PRA regulations are constitutional.

20 ///

21 ///

22 ///

23

24     [4] The compelled disclosure discussion undertaken in Buckley,
   a case involving federal regulation of candidate elections,
25 applies equally in the ballot measure context.  See CPLC v.
   Getman 328 F.3d 1088, 1104 (9th Cir. 2003), quoting McIntyre v.
26 Ohio Elections Com'n, 514 U.S. 334, 347 (1995) ("[T]here can be
   no doubt that states may regulate express ballot-measure advocacy
27 through disclosure laws.  Such speech is political in nature and
   '[t]the principles enunciated in Buckley extend equally to issue-
28 based elections...'") ("Getman I").

                                  15

For California to regulate individuals or organizations...who engage in activities other than political advocacy, California must have a compelling interest, and the regulation imposed must be narrowly tailored to advance the relevant interest." Getman I, 328 F.3d at 1101.

Nevertheless, in a related footnote, the Getman I court also recognized:

> [T]he Supreme Court has been less than clear as to the proper level of judicial scrutiny we must apply in deciding the constitutionality of disclosure regulations such as those in the PRA. The Buckley Court claimed to apply "exacting scrutiny" in analyzing the FECA disclosure and reporting requirements, 424 U.S. at 64, but then noted that its review was whether a "'substantial relation' existed between the governmental interest and the information required to be disclosed." Id. In C&C Plywood, a case filed two years after Buckley, we observed that disclosure regulations for express ballot-measure advocacy may be enacted "without a showing of a compelling state interest." 583 F.2d 421, 425 (9th Cir. 1978). We obviously assumed there that strict judicial review of disclosure statutes was inappropriate.
>
> Notwithstanding Buckley and C & C Plywood, we subject California's disclosure requirements to strict scrutiny. In doing so, we follow the Court's post-Buckley decision of [Federal Election Com'n v. Massachusetts Citizens for Life, Inc.], 479 U.S. 238 (1986). There the Court subjected disclosure and reporting provisions of FECA to strict scrutiny because those provisions applied to "organizations whose major purpose is not campaign advocacy, but who occasionally make independent expenditures on behalf of candidates." 479 U.S. at 252-53. The Court recognized that reporting and disclosure requirements are more burdensome for multipurpose organizations (such as CPLC) than for political action committees whose sole purpose is political advocacy. See id. at 255-56. Given that the MCFL Court considered FECA's disclosure requirements to be a severe burden on political speech for multipurpose organizations, we must analyze the California statute under strict scrutiny. Post- Buckley, the Court has repeatedly held that any regulation severely burdening political speech must be narrowly tailored to advance a compelling state interest.

Getman at 1101 n.16 (final citations omitted).

16

The Ninth Circuit has not since clarified matters.  See Alaska Right to Life Comm. v. Miles, 441 F.3d 773, 787-788 (9th Cir. 2006); American Civil Liberties Union of Nev. v. Heller, 378 F.3d 979, 992-993 (9th Cir. 2004).

Thus, the appropriate standard of review is an open question, and it will remain so until another day.  Today, because Plaintiffs' likelihood of success on the merits is minimal even under the most stringent review, the Court will assume without deciding that strict scrutiny applies.  Accordingly, the Government "bears the burden of proving that the [statutory] provisions are (1) narrowly tailored, to serve (2) a compelling state interest."  CPLC v. Randolph, 507 F.3d 1172, 1178 (9th Cir. 2007).

Plaintiffs' concede, as they must, that California has a compelling justification for requiring disclosure of Plaintiffs' contributors.  Plaintiffs' concession, however, gives short shrift to both the nature and magnitude of the State's actual interest.

According to Buckley, California's interests in its current compelled disclosure regime potentially fall into three categories.  424 U.S. at 66.  "First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office...Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity...Third,...recordkeeping, reporting, and disclosure requirements are an essential means of

17

gathering the data necessary to detect violations of the contribution limitations." Id. at 66-68.

However, unlike the election before the Buckley Court, which concerned candidates, the instant case bears on a recent ballot-initiative measure. Since Buckley, the Ninth Circuit has determined that "[o]nly the informational interest applies in the ballot-measure context." See Getman I, 328 F.3d at 1105 n.23. Nevertheless, the Supreme Court has repeatedly emphasized the importance of disclosure as it relates to the passage of initiatives. See CPLC v. Getman, No. 00-1698, slip op. at 15:9-11 (E.D. Cal. February 25, 2005) ("Getman II").

Such import derives, in no small part, from the fact that "[e]very other year, California voters decide the fate of complex policy proposals of supreme public significance...California voters have passed propositions increasing the sentences for 'third strike' criminal offenders, rendering illegal aliens ineligible for public services, banning affirmative action, mandating that public education be conducted in English, and imposing contribution limits for political campaigns." Getman I, 328 F.3d at 1105. In 1974, California voters even passed the initiative necessary to establish the PRA and its disclosure requirements. See Cal. Gov't code § 81000.

"California's high stakes form of direct democracy is not cheap. Interest groups pour millions of dollars into campaigns to pass or defeat ballot measures. Nearly $200 million was spent to influence voter decisions on the 12 propositions on the 1998 ballot. Of that total, $92 million was spent on one gaming initiative.

18

The total amount spent by proponents and opponents of ballot
measures has even outpaced spending by California's legislative
candidates."  Getman I, 328 F.3d at 1105.

Despite the fact that powerful issues are presented to the
California voters and that the economic support for state
initiatives is staggering, Plaintiffs argue that the public's
"general want of knowledge" is insufficient to sustain the burden
disclosure imposes on contributors' First Amendment liberties.
Motion, 28:11-13.  However, the Government's interest before the
Court cannot be diminished by characterization as a general want
of knowledge.  The influx of money referenced above "produces a
cacophony of political communications through which California
voters must pick out meaningful and accurate messages.  Given the
complexity of the issues and the unwillingness of much of the
electorate to independently study the propriety of individual
ballot measures,...being able to evaluate who is doing the
talking is of great importance."  Getman I, 328 F.3d at 1105.

"Voters rely on information regarding the identity of the
speaker to sort through this 'cacophony,' particularly where the
effect of the ballot measure is not readily apparent.  While the
ballot pamphlet sent to voters by the state contains the text and
a summary of ballot measure initiatives, many voters do not have
the time or ability to study the full text and make an informed
decision.

///

///

///

///

Since voters might not understand in detail the policy content of a particular measure, they often base their decisions to vote for or against it on cognitive cues such as the names of individuals supporting or opposing a measure, as listed in the ballot pamphlet, or the identity of those who make contributions or expenditures for or against the measure, which is often disclosed by the media or in campaign advertising.  Such cues play a larger role in the ballot measure context, where traditional cues, such as party affiliation and voting record, are absent." <u>Getman II</u>, No. 00-1698 at 17:12-28.

Moreover, this Court cannot ignore the fact that, "[v]oters act as legislators in the ballot-measure context, and interest groups and individuals advocating a measure's defeat or passage act as lobbyists; both groups aim at pressuring the public to pass or defeat legislation.... Californians, as lawmakers, have an interest in knowing who is lobbying for their vote, just as members of Congress may require lobbyists to disclose who is paying for the lobbyists' services and how much." <u>Getman I</u>, 328 F.3d at 1106.  It follows that "[i]f our Congress 'cannot be expected to explore the myriad pressures to which they are regularly subjected,' then certainly neither can the general public.  People have jobs, families, and other distractions. While we would hope that California voters will independently consider the policy ramifications of their vote, and not render a decision based upon a thirty-second sound bite they hear the day before the election, we are not that idealistic nor that naive.

///

///

20

By requiring disclosure of the source and amount of funds spent
for express ballot-measure advocacy, California -at a minimum-
provides its voters with a useful shorthand for evaluating the
speaker behind the sound bite." Id.

That shorthand is arguably even more necessary to the
evaluation of ballot initiatives than it is in the scrutiny of
candidates for political office. "'Even more than candidate
elections, initiative campaigns have become a money game, where
average citizens are subjected to advertising blitzes of
distortion and half-truths and are left to figure out for
themselves which interest groups pose the greatest threats to
their self-interest.' Knowing which interested parties back or
oppose a ballot measure is critical, especially when one
considers that ballot-measure language is typically confusing,
and the long-term policy ramifications of the ballot measure are
often unknown. At least by knowing who supports or opposes a
given initiative, voters will have a pretty good idea of who
stands to benefit from the legislation." Getman I, 328 F.3d at
1105-1106.

More to the point, "[d]isclosure...prevents the wolf from
masquerading in sheep's clothing. Proposition 199, which was on
the March 1996 Primary Election ballot, provides such an example.
That initiative was entitled the 'Mobile Home Fairness and Rental
Assistance Act,' but the proposed law was hardly the result of a
grassroots effort by mobile home park residents wanting
'fairness' or 'rental assistance.' Two mobile home park owners
principally backed the measure.
///

After the real interests behind the measure were exposed, various newspaper editorials decried the initiative's 'subtly misleading name' and explained that the initiative's real purpose was to eliminate local rent control for mobile home parks.  The measure was soundly defeated, though proponents outspent opponents $3.2 million to $884,000."  Getman I, 328 F.3d at 1106 n.24 (emphasis in original).

The Ninth Circuit made similar statements in CPLC v. Randolph, 507 F.3d 1172.  In that case the appellate court stated, "[I]n the context of disclosure requirements, the government's interest in providing the electorate with information related to election and ballot issues is well-established."  Id. 1179 n.8.  As here, that plaintiff conceded the state's interest was compelling, but the court nevertheless engaged in an extensive discussion of why that the government's informational interest is not only compelling, but of the highest order.[5]

_____

[5] That court stated:

Despite the fact that CPLC conceded that California has a compelling informational interest, California also presented persuasive evidence demonstrating the importance of providing the electorate with pertinent information.  Researcher David Binder conducted a telephone survey from June 23-26, 2001. "The goals of this project were to determine objectively, using established methods of scientific public opinion research, what sources of information regarding candidates and ballot measures are important to California voters." According to Binder's findings, "[m]ore than seven of ten California voters (71%) state that it is important to know the identity of the source and amount of campaign contributions to the ballot measure by both supporters and opponents, including unions, businesses or other interest groups."

(continued...)

"Fifty seven percent (57%) of California voters state
that endorsements by interest groups, politicians or
celebrities are important in helping them make up their
mind [sic] on how to vote on ballot measures." "A
majority of California voters (57%) state they would be
less likely to vote for a proposition to build senior
citizen housing if the proposition was supported by a
well-known and respected senior activist who was
discovered to have been paid by developers to promote
the proposition. Only one-third (34%) stated that this
information would not make any difference in their
vote."

   Professor Bruce Cain, a Professor of Political

Science at the University of California, Berkeley, and
Director of the Institute of Governmental Studies,
added that "there are several compelling reasons for
such a requirement.  Foremost among them is the fact
that the names groups give themselves for disclosure
purposes can be, and frequently are, ambiguous or
misleading."

   Sandy Harrison, a former journalist for radio
stations and newspapers and since 1995, a press
secretary and communications director for the president
pro tem of the state Senate, the state Department of
Finance, and the state Controller, emphasizes this
point in her affidavit:

   A prime example of this was Proposition 188
   on the November 1994 ballot, an effort to
   overturn California's recently enacted
   workplace smoking ban.  Supporters falsely
   portrayed the measure as a grassroots effort
   by small businesses.  By reviewing the
   campaign finance report, I was able to report
   to readers that it was not the work of small
   businesses, but actually giant tobacco
   companies.... If the campaign finance report
   had not been public, I could not have
   substantiated or conveyed this important
   information to the readers, and they may
   never have learned the truth about who was
   really behind this proposition.


   According to Stephen K. Hopcraft, the
President and co-owner of "a full-service public
relations firm specializing in grass roots and
public education campaigns[,]" "the information
gleaned from ... disclosure reports is <u>absolutely
critical</u> to assist news media and voters in

                                        (continued...)

                        23

Thus, "because groups supporting and opposing ballot measures frequently give themselves ambiguous or misleading names, reliance on the group, without disclosure of its source of funds, can be a trap for unwary voters. For example, a tobacco manufacturing group that opposes regulations on smoking might call itself 'Citizens for Consumer Protection.' This name might mislead voters into thinking that Citizens for Consumer Protection is a consumer advocacy group when, in fact, it protects the commercial interest of the tobacco industry. If the organization's donor information is disclosed and opposing groups and the press publicize the information, voters have a better chance of discerning the organization's true interest." Getman II, No. 00-1698 at 18:1-12.[6]

---

[5](...continued)
sorting through the claims and counter-claims in a ballot measure campaign.... With all the hyperbole in campaigning, the financial backing of each side gives voters a yardstick to measure the truth of the assertions." Indeed, CPLC admitted that "[b]ecause political operators in many states are able to avoid campaign finance disclosure requirements, citizens are likely to be uninformed and unaware of the tens of millions of dollars that are spent on ballot measure campaigns by veiled political actors ..."

Randolph, 507 F.3d at 1179 n.8 (emphasis in original).

[6] See also McConnell v. Fed. Election Comm'n, 540 U.S. 93, 128 (2003) ("Because FECA's disclosure requirements did not apply to so-called issue ads, sponsors of such ads often used misleading names to conceal their identity. 'Citizens for Better Medicare,' for instance, was not a grassroots organization of citizens, as its name might suggest, but was instead a platform for an association of drug manufacturers. And 'Republicans for Clean Air,' which ran ads in the 2000 Republican Presidential primary, was actually an organization consisting of just two individuals-brothers who together spent $25 million on ads supporting their favored candidate."); Id. at 128 n.23 ("Other
(continued...)

24

"Interest groups also seek to conceal their political involvement by availing themselves of complicated arrangements consisting of nonprofit corporations, unregulated entities and unincorporated entities.  Without disclosure requirements, citizens are likely to be uninformed and unaware that tens of millions of dollars are spent on ballot measure campaigns by such veiled political actors."  Id. at 18:14-20.  Of particular relevance in this case is the number of out-of-state individuals and corporations contributing to the passage of a California referendum.  Surely California voters are entitled to information as to whether it is even citizens of their own republic who are supporting or opposing a California ballot measure.

Moreover, "[w]hen asked, voters have indicated that information regarding the source and amount of campaign contributions to ballot measures plays an important role in their decision-making.  Voters rate such information as more valuable than newspaper endorsements, campaign mailings, TV and radio advertisements, and endorsements by interest groups, politicians or celebrities."  Id. at 18:21-19:2.

///

///

///

///

_____

[6](...continued)
examples of mysterious groups included 'Voters for Campaign Truth,' 'Aretino Industries,' 'Montanans for Common Sense Mining Laws,' 'American Seniors, Inc.' 'American Family Voices,' and the 'Coalition to Make our Voices Heard.'") (internal citations omitted).

"In light of the number and complexity of ballot measures
confronted by California voters, the staggering sums expending to
influence their passage or defeat, the very real potential for
deception through the information of advocacy groups with
appealing but misleading names, and voters' heavy reliance on
funding source information when deciding to support or oppose
ballot measures,...California has a compelling informational
interest in providing the electorate with information regarding
contributors and expenditures made to pass or defeat ballot
measure initiatives." <u>Id</u>. at 19:3-12.

The disclosure requirements provide some of the only truly
objective information on which the electorate can rely to make an
informed decision, and the state surely has the utmost
justification for requiring the disclosure of information likely
to ensure that its electorate is informed and able to effectively
evaluate ballot measures.  If ever disclosure was important,
indeed vital, to fuel the public discourse, it is in the case of
ballot measures.

Thus, even if, as Plaintiffs argue, individual voters will
not be "clamoring" to know the name and other pertinent
information of every contributor of over $100 to every
initiative, the cumulative effect of disclosure ensures that the
electorate will have access to information regarding the driving
forces backing and opposing each bill.  Accordingly, the
Government's interest is not only compelling, but critical to the
proper functioning of the State's system of direct democracy.
///
///

Finally, "[i]n determining whether legislation is narrowly tailored, [the Court] consider[s] whether the restriction '(1) promotes a substantial government interest that would be achieved less effectively absent the regulation, and (2) [does] not burden substantially more speech than is necessary to further the government's legitimate interests.'" Randolph, 507 F.3d at 1183, quoting Kuba v. 1-A Agric. Ass'n, 387 F.3d 850, 861 (9th Cir. 2001). To be narrowly tailored, a statute need not be the least restrictive means of furthering the government's interest, but the restriction may not burden substantially more speech than necessary." Id. at 1186, quoting Menotti v. City of Seattle, 409 F.3d 1113, 1130-1131 (9th Cir. 2005).

According to Plaintiffs, neither the $100 contribution threshold that triggers California's statutory disclosure requirements nor the post-election reporting requirements are narrowly tailored to a compelling state interest. Each of those arguments will be addressed in turn, but the Court first turns to Plaintiffs' as-applied challenge.

**B.    Plaintiffs' As-Applied Challenge to the Disclosure Statute: Whether There is a Reasonable Probability that Compelled Disclosure Will Result in Threats, Harassment, and Reprisals to Contributors to a Minor Party**

Plaintiffs' first argument, which raises an as-applied challenge to the application of California's disclosure laws, does not involve the above strict scrutiny analysis, but instead turns on a test first articulated in Buckley and later applied in Brown v. Socialist Workers '74 Campaign Comm. (Ohio),

27

459 U.S. 87 (1982), and its progeny.  Nevertheless, the above departure into the nature of the State's interest is relevant to the Court's resolution of Plaintiffs' instant claim.

The test applicable to Plaintiffs' First Cause of Action was initially formulated in Buckley when the Supreme Court rejected an overbreadth challenge to all reporting requirements imposed on minor parties.  424 U.S. 1.  Despite its rejection of a blanket disclosure exemption for all such groups, the Court left open the possibility that similar minor parties in the future might be able to seek such immunity if they could show that there was a reasonable probability their contributors would suffer from harassment, threats, or reprisals as a result of such revelation.

The Buckley Court began its discussion by noting that the "governmental interest in disclosure is diminished when the contribution in question is made to a minor party with little chance of winning an election.  As minor parties usually represent definite and publicized viewpoints, there may be less need to inform the voters of the interests that specific candidates represent.  Major parties encompass candidates of greater diversity.  In many situations the label 'Republican' or 'Democrat' tells a voter little.  The candidate who bears it may be supported by funds from the far right, the far left, or any place in between on the political spectrum.  It is less likely that a candidate of, say, the Socialist Labor Party will represent interests that cannot be discerned from the party's ideological position."  Id. at 70.

///

///

28

Additionally, that Court was cognizant that "the damage done by disclosure to the associational interests of the minor parties and their members and to supporters of independents could be significant. These movements are less likely to have a sound financial base and thus are more vulnerable to falloffs in contributions. In some instances fears of reprisal may deter contributions to the point where the movement cannot survive. The public interest also suffers if that result comes to pass, for there is a consequent reduction in the free circulation of ideas both within and without the political arena." Id. at 71.

Accordingly, the Buckley Court determined that, though such facts were not before it, "[t]here could well be a case...where the threat to the exercise of First Amendment rights is so serious and the state interest furthered by disclosure so insubstantial that the Act's requirements [could not] be constitutionally applied." Id. That Court further observed "that unduly strict requirements of proof could impose a heavy burden, but it does not follow that a blanket exemption for minor parties is necessary. Minor parties must be allowed sufficient flexibility in the proof of injury to assure a fair consideration of their claim. The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisal from either Government officials or private parties. The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself.
///

29

A pattern of threats or specific manifestations of public hostility may be sufficient." Id. at 74.[7]

The Supreme Court later had occasion to apply the Buckley test in Brown. The Brown Court addressed the issue of "[w]hether certain disclosure requirements of the Ohio Campaign Expense Reporting Law...[could] be constitutionally applied to the Socialist Workers Party ["SWP"], a minor political party which historically ha[d] been the object of harassment by government officials and private parties." Brown, 459 U.S. at 88. That Court emphasized several points raised in Buckley reiterating that "[t]he government's interests in compelling disclosures are 'diminished' in the case of minor parties...[and at] the same time, the potential for impairing First Amendment interests is substantially greater." Id. at 92, quoting Buckley, 424 U.S. at 70.

///

---

[7]     The Buckley Court noted that the facts in NAACP v. Alabama could possibly have warranted sustaining an as-applied challenge to Alabama's compelled disclosure requirements.  Id. at 71.  The NAACP v. Alabama Court stated, "We think that the production order, in the respects here drawn in question, must be regarded as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association.  Petitioner has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility.  Under these circumstances, we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." NAACP v. Alabama, 357 U.S. at 462-463.

In <u>Brown</u>, the Court had before it "'substantial evidence of both governmental and private hostility toward and harassment of SWP members and supporters.'  Appellees introduced proof of specific incidents of private and government hostility toward the SWP and its members within the four years preceding the trial. These incidents, many of which occurred in Ohio and neighboring states, included threatening phone calls and hate mail, the burning of SWP literature, the destruction of SWP members' property, police harassment of a party candidate, and the firing of shots at an SWP office.  There was also evidence that in the 12-month period before trial, 22 SWP members, including four in Ohio, were fired because of their party membership.  The evidence amply support[ed] the District Court's conclusion that 'private hostility and harassment toward SWP members make it difficult for them to maintain employment.'"  <u>Brown</u> at 98-99.

Moreover, "[t]he District Court also found a past history of government harassment of the SWP.  FBI surveillance of the SWP was 'massive' and continued until at least 1976.  The FBI also conducted a counterintelligence program against the SWP and the Young Socialist Alliance, the SWP's youth organization.  One of the aims of the 'SWP Disruption Program' was the dissemination of information designed to impair the ability of the SWP and the YSA to function.  This program included 'disclosing to the press the criminal records of SWP candidates, and sending anonymous letters to SWP members, supporters, spouses, and employers.'  Until at least 1976, the FBI employed various covert techniques to obtain information about the SWP, including information concerning the source of its funds and the nature of its expenditures.

31

The District Court specifically found that the FBI had conducted
surveillance of the Ohio SWP and had interfered with its
activities within the State.  Government surveillance was not
limited to the FBI.  The United States Civil Service Commission
also gathered information on the SWP, the YSA, and their
supporters, and the FBI routinely distributed its reports to
Army, Navy, and Air Force Intelligence, the United States Secret
Service, and the Immigration and Naturalization Service." Id. at
99-100.

Finally, "the Government possesse[d] about 8,000,000
documents relating to the SWP, YSA...and their members...Since
1960, the FBI ha[d] had about 300 informants who were members of
the SWP and/or YSA and 1,000 non-member informants.  Both the
Cleveland and Cincinnati FBI field offices had one or more SWP or
YSA member informants.  Approximately 2 of the SWP member
informants held local branch offices.  Three informants even ran
for elective office as SWP candidates.  The 18 informants whose
files were disclosed to [the Special Master] received total
payments of $358,648.38 for their services and expenses." Id. at
100 n.18.

The Brown court determined that "the evidence of private and
government hostility toward the SWP and its members establishe[d]
a reasonable probability that disclosing the names of
contributors and recipients [would] subject them to threats,
harassment, and reprisals." Id. at 100.

///

///

///

32

Accordingly, this Court must now evaluate whether <u>Brown</u> can

properly be applied to groups that were successful at the polls,

that have evidenced a very minimal effect on their ability to

sustain their movement, and that are unable to produce evidence

of pervasive animosity even remotely reaching the level of that

present in <u>Brown</u>.


### C. Balancing the Government's Interest with the Burden Imposed on Minor Parties

Both Buckley and Brown addressed the need to balance the

government's diminished interest in the disclosure of

contributors to minor parties against the burden imposed on those

small groups by requiring such disclosure.  In light of clearly

established precedent, this Court is unable to say that the

State's interest here is similarly diminished or that the

Plaintiffs' potential burden is even remotely comparable.

Unlike the facts in <u>Brown</u>, the proponents of Proposition 8

succeeded in persuading over seven million voters to support

their cause.  They were successful in their endeavor to pass the

ballot initiative and raised millions of dollars in the process.

This set of circumstances is a far cry from the sixty-member SWP

party, repeatedly unsuccessful at the polls, and incapable of

raising sufficient funds.  Indeed, it became abundantly clear

during oral argument that Plaintiffs could not in good conscience

analogize their current circumstances to those of either the SWP

or the Alabama NAACP *circa* 1950.

///

///

Additionally, the Court has already extensively evaluated the nature of the State's interest and, in light of the marked differences between this and every other case in which an exemption has been allowed, simply cannot by any stretch of the imagination say that the Government's interest "is so insubstantial that the Act's requirements cannot be constitutionally applied" to Plaintiffs. To the contrary, as applied to the massive movement waged by Plaintiffs, the State's interest in disclosure is at full force.

Similarly, the greater burden alleged to be imposed on Plaintiffs also necessarily derives from their minority status. The Second Circuit stated in Federal Election Commission v. Hall-Tyner Election Campaign Committee that "[a]cknowledging the importance of fostering the existence of minority political parties, we must also recognize that such groups rarely have a firm financial foundation. If apprehension is bred in the minds of contributors to fringe organizations by fear that their support of an unpopular ideology will be revealed, they may cease to provide financial assistance. The resulting decrease in contributions may threaten the minority party's very existence. Society suffers from such a consequence because the free flow of ideas, the lifeblood of the body politic, is necessarily reduced. Accordingly, a nation dedicated to free thought and free expression cannot ignore the grave results of facially innocuous election requirements." 678 F.2d 416, 420 (2d Cir. 1982).

///

///

///

Moreover, "[t]he power of a government to repress dissent is substantial and can be exercised in a myriad of subtle ways. Privacy is an essential element of the right of association and the ability to express dissent effectively...[F]orced revelations would likely lead to 'vexatious inquiries' which consequently could instill in the public an unremitting fear of becoming linked with the unpopular or unorthodox." Id.

Notably absent from this case is any evidence that those burdens hypothesized by the Supreme Court would befall the current Plaintiffs. There is no evidence that their financial backing is so tenuous as to render them susceptible to a relatively minor and entirely speculative fall-off in contributions. There is surely no evidence that the seven million individuals who voted in favor of Proposition 8 can be considered a "fringe organization" or that their beliefs would be considered unpopular or unorthodox. Finally, there is no evidence that any of Plaintiffs' contributors intend to retreat from the marketplace of ideas such that available discourse will be materially diminished.

Finally, it would appear that, while minor status is a necessary element of a successful as-applied claim, even minor status alone could not independently sustain Plaintiffs' current cause of action. Brown and its progeny each involved groups seeking to further ideas historically and pervasively rejected and vilified by both this country's government and its citizens.

///

///

///

35

In dicta, the Ninth Circuit addressed this pattern when it rejected a plea for exemption waged by a contributor to a minor party that "was not promoting a reviled cause or candidate." Goland v. U.S., 903 F.2d 1247, 1260 (9th Cir. 1990).

The facts in the current case could not be more distinguishable from those in which successful challenges have been brought. Here, Plaintiffs orchestrated a massive movement to amend the California Constitution. Proponents of the initiative were successful in their endeavor, raising nearly $30 million, securing 52.3% of the vote and convincing over seven million voters to support Proposition 8. Declaration of Lynda Cassady in Support of Defendants' Opposition to Motion for Preliminary Injunction, ¶ 7, Exh. A. Plaintiffs did not seek to promote a "reviled cause," and instead sought to legislate a concept steeped in tradition and history. Accordingly, in light of Plaintiffs' success at the polls and the State's above-discussed informational interest, the Court cannot say that the Government's interest in this case is so insubstantial or the burden on Plaintiffs so great as to warrant an exemption from disclosure.

Plaintiffs nonetheless would have the Court find these comparisons irrelevant. Plaintiffs contend that the Buckley Court's reference to "minor" parties is applicable only in the context of its rejection of the request before it for a blanket exemption. See Motion, 13:19-24. According to Plaintiffs, the Supreme Court determined in Buckley that if a group could prove there was a reasonable probability that disclosure would lead to harassment, threats, and reprisals, an exemption was required.

36

However, Plaintiffs' interpretation renders superfluous the Buckley Court's analysis of the relative governmental interest and individual burdens in the context of minor parties. Neither did the Brown Court so broadly interpret Buckley when it repeated, "The First Amendment prohibits a state from compelling disclosures by a minor party that will subject those persons identified to the reasonable probability of threats, harassment or reprisals." Brown, 459 U.S. at 101-102 (emphasis added).

Since Buckley, as-applied challenges have been successfully raised only by minor parties, specifically those parties, as discussed, having small constituencies and promoting historically unpopular and almost universally-rejected ideas. As stated, in Brown, the SWP consisted of only sixty members in Ohio. Id. at 88. The parties' "aim was the abolition of capitalism and the establishment of a workers' government to achieve socialism." The party was historically unsuccessful at the polls though its members regularly ran for public office. Id. Additionally, campaign contributions and expenditures...averaged approximately $15,000 annually." Id. at 89.

Similarly, in Hall-Tyner, a committee supporting the Communist Party successfully sought exemption from state disclosure laws. 678 F.2d 416. Later, in McArthur v. Smith, members of the SWP, described as a "small and unpopular political party," again successfully challenged state disclosure requirements. 716 F. Supp. 592, 593 (S.D. Fla. 1989). There is simply no plausible analogy to be had in this case.

///

///

37

1    Finally, this Court is confident that the Supreme Court's
2  decisions in Buckley and Brown, both of which narrowly
3  articulated the instant exception to disclosure laws, were not
4  made without great consideration.  Prior courts surely were aware
5  that members of major parties might potentially, on some future
6  occasion, become the target of threats or harassment at the hands
7  of extremist members of an opposing group.  Despite that
8  possibility, the Supreme Court created an exception not for the
9  majority, but for those groups in which the government has a
10 diminished interest.

11     This Court finds that the "minor party" requirement
12 articulated in Buckley is very much relevant and intact.
13 Accordingly, Plaintiffs' as-applied challenge to California's
14 disclosure laws has only a very minimal chance of success in
15 light of Plaintiffs' non-minor status and lack of evidence that
16 they have suffered animosity rising to the level hypothesized in
17 Buckley and existing in Brown.

18
19     **D.    Reasonable Probability of Threats, Harassment, and**
            **Reprisals**
20

21     Even if Plaintiffs were able to successfully navigate the
22 precedents discussed above, Plaintiffs' claim would have little
23 chance of success in light of the relatively minimal occurrences
24 of threats, harassment, and reprisals.  Plaintiffs allege that
25 their supporters have been the victim of vandalism, protests that
26 at times turned violent, and the threat of injury, up to and
27 including one death threat.
28 ///

This Court is cognizant of the relaxed nature of proof required by the Supreme Court under such circumstances. Nevertheless, the Court cannot say that the threats and harassment here rise to the level previously found to justify the exemption sought.

Unlike prior cases, in which plaintiffs alleged to have suffered mistreatment over extended periods of time, the alleged harassment directed at Proposition 8 supporters occurred over the course of a few months during the heat of an election battle surrounding a hotly contested ballot initiative. Only random acts of violence directed at a very small segment of the supporters of the initiative are alleged.

Moreover, while Plaintiffs are quite correct that under Buckley evidence of harassment "from either Government officials or private parties" could suffice to establish the requisite proof of reprisals, the facts of subsequent cases evidence not only the existence of some governmental hostility, but quite pervasive governmental hostility at that. Buckley, 424 U.S. at 74 (emphasis added); see also McArthur, 716 F. Supp. at 594 ("[H]arassment, reprisals or threats from private persons are sufficient to allow [the] court to enforce the plaintiff's first amendment rights by cloaking the contributors and recipients' names in secrecy.").

///
///
///
///
///
///

Indeed, the <u>Brown</u> Court was confronted with countless acts of government harassment and retribution against members of the SWP, which are detailed above.  Furthermore, in <u>Hall-Tyner</u>, the Second Circuit stated, "[t]he evidence relied on by the district judge included the extensive body of state and federal legislation subjecting Communist Party members to civil disability and criminal liability, reports and affidavits documenting the history of governmental surveillance and harassment of Communist Party members, as well as affidavits indicating the desire of contributors to the Committee to remain anonymous."  678 F.2d at 419.

Plaintiffs do not, indeed cannot, allege that the movement to recognize marriage in California as existing only between a man and a woman is vulnerable to the same threats as were socialist and communist groups, or, for that matter, the NAACP.  Proposition 8 supporters promoted a concept entirely devoid of governmental hostility.  Plaintiffs' belief in the traditional concept of marriage, to disagreement, have not historically invited animosity.  The Court is at a loss to find any principled analogy between two such greatly diverging sets of circumstances.

Finally, Plaintiffs' exemption argument appears to be premised, in large part, on the concept that individuals should be free from even legal consequences of their speech.  That is simply not the nature of their right.  Just as contributors to Proposition 8 are free to speak in favor of the initiative, so are opponents free to express their disagreement through proper legal means.

///

While the Court is cognizant of the deplorable nature of many of acts alleged by Plaintiffs, the Court also must reiterate that the legality or morality of any specific acts is not before it. Thus, as much as the Court strongly condemns the behavior of those who resort to violence, and/or other illegal behavior, the Court need not, indeed cannot, evaluate the proper legal consequences of those actions today.

By the same token, nothing in the Court's decision immunizes or excuses those who have engaged in illegal acts from the consequences of their conduct. Those responsible for threatening the lives of supporters of Proposition 8 are subject to criminal liability. See Troupis Decl, Exh. C (noting that the Fresno chief of police stated the department was "close to making an arrest" in the case of the death threats delivered to the mayor and a local pastor.) Those choosing to vandalize the property of individuals or the public are likewise liable. Those mailing white powder to organizations are subject to federal prosecution. In each case, there are appropriate legal channels through which to rectify and deter the reoccurrence of such reprehensible behavior.

As much as those channels are available today, it is unlikely that groups previously successful in seeking exemptions were privy to the same opportunities. Again, Plaintiffs have shown no societal or governmental hostility to their cause. Contrary to groups such as the SWP, Plaintiffs can seek adequate relief from law enforcement and the legal system.

///

///

41

Such was not the case for those thought to be supporting the SWP or communist groups, those subject to actual criminal liability based on their beliefs and their associations.

Moreover, the Court simply cannot ignore the fact that numerous of the acts about which Plaintiffs' complain are mechanisms relied upon, both historically and lawfully, to voice dissent. The decision and ability to patronize a particular establishment or business is an inherent right of the American people, and the public has historically remained free to choose where to, or not to, allocate its economic resources. As such, individuals have repeatedly resorted to boycotts as a form of civil protest intended to convey a powerful message without resort to non-violent means. The Supreme Court has acknowledged these rights on many an occasion:

> In Thornhill v. Alabama, 310 U.S. 88 (1940), the Court held that peaceful picketing was entitled to constitutional protection, even though, in that case, the purpose of the picketing "was concededly to advise customers and prospective customers of the relationship existing between the employer and its employees and thereby to induce such customers not to patronize the employer." Id. at 99. Cf. Chauffeurs v. Newell, 356 U.S. 341. In Edwards v. South Carolina, 372 U.S. 229, we held that a peaceful march and demonstration was protected by the rights of free speech, free assembly, and freedom to petition for a redress of grievances.

NAACP v. Claiborne Hardware Co., 458 U.S. 886, 909 (1982). Notably, "[s]peech does not lose its protected character...simply because it may embarrass others or coerce them into action." Id. at 910.

///

///

///

1   Accordingly, this Court concurs in the assessment that

2   "expression on public issues has always rested on the highest

3   rung of the hierarchy of First Amendment values.  Speech

4   concerning public affairs is more than self-expression; it is the

5   essence of self-government.  There is a profound national

6   commitment to the principle that debate on public issues should

7   be uninhibited, robust, and wide-open." Id. at 913 (internal

8   citations and quotations omitted).  Accordingly, this Court

9   cannot condemn those who have legally exercised their own

10  constitutional rights in order to display their dissatisfaction

11  with Plaintiffs' cause.[8]

12      Plaintiffs nevertheless contend that "while a boycott may be

13  an acceptable method for exacting social change, the Supreme

14  Court did not list providing the electorate with the information

15  necessary to boycott supporters of a political position as an

16  acceptable justification for compelled disclosure."  Motion,

17  28:17-20.  Plaintiffs miss the point.  California's interest in

18  disclosure, an interest of paramount importance in the context of

19  ballot measures, is based on its need to educate its electorate.

20  ///

21  ///

22

23      [8] The Court also finds great irony in the fact that
    Plaintiffs' lament the extent of their economic suffering at the
24  hands of the anti-Proposition 8 contingent, but Plaintiffs' own
    evidence indicates that supporters of Proposition 8 engaged in
25  remarkably similar tactics.  See Troupis Decl., Exh. A ("Indeed,
    supporters of Prop. 8 engaged in pressure tactics.  At least one
26  businessman who donated to 'No on 8,' Jim Abbot of Abbot &
    Associates, a real estate firm in San Diego, received a letter
27  from the Prop. 8 Executive Committee threatening to publish his
    company's name if he didn't also donate to the 'Yes on 8'
28  campaign.").  Apparently, the threat of economic injury was a
    sword wielded on both sides of this fight.

43

The fact that Plaintiffs' opponents may use publicly available information as the basis for exercising their own First Amendment rights does not in any way diminish the State's interest.

To the contrary, "[k]eeping the electorate fully informed of the sources of campaign-directed speech and the possible connections between the speaker and individual candidates, [itself] derives directly from the primary concern of the First Amendment. The vision of a free and open market place of ideas is based on the assumption that the people should be exposed to speech on all sides, so that they may freely evaluate and choose from among competing points of view. One goal of the First Amendment, then, is to ensure that the individual citizen has available all the information necessary to allow him to properly evaluate speech.... The allowance of free expression loses considerable value if expression is only partial. Therefore, disclosure requirements, which may at times inhibit the free speech that is so dearly protected by the First Amendment, are indispensable to the proper and effective exercise of First Amendment rights." <u>Fed. Election Com'n v. Furgatch</u>, 807 F.2d 857, 862 (1987). Indeed, Defendants pointed out during oral argument that the Government's disclosure requirements actually serve to facilitate discourse.

The Court observes that Plaintiffs, the backers of a historically non-controversial belief, seem genuinely surprised to be on the receiving end of such powerful discord.

///

///

///

However, such surprise does not warrant an injunction against the enforcement of the State of California's laws or this Court's censorship of information pertaining to one side of one initiative, information that, years ago, the voters of California determined should be available to the public. Indeed, the Court's acceptance of Plaintiffs' argument would effectively render California's legislative mandate obsolete. Such a decision would establish precedent for any group backing any controversial ballot initiative to come before this Court with evidence of the actions of fringe opposition groups to support their arguments for exemption from California's disclosure requirements. Such a holding would thwart the will of California's government and the will of the electorate to garner objective information necessary to evaluation their own legislation.

Thus, though the Court regards with contempt numerous of the acts about which Plaintiffs complain, it cannot say that Plaintiffs allegations rise to the level of those existing in <u>Brown</u> and its progeny. Because Plaintiffs' ability to garner support for their cause is hardly comparable to the SWP claims or to those raised by other historically ostracized groups, groups whose very viability was threatened by forced compliance with disclosure laws, the Court cannot say the threat to Plaintiffs' First Amendment rights is so serious as to warrant an exception here.

///

///

///

Accordingly, Plaintiffs have failed to convince the Court that Buckley and Brown can be applied to them in any principled manner or that there is a reasonable probability that disclosure in compliance with the California Government Code will result in threats, harassment, and reprisals. The Court finds very little possibility of success on the merits of Plaintiffs' as-applied challenge.

**E. Plaintiffs' Remaining Challenges: Whether the $100 Disclosure Threshold and Post-Election Reporting are Constitutional**

To reiterate, the Court will apply strict scrutiny in evaluating Plaintiffs' causes of action.

**1. $100 Disclosure Threshold**

Plaintiffs argue that the Government's interest in the compelled disclosure of those who contributed amounts as low as $100 to support Proposition 8 is negligible. Specifically, Plaintiffs' express disbelief that "the public is clamoring for the knowledge of the name, address, occupation, and employer of every person who contributed one hundred dollars or more to a ballot measure." Id., 21-23. According to Plaintiffs, the State's threshold is therefore set too low and must fail for lack of adjustment for inflation.

///
///
///

This Court disagrees and holds that the legislative line drawn is narrowly tailored to the State's compelling informational interest, that the threshold need not be indexed for inflation, and that a contrary holding would call into question scores of statutes in which the legislature or the people have sought to draw similar lines.

In _Buckley_, as here, the appellants argued "that the monetary thresholds in the record-keeping and reporting provisions lack[ed] a substantial nexus with the claimed governmental interests, for the amounts involved [were] too low even to attract the attention of the candidate, much less have a corrupting influence." _Buckley_, 424 U.S. at 82. There, the Act "required political committees to keep detailed records of both contributions and expenditures." _Id._ at 63. As in the instant case, "[e]ach committee...[was] required to file quarterly reports. The reports [were] to contain detailed financial information, including the full name, mailing address, occupation, and principal place of business of each person who had contributed over $100 in a calendar year, as well as the amount and date of those contributions." _Id._ (internal citations omitted). On facts remarkably similar to those before this court, the Supreme Court held that "the $100 threshold was...within the 'reasonable latitude' given the legislature 'as to where to draw the line.'" _Id._ at 83.

The Court elaborated on its decision stating, "The $10 and $100 thresholds are indeed low. Contributors of relatively small amounts are likely to be especially sensitive to recording or disclosure of their political preferences.

These strict requirements may well discourage participation by some citizens in the political process, a result that Congress hardly could have intended. Indeed, there is little in the legislative history to indicate that Congress focused carefully on the appropriate level at which to require recording and disclosure. Rather it seems merely to have adopted the thresholds existing in similar disclosure laws since 1910. But we cannot require Congress to establish that it has chosen the highest reasonable threshold. The line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion. We cannot say on this bare record that the limits are wholly without rationality."[9] Id.

The Eastern District later stated that "as a general matter, the court will not second guess a legislative determination as to where the line for contribution limits should be drawn." CPLC v. Scully, 989 F. Supp. 1282, 1293 (E.D. Cal. 1998). The same holds true on the facts before this Court.

First, this Court finds the disclosure thresholds set in other states to be instructive. California's current $100 threshold falls well within spectrum of those mandated by its sister states, which range from no threshold requirement to $300. In fact, only six states in the United States have higher threshold requirements.[10]

---

[9] The parties dispute the level of scrutiny actually applied in Buckley. However labeled, the Buckley Court clearly determined that the $100 threshold passed constitutional muster, and this Court is bound by that decision.

[10] Reporting Requirements:

(continued...)

48

(...continued)

**No Threshold Requirement**
Alaska: Alaska Stat. § 15313.040(a)
Florida: Fla. Stat. § 106.07(4)(1).
Louisiana: La. Rev. Stat. Ann. § 18:1495.5(b)(4).
Maryland: Md. Code Ann., Election Law § 13-304.
Michigan: Mich. Comp. Laws. Ann. § 169.226(1)(e) (Names and addresses of all contributors are reported, but occupation, employer or principal place if business are not required unless the contribution exceeds $100.).
New Mexico: N.M. Stat. Ann. § 1-19-31(a) (additional employment information only required for contributors of $250 or more).

**$20 Threshold**
Colorado: Colo. Rev. Stat. Ann. § 1-45-108(1)(a)(I).
Wisconsin: Wis. Stat. Ann. § 11.06(1)(a) (additional employment information disclosed for those individuals that contribute in excess of $100).

**$25 Threshold**
Arizona: Ariz. Rev. Stat. Ann. 16-915(3)(a).
New Hampshire: N.H. Rev. Stat. § 664:6(I) (additional employment information required for contributors of over $100).
Ohio: Ohio Rev. Code Ann. § 3517.10(B)(4)(e).
Wyoming: Wyo. Stat. Ann. § 22-25-106(a)(iv).

**$35 Threshold**
Montana: Mont. Code Ann. § 13-37-229(2).

**$50 Threshold**
Arkansas: Ark. Code Ann. § 7-6-207(b).
Connecticut: Conn. Gen. Stat. Ann. § 9-608(c)(4).
District of Columbia: D.C. Code § 1-1102.06(b)(2).
Idaho: Idaho Code Ann. § 67-6612(a)(1).
Kansas: Kan. Stat. Ann. § 25-4148(b)(2).
Maine: Me. Rev. Stat. Ann. tit. 21-A, § 1017(5).
Massachusetts: Mass. Gen. Laws Ann. ch. 55, § 18.
North Carolina: N.C. Gen. Stat. Ann. § 163-278.11(a1).
Oklahoma: Okla. Stat. tit. 74, § Ch. 62, App. 257:10-1-14(a)(3)(D).
Pennsylvania: 25 Pa. Cons. Stat. § 3246 (b) (Names and addresses of those who contribute over $50 are reported, but occupation, name of employer or principal place of business is not required unless the contribution exceeds $250.).
Texas: Tex. Election Code Ann. § 254.031(a)(1).
Utah: Utah Code Ann. § 20A-11-208 (3) (provides only for a "detailed listing").

(continued...)

The Supreme Court has previously made similar comparisons.

Randall v. Sorrell, 548 U.S. 230 (2006).  That Court stated, "As compared with the contribution limits upheld by the Court in the past, and with those in force in other States, [the Act's] limits

---

(...continued)
**$100 Threshold**
Alabama: Ala. Code § 17-5-8(c)(2).
California: Cal. Gov't Code § 84211(f).
Delaware: Del. Code tit. 15 § 8030(d)(2).
Georgia: Ga. Code Ann. § 21-5-34(b).
Hawaii: Haw. Rev. Stat. § 11-212(2)(B).
Indiana: Ind. Code § 3-9-5-14(a)(1).
Kentucky: Ky. Rev. Stat. Ann. § 121-180(3)(a)(2).
Minnesota: Minn. Stat. Ann. § 10A.20(Subd. 3)(b).
Missouri: Mo. Ann. Stat. § 130.041(1)(3)(a),(e).
Nevada: Nev. Rev. Stat. § 294A.120(8).
New York: N.Y. Election Law § 14-102(1).
Oregon: Or. Rev. Stat. § 260.083(1)(a).
Rhode Island: R.I. Gen.Laws § 17-25-11(a)(3).
South Carolina: S.C. Code Ann. § 8-13-1308(F)(2).
South Dakota: S.D. Codified Laws § 12-27-24(14).
Tennessee: Tenn. Code Ann. § 2-10-107(a)(2)(A)(I).
Vermont: Vt. Stat. Ann. tit. 17, § 2803(a).
Virginia: Va. Code Ann. § 24.2-947.4(B)(2).
Washington: Wash. Rev. Code Ann. § 42.17.090(1)(b).

**$150 Threshold**
Illinois: 10 Ill. Comp. Stat. 5/9-12(3).

**$200 Threshold**
Iowa: Iowa Code § 68A.402A(1)(b) ($200 disclosure threshold is applicable only to state statutory political committees. $50 threshold imposed on county statutory political committees and $25 threshold on all candidates and political committees.)
Mississippi: Miss. Code Ann. § 23-15-807(d)(ii).
North Dakota: N.D. Cent. Code § 16.1.08.1-02(2).
United States: 2 U.S.C. § 434(b)(3)(A).

**$250 Threshold**
Nebraska: Neb. Rev. Stat. § 49-1455(d).
West Virginia: W. Va. Code § 3-8-5a(a)(3) (Names of all contributors are reported, but residence and mailing address, along with major business affiliation and occupation are reported for those individuals contributing in excess of $250.).

**$300 Threshold**
New Jersey: N.J. Stat. Ann. § 19:44A-16(f).

are sufficiently low as to generate suspicion that they are not closely drawn." Id. at 249. That Court went on to point out that "[t]hese limits are well below the limits this Court upheld in Buckley. Indeed, in terms of real dollars (i.e., adjusting for inflation), the Act's $200 per election limit on individual contributions to a campaign for governor is slightly more than one-twentieth of the limit on contributions to campaigns for federal office before the Court in Buckley. Adjusted to reflect its value in 1976, Vermont's contribution limit on campaigns for statewide office (including governor) amounts to $113.91 per 2-year election cycle, or roughly $57 per election, as compared to the $1,000 per election limit on individual contributions at issue in Buckley." Id. at 250.

However, the Randall Court also determined that the lower contributions limits constituted only a danger sign that the "contribution limits may fall outside tolerable First Amendment limits." Id. at 253. Since the actual dollar amount of the statutory threshold was not dispositive, the Court also looked at the Act's substantial restrictions on the ability of candidates to raise the funds necessary to run a competitive election, the ability of political parties to help their candidates get elected, and the ability of individual citizens to volunteer their time to campaigns. Id.

Accordingly, even if this Court were inclined to make the determination, which it is not, that California's $100 disclosure threshold was too low, such a determination alone would be insufficient to warrant award of a preliminary injunction.
///

51

Nevertheless, in keeping with the Randall Court's foray into
the hypothecated effects of inflation, Plaintiffs assert that
California's disclosure regime is constitutionally suspect based,
in part, on its failure to account for such economic conditions.
According to Plaintiffs, the $100 disclosure threshold approved
of in Buckley would equate to approximately $38.79 today.
Motion, 24:6-8. Therefore, Plaintiffs contend that Buckley
establishes the benchmark below which disclosure thresholds
should not be permitted to fall.

Such a conclusion runs contrary to both logic and the law.
"In Buckley, [the Court] specifically rejected the contention
that $1,000, or any other amount, was a constitutional minimum
below which legislatures could not regulate...[The Court]
referred instead to the outer limits of contribution regulation
by asking whether there was any showing that the limits were so
low as to impede the ability of candidates to 'amas[s] the
resources necessary for effective advocacy,' 424 U.S., at 21.
[The court] asked, in other words, whether the contribution
limitation was so radical in effect as to render political
association ineffective, drive the sound of a candidate's voice
below the level of notice, and render contributions pointless.
Such being the test, the issue in later cases cannot be truncated
to a narrow question about the power of the dollar, but must go
to the power to mount a campaign with all the dollars likely to
be forthcoming...[T]he dictates of the First Amendment are not
mere functions of the Consumer Price Index. 161 F.3d at 525
(dissenting opinion)." Nixon v. Shrink Mo. Gov't PAC, 528 U.S.
377, 397 (2000).

Neither can the constitutional principles at issue in the current case be construed solely in terms of the rate of inflation, and the Court finds that the disclosure threshold negligibly affects, if it affects at all, Plaintiffs' ability to amass resources or to advocate their cause.

The Court also finds it relevant that numerous existing statutes contain reference to dollar values beyond which certain rights or benefits may be taken away or become unavailable. For example, California Penal Code § 487 states that when "money, labor, or real or personal property taken is of a value exceeding four hundred dollars ($400)" such a taking constitutes grand theft. Cal. Pen. Code § 487(a). Additionally, grand theft is also found "[w]hen domestic fowls, avocados, olives, citrus or deciduous fruits, other fruits, vegetables, nuts, artichokes, or other farm crops are taken of a value exceeding one hundred dollars ($100)." Id., § 487(1)(A). These dollar values were set by the legislature in 1982. See 1982 Cal. Stat. 1693. Were the Court to accept Plaintiffs' current argument, it would call into question this and every other statutory provision in which the legislature thought to classify by dollar amount without tying that amount to some articulated rate of inflation. The Court is unwilling to render a decision that would create such a striking precedent.

Finally, in Buckley, the Supreme Court stated that "disclosure requirements, as a general matter, directly serve substantial governmental interests. In determining whether these interests are sufficient to justify the requirements we must look to the extent of the burden that they place on individual rights."

Buckley, 424 U.S. at 68. To reiterate, "[i]t is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute. In some instances, disclosure may even expose contributors to harassment or retaliation. These are not insignificant burdens on individual rights, and they must be weighed carefully against the interests which Congress has sought to promote by this legislation. In this process we note and agree...that disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption." Id.

Thus, disclosure requirements, by their very nature, are the least restrictive means through which to educate the electorate. The requirements do not limit the amount of contributions or expenditures by the entity or the contributor. They do not limit the entity's ability to raise funds, nor do they impose burdensome structural requirements on Plaintiffs. See Alaska Right to Life Committee v. Miles, 441 F.3d 773, 791 (9th Cir. 2006). Moreover, Plaintiffs point to no threshold that would be more narrowly tailored to serve the State's interest. The Court simply cannot say that the cumulative effect of the disclosure of the contributors of $100 is not narrowly tailored to the Government's compelling informational interest.[11]

---

[11] As an example, the public could very well be swayed by the fact that numerous donations to Plaintiffs, and likely to others, came from out of state. It appears very probable to this Court that the California electorate would be interested in knowing if a California initiative was funded by the citizens it is intended to affect or by out of state interest groups and
(continued...)

54

Accordingly, the Court finds that California's disclosure threshold is properly drawn. California's decision to compel disclosure of those who contribute in excess of $100 to groups such as Plaintiffs is narrowly tailored to the State's compelling informational interest and Plaintiffs' likelihood of success on the merits is minimal.

### 2. Post-Election Disclosure

Plaintiffs' Third Cause of Action seeks a holding that the PRA disclosure requirements are unconstitutional to the extent they require post-election reporting of contributors to ballot-initiatives. Despite the fact that the Court has found no case law supporting the proposition, Plaintiffs contend that such reporting cannot be related to the State's informational interest because the votes have already been cast, nullifying the electorate's need for disclosure. While Plaintiffs acknowledge that the State maintains an interest in the election of candidates after an election has come and gone, they contend that the State's interest in contributors to ballot initiatives "disappears" essentially when the deciding vote is cast at the polls.

///

///

---

[11](...continued)
individuals. In order to properly capture the number of non-California donors, it is quite logical to require a lower, rather than a higher, reporting threshold.

1    This Court disagrees.  No legislation is carved in stone,

2  incapable of repeal, nor do ballot initiatives, once passed,

3  become a legacy that future generations must endure in silence.

4  Indeed, it is the initiative process itself that directly allows

5  individuals to affirm or correct prior decisions.  To assume that

6  the passage of an election draws a line in the sand past which no

7  issues remain open to public debate is simply not congruent with

8  the form of democracy the people of California have determined to

9  employ.  Thus, it is possible that the post-election light shed

10 on those contributors who donated during the final weeks of the

11 campaign, and who continue to donate today, might reveal

12 information the electorate requires in order to evaluate the

13 appropriateness of its decision.

14   Indeed, it is unclear how "'uninhibited, robust, and wide-

15 open' speech can occur when organizations hide themselves from

16 the scrutiny of the voting public...Plaintiffs' argument for

17 striking down [the] disclosure provisions does not reinforce the

18 precious First Amendment values that Plaintiffs argue are

19 trampled.., but ignores the competing First Amendment interests

20 in individual citizens seeking to make informed choices in the

21 political marketplace."  McConnell, 540 U.S. at 198, affirming in

22 part and reversing in part McConnell v. Federal Election Com'n,

23 251 F. Supp. 2d 176, 237 (D.D.C. 2003).

24   Thus, the Court simply cannot say that the occurrence of an

25 election moots the electorate's need for relevant information.

26 Here, the battle over Proposition 8 continues to be waged, both

27 in the state courts and state legislature.

28 ///

The Government's informational interest cannot be met without requiring the disclosure of all pertinent contribution information such that "uninhibited, robust, and wide-open" speech can continue to be had.

Moreover, Defendants proffer a particularly practical justification for setting a post-election reporting date, namely that it would be impossible for committees to provide final financial information until their operations have wound down. Under Plaintiffs' argument, in order to obtain disclosure, committees would have to file the names of their contributors on election day. Any later filing deadline cannot, according to Plaintiffs, relate to the State's interest. Nothing short of discontinuing committee operations pre-election would render it possible for a committee to file complete reports at the height of the electoral process. Thus, the State established a future date on which full disclosure of all campaign finances is due.

The Court finds analogy to the payment of federal taxes instructive. Income is earned and due to the IRS as of the end of each calendar year. Nevertheless, the IRS requires filing and payment in April, one would assume to allow, at least in part, for wrapping up the prior year's business and for compiling the necessary documentation to render filing proper. It is the unlikely individual that would be prepared to file on the final day of the calendar year.

Finally, as discussed in the prior section, relying on the Buckley Court's directive to examine the burden on Plaintiffs, this Court finds that the burden imposed by requiring post-election reporting is minimal.

Thus, as in the case of its established disclosure threshold, the Government drew a line. This time the line chosen was a particular date rather than a dollar value. Nevertheless, that line does not burden any more speech than would any other chosen date. Accordingly, even under a strict scrutiny analysis, this Court finds that the post-reporting requirement is directly related to the State's informational interest and that it burdens no more speech than necessary to further that interest.

## II.  IRREPARABLE HARM AND THE BALANCE OF HARDSHIPS

According to the United States Supreme Court, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). "[E]ven if the merits of the constitutional claim were not 'clearly established' at this early stage in the litigation, the fact that a case raises serious First Amendment questions compels a finding that there exists 'the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [Plaintiffs'] favor. 'Under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim.'" Sammartano v. First Judicial Dist. Ct., in and for county of Carson City, 303 F.3d 959, 973 (9th Cir. 2002), quoting Viacom Int'l, Inc. v. FCC, 828 F. Supp. 741, 744 (N.D. Cal. 1993).

58

"Because the test for granting a preliminary injunction is 'a continuum in which the required showing of harm varies inversely with the required showing of meritoriousness,' when the harm claimed is a serious infringement on core expressive freedoms, a plaintiff is entitled to an injunction even on a lesser showing of meritoriousness.'" Id., citing San Diego Committee Against Registration and the Draft (Card) v. Governing Bd. Of the Grossmont Union High School Dist., 790 F.2d, 1471, 1473 n.3 (9th Cir. 1986), abrogated on other grounds by Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260 (1988).

Finally, "[w]hen an injunction will affect the public, the Court should also determine whether the public interest favors the moving party." Cupolo v. Bay Area Rapid Transit, 5 F. Supp. 2d 1078, 1082 (N.D. Cal. 1997). The Ninth Circuit has, at times, "subsumed this inquiry into the balancing of hardships." Sammartano, 303 F.3d at 974. However, that court has also stated, "it is better seen as an element that deserves separate attention in cases where the public interest may be affected." Id. "The public interest inquiry primarily addresses impact on non-parties rather than parties." Id.

In this case, the Court finds no serious First Amendment questions are raised. As discussed above, the merits of each constitutional claim are not only not "clearly established," but almost certainly must fail. Thus, there is no risk of irreparable injury to Plaintiffs' contributors. Furthermore, the impact on non-parties, specifically the California electorate, should the Court grant Plaintiffs the relief they seek is great.
///

59

As discussed in great detail above, if disclosure is prevented, the people of California will be denied the ability to fully inform themselves of the circumstances surrounding the passage of Proposition 8. For the reasons already articulated, the balance of hardships favors the Plaintiffs and consideration of the public interest weighs against injunctive relief.

## III. CONCLUSION

Because the Court finds very little chance of success on the merits of Plaintiffs' claims, because there is likewise minimal probability of the occurrence of irreparable harm to Plaintiffs or their contributors, and because the balance of interests, including the public's interest, weighs against it, Plaintiffs' Motion for Preliminary Injunction is DENIED. Indeed, any contrary holding would require the Court to legislate from the bench and to act contrary to the law. That it cannot do.

## IV. PROTECTIVE ORDER

Despite this Court's denial of Plaintiffs' Motion for Preliminary Injunction, Plaintiffs request that the existing protective order remain in effect. Defendants posed no current objection, but reserved the right to object to each individual's file being sealed in the future. Accordingly, the current protective order is extended and will remain in effect until the Court orders otherwise.

///

**CONCLUSION**

    Plaintiffs' Motion for Preliminary Injunction is DENIED and the Motion to Extend the Existing Protective Order is GRANTED.

    IT IS SO ORDERED.

Dated: January 30, 2009

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE