James Bopp, Jr. (Ind. State Bar No. 2838-84)*
Richard E. Coleson (Ind. State Bar No. 11527-70)*
Barry A. Bostrom (Ind. State Bar No.11912-84)*
Sarah E. Troupis (Wis. State Bar No. 1061515)*
Scott F. Bieniek (Ill. State Bar No. 6295901)*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
Telephone:    (812) 232-2434
Facsimile:    (812) 235-3685
Counsel for All Plaintiffs

Benjamin W. Bull (AZ Bar No. 009940)*
ALLIANCE DEFENSE FUND
15100 North 90th Street
Scottsdale, Arizona  85260
Telephone:    (480) 444-0020
Facsimile:    (480) 444-0028
Counsel for All Plaintiffs

Timothy D. Chandler (Cal. State Bar No. 234325)**
ALLIANCE DEFENSE FUND
101 Parkshore Drive, Suite 100
Folsom, CA 95630
Telephone:    (916) 932-2850
Facsimile:    (916) 932-2851
Counsel for All Plaintiffs

* Admitted Pro Hac Vice
** Designated Counsel for Service

### United States District Court
### Eastern District of California
### Sacramento Division

| | |
|---|---|
| **PROTECTMARRIAGE.COM, et al.,** | Case No. 2:09-CV-00058-MCE-DAD |
| **Plaintiffs,** | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| **vs.** | |
| **DEBRA BOWEN, et al.,** | Date:        Aug. 13, 2009 |
| **Defendants.** | Time:        2:00 P.M. Courtroom:  7, 14th Floor Judge Morrison C. England, Jr. |

# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.   Compelled disclosure provisions are subject to strict scrutiny. . . . . . . . . . . . . . . . . . 3

II.  Compelled disclosure provisions impose substantial burdens
     on First Amendment rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.   Technological advances have qualitatively changed the
          landscape in which compelled disclosure takes place. . . . . . . . . . . . . . . . . . . . 6

     B.   While compelled disclosure imposes substantial burdens
          on First Amendment rights, compelled *public* disclosure
          increases the burdens exponentially. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     C.   Research demonstrates that compelled disclosure has a
          significant chilling effect on political speech. . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. There is a reasonable probability that any individuals supporting
     a traditional definition of marriage will be subjected to threats,
     harassment, and reprisals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     A.   The standards of the disclosure exemption test. . . . . . . . . . . . . . . . . . . . . . . . . 17

     B.   The quantum and quality of evidence required
          to meet the reasonable-probability test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          1.   Plaintiffs are not required to establish a direct causal
               link between disclosure and specific instances of
               threats, harassment, and reprisals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

          2.   Plaintiffs need not demonstrate that they, or their
               members, have been subjected to threats, harassment,
               and reprisals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

3.    The reasonable-probability test requires only that threats, harassment, and reprisals exist, not that they be severe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

4.    The exemption is not limited to minor political parties. . . . . . . . . . . . . . . . . . . . 22

5.    The test does not require any threats, harassment, or reprisals to be directed at Plaintiffs by government officials. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C.    There is a reasonable probability of threats, harassment, and reprisals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

IV.  The PRA's $100 reporting threshold is unconstitutional, facially and as-applied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A.    California lacks a compelling interest sufficient to justify compelled ballot measure disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.    The PRA's $100 reporting threshold fails strict scrutiny. . . . . . . . . . . . . . . . . . . . . . 35

1.    California has only a limited compelling informational interest in disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2.    The $100 reporting threshold is not narrowly tailored to the State's interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

3.    The PRA's failure to account for inflation must factor into the strict-scrutiny analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

4.    California cannot support its $100 disclosure provision by arguing that it is necessary to enforce some higher constitutional threshold. . . . . . . . . . . . . . . . . . . . . . . . . . 44

C.    The threshold is unconstitutional as-applied to Plaintiffs because there is a reasonable probability of threats, harassment, and reprisals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

V.  Post-election public ballot-measure reporting and the failure to purge public reports after the election are unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . 45

Plaintiffs' Memorandum in Support
of Motion for Summary Judgment

A. California does not have a compelling state interest in the *public* disclosure of donors to a ballot measure *after* the election. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

B. Post-election public disclosure is not the least restrictive means of addressing the potential interests of the State. . . . . . . . . . . . . . . . . . . . . . . 47

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**Plaintiffs' Memorandum in Support of Motion for Summary Judgment**

# Table of Authorities

*Cases:*

*AFL-CIO v. FEC,*
    333 F.3d 168 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Alaska Right to Life Comm. v. Miles,*
    441 F.3d 773 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Am. Civil Liberties Union of Nev. v. Heller,*
    378 F.3d 979 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12, 13, 47

*Am. Constitutional Law Found., Inc. v. Meyer,*
    120 F.3d 1092 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S. Ct. 2505 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Averill v. City of Seattle,*
    325 F. Supp. 2d 1173 (W.D. Wash. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 27, 31

*Bay Area Citizens Against Lawsuit Abuse,*
    982 S.W.2d 371 (Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Brown v. Socialist Workers '74 Campaign Comm.,*
    459 U.S. 87, 103 S. Ct. 416 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21, 29

*Buckley v. Valeo,*
    424 U.S. 1, 96 S. Ct. 612 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Buckley v. Am. Constitutional Law Found., Inc.,*
    525 U.S. 182, 119 S. Ct. 636 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 34

*Cal. Pro-Life Council, Inc. v. Getman,*
    328 F.3d 1088 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Cal. Pro-Life Council , Inc. v. Randolph,*
    507 F.3d 1172 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth,*
    556 F.3d 1021 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

*Citizens Against Rent Control v. Berkley*,

454 U.S. 290, 102 S. Ct. 434 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Davis v. FEC*,

_ U.S. _, 128 S. Ct. 2759 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 12

*Eu v. San Francisco County Democratic Cent. Comm.*,

489 U.S. 214, 109 S. Ct. 1013 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*FEC v. Hall-Tyner Election Campaign Comm.*,

678 F.2d 416 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*FEC v. Wisconsin Right to Life, Inc.*,

551 U.S. 449, 127 S. Ct. 2652 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 44, 47

*First Nat'l Bank of Boston v. Bellotti*,

435 U.S. 765, 98 S. Ct. 1407 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Indep. Newspapers, Inc. v. Brodie*,

966 A.2d 432 (Md. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Jansson v. Bowen*,

No. 34-2008-00017351 (Sup. Ct. Of Cal., Dept. 29,

Sacramento, Cal., Aug. 7, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Marks v. United States*,

430 U.S. 188, 97 S. Ct. 990 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*McArthur v. Smith*,

716 F. Supp. 592 (S.D. Fla. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*McConnell v. FEC*,

251 F. Supp. 2d 176 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 23

*McConnell v. FEC*,

540 U.S. 93, 124 S. Ct. 619 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 18

*McIntyre v. Ohio Elections Comm'n.*,

514 U.S. 334, 115 S. Ct. 1511 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15, 21, 34

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

*NAACP v. Alabama*,

    357 U.S. 449, 78 S. Ct. 1163 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*New York Times Co. v. Sullivan*,

    376 U.S. 254, 84 S. Ct. 710 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Oregon Socialist Workers 1974 Campaign Comm. v. Paulus*,

    432 F. Supp. 1255, 1259 (D. Or. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

*People v. Scott*,

    119 Cal. Rptr. 2d 797 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Randall v. Sorrell*,

    548 U.S. 230, 126 S. Ct. 2479 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 43

*Republican Party of Minnesota v. White*,

    536 U.S. 765, 122 S. Ct. 2528 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 35, 45

*Rutan v. Republican Party of Illinois*,

    497 U.S. 62, 110 S. Ct. 2729 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Simon & Schuster v. New York State Crime Victims Bd.*,

    502 U.S. 105, 112 S. Ct. 501 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Stromberg v. People of the State of California*,

    283 U.S. 359, 51 S. Ct. 532 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Turner Broad. Sys. v. FEC*,

    512 U.S. 622, 114 S. Ct. 2445 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 50

***Constitutions, Statutes, Administrative Regulations, and Court Rules:***

U.S. Const. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1931 Ohio Laws 113 v. 307 § 186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

1931 Ohio Laws 114 v. 712 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

1980 Cal. Stat. 611 § 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Cal. Elec. Code § 9050 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Cal. Elec. Code § 9081 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 39

Cal. Elec. Code § 9084 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 39

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

Cal. Gov't Code § 81000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Cal. Gov't Code § 81001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

Cal. Gov't Code § 81008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Cal. Gov't Code § 82000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Cal. Gov't Code § 82003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Cal. Gov't Code § 84102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Cal. Gov't Code § 84106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Cal. Gov't Code § 84200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 49

Cal. Gov't Code § . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Cal. Gov't Code § 84503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Cal. Gov't Code § 84504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Cal. Gov't Code § 84600 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Cal. Gov't Code § 84602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Cal. Gov't Code § 88000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 39

Cal. Gov't Code § 88001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 39

Cal. Gov't Code § 91000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 49

Cal. Code Regs. tit. 2, § 18402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

E.D. Cal. R. 5-133 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fair Campaign Practices Act, Colorado (eff. Jan. 15, 1997) . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. Civ. P. 5.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Laws 1979, c. 79-400 (Fla.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Mass. Gen Laws ch. 345, §§ 3, 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Wash. Rev. Code Ann. § 42.17.090(1)(b) (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

***Other Sources***

AbsoluteAstronomy.com . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Andres Araiza, *Prop 8 Threat: Fresno Police Close
    to Arrest*, ABC-30 (KFSN-TV) (Oct. 31, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

ARPANET - The First Internet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Aurelio Rojas, *State to Prope Allegation of Mormon Church Role*

    *in Prop. 8*, Sacramento Bee (Nov. 25, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Black's Law Dictionary (7th ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Bipartisan Commission on the Political Reform Act of 1974,

    *Overly Complex and Unduly Burdensome: The Critical*

    *Need to Simplify the Political Reform Act* (July 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 43

Bob Egelko, *Prop. 8 Stands; More Ballot Battles Ahead*,

    San Francisco Chronicle (May 27, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Brad Stone, *Prop. 8 Donor Web Site Shows Disclosure Law*

    *Is 2-Edged Sword*, N.Y. Times (Feb. 8, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bureau of Labor Statistics, CPI Inflation Calculator . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

California Secretary of State - CalAccess - Campaign Finance,

    http://cal-access.sos.ca.gov/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Californians Against Hate*, http://www.californiansagainsthate.com/ . . . . . . . . . . . . . . . . . . . 27

California Voter Foundation, *About CVF*,

    http://www.calvoter.org/about/index.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Center for Governmental Studies, *Democracy by Initiative: Shaping*

    *California's Fourth Branch of Government* (2d ed. 2008) . . . . . . . . . . . . . . . . . . . . . . . 37, 38

Craig B. Holman & Robert M. Stern, *Access Delayed Is Access*

    *Denied: Electronic Reporting of Campaign Finance Activity*

    (Winter 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

David S. Broder, Democracy Derailed: Initiative Campaigns

    and the Power of Money (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

Dick M. Carpenter II, *Disclosure Costs*: *Unintended Consequences*

    *of Campaign Finance Reform* (March 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Dick M. Carpenter II, *Mandatory Disclosure for Ballot-Initiative*

    *Campaigns*, The Independent Review (Spring 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

Federal Communications Commission, 13th Annual CMRS Competition

Report, Jan. 15, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hilton, Miss California Take Sides on "Today,"*

San Francisco Chronicle (Apr. 23, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IBM Archives, The Typewriter: An Informal History, Aug. 1977 . . . . . . . . . . . . . . . . . . . . . 6

James Bopp, Jr. & Josiah Neeley, *How Not to Reform Judicial*

*Elections: Davis, White, and the Future of Judicial Campaign*

*Financing*, 86 Denv. U. L. Rev. 195 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Jeffrey Milyo, *The Political Economics of Campaign Finance*,

The Independent Review, Vol. 3, Issue 4 (Spring 1999) . . . . . . . . . . . . . . . . . . . . . . . . 14

Martha Neil, *Fordham Law Class Collects Personal Info About*

*Scalia; Supreme Ct. Justice is Steamed*, ABA Journal (Apr. 29, 2009) . . . . . . . . . . . . . . . . 9

Nat'l Telecomm. & Info. Admin., *Networked Nation: Broadband*

*in America 2007*, Jan. 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Newsom Tweets in to Governor's Race*, San Francisco Chronicle,

A-14 (Apr. 22, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Notebook Sales Surpass PCs for First Time in U.S.*, Oct. 29, 2008 . . . . . . . . . . . . . . . . . . . 7

PCMag.com, *PC Magazine Online Encyclopedia*,

http://www.pcmag.com/encyclopedia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 26

PONG-Story . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Prop 8 Maps*, http://www.eightmaps.com/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 26

Stuart Silverstein and Johanna Neuman, *Joe Biden is Obama's*

*Running Mate*, L.A. Times (Aug. 23, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

William McGeveran, *Mrs. McIntyre's Checkbook: Privacy*

*Costs of Political Contribution Disclosure*, 6 U. Pa. J. Const. L. 1 (2003) . . . . . . . . . . . 7, 13

Xerox Factbook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# INTRODUCTION

Plaintiffs ProtectMarriage.com—Yes on 8, a Project of California Renewal ("**ProtectMarriage.com**"), National Organization for Marriage—Yes on 8, Sponsored by National Organization for Marriage ("**NOM-California**"), John Doe #1, an individual, and as a representative of the proposed Class of Major Donors ("**Major Donors**"),[1] and National Organization for Marriage California PAC ("**NOM-California PAC**")[2] seek summary judgment on all counts in their Third Amended Complaint, declaring:

(1) The Political Reform Act of 1974, Cal. Gov't Code §§ 81000 *et seq.* (the "PRA"), is unconstitutional as applied to Plaintiffs because compliance with the PRA will expose Plaintiffs to a reasonable probability of threats, harassment, and reprisals;

(2) The PRA's requirement that committees report the name, address, occupation, and employer for every contributor of $100 or more is unconstitutionally overbroad and in violation of the First Amendment because it is not narrowly tailored to serve a compelling government interest;

(3) The PRA's requirement that reports submitted after an election on a ballot measure be publicly disclosed is unconstitutional under the First Amendment, facially and as-applied, because it is not narrowly tailored to serve a compelling government interest; and

(4) The PRA is unconstitutional under the First Amendment, facially and as-applied, because it lacks a mechanism for purging public reports related to a ballot measure after the election to which they relate has occurred.

---

[1] Plaintiffs filed their Motion for Class Certification and Memorandum in Support of Motion for Class Certification concurrently with their Motion for Summary Judgment.

[2] Together, ProtectMarriage.com, NOM-California, NOM-California PAC and the Class of Major Donors are referred to as "**Plaintiffs**." ProtectMarriage.com and NOM-California are referred to collectively as "**Ballot Committee Plaintiffs**." Plaintiffs ProtectMarriage.com, NOM-California, and NOM-California PAC are referred to collectively as "**Committee Plaintiffs**."

# PROCEDURAL HISTORY

Plaintiffs filed suit on January 7, 2009, challenging various PRA provisions. On January 9, 2009, Plaintiffs filed a Motion for Preliminary Injunction along with their First Amended Complaint, adding Plaintiff John Doe #1 and the proposed class of Major Donors. On January 22, 2009, Plaintiffs filed their Second Amended Complaint, substituting Defendant Herrera for Defendant Teichert. A hearing on the Preliminary Injunction Motion was held on January 29, 2009. At the close of the hearing, this Court denied Plaintiffs' Motion for Preliminary Injunction. A written order and memorandum followed on January 30, 2009. On May 28, 2009, Plaintiffs filed their Third Amended Complaint, adding Plaintiff NOM-California PAC. Plaintiffs now file a Motion for Summary Judgment, together with this Memorandum in Support of Motion for Summary Judgment.

# STATEMENT OF UNDISPUTED FACTS

Plaintiffs have set forth the facts in their Statement of Undisputed Facts, filed concurrently with this Memorandum in Support of Motion for Summary Judgment. Since the preliminary injunction hearing, Plaintiffs have uncovered an alarming amount of harassment—including evidence of a larger, coordinated campaign designed to intimidate any supporter of Proposition 8 or a traditional definition of marriage. The forty-nine additional declarations filed concurrently with this motion supplement the nine declarations originally filed in support of Plaintiffs' Motion for Preliminary Injunction, each of which details an example of the type of threats, harassment, and reprisals directed at supporters of a traditional definition of marriage. In some instances the harassment can be traced directly to an individual's financial contribution to a committee that supported Proposition 8. For example, John Doe #11 had the back window of her car smashed for supporting Proposition 8 and John Doe #14 had his home egged and floured. John Doe Decl. #11 & #14. Moreover, the declarations demonstrate that the threats, harassment, and reprisals described in earlier declarations continue to occur months after the election and are likely to occur in the future. *See* John Doe Decl. #10 (stating his only activity in support of Proposition 8 was a financial contribution first reported on February report, harassment occurred shortly after his contribution was publicly reported) & #54 (same).

# ARGUMENT

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). This does not mean that there cannot be some dispute as to the facts: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2509-10 (1986). Further, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S. Ct. at 2510. Here, there is no genuine issue as to any material fact that might affect the outcome and Plaintiffs are entitled to judgment on all claims in their Third Amended Complaint.

## I. Compelled disclosure provisions are subject to strict scrutiny.

The First Amendment to the United States Constitution states, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.[3] The freedoms of speech and association protected by the First Amendment have their "fullest and most urgent application precisely to the conduct of campaigns for political office," *Buckley v. Valeo*, 424 U.S. 1, 15, 96 S. Ct. 612, 632 (1976) (citation omitted), and the protections undoubtedly apply in the context of both candidate and ballot measure elections. *Citizens Against Rent Control v. Berkley*, 454 U.S. 290, 295, 102 S. Ct. 434, 436-37 (1981) (citation omitted). In the context of a ballot measure, the First Amendment is especially important because it ensures that a collection of individuals "can make their views known, when, individually, their voices would be faint or lost." *Id.* at 294, 102 S. Ct. at 436; *see also infra* n. 40 (discussing the tremendous amount of resources it takes to circulate a petition and campaign for a ballot measure).

//

---

[3] The First Amendment is applicable to the states through the Fourteenth Amendment. *Stromberg v. People of the State of California*, 283 U.S. 359, 368, 51 S. Ct. 532, 535 (1931).

Compelled disclosure provisions such as those contained in the PRA undeniably impinge upon the core freedoms protected by the First Amendment. *Davis v. FEC*, _ U.S. _, 128 S. Ct. 2759, 2774-75 (2008). "[C]ompelled disclosure cannot be justified by a mere showing of some legitimate government interest. . . . [It] must survive exacting scrutiny. . . . [T]here must be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Buckley*, 424 U.S. at 64, 96 S. Ct. at 656.

Furthermore, exacting scrutiny is required "even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure." *Id.* at 65, 96 S. Ct. at 656 (*citing NAACP v. Alabama*, 357 U.S. 449, 463, 78 S. Ct. 1163, 1172 (1958)).[4]

"Exacting scrutiny," as used in *Buckley*, is "strict scrutiny." *Buckley* required "exacting scrutiny" of FECA's compelled disclosure provisions, *id.* at 64, 96 S. Ct. at 656, which it referred to as the "strict test," *id.* at 66, 96 S. Ct. at 657, and by which it meant "strict scrutiny." *See FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 127 S. Ct. 2652, 2669 n.7 (2007) (*Buckley*'s use of "exacting scrutiny," 424 U.S. at 44, 96 S. Ct. at 647, was "strict scrutiny") ("*WRTL II*"); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347, 115 S. Ct. 1511, 1519 (1995) (*citing First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 786, 98 S. Ct. 1407, 1421 (1978)) (equating "exacting" scrutiny with "strict" scrutiny).[5] Under strict scrutiny,

---

[4] California is not required to take direct action to restrict the First Amendment rights of Plaintiffs for the provisions of the PRA challenged herein to be found unconstitutional. *NAACP v. Alabama*, 357 U.S. at 463, 78 S. Ct. at 1172. "In the domain of these indispensable liberties, whether of speech, press, or association, the decisions of this Court recognize that abridgement of such rights, *even though unintended*, may inevitably follow from varied forms of governmental action." *Id.* at 461, 78 S. Ct. at 1171. "The crucial factor is the interplay of governmental and private action, for it is only after the initial exertion of state power represented by the production order that private action takes hold." *Id.* at 463, 78 S. Ct. at 1172. *See also infra* Part III.B.5.

[5] In *Canyon Ferry*, the Ninth Circuit again declined to clarify whether strict scrutiny applies in the context of ballot measure disclosure. *Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1031 (9th Cir. 2009) (striking Montana's disclosure statute under any standard of review). *See also Cal. Council Pro-Life , Inc. v. Randolph*, 507 F.3d 1172
(continued...)

**Plaintiffs' Memorandum in Support of Motion for Summary Judgment**

"California bears the burden of proving that the PRA provisions at issue are '(1) narrowly tailored, to serve (2) a compelling state interest.'" *Cal. Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1178 (9th Cir. 2007) (*citing Republican Party of Minnesota v. White*, 536 U.S. 765, 774-75, 122 S. Ct. 2528, 2534 (2002)) ("*CPLC II*").

## II. Compelled disclosure provisions impose substantial burdens on First Amendment rights.

The Supreme Court has consistently held that compelled disclosure provisions such as those contained in the PRA impose substantial burdens on the First Amendment freedoms of speech and association. *Davis*, 128 S. Ct. at 2774-75 (*citing Buckley*, 424 U.S. at 64, 96 S. Ct. at 656). Indeed, the Supreme Court predicted that compelled disclosure provisions might deter some individuals from contributing because of the risk that compelled disclosure would expose contributors to harassment and retaliation. *Buckley*, 424 U.S. at 68, 96 S. Ct. at 656; *see also id.* at 237, 96 S. Ct. at 735 (Burger, C.J., concurring in part and dissenting in part) (discussing the social costs of public disclosure and a $100 threshold he called "irrational"). Yet the Supreme Court made this prediction on the assumption that "sunlight is said to be the best of

---

[5] (...continued)
(9th Cir. 2007)(applying strict scrutiny); *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 787-88 (9th Cir. 2006) (assuming without deciding that strict scrutiny applies); and *Am. Civil Liberties Union of Nev. v. Heller*, 378 F.3d 979, 992-93 (9th Cir. 2004) (applying strict scrutiny).

Other cases have indicated that the "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis*, 128 S. Ct. at 2775. Severe burdens on First Amendment rights must be narrowly tailored to serve a compelling government interest. *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 206-07, 119 S. Ct. 636, 649 (1999) (Thomas, J., concurring). Regulations that "entail only a marginal restriction upon [First Amendment rights]" are subject to "closely drawn scrutiny." *See McConnell v. FEC*, 540 U.S. 93, 137, 124 S. Ct. 619, 656 (2003) (discussing contribution limits and how such limits still permit individuals to exercise their First Amendment speech and associational rights). Such regulations need only be "closely drawn" to a "sufficiently important interest." *Id.* at 136, 124 S. Ct. at 656.

However, regardless of whether this Court accepts that "exacting scrutiny" is always the same as "strict scrutiny," or whether it first examines the extent of the burden on First Amendment rights, strict scrutiny must apply to the PRA's disclosure provisions because compelled disclosure provisions constitute substantial First Amendment burdens. *Davis*, 128 S. Ct. at 2774-75.

disinfectants," without the benefit of any social science research on the effect of compelled disclosure on First Amendment rights, and on a record devoid of any meaningful discussion as to the proper level at which to impose record-keeping and disclosure. *Id.* at 67, 72, 83, 96 S. Ct. at 658, 660, 665. Furthermore, there have been many technological advances since *Buckley*, advances that have altered the fundamental nature of campaign finance disclosure in ways the *Buckley* Court could never have imagined.

> **A. Technological advances have qualitatively changed the landscape in which compelled disclosure takes place.**

To say that technology has advanced in the years since 1974 would be a vast understatement. In 1974, the year California citizens enacted the PRA, communication systems and technology were advancing at a rapid pace. Two years earlier, many Americans had their first taste of a computer with the arrival of the video game Pong in bars. PONG-Story, *available at* http://www.pong-story.com/arcade.htm. The "Internet" consisted of a grand total of sixty-two computers at various universities and other locations connected to a system called ARPANET. ARPANET— The First Internet, *available at* http://www.livinginternet.com/i/ii_arpanet.htm. With the introduction of the Exxon Qwip, the fax machine began its invasion of offices across the United States. AbsoluteAstronomy.com, *available at* http://www.absoluteastronomy.com/ topics/Fax. The first commercial copier to use plain paper—the Xerox 914—celebrated its fifteenth birthday in 1974. Xerox Factbook, *available at* http://www.xerox.com/go/xrx/template/ 019d.jsp?view=Factbook&id=Historical&Xcntry=USA&Xlang=en_US. The revolutionary IBM Correcting Selectric II typewriter had just been introduced; it was the first typewriter "in the history of typing to actually make typing errors disappear from original copies." IBM Archives, The Typewriter: An Informal History, Aug. 1977, *available at* http://www-03.ibm.com/ibm/ history/exhibits/modelb/modelb_informal.html.

Fast forward 35 years, to the present day. Personal computers are a necessary part of daily life. For example, parties to this lawsuit are required to file documents electronically. *See* E.D. Cal. R. 5-133. Broadband access to the Internet is available to 99% of the American population, a far cry from the sixty-two computers connected to the Internet's predecessor in 1974. Nat'l

Telecomm. & Info. Admin.*, Networked Nation: Broadband in America 2007*, Jan. 2008, *available at* http://www.ntia.doc.gov/reports/2008/NetworkedNationBroadbandinAmerica2007 .pdf. For the first time ever, the majority of computers sold in the United States are notebook computers. *Notebook Sales Surpass PCs for First Time in U.S.*, Oct. 29, 2008, *available at* http://afp.google.com/article/ALeqM5hkYOf_SCQ1ugSXKLXCsSs7qWnsQA. These notebooks have "wireless" technology, allowing their users to access the Internet through "wi-fi hotspots" and cellular data networks from coast to coast. Speaking of portability, as of 2007, the Federal Communications Commission estimated that there were 263 million mobile phone subscribers—an increase of over 20 million subscribers from 2006. Federal Communications Commission, *13th Annual CMRS Competition Report*, ¶ 194, Jan. 15, 2009 *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-09-54A1.pdf. Many of these mobile phones are capable of accessing the Internet, sending email, or looking up a map to a person's home with the push of a few buttons. *Id*. at ¶ 201 (over 50% of mobile phone subscribers used data services on their cell phones). Instead of faxing a document—a technology introduced to the market, universally accepted, and one that has become nearly obsolete, in the 35 years since the passage of the PRA—one can scan and send a document via email. Moreover, one can send that document to a nearly unlimited number of recipients, at little to no cost, with almost instantaneous delivery. And American kids would have trouble putting a piece of paper into a typewriter, let alone using the machine to create a document.

All of these technological advances have completely changed the way in which campaign finance data is compiled, accessed, and disseminated. As one commentator has said, "the law may remain the same, but its effect is entirely different." William McGeveran, *Mrs. McIntyre's Checkbook: Privacy Costs of Political Contribution Disclosure*, 6 U. Pa. J. L. 1, 11 (2003) ("McGeveran"). For example, in 1974, reports of campaign contributions were kept on handwritten forms that often contained completely illegible entries. Craig B. Holman & Robert M. Stern, *Access Delayed Is Access Denied: Electronic Reporting of Campaign Finance Activity*, Public Integrity, Winter 2000 (*available at* http://www.cgs.org/images/publications/Access DelayedisAccessDenied.pdf) ("*Access Delayed*"). In theory, reports were public records, but

access was extremely limited because it entailed a trip to a governmental office during normal business hours. *See*, *e.g.*, Cal. Gov't. Code § 81008 (1975) (copies available at the Secretary of State's office in Sacramento, the Registrar-Recorder's office in Los Angeles, and the Department of Elections' office in San Francisco). Copies had to be prepared by hand or at a cost to the individual requesting copies on a per-page basis.[6] To search, an individual had to manually flip through page after page of reports. And the process was complicated by candidates seeking to game the system, such as former New York Governor George Pataki, who is famous for organizing his lists alphabetically by *first* name. *Access Delayed* at 1. If an individual overcame all of these obstacles, he or she still needed to find a way to communicate the message to the public, a task virtually impossible in 1974 without the assistance of the mainstream media.

Today, disclosure records are kept and prepared using complex computer databases. California requires reports to be filed electronically and also makes them available to the public in electronic format. *See* Cal. Gov't Code § 84600 *et seq.* An individual no longer has to visit a government office; he can obtain a copy of the reports from the privacy of his living room, and he has a choice between an online, html format, and a downloadable Microsoft Excel spreadsheet.[7] *See* California Secretary of State - CalAccess - Campaign Finance, http://cal-access.sos.ca.gov/Campaign/ ("Cal-Access"). Having the donor information available on Cal-Access in html format makes the information easily searchable and the spreadsheet format allows individuals to manipulate the data even further. For example, using the spreadsheet, one can organize the donors by first name, last name, or any other piece of publicly disclosed information. Searches can also be combined—in a matter of seconds you can find every dentist in San Francisco that gave more than $500 in support of Proposition 8 in the month of October.

//

//

---

[6] If one were to make a copy of ProtectMarriage.com's final report of 2,800 pages, at five cents per page, the total cost of a final report would be $140.

[7] The federal government and a majority of states make campaign disclosure information available on the Internet. *See Access Delayed* at 4.

The spreadsheet can also be easily combined with other information, such as addresses and phone numbers available on Internet white page directories.[8] *See, e.g.*, *Prop 8 Maps*, http://www.eightmaps.com ("EightMaps.com"). Ironically, the creators of EightMaps.com have exercised their First Amendment right to remain anonymous, a choice the financial supporters of Proposition 8 cannot make because of the PRA.[9] Brad Stone, *Prop 8 Donor Web Site Shows Disclosure Law is 2-Edged Sword*, N.Y. Times (Feb. 8, 2009).

Furthermore, the costs associated with accessing and disseminating donor information today–both in terms of time and money–are virtually non-existent. In 1974, it was highly unlikely that an employer would take the time to make a trip to one of the government offices to search campaign finance records for the name of his or her employees. Today, that same employer can run a single search from the comfort of his or her office and instantly learn if any employee gave to the Proposition 8 campaign, to which side, and in what amount. The same can be said about curious customers, suppliers, and neighbors. And an individual no longer needs to

//
//
//
//
//

---

[8] Fordham law professor Joel Reidenberg was excoriated by Supreme Court Justice Antonin Scalia after he asked his students to compile personal information about the Justice. The students turned in a fifteen page dossier that included Justice Scalia's home address, phone number, home value, food and movie preferences, his wife's *personal* e-mail address, and photos of his grandchildren. Martha Neil, *Fordham Law Class Collects Personal Info About Scalia; Supreme Ct. Justice is Steamed*, ABA Journal (Apr. 29, 2009) (*available at* http://www.abajournal.com/weekly/fordham_law_class_collects_scalia_info_justice_is_steamed).

[9] Any individual seeking to learn the identity of the creators of EightMaps.com would find that the task is extremely difficult given the sensitive First Amendment concerns. *See, e.g.*, *Indep. Newspapers, Inc. v. Brodie*, 966 A.2d 432, 456 (Md. 2009). By citing this case, Plaintiffs do not mean to suggest that the creators of EightMaps.com are entitled to any less protection by the First Amendment. Instead, it is cited to demonstrate just how zealous the courts are and should be in protecting First Amendment rights.

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

rely on the mainstream media to spread the word, he can now email, blog,[10] text, tweet,[11] and Facebook.[12]

In today's "information age," the legislature and courts simply cannot ignore the tremendous invasions of privacy that occur when donor information is made widely available to the public. For example, the Federal Rules of Civil Procedure require litigants to redact certain personal identifying information, including social security numbers, taxpayer-identification numbers, birth dates, names of minors, and financial account numbers.[13] Fed. R. Civ. P. 5.2. The rule goes even further, allowing parties to make a motion to redact additional information and or to limit

---

[10] The word "blog" is a contraction of the words "web" and "log," and is defined as "a website that contains dated text entries in reverse chronological order (most recent first) about a particular topic. Blogs serve many purposes, from online newsletters to personal journals to "ranting and raving." Written by one person or a group of contributors, entries contain commentary and links to other Web sites, and images and videos as well as a search facility may be included." PC Magazine Online Encyclopedia, PCMag.com, "blog," http://www.pcmag.com/ encyclopedia ("PCMag.com"). The word has become so popular that it has been turned into a verb, e.g., "I'll blog about that topic next week." *Id.*

[11] "Twitter" is "a Web site and service that lets users send short text messages from their cellphones to a group of friends. Launched in 2006, Twitter (www.twitter.com) was designed for people to broadcast their current activities and thoughts. Twitter expanded 'mobile blogging' (updating a blog from a cellphone) into 'microblogging,' the updating of an activities blog (microblog) that distributes the text to a list of names. Messages can also be sent and received via instant messaging, the Twitter Web site or a third-party Twitter application. A MySpace account can also be updated." PCMag.com, "Twitter." The individual messages are called "tweets," and like "blog," the term has become so popular that individuals now use it as a verb, e.g., "I'm going to tweet about that." *Id.*

[12] For example, rather than holding a traditional press conference, President Barack Obama first announced his selection of Senator Joe Biden as his Vice Presidential nominee to supporters via text message. Stuart Silverstein and Johanna Neuman, *Joe Biden is Obama's Running Mate*, L.A. Times (Aug. 23, 2008) (*available at* http://www.latimes.com/news/printedition/front/la-na-biden23-2008aug23,0,7564344.story). San Francisco's mayor, Gavin Newsom, announced his 2010 candidacy for California governor via a "tweet" on Twitter, as well a post on Facebook. *Newsom Tweets in to Governor's Race*, San Francisco Chronicle, A-14, Apr. 22, 2009 (*available at* http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2009/04/22/EDO1176DR8.DTL).

[13] The rule provides that filings should contain only the last four digits of the social-security number and taxpayer-identification number, the year of the individual's birth, the minor's initials, and the last four digits of the financial-account number. Fed. R. Civ. P. 5.2.

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

or prohibit a non-party's remote electronic access to a document filed with the court for good cause. *Id*. Indeed, the California legislature appears to have at least recognized the potential harm that comes with making information available on the Internet, allowing committees to redact the street addresses from any electronically filed reports. Cal. Gov't Code § 84602(d). But the legislature grossly underestimated the potential harm. As the facts of this case demonstrate, individuals can, will, and do use the compelled disclosure reports to harass and intimidate individuals exercising their First Amendment rights.

In an area as sensitive as the First Amendment, the burden is on the government to demonstrate that its statute is narrowly drawn to serve a compelling government interest. Here, individuals that contributed as little as $100 to a campaign that raised and spent over $70 million dollars have been subjected to what this Court has already called "the deplorable nature of many of [the] acts alleged by Plaintiffs." (Mem. & Order, p. 41, Jan. 30, 2009.) Countless others were no doubt intimidated from putting up a sign or contributing to the cause for fear of similar harassment. Yet these individuals are a far cry from the monied interests that campaign disclosure statutes are meant to uncover. Because the PRA and its irrational $100 threshold, *see Buckley*, 424 U.S. at 237, 96 S. Ct. at 735 (Burger, C.J., concurring in part and dissenting in part), California citizens must make a Hobson's choice: refrain from exercising their First Amendment rights or be prepared to be harassed for engaging in the political process. The First Amendment simply cannot tolerate a law that forces citizens to make such a choice, and certainly not at the dollar level contained in the PRA. As Kim Alexander, president of the California Voter Foundation, recently said, "This is not really the intention of voter disclosure laws. But that's the thing about technology. You don't really know where it is going to take you."[14] Stone, *supra*, at 9.

---

[14] The California Voter Foundation is a non-profit, nonpartisan organization that promotes the responsible use of technology to improve the democratic process. Its mission statement includes the following language, "CVF advances accountability in government and ensures voters are empowered to make informed, confident decisions by making it possible to 'follow the money.' CVF is a pioneer of electronic filing and Internet disclosure of campaign finance

(continued...)

**B. While compelled disclosure imposes substantial burdens on First Amendment rights, compelled *public* disclosure increases the burdens exponentially.**

An important distinction needs to be drawn in this case between disclosure of donor information and *public* disclosure of donor information. There is no dispute that compelled disclosure represents a burden on First Amendment rights. *See Davis*, 128 S. Ct. at 2774-75; *Buckley*, 424 U.S. at 64, 96 S. Ct. at 656. However, in prior cases discussing compelled disclosure provisions, there has been a failure—or lack of need—to address the difference between compelled "private" disclosure (i.e., disclosure made only to the government) and compelled "public" disclosure (i.e., disclosure made available to the public). As discussed above, the technological advances that have occurred in the last thirty years make it imperative for the Court to consider the differences between private and public disclosure, and the respective benefits and burdens associated with each.[15]

Strict scrutiny requires that each application of a statute restricting speech must be supported by a compelling government interest. *WRTL II*, 127 S. Ct. at 2672.[16] *See also Heller*, 378 F.3d at 991 ("[I]t is not just *that* a speaker's identity is revealed, but how and when that

---

[14] (...continued)
records, shining 'digital sunlight' on money in politics throughout the state and nation. CVF's work advancing online disclosure opens up public access to this data and provides voters with crucial information about who is funding candidates and measures." California Voter Foundation, *About CVF*, http://www.calvoter.org/about/goals.html.

[15] As set forth in more detail below, there is also a difference between pre- and post-election reporting. *See infra* Part V. In applying strict scrutiny, these differences must be factored into the analysis. For example, a provision requiring pre-election *public* reporting might be constitutional, whereas a post-election *public* reporting provision may be unconstitutional. *See Heller*, 378 F.3d at 991 ("[I]t is not just *that* a speaker's identity is revealed, but how and when that identity is revealed, that matters in a First Amendment analysis of a state's regulation of political speech.") (emphasis in original).

[16] The cited opinion is by Chief Justice Roberts, joined by Justice Alito. As the controlling *WRTL II* opinion, the principal opinion states the holding of the Court and will herein simply be referred to as *WRTL II*. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (citation omitted)).

identity is revealed, that matters in a First Amendment analysis of a state's regulation of political speech.") (emphasis in original) Thus, in applying strict scrutiny to the provisions of the PRA challenged herein, the Court must be cognizant of the fact that private and public reporting provisions impact First Amendment rights in slightly different ways. A compelled disclosure system that requires only private reporting may be constitutional in a situation where public reporting may not.

**C. Research demonstrates that compelled disclosure has a significant chilling effect on political speech.**

Campaign disclosure statutes are often trumpeted on the grounds that "sunlight is the best disinfectant" and as enjoying wide public support. *See Buckley*, 424 U.S. at 67, 96 S. Ct. at 658; *CPLC II*, 507 F.3d at 1179. Yet few have actually studied whether campaign disclosure actually solves the problems it seeks to address, and fewer still have probed voters about the specifics of compelled disclosure statutes.[17]

In 2007, the Institute for Justice commissioned a study to examine the burdens of compelled disclosure provisions on First Amendment rights. *See* Dick Carpenter, Ph.D, *Disclosure Costs: Unintended Consequences of Campaign Finance Reform*, Institute for Justice, March 2007 (*available at* http://www.ij.org/publications/other/disclosurecosts.html) ("*Disclosure Costs*").

---

[17] Evidence of the social costs associated with compelled public disclosure was part of the record in *McConnell v. FEC*. 251 F. Supp. 2d 176, 227-229 (D.D.C. 2003) (per curiam). The evidence ranged from large numbers of contributions at just below the disclosure trigger amount, to vandalism after public disclosure, to non-contribution because of concerns about a group's ability to retain confidentiality, to concerns about employers, neighbors, other business entities, and others knowing of support are not popular everywhere and the results of such disclosure. *Id. See also AFL-CIO v. FEC*, 333 F.3d 168, 176, 179 (D.C. Cir. 2003) (recognizing that releasing names of volunteers, employees, and members would make it hard to recruit personnel, applying strict scrutiny, and striking down an FEC rule requiring public release of all investigation materials upon conclusion of an investigation); Dick M. Carpenter II, *Disclosure Costs: Unintended Consequences of Campaign Finance Reform* (2007) (available at http://www.ij.org/ publications/other/disclosurecosts.html); William McGeveran, *Mrs. McIntyre's Checkbook: Privacy Costs of Political Contribution Disclosure*, 6 U. Pa. J. Const. L. 1 (2003); James Bopp, Jr. & Josiah Neeley, *How Not to Reform Judicial Elections: Davis, White, and the Future of Judicial Campaign Financing*, 86 Denv. U. L. Rev. 195, 218-20 (2008) (discussing the burdens of disclosure).

**Plaintiffs' Memorandum in Support of Motion for Summary Judgment**

Prior to this study, "no one [had] analyzed systematically the effects of campaign-finance regulations on freedom of speech or association." Jeffrey Milyo, Ph.D., *The Political Economics of Campaign Finance*, The Independent Review, Vol. 3, Issue 4, 537, 537 (Spring 1999).

Carpenter's study is important for several reasons. First, the study specifically addresses opinions regarding campaign finance disclosure in the context of ballot measures. *Disclosure Costs* at 5. The few studies conducted prior to Carpenter's focused almost exclusively on candidate disclosure. The distinction is important because the courts have said that the state possesses fewer interests with respect to ballot measure disclosure. *See infra* n. 37. Second, the sample population for the survey was drawn from six states that allow citizen-initiated ballot measures, including California. *Disclosure Costs* at 6. Third, each of the states included in the sample population compels disclosure of ballot measure contributions after an initial threshold is met and the disclosed information includes the contributor's name, address, contribution amount, and employer. *Id.* Finally, each of these states publishes at least some of the donor information collected on a campaign finance website. *Id.*

The results of the study are consistent in one respect with prior studies on campaign finance disclosure—over 80% of the respondents agreed that the government should make public the identities of those who contribute to ballot measures.[18] *Id.* at 7. However, that is where the similarities end.

When the issue was personalized, support for public disclosure waned significantly. Only 40% of respondents were comfortable with their *own* name and address being posted on a government website as a result of a contribution to a ballot committee. *Id.* Even fewer respondents (24%) felt that their employer's name should be posted on the Internet because of their political contribution. *Id.* Nearly 60% of respondents indicated that they would think twice

---

[18] Respondents were asked to state how they felt about the following statement. "The government should require that the identities of those who contribute to ballot issue campaigns should be available to the public." This finding is consistent with the findings of David Binder, relied upon by the court in *CPLC II*, where 71% of respondents felt that it was important to know the identities of individuals that contributed to a ballot measure committee. *CPLC II*, 507 F.3d at 1179.

about donating if it meant that their name and address would be released to the public. *Id.* Furthermore, after comparing general support for disclosure laws with an individual's likelihood of contributing to a campaign if their information is made public, Carpenter found that "even those who strongly support forced disclosure laws will be less likely to contribute to an issue campaign if their contribution and personal information will be made public." *Id.* at 7. When asked why they would think twice before donating, respondents cited a desire to remain anonymous, fear of retaliation (both personal and economic), and that public disclosure would take away their right to a secret ballot. *Id. See also McIntyre*, 514 U.S. at 343, 115 S. Ct. at 1517 ("The specific holding in *Talley* related to advocacy of an economic boycott, but the Court's reasoning embraced a respected tradition of anonymity in the advocacy of political causes. This tradition is perhaps best exemplified by the secret ballot, the hard-won right to vote one's conscience without fear of retaliation."). As Carpenter concluded

> while voters appear to like the idea of disclosure in the abstract (that is, as it applies to someone else), their support weakens dramatically in the concrete (that is, when it involves them). Stated succinctly, it is 'disclosure for thee, but not for me.' . . . But the potential costs do not end there. Most respondents also reported themselves less likely to contribute to an issue campaign if their personal information was disclosed . . . . Thus, the cost of disclosure also seems to include a chilling effect on political speech and association as it relates to ballot issue campaigns. . . . The vast majority of respondents possessed no idea where to access lists of contributors and never actively seek out such information before they vote. At best, some learn of contributors through passive information sources, such as traditional media, but even then only a minority of survey participants could identify *specific* funders of campaigns related to the ballot issue foremost in their mind. . . . Such results hardly point to a more informed electorate as a result of mandatory disclosure . . . .[19]

---

[19] Carpenter's research has demonstrated just how little the information gleaned from compelled disclosure is used by voters. His research demonstrates that voters, in the abstract, want public disclosure and indicate that it would effect their vote. However, in the concrete, donors are reluctant to make their financial support public and almost never access the public disclosure reports. Moreover, even traditional information sources relied upon by voters, such as newspapers and television, tend to ignore campaign disclosure reports.

Campaign disclosure is typically justified on the ground that "[voters are] cognitively limited decision makers, processing only a small fraction of the information to which they are exposed. Rather than engaging in a comprehensive information search and then deliberating to achieve an optimal choice, the argument goes, individuals tend to rely on cues to make judgments." *Disclosure Costs* at 4.

Carpenter's research indicates that nearly two-thirds of the voters rely upon traditional

(continued...)

*Disclosure Costs* at 13. Thus, in addition to having a significant chilling effect on political speech, the research also indicates that compelled disclosure provisions do little to solve the problem that they are meant to address.

**III. There is a reasonable probability that any individuals supporting a traditional definition of marriage will be subjected to threats, harassment, and reprisals.**

Summary judgment should be granted on Plaintiffs' first count because there is a reasonable probability that compliance with the PRA's compelled disclosure provisions will expose

//

//

---

[19] (...continued)

forms of media, including newspaper, television, and radio, as sources of information on ballot measures. *Id.* at 12. Only 12% indicated that they used the Internet, but the study does not indicate how the Internet was used. In other words, the voter could have been visiting the websites of traditional news sources. *Id.* at 12.

In a later study, Carpenter analyzed how often traditional media–from which the typical voter obtains most of his or her information–used disclosure information in their stories. Carpenter found that traditional media rarely uses public disclosure in their stories: "Although voters enjoyed a wealth of information about ballot issues in 2006, little of that information included data that drew on, appeared to draw on, or made reference to information related to or resulting from campaign-finance disclosure laws. Despite the posting of disclosure information on the Colorado Secretary of State's website, and the alleged importance of such information to voters, only 4.8 percent of the information sources included any discussion of disclosure-related data. Instead, more than 95 percent of the sources in this sample focused on the content of the ballot issues, predicted effects of the issues' passage or defeat, and otherwise discussed the merits or demerits of the proposed initiatives without making any reference to information resulting from disclosure." Dick Carpenter, Ph.D, *Mandatory Disclosure for Ballot-Initiative Campaigns*, The Independent Review, 578 (Spring 2009) (*available at* http://www.independent .org/pdf/tir/tir_13_04_6_carpenter.pdf) ("*Mandatory Disclosure*"). Even as the election draws near, traditional media sources do not increase the number of stories relying on donor disclosure. *Id.* (97% of traditional media sources in two weeks immediately before election did not draw on, appear to draw on, or make reference to disclosure reports).

In conclusion, Carpenter noted: "It therefore appears that it is not only citizens who do not consult disclosure information directly, but also media, think tanks, and other 'elites' that, according to cue-taking literature, ordinarily assume a 'cue-giving' role to the general public." *Id.* at 578. The voters, who gain most of their information from the news media, rely on a source that, for all practical purposes, ignores the public disclosure system in its coverage of ballot measures. Thus, the voters are not gaining valuable information from the public disclosure of donors - particularly in light of the First Amendment harms being caused to citizens because of this compelled public disclosure.

Plaintiffs and their contributors to a reasonable probability of threats,[20] harassment,[21] and reprisals.[22] Plaintiffs must meet but one test for an exemption from the reporting requirements to be granted—the "reasonable-probability test." Under this test, Plaintiffs must demonstrate a reasonable probability that the compelled disclosure will subject individuals identified to threats, harassment, or reprisals. As set forth below, Plaintiffs have demonstrated that individuals and organizations supporting Proposition 8 and a traditional definition of marriage have been subjected to the sort of threats, harassment, and reprisals prior courts have considered and found sufficient to grant a disclosure exemption.[23] Given the existence and prevalence of the threats, harassment, and reprisals directed at supporters of Proposition 8 and a traditional definition of marriage, there is a reasonable probability that any individual supporting Proposition 8 or a traditional definition of marriage identified as a result of the compelled disclosure provisions of the PRA will be subjected to similar threats, harassment, and reprisals.

### A. The standards of the disclosure exemption test.

In *Buckley*, the Court created the reasonable-probability test in response to, and in rejection of, the argument that the proof of a chill on expressive association would be impossible. *Buckley*, 424 U.S. at 73, 96 S. Ct. at 660. An opinion dissenting in part from the lower court's decision in *Buckley* argued that a blanket exemption must be created for minor parties because the "evils of chill and harassment are largely incapable of formal proof." *Id.* (citation omitted). The dissenter

---

[20] "Threat, *n*. 1. A communicated intent to inflict harm or loss on another or on another's property, esp. One that might diminish a person's freedom to act voluntarily or with lawful consent . . . . 2. An indication of an approaching menace . . . . 3. A person or thing that might well cause harm . . . ." Black's Law Dictionary 1489-90 (7th ed. 1999).

[21] "Harassment . . . . Words, conduct, or action (usu. repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose." Black's Law Dictionary 721 (7th ed. 1999).

[22] "Reprisal . . . . 3. Any act or instance of retaliation, as by an employer against a complaining employee." Black's Law Dictionary 1305 (7th ed. 1999).

[23] Plaintiffs are not required to establish a causal link between the compelled disclosure statute and the instances of threats, harassment, and reprisals. *Buckley*, 424 U.S. at 74, 96 S. Ct. at 661.

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

noted the difficulty of obtaining "witnesses who are too fearful to contribute but not too fearful to testify about their fear." *Id.* at 74, 96 S. Ct. at 661. The Supreme Court rejected this argument by establishing the reasonable-probability test, including its mandate of "sufficient flexibility" in evidence to fit the situation where witnesses would be difficult to obtain because they are chilled by fear of threats, harassment, or reprisals. *Id.* Rather than create the blanket exemption urged by the lower court's dissent, the Supreme Court recognized the inherent problem created by the threat of threats, harassment, or reprisals after disclosure (or the possibility of such threats, harassment, or reprisals), and then required only a minimal amount of proof—but some proof, nonetheless—for those requesting an exemption from reporting.

Thus, to obtain a disclosure exemption, Plaintiffs must meet only *one* test: whether there is a "reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *McConnell*, 540 U.S. at 198, 124 S. Ct. at 692 (2003) (citation omitted). If that test is met, Plaintiffs must receive an exemption. There is no further test or balancing because the Supreme Court has already done the balancing and established the reasonable-probability test as the sole criterion a party needs to meet to gain a disclosure exemption.[24] *Id.*

**B. The quantum and quality of evidence required to meet the reasonable-probability test.**

The First Amendment context and the reasonable-probability test also govern the quantum and quality of evidence that must be presented to establish a reasonable probability of threats, harassment, and reprisals. The Supreme Court has set forth five requirements on the quantum and quality of evidence required to meet the reasonable-probability test that are applicable here.

//

---

[24] Nevertheless, if the Court were to weigh California's interest in disclosure against the First Amendment harms, the evidence set forth in Part II, *supra*, demonstrates that the balance tips even more in favor of Plaintiffs than it did in *Buckley* or *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 103 S. Ct. 416 (1982), because of the technological changes that have altered the dynamics of public disclosure, and the social science research that has illuminated these harms and dispelled the notion that donor information solves the problem of voter ignorance.

**1.     Plaintiffs are not required to establish a direct causal link between disclosure and specific instances of threats, harassment, and reprisals.**

First, the Supreme Court has rejected the notion that a causal link must be established between the threats, harassment, and reprisals, and public disclosure. *Buckley*, 424 U.S. at 74, 96 S. Ct. at 661. ("A strict requirement that chill and harassment be directly attributable to the specific disclosure from which the exemption is sought would make the task even more difficult."). In the present case, the critical question is whether each particular individual was subjected to threats, harassment, or reprisals because of his or her support for Proposition 8 or a traditional definition of marriage.[25] If the answer is "yes," then the Court can assume, as a matter of law, that there is a reasonable probability that any individual who is disclosed because he or she gave to an organization that supported Proposition 8 or a traditional definition of marriage will likewise be subjected to threats, harassment, and reprisals. To the extent that Plaintiffs can demonstrate a causal link, it only strengthens their case and demonstrates that the assumption is well-justified.

**2.     Plaintiffs need not demonstrate that they, or their members, have been subjected to threats, harassment, and reprisals.**

Similarly, the second "sufficient flexibility" standard allows an organization to rely not only on evidence of specific incidents of harassment directed at its members or the organization itself, but also on evidence of threats, harassment, or reprisals directed at other individuals and organizations holding similar views. Thus, in *Averill v. City of Seattle*, the court granted an exemption to a specific candidate's campaign committee primarily upon evidence of threats and harassment directed at the Freedom Socialist Party and Radical Women generally. 325 F. Supp. 2d 1173, 1175 (W.D. Wash. 2004). The only additional evidence submitted by the committee consisted of several harassing and crank calls directed at contributors to the committee. *Id.* at

---

[25] The Second Circuit provides a helpful application of the reasonable-probability test in *FEC v. Hall-Tyner Election Campaign Committee*, 678 F.2d 416 (2d Cir. 1982), in which it, *inter alia*, makes clear that those seeking exemption have no burden to prove "harassment will certainly follow compelled disclosure" because "breathing space" is required in the First Amendment context. *Id.* at 421.

1178.[26] Once Plaintiffs have established such evidence, there is, as a matter of law, a reasonable

probability of threats, harassment, and reprisals. The fact that Plaintiffs themselves have been

harassed only strengthens their case and demonstrates that the analytical inference is well-

justified.

### 3. The reasonable-probability test requires only that threats, harassment, and reprisals exist, not that they be severe.

Third, the reasonable-probability test does not require threats, harassment, or reprisals to be

substantial or severe, only that threats, harassment, and reprisals exist. The test is one of

probability, making numerosity a logical criterion. However, the nature of the claim makes it

difficult to rely solely on the number of instances of threats, harassment, and reprisals that have

occurred. As the Court recognized in *Buckley*, plaintiffs face a daunting task in trying to find

witness who are "too fearful to contribute but not too fearful to testify about their fear." 424 U.S.

at 74, 96 S. Ct. at 661.

Accordingly, the courts must look to a variety of other factors. The severity of reprisals

certainly has a proper role to play in the analysis. When the incidents occurred may be relevant.[27]

---

[26] In cases where the courts have found it inappropriate to look to evidence of harassment directed at other organizations, they have done so on the grounds that it was impossible to determine the specific cause of the harassment. *See*, *e.g.*, *Oregon Socialist Workers 1974 Campaign Comm. v. Paulus*, 432 F. Supp. 1255, 1259 (D. Or. 1977) (noting that the harassment was "at least as likely to be the product of the other political activities of the affiants."). The numerous declarations filed in this case leave little doubt as to the cause of the harassment—each individual was threatened or harassed because he or she supported a traditional definition of marriage. Together, this evidence demonstrates that there is a reasonable probability that any individuals advocating a traditional definition of marriage will be subjected to similar threats, harassment, and reprisals.

[27] The evidence presented in this case suggests that the threats, harassment, and reprisals directed at individuals supporting a traditional definition of marriage are not limited to the election surrounding Proposition 8. First, the threats and harassment have occurred both before, *see*, *e.g.*, John Doe Decl. #30, and after the election. S*ee*, *e.g.*, John Doe Decl. #54 (specifically making reference to the February 2, 2009 disclosure report). In late April, a national controversy erupted when Carrie Prejean, First Runner-Up, Miss USA, said she did not support gay marriage when answering a question from Miss USA judge Perez Hilton. *See Hilton, Miss California Take Sides on "Today,"* S.F. Chronicle, Apr. 23, 2009 (indicating that her answer may have cost her

(continued...)

So too might the geographic dispersion and publicity surrounding the incidents.[28] However, it is inappropriate to distinguish any case on a single factor. A few severe and public threats could be sufficient to warrant an exemption. Likewise, relatively minor instances of threats, harassment, and reprisals may be sufficient if they are widespread. In fact, *Averill* recognized that "even small threats" could be sufficient. *Averill*, 325 F. Supp. 2d at 1176.

Thus, in determining whether there is a reasonable probability of threats, harassment, and reprisals, the courts have considered everything from boycotts to death threats to determine whether there is a reasonable probability of future threats, harassment, and reprisals. *See*, *e.g.*, *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 99, 103 S. Ct. at 423-24 (1982) (threatening phone calls and hate mail, the burning of organizational literature, destruction of members' property, police harassment, and shots fired into organization's office); *Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371 (Tex. 1998) (boycotts).[29] Each has a proper role

---

[27] (...continued)
the Miss USA crown). The evidence suggests that the threats and harassment directed at individuals supporting a traditional definition of marriage are anything but isolated incidents.

[28] Plaintiffs have submitted numerous declarations, not only from individuals throughout the State of California, but also, across the entire United States. *See* John Doe Decl. #19 (Louisiana); #27 (Michigan); #29 (New York); & #32 (Ohio).

[29] Much was made at the preliminary injunction stage about boycotts and whether it is appropriate to consider them as a form of reprisal. Plaintiffs maintain that a boycott is no less a form of a reprisal than a death threat. One may be more severe and illegal, but each is a reprisal nonetheless.

Plaintiffs do not mean to suggest that supporters of Proposition 8 who choose to make their support of Proposition 8 public should be free from the lawful consequences of their speech. Those who voluntarily make their position known (e.g., by placing a "Yes on 8" sign in a store window) should be prepared to accept the lawful consequences of their speech.

But this case is not about the individuals who *voluntarily* chose to speak by placing a sign in their window. Instead, this case is about the thousands of individuals who were *compelled* to speak because of their relatively modest financial contribution. And as the Supreme Court has said, there is nothing inherently wrong or suspect with an individual wanting to keep his support for a particular issue private. *See McIntyre*, 514 U.S. at 341-42, 115 S. Ct. at 1516 ("The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible.").

(continued...)

Plaintiffs' Memorandum in Support
of Motion for Summary Judgment

to play in the analysis and an exemption must be granted if the Court determines that there is a reasonable probability of threats, harassment, and reprisals.

### 4. The exemption is not limited to minor political parties.

Fourth, while *Buckley* and *Brown* make references to "minor parties," nothing in *NAACP v. Alabama*, 357 U.S. 449, 78 S. Ct. 1163—the opinion on which the exemption is premised—suggests that the exemption is so limited. The "minor party" language in *Buckley* results from the parties' argument for a "blanket exemption" for minor parties from the disclosure requirements without first having to demonstrate the requisite level of harm under *NAACP v. Alabama. See Buckley*, 424 U.S. at 68-74, 96 S. Ct. at 658-61. As the *NAACP v. Alabama* Court put it, compelled disclosure is just as "likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their

[29] (...continued)
The problem is not the boycotts, it is what they represent. These boycotts, like the death threats, are directed at individuals merely because they supported a traditional definition of marriage. Each creates an environment likely to discourage protected First Amendment activity and is therefore proper to consider in determining whether a reasonable probability of threats, harassments, and reprisals exists. The question here is not whether particular organizations can boycott businesses that supported Proposition 8, it is whether the state can continue to *compel* speech that would otherwise not be forthcoming in light of the very realistic probability of a reprisal. Under *Buckley* and *Brown*, the answer is that California cannot. *See NAACP v. Alabama*, 357 U.S. at 461, 78 S. Ct. at 1171 ("In the domain of these indispensable liberties, whether of speech, press, or association, the decisions of this Court recognize that abridgement of such rights, *even though unintended*, may inevitably follow from varied forms of governmental action.").

Whether Plaintiffs are granted an exemption does not affect any individual's First Amendment right to engage in a legal boycott. The only difference is that if an exemption is granted, California cannot *compel* a business to disclose whether it is "Yes on 8" or "No on 8." California citizens would remain free to boycott any business that voluntarily chooses to make its position known on Proposition 8.

An analogous situation is that of employer-employee, particularly if the employee is "at-will." Taking away a contributors right to make an anonymous contribution ensures that the contributor cannot take a position contrary to that of his or her employer without risking some form of reprisal.

**Plaintiffs' Memorandum in Support of Motion for Summary Judgment**

associations and of the consequences of this exposure." 357 U.S. at 462-63, 78 S. Ct. at 1172. Indeed, in *McConnell v. FEC*, the Court expressly affirmed the analysis and holding of the district court, which applied the reasonable-probability test to entities that were, by no stretch of the imagination, minor parties. *McConnell v. FEC*, 251 F. Supp. 2d 176, 245-47 (D.D.C. 2003) (applying the reasonable-probability test to a Chamber of Commerce coalition, the American Builders and Contractors, Associated General Contractors of America, the American Civil Liberties Union, and the National Rifle Assocation). The exemption has also been applied in non-partisan elections. *McArthur v. Smith*, 716 F. Supp. 592, 594 (S.D. Fla. 1989). Non-partisan elections, like ballot measures, are about the issues, not the political party of the candidate. *See also Oregon Socialist Workers 1974 Campaign Comm. v. Paulus*, 432 F. Supp. 1255, 1257 (D. Or. 1977) (noting that courts must be especially vigilant in cases involving minor parties, but in no way limiting the exemption to minor parties).

Furthermore, "the First Amendment does not 'belong' to any definable category of persons or entities: It belongs to all who exercise its freedoms." *Bellotti*, 435 U.S. at 802, 98 S. Ct. at 1429 (Burger, J., concurring). As the *Buckley* court put it, age, size, and political success, are all poor factors upon which to create a blanket exemption. *Buckley*, 424 U.S. at 73, 96 S. Ct. at 660. The Court explained that some "long-established parties are winners—some are consistent losers," and sometimes a new party "may garner a great deal of support if it can associate itself with an issue that has captured the public's imagination." *Id.* Today's winners might be tomorrow's losers, and the First Amendment must protect both.[30] Tying the *Brown* exemption to minor parties fails to protect the First Amendment's goal of encouraging "uninhibited, robust,

---

[30] The issue of same-sex marriage was also before the voters in 2000, and it appears that the issue of same-sex marriage will once again be before the California voters in 2010. *See* Website of the Secretary of State of California, http://cal-access.ss.ca.gov/Campaign/Measures/list.aspx? session=1999 (Proposition 22 "2000 Definition of Marriage" on November 2000 general election ballot); Website of the Secretary of State of California, http://www.sos.ca.gov/elections/ elections_j.htm#circ (Ballot measure titled "Reinstates Right of Same-Sex Couples to Marry" currently in circulation; Another ballot measure titled "Substitutes Domestic Partnership for Marriage in California Law" also currently in circulation). *See also* Bob Egelko, *Prop. 8 Stands; More Ballot Battles Ahead*, San Francisco Chronicle (May 27, 2009).

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

and wide-open" debate. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 721 (1964). All parties, whether large or small, new or well-established, winners or losers, must be free to advocate their position free from the deplorable acts directed at supporters of Proposition 8 and a traditional definition of marriage.[31]

### 5. The test does not require any threats, harassment, or reprisals to be directed at Plaintiffs by government officials.

Finally, it is of little import that none of the threats, harassment, and reprisals introduced into evidence come directly at the hands of state actors. As the Supreme Court said in *NAACP v. Alabama*, "it is only after the initial exertion of state power represented by the production order that private action takes hold." 357 U.S. at 463, 78 S. Ct. at 1172. An exemption is warranted from the most well-intentioned disclosure statute if there is a reasonable probability of threats, harassment, and reprisals. *See id.* (noting the deterrent effect of *unintended*, but *inevitable* results

---

[31] The fact that the criminal code may apply to some of the activity directed at supporters of Proposition 8 is irrelevant. First, criminal sanctions are *post hoc*, if they are forthcoming at all. *See* John Doe Decl. #42 (reported sign theft but police refused to take any action).

Second, criminal sanctions cannot address the First Amendment chill that occurs as a result of the threats, harassment, and reprisals. Like the burglary victim who can't return home without worrying that he or she will open the door to a scene of theft and destruction, individuals who have had their speech chilled will always think twice before speaking in the future, lest their speech be once again chilled.

Third, *post hoc* criminal remedies only serve to remedy the specific physical harm that one person suffered - they do not address the larger First Amendment chill that occurs when incidents of violence, theft, and harassment are publicized.

The threats, harassment, and reprisals directed at supporters of Proposition 8 are designed to discourage support for Proposition 8 and have their desired effect whether or not criminal sanctions are forthcoming. As soon as a person feels that he or she cannot exercise his or her First Amendment rights in a future election without being subjected to similar threats, harassment, and reprisals, the damage has been done. *See*, *e.g.*, John Doe Decl. #13 (would be hesitant about supporting a similar cause); #19 (will "think twice" about support in the future); #23 (will not contribute if he has to make his identity known); #18 (less likely to get involved unless confidentiality can be assured); #30 (will not speak out in public with his opinion); #39 (would not place bumper sticker on car during Proposition 8 campaign because of fear of aggression); #43 (will be careful to avoid association with a cause such as Proposition 8 in the future); #45 (concerned about the effect political activity could have on his family's safety); #51 (less likely to donate if it cannot be done anonymously). These actions are nothing short of domestic terrorism.

**Plaintiffs' Memorandum in Support of Motion for Summary Judgment**

flowing from compelled disclosure provisions); *McArthur*, 716 F. Supp. at 594 ("The Court clearly stated that the first amendment prohibits compelled disclosure of contributors or recipients' names if the revelation would subject them to harassment from *either* government officials or private parties. The Court's use of 'either' indicates that harassment, reprisals or threats from private persons is sufficient to allow this court to enforce the plaintiff's first amendment rights by cloaking the contributors and recipients' names in secrecy." (emphasis in original)). Under the First Amendment and the reasonable-probability test announced in *Buckley*, California simply cannot stick its head in the sand and ignore the real and inevitable consequences that flow from its compelled-disclosure statute, however well-intentioned that statute may be. In light of these burdens, California's interest in ballot measure disclosure must give way to greater First Amendment concerns in order to protect the free and robust debate necessary to preserve our form of government.

**C.   There is a reasonable probability of threats, harassment, and reprisals.**

Plaintiffs, through the numerous declarations filed in support of their motions for preliminary injunction and summary judgment, have demonstrated that compliance with the compelled disclosure provisions of the PRA will expose Plaintiffs and their contributors to a reasonable probability of threats, harassment, and reprisals. The evidence demonstrates that the reprisals recited in the declarations are not isolated events perpetuated by one or two individuals, but are instead, part of a larger campaign designed to silence any individual supporting Proposition 8 or a traditional definition of marriage. In light of such evidence, Plaintiffs are entitled to summary judgment because their right to exercise their First Amendment freedoms of expression and association free from threats, harassment, and reprisals outweighs California's interest in compelled disclosure.

Although Plaintiffs are not required to establish a causal link between the compelled disclosure and the incidents of threats, harassment, and reprisals, *see supra* Part III.B.1, there is significant evidence that the public disclosure of the campaign finance reports led directly to contributors being singled out for their donation. For example, John Doe #54 received an email shortly after this Court denied Plaintiffs' Motion for Preliminary Injunction. John Doe Decl. #54.

The email specifically referenced this Court's order and the declarant's financial contribution first disclosed on the February 2, 2009 report. John Doe Decl. #54 ("The judge released the names today of the donors who supported Prop 8, and your name is on the list as having donated . . . You're a queer-hating douchebag. Fuck you. Best, Julia"). A few days later, John Doe #54 received a handwritten letter at his home address that read, in its entirety, "STUPID MOTHER FUCKER. MAKE A DONATION Like that AND YOU ARE LISTED." *Id.* Likewise, John Doe #53 and his co-workers began receiving harassing phone calls at work shortly after his donation was made public in the February report. John Doe Decl. #53. The declarations contain countless other examples of individuals being singled out after their financial support became public. *See*, *e.g.*, John Doe Decl. #2; #4; #5; #6; #10; #17; #19; #20; #27; #28; #29; #30; & #32. This evidence is extremely relevant because, in addition to demonstrating that there is a reasonable probability of threats, harassment and reprisals, the evidence demonstrates that individuals are in fact using information obtained from the campaign finance reports to harass individuals that support a traditional definition of marriage.

As discussed above, *see* Part II.A., *supra*, technological advances have changed how information about donors is used by the public. The campaign against any individual that financially supported Proposition 8 is enabled in part by Internet web sites that combine information gleaned from the campaign finance reports and elsewhere with other publicly available information, enabling those opposing Proposition 8 and a traditional definition of marriage to harass these individuals at home and at work. For example, the web site EightMaps.com is a GoogleMaps "mashup"that combines data contained in the campaign finance reports with an interactive map.[32] An individual can use the website to search for any city (e.g., Sacramento) and print a map graphically illustrating the name, address, amount, occupation, and employer of each individual that donated to Proposition 8 located in

---

[32] PCMag.com, "Mashup" ("A mixture of content or elements. For example, an application that was built from routines from multiple sources or a Web site that combines content and/or scripts from multiple sources is said to be a mashup. The term became popular in the 2005 time frame.").

**Plaintiffs' Memorandum in Support of Motion for Summary Judgment**

Sacramento. However, these web sites do more than facilitate reprisals by further disseminating information regarding donors to the Proposition 8 campaign; some web sites encourage individuals to harass donors. *See*, *e.g.*, http://www.californiansagainsthate.com (stated purpose of web site is to "identify and take action against those who want to deny us our equal protection rights"). *See also* http://www.antigayblacklist.com.[33] Internet message boards have been used to exchange information about donors and coordinate harassment efforts. *See*, *e.g.*, http://broadway world.com/board/readmessage.cfm?thread=983640&boardid=2. These web sites are just the newest method of harassing individuals that supported Proposition 8 and a traditional definition of marriage; supporters of Proposition 8 have also been subjected to the forms of threats, harassment, and reprisals previously found sufficient to warrant an exemption from compelled disclosure provisions.

Like the petitioners in *Averill*, 325 F. Supp. 2d at 1178 (granting an exemption upon evidence of frequent hang-ups and crank calls), countless supporters of Proposition 8 and a traditional definition of marriage have been subjected to threatening phone calls, e-mails, and postcards. *See*, *e.g.*, John Doe Decl. #1 (multiple threatening phone calls); #28 (received a voice mail message from a caller identifying himself as a "neighbor" and calling declarant a "scum-fuck"); #52 (public relations director assisting Proposition 8 campaign received one to three phone calls per day, as well as emails, from angry callers prior to election; after election, the calls and emails of this nature increased and became more threatening; one caller called and re-called to the point where business was interrupted and the Sheriff became involved); #53 (received phone calls at work); #54 (received letter calling him a "stupid mother fucker"); #4 (received multiple emails at his business address including one that read, "hello propagators & litagators [sic] burn in hell," and another that read, "congratulations. For your support of prop 8, you have won our tampon of the year award"); #2 (flyer circulated in his neighborhood, calling him a "Bigot" and listing his occupation, employer, and the amount of his contribution); #6

---

[33] The web site AntiGayBlacklist.com appears to have been removed at some point after May 10, 2009. It is still available as a "cached" web site on Google. Search "antigayblacklist.com" and click on "Cached."

(received a postcard chastising her for her support of Proposition 8); #10 (received an email calling her "rotten"); #17 (received a phone call where female caller sarcastically told him he must be proud of his decision to donate to Proposition 8); #19 (colleagues received email from an alumna who refused to donate to her employer because of her contribution); #29 (received over 50 emails, including a threat of a boycott, destruction of her art work, and warning her not to show up at any gathering of homosexuals); #51 (received many emails which called him a "bigot" and a "gay hater"); & #56 (received voice mail at work calling him a "bigot").

In some instances the phone calls and emails were accompanied by threats of physical violence. These threats are made all the more plausible by web sites listing the addresses of the donors. *See*, *e.g.*, John Doe Decl. #16 (passenger in car threw unidentified object at her while she participated in sign-waving event) & #29 (received email stating "I tolerate you because I don't come to where you are and slaughter you"). Fresno Mayor Alan Autry received a death threat after participating in a rally in support of Proposition 8. Andres Araiza, *Prop 8 Threat: Fresno Police Close to Arrest*, ABC-30 (KFSN-TV) (Oct. 31, 2008) (*available at* http://abclocal.go.com /kfsn/story?section=news/local&id=6479879).

Others live in constant fear of the physical harm that may be directed at them or their family because they supported Proposition 8 and a traditional definition of marriage. *See*, *e.g.*, John Doe Decl. #13 (feared physical violence would erupts at sign-waving events that she attended; refused to bring her children to the events; worried about future violence to her family if she supports a similar cause in the future); #18 (Proposition 8 incidents "shook" declarant "to the core"); #19 (donor in Louisiana worried that someone "could go after" her family in California); #20 (would not host a wave party without a man present because of safety concerns); #23 (concerned about the safety of his children and instructed principal that only he or his wife could pick them up from school); #30 (will not speak out publicly in the future because he "would fear for the safety of [his] children"); #39 (did not display a bumper sticker on her car because of aggression directed toward family and friends who supported Proposition 8); #45 (would have to "seriously consider . . . the safety of [her] family in the future when deciding to support a cause similar to Proposition 8"); & #52 (fears for her safety and the safety of her daughters).

Like the petitioners in *Brown*, 459 U.S. at 99, 103 S. Ct. at 424 (granting an exemption in part upon evidence of destruction of personal property), supporters of Proposition 8 and a traditional definition of marriage have seen their car windows broken, homes vandalized, and their cars spray painted and scratched. *See, e.g.*, John Doe Decl. #11 (back window of car broken out while parked in front of declarant's house); #12 (car scratched and tires deflated while car parked at grocery store; staircase leading downstairs from her home covered in urine with a puddle of urine at the bottom); #13 (car scratched, leaving 27-inch gash); #14 (home egged and floured multiple times; car egged, floured, and honeyed multiple times; motorbike tipped over); #24 (bumper sticker ripped off of car while parked in a shopping area); & #26 (bumper sticker ripped off of family car while parked at school).

The threats, harassment, and reprisals have also affected the work lives of individuals that supported Proposition 8 and a traditional definition of marriage. One individual reported that she is worried that she may lose her job as a result of her support for Proposition 8. John Doe Decl. #16 ("I suspect that [my support] has put [my job] in jeopardy"). Others have had their employers contacted because they supported Proposition 8. *See, e.g.*, John Doe Decl. #10 (emailer stated that she was going to contact the parents of the students at the school where declarant works); & #17 (human resources department at declarant's workplace notified of declarant's support of Proposition 8).

Businesses have also been targeted because the owners or employees supported Proposition 8. *See, e.g.*, John Doe Decl. #20 (lesbian couple who patronized business of declarant for several years told declarant they would no longer support her business and have not patronized her business since); #1 (organized protest at his business and numerous reports of organized boycotts); #4 (received an email stating that, "I AM BOYCOTTING YOUR ORGANIZATION AS A RESULT OF YOUR SUPPORT OF PROP 8"); #5 (received email suggesting that his business would suffer as a result of his donation in support of Proposition 8); #27 (name posted on an Internet "Boycott H8ers List"); #29 (boycott of artist threatened via email); #30 (received email stating "Your company is now on a list I am producing of those that will be boycotted and shut down soon"); #20 (business review of declarant's business on YellowPages.com makes a

reference to declarant's support of Proposition 8); #52 (declarant's business received so many calls at work from one person that no customers could get through and Sheriff had to intervene); & #56 (voice mail left at work calling him a "bigot").

Something seemingly as simple as standing on a street corner with a sign supporting Proposition 8 often led to harassment and physical or verbal assault. *See*, *e.g.*, John Doe Decl. #13 (participated in 6-7 sign-waving events; at each event, people would shout obscenities at, make obscene gestures to, and argue with supporters of Proposition 8); #16 (while holding sign supporting Proposition 8 on a street corner, was called a "filthy bag of shit" and "bitch"; unknown object thrown at her); #25 (people driving by peaceful sign demonstration by supporters of Proposition 8 made obscene gestures and yelled obscenities); & #56 (people regularly made obscene gestures and yelled at people participating at wave parties).

Family relationships and friendships have ended or been strained by support for Proposition 8. *See*, *e.g.*, John Doe Decl. #15 (brother no longer speaks to declarant because of her support for Proposition 8); #21 (openly gay members of declarant's country club give him looks of disdain and do not greet him as he passes, unlike formerly warm greetings); & #49 (friendship with long-time friend risked because of declarant's support for Proposition 8).

Reprisals were also directed at churches that supported Proposition 8. *See*, *e.g.*, John Doe Decl. #3 (church window broken using "Yes on 8" yard sign); #14 (helped clean up graffiti at his church's temple); & #23 (face of Mary statue outside church painted orange). Even churches whose hierarchy supported Proposition 8 have not always been safe havens for supporters of Proposition 8. *See* John Doe Decl. #18 (while placing signs supporting Proposition 8 at his Roman Catholic church, a church member and her daughter told declarant that they did not like him putting up the signs supporting Proposition 8); & #49 (declarant's pastor at a Roman Catholic church told declarant that she should find another church because of her support for Proposition 8).

At least one supporter of Proposition 8 received no help from the police after reporting threats, harassment, and reprisals. John Doe Decl. #42 (reported yard sign theft and vandalism to police on three separate occasions, but received no response from police department). Another

supporter did not even bother reporting harassment, because she felt that she would not receive any help for her problems. John Doe Decl. #46 (declarant spoke to police dispatcher about sign theft, but never reported any theft because she did not believe that reporting would prevent future sign theft).[34]

Plaintiffs have also submitted several declarations demonstrating that the threats, harassment, and reprisals are chilling First Amendment speech. *See, e.g.*, John Doe Decl. #13 (would hesitate before donating in the future); #19 (will think twice before donating in the future); #20 (would alter the way she supports issues in the future); #23 (will not donate if his name must be disclosed); #25 (would change how he supports issue in the future); #27 (less likely to give in the future); & #30 (will change how he supports similar issues in the future). *See also* John Doe Decl. #37; #39; #43; #44; #45; #47; #49; #51; & #52. Evidence of chill is not required for an exemption to be granted under the reasonable-probability test. *Averill*, 325 F. Supp. at 1179 ("Although the Supreme Court took great pains to explain how the likelihood of threats and harassment could discourage political associations and silence alternative viewpoints, it required a showing of only the first of the three elements set forth in SMC 2.04.320.").[35] A reasonable probability of threats, harassment, and reprisals creates the "*legal presumption* that such disclosure would adversely impact rights of association and advocacy." *Id.* (emphasis added). Chill merely demonstrates that there is a reasonable probability of threats, harassment, and reprisals. *Id.* Plaintiffs have submitted evidence of chill to demonstrate that there is a reasonable probability of threats, harassment, and reprisals, and to demonstrate that the legal presumption that such threats will chill First Amendment activities is well justified.

//

---

[34] *See supra* n. 31 (discussing how criminal sanctions do not cure the chilling effect of the threat, harassment, or reprisal directed at an individual merely for espousing his political views).

[35] The Seattle Ethics and Elections Commission required a party to demonstrate (1) a reasonable probability of future threats, (2) interference with advocacy, and (3) a chill on the exercise of First Amendment rights. *Averill*, 325 F. Supp. At 1179. The court found the Commission's requirement to be inconsistent with *Buckley*, which requires proof of only the first element. *Id.*

Together, this evidence demonstrates that supporters of Proposition 8 and a traditional definition of marriage have been subjected to exactly the sort of threats, harassment, and reprisals that the courts have previously found sufficient to warrant an exemption from compelled disclosure; indeed, for some of them, these threats, harassment, and reprisals arose only because of California's compelled disclosure system. Thus, Plaintiffs have demonstrated that there is a reasonable probability of threats, harassment, and reprisals unless this Court prevents further compelled disclosure of donors to groups that supported the passage of Proposition 8 or a traditional definition of marriage. Therefore, Plaintiffs are entitled to summary judgment on their as-applied challenge to the constitutionality of the PRA on the grounds that their First Amendment rights outweigh the State's interest in compelled disclosure.

**IV. The PRA's $100 reporting threshold is unconstitutional, facially and as applied.**

Compelled disclosure provisions such as those contained in the PRA must survive strict scrutiny. Strict scrutiny requires a narrowly tailored remedy to serve a compelling government interest. California lacks a compelling government interest sufficient to justify the compelled disclosure of ballot-measure contributors. However, even if the Court finds that California has a compelling government interest, the $100 reporting threshold still fails strict scrutiny because it is not narrowly tailored to serve the only potential compelling state interest: preventing voter ignorance. Further, because the PRA does not account for inflation, the disconnect between the $100 threshold and the only possible state interest continues to grow farther apart every year as a result of inflation. Thus, the $100 must be found unconstitutional because it is not narrowly tailored to serve a compelling government interest.

**A. California lacks a compelling interest sufficient to justify compelled ballot measure disclosure.**

In *Buckley*, the Supreme Court stated that "disclosure requirements, as a general matter, directly serve [three] substantial governmental interests." 424 U.S. at 68, 96 S. Ct. at 658. "First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office [("Informational Interest")]. . . . Second, disclosure requirements deter actual

corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity [("Corruption Interest")]. . . . Third, . . . recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limits [("Enforcement Interest")]." *Id.* at 66-68, 96 S. Ct. 657-58.

Subsequent courts have clarified that the Corruption and Enforcement Interests are unique to candidate elections, and; therefore, cannot be relied upon to justify compelled ballot-measure disclosure. *See Bellotti*, 435 U.S. at 789-90, 98 S. Ct. at 1422-23 (holding that the state lacked a compelling interest in combating corruption in the context of a ballot-measure election because there is no risk of *quid pro quo* corruption); *Cal. Pro-Life Council, Inc. v. Getman,* 328 F.3d 1088, 1105 n.23 (same) ("*CPLC I*"). S*ee also Canyon Ferry Road*, 556 F.3d at 1031-32 (noting that the Enforcement Interest cannot justify ballot-measure disclosure because it necessary only to enforce contribution limits—limits that are unconstitutional in the context of a ballot-measure election); *CPLC I,* 328 F.3d at 1105 n.23 (9th Cir. 2003) (same). However, these courts have suggested that the Informational Interest may be sufficient to justify compelled ballot-measure disclosure, a conclusion that appears to be premised on a misreading of *Buckley* and the Informational Interest discussed therein. *See, e.g.*, *CPLC II*, 507 F.3d at 1178-80.[36]

In *Buckley*, the Supreme Court stated that information regarding contributions and expenditures "allows voters to place each candidate in the political spectrum" and that the "sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance." 424 U.S. at 67, 96 S. Ct. at 657. The need to provide this information to voters is a direct result of the realities of a political campaign involving *candidates*; candidates often discuss their general policies regarding education, health care, and taxes, but rarely disclose detailed policy

---

[36] The issue as to whether California has a compelling interest sufficient to justify disclosure provisions was not litigated in *CPLC II* because the plaintiffs had conceded that California has a compelling interest in regulating true contributions in the context of a ballot measure. *CPLC II*, 507 F.3d at 1172.

positions about those topics. Issues that escape the attention of the media are simply not discussed. Thus, information regarding contributors to a candidate allows voters to better predict some of the difficult policy decisions that an elected official is called to make in office, especially on those issues that are not discussed publicly during a campaign.

By comparison, everything the voter needs to know about a ballot measure is contained in the text of the measure itself. There is no "political spectrum" and certainly no "future performance." Initiatives can be incredibly complex pieces of legislation, but the first *Buckley* interest is not about simplifying the message for voters. *See Bellotti*, 435 U.S. at 792, 98 S. Ct. at 1424 ("But if there be any danger that the people cannot evaluate the information and arguments advanced . . . it is a danger contemplated by the Framers of the First Amendment."). Information about contributors no doubt may change perceptions about a ballot measure, but it simply does not change the nature of the ballot measure itself. The First Amendment grants advocates the right to separate their message from their identity to ensure that the message will not be prejudged simply because voters do not like the proponent. *McIntyre*, 514 U.S. at 342, 115 S. Ct. at 1517. The identity of the speaker is no doubt helpful in evaluating the message, "but the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Id.* at 348 n. 11, 115 S. Ct. at 1519 n. 11 (citations omitted). "Don't underestimate the common man. People are intelligent enough to evaluate the source of anonymous writing. They can evaluate its anonymity along with its message, as long as they are permitted, as they must be, to read that message. And then, once they have done so, it is for them to decide what is 'responsible', what is valuable, and what is truth." *Id.*

Because the identity of the speaker does not change the message communicated and because it simply cannot alter the text of the measure itself, California lacks a compelling government interest to force a speaker to make a statement that he would otherwise omit. *See id. See also Buckley II*, 525 U.S. at 203, 119 S. Ct. at 647 (noting that ballot-measure expenditure reporting adds little insight as to the measure), *aff'g Am. Constitutional Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1104-05 (10th Cir. 1997) ("The first and third [*Buckley* interests] are inapplicable because [the statute] addresses expenditures, not contributions.").

**B. The PRA's $100 reporting threshold fails strict scrutiny.**

However, even if the Court determines that California has a compelling interest sufficient to justify compelled ballot measure disclosure, the $100 threshold fails to survive the second part of the strict scrutiny analysis. To survive strict scrutiny, the law or regulation in question must also be narrowly tailored to further a compelling government interest. *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 222, 109 S. Ct. 1013, 1019 (1989). A law can fail to be narrowly tailored in one of several ways. It may be overinclusive if it restricts speech that does not implicate the government's compelling interest in the statute. *Simon & Schuster v. New York State Crime Victims Bd.*, 502 U.S. 105, 121, 112 S. Ct. 501, 511 (1991). The regulation may also be underinclusive if it fails to restrict speech that does implicate the government's interest. *See, e.g.*, *White*, 536 U.S. at 779-80, 122 S. Ct. at 2537. Finally, a regulation is not narrowly tailored if the state's compelling interest can be achieved through a less restrictive means. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75, 110 S. Ct. 2729, 2737 (1990).

**1. California has only a limited compelling informational interest in disclosure.**

In the context of ballot initiatives, from *Buckley* forward, courts have recognized only one possible state interest sufficient to justify the disclosure of contributions and expenditures: combating voter ignorance by informing voters about who supports and opposes a ballot issue.[37]

---

[37] In *Buckley*, the Supreme Court stated that "disclosure requirements, as a general matter, directly serve [three] substantial governmental interests." 424 U.S. at 68, 96 S. Ct. at 658. "First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office. . . . Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. . . . Third, . . . recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limits." *Buckley*, 424 U.S. at 66-68, 96 S. Ct. at 657-58.

In subsequent decisions, courts have expanded upon *Buckley*'s analysis of the reasons why the second interest (the "corruption interest") and the third interest (the "enforcement interest") do not apply to ballot measure disclosure. *See Bellotti*, 435 U.S. at 789-90, 98 S. Ct. at 1422-23 (holding that the state lacked a compelling interest in combating corruption in the context of a ballot measure election because there is no risk of *quid pro quo* corruption); *CPLC I*, 328 F.3d at 1105 n.23 (same). S*ee also Canyon Ferry Road*, 556 F.3d at 1031-32 (noting that the third

(continued...)

**Plaintiffs' Memorandum in Support of Motion for Summary Judgment**

*Canyon Ferry Road*, 556 F.3d at 1032-33; *CPLC I*, 328 F.3d at 1105 n.23 (9th Cir. 2003) (*quoting Bellotti*, 435 U.S. at 789-90, 98 S. Ct. at 1422-23); *see also Buckley*, 424 U.S. at 68, 96 S. Ct. at 658. This interest carries with it three significant limitations. First, it is limited to identifying those "persons *financially* supporting or opposing a . . . ballot measure." *Canyon Ferry Road*, 556 F.3d at 1032. Second, the interest is compelling only if it is directed at combating voter ignorance. *See Buckley*, 424 U.S. at 68, 96 S. Ct. at 658; *Canyon Ferry Road*, 556 F.3d at 1032, 1034. Third, the interest is temporal in nature—voter ignorance can only be addressed prior to a voter casting his or her vote; once the vote has been cast, the interest is extinguished, because voter ignorance (or knowledge) is immediately a moot point. *See infra* Part V.

Because the State's informational interest is compelling only if the chosen remedy addresses the problem of voter ignorance, it is necessary to accurately define voter ignorance before attempting to conduct the requisite strict-scrutiny analysis. Voter ignorance with regard to ballot measures can be based on a variety of factors, only one of which is more than tangentially related to the compelled disclosure of donors.

First, the issues submitted to the voters through ballot measures have become increasingly complex. *CPLC I*, 328 F.3d at 1105. Donor disclosure is said to alleviate these problems in an indirect manner by providing donors with an analytical shortcut, premised on the assumption that only those with a vested interest in the outcome of the ballot campaign would expend resources in support or opposition to the measure, and that, knowing this, voters will actively seek out information on these donors to know who is supporting a ballot measure to find out who will benefit from the ballot measure. *See CPLC I*, 328 F.3d at 1106. *But see Disclosure Costs* at 4 (discussing how little information voters actually consult). Common sense dictates that it is the information regarding the major donors to either side that is most likely to provide a meaningful

[37] (...continued)
interest cannot justify ballot measure disclosure because it necessary only to enforce contribution limits—limits that are unconstitutional in the context of a ballot measure election); *CPLC I*, 328 F.3d at 1105 n.23 (same).

voting cue.[38] Furthermore, knowing who donated to a ballot measure does little to lessen the complexity of the ballot issue itself. Instead, the issue of complexity is dealt with by making the measure simpler and clearer for the voter—an issue that has been addressed by the California legislature through other means.[39]

Second, campaigns surrounding ballot measures are not cheap and are often dominated by special interest groups that pour millions of dollars into ballot measure campaigns.[40] *CPLC I*,

---

[38] Further, what little research that exists on the use of compelled donor disclosure for voter decision-making related indicates that public disclosure is an insignificant factor in providing voters with knowledge about ballot measures. *See supra* n. 19.

[39] For example, under California Elections Code § 9050, the Attorney General determines the "ballot title for each measure submitted to the voters of the whole state." This power extends to changing the ballot title after petitions have been circulated and signed, yet before the measure is submitted to the voters. A lawsuit was brought against just such a change in the ballot title of Proposition 8. *See Jansson v. Bowen*, No. 34-2008-00017351 (Sup. Ct. of Cal., Dept. 29, Sacramento, Cal., Aug. 7, 2008) (available at http://ag.ca.gov/cms_attachments/press/pdfs/n1597_ruling_on_proposition_8.pdf).

Moreover, the California legislature has tasked the Secretary of State with compiling and drafting a ballot pamphlet that can be read and understood by the average voter. *See* Cal. Elec. Code §§ 9081, 9084 (e); Cal. Gov't Code §§ 88000, 88001(e). The necessary mechanisms for clarifying the sometimes difficult concepts of California ballot measures have been put in place by the legislature; whether they are being properly and effectively used is an issue unrelated to campaign disclosures.

[40] The amount spent on ballot measure campaigns is enormous: "From 2000 through 2006, special interests spent over $1.3 billion passing or defeating ballot measures. . . . The median initiative campaign spent $4.3 million in 2000, and median expenditures rose steadily since then to $15.7 million in 2006—with the extreme exception of the November 2005 election, when the median campaign spent $36.7 million." Center for Governmental Studies, *Democracy by Initiative: Shaping California's Fourth Branch of Government*, 282 (2d ed. 2008) (*available at* http://cgs.org/images/publications/cgs_dbi_full_book_f.pdf) ("*Democracy by Initiative*").

Even the basic task of getting a ballot measure on the ballot is a difficult and expensive proposition that prevents small, unorganized donors—such as those who are only contributing $100—from being able to influence an election. In his 2000 book, Democracy Derailed: Initiative Campaigns and the Power of Money, David S. Broder discussed at length the industry that has built up around the complicated process of getting an initiative on the California ballot. Those who specialize in ballot measure campaigns agreed that even ten years ago, the cost to get an initiative on the ballot was prohibitively expensive to all but the wealthy:

    As it is, that cost [of getting initiatives on the ballot] is so great that, with rare
                                                                        (continued...)

328 F.3d at 1105. As set forth in greater detail below, it is the information about these special

interest groups that is important to voters; those who give a small amount have no discernable

influence on the ballot measure campaign. A small donor no longer has any influence on a ballot

initiative campaign in California. *Democracy by Initiative* at 289 ("With large contributions

coming from all sides, ballot measure campaigns have become battles between fewer and fewer

major interests, while contributions from small donors have become insignificant"). In a

campaign that spent a combined $70 million, the identity of small donors is irrelevant. *See*

*Canyon Ferry Road*, 556 F.3d at 1036 (Noonan, J., concurring) ("How do the names of small

contributors affect anyone else's vote? Does any voter exclaim, 'Hank Jones gave $76 to this

cause. I must be against it!'"). Therefore, disclosing the identity of thousands of small donors is

irrelevant to alleviating voter ignorance.

Third, the public has neither the time nor the ability to "independently study the propriety of

individual ballot measures," a problem exacerbated by a ballot measure pamphlet provided by

the state that is virtually incomprehensible. *CPLC I*, 328 F.3d at 1105 (voters have neither the

time or ability to independently study each measure); Cal. Gov't Code § 81001(g) (pamphlet

provided by the State is virtually incomprehensible). Here, as with the first factor, the issue is

---

[40] (...continued)
exceptions, only the wealthy can apply. I asked most of the proprietors I interviewed to
tell me what they would say if I walked into their office carrying a proposal I wanted
put on the ballot in California. Mike Arno [founder of American Political Consultants,
a company specializing in initiatives] gave me the fullest answer. "The first question
I've got to ask you is, 'Can you raise the money?' And not just raise the money for our
services but raise the money to have a lawyer draft it, to do a poll to make sure you've
drafted it correctly, and then you still have to think about the campaign. It would be at
least half a million to get a statute on the ballot here; for a Constitutional amendment
[requiring more signatures] I'd say $800,000 or maybe $900,000 to be safe."

David S. Broder, *Democracy Derailed: Initiative Campaigns and the Power of Money*, 68-69
(2000). *See also Democracy by Initiative* at 284 ("Today, qualifying a measure on the ballot can
cost between $500,000 and $3 million . . . . Any individual, corporation or organization with
approximately $1.5 million to spend can now place any issue on the ballot and at least have a
chance of enacting a state law. Says Fred Kimball of the signature-gathering firm Kimball
Petition Management, 'If you want to have your kid's birthday as a holiday, give me a million
and a half dollars and I'll at least get it on the ballot for people to vote on.'").

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

already dealt with through other legislative means.[41] Any tangential relationship compelled

disclosure has to this third factor is dealt with by the concerns addressed below.

Finally, groups supporting or opposing ballot measures often use "ambiguous or

misleading" names, and voters may never know the identity of veiled political actors that have

poured "tens of millions of dollars" into a campaign.[42] *CPLC II*, 507 F.3d at 1179. Public

disclosure of campaign contributions is chiefly addressed to remedy this last of the four

difficulties. Sandy Harrison, a former journalist and government employee, described the

problem as follows:

> A prime example of this was Proposition 188 on the November 1994 ballot, an effort to
> overturn California's recently enacted workplace smoking ban. Supporters falsely
> portrayed the measure as a grassroots effort by small businesses. By reviewing the
> campaign finance report, I was able to report to readers that it was not the work of small
> businesses, but actually giant tobacco Companies. . . . If the campaign finance report had
> not been public, I could not have substantiated or conveyed this important information to
> the readers, and they may never have learned the truth about who was really behind this
> proposition.

*CPLC I*, 507 F.3d at 1179.

The goal of campaign disclosure then, is to prevent "the wolf from masquerading in sheep's

clothing." *CPLC I*, 328 F.3d at 1106 n.24. Accordingly, in applying strict scrutiny, the essential

question for the Court is whether the PRA's $100 disclosure threshold addresses the "wolf in

sheep's clothing" problem, alleviating concerns that donors who donate an amount substantial

enough to influence a campaign are masking their support for, or opposition to, a particular

ballot measure, and causing voter ignorance.

[41] Under California law, the Secretary of State is charged with preparing the state ballot
pamphlet. Cal. Elec. Code § 9081; *see also* Cal. Gov't Code § 88000 (also charging Secretary of
State with preparing the state ballot pamphlet). The Secretary of State is required to include in
the ballot pamphlet "[t]ables of contents, indexes, art work, graphics, and other materials that the
Secretary of State determines will make the ballot pamphlet easier to understand or more useful
for the average voter." Cal. Elec. Code § 9084(e); *see also* Cal. Gov't Code § 88001(e) (identical
language to Cal. Elec. Code § 9084(e)). While there is a significant amount of information that
must be included in the ballot pamphlet under California law, the California legislature has
already designated that the Secretary of State handle the issues of clarity in the ballot pamphlet.

[42] The statute itself lists only the confusing nature of the ballot pamphlet mailed to voters by
the state and the influence of *large campaign contributions* as the justifications for ballot
measure disclosure. Cal. Gov't Code § 81001(g).

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

**2.    The $100 reporting threshold is not narrowly tailored to the State's interest.**

The $100 threshold for reporting contributors is not narrowly tailored to the State's interest in avoiding the "wolf in sheep's clothing" problem that donors whose real identity could influence an election are hiding their identity. California may have an interest in providing voters with the information necessary to determine "who [is] really behind [a] proposition." *CPLC II*, 507 F.3d at 1179. However, common sense dictates—and the Ninth Circuit has found—that the "value of this financial information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level." *Canyon Ferry Road*, 556 F.3d at 1033. Voters gain little, if any, information from the disclosure of small donors. As Justice Noonan said in *Canyon Ferry Road*, "[h]ow do the names of small contributors affect anyone else's vote? Does any voter exclaim, 'Hank Jones gave $76 to this cause. I must be against it!'" *Canyon Ferry Road*, 556 F.3d at 1036 (Noonan, J., concurring).

The question is undoubtedly one of degree, not kind, because at some level, the State's informational interest may be sufficient to warrant the compelled disclosure of campaign expenditures and contributions. *Canyon Ferry Road*, 556 F.3d at 1033. However, while the Supreme Court has stated that the legislature should be granted some deference in determining where disclosure should begin, *Buckley*, 424 U.S. at 83, 96 S. Ct. 665, in the context of the First Amendment, the usual deference granted to the legislature does "'not foreclose [a court's] independent judgment of the facts bearing on an issue of constitutional law.'" *Turner Broad. Sys. v. FEC*, 512 U.S. 622, 666, 114 S. Ct. 2445, 2471 (1994) (citation omitted). The Court's role is to assure that the legislature "has drawn *reasonable inferences* based on *substantial* evidence." *Id.* (emphasis added). California's disclosure threshold cannot survive this level of review.

California's disclosure statute, which requires an organization to report the name, address, occupation, and employer for any individual or organization that contributes $100 or more to a ballot-measure committee and then makes some of that information available to the public via the Internet, burdens substantially more speech than is necessary to serve the state's interest. A $100 disclosure threshold simply does not address the problem of the "wolf in sheep's clothing" in a direct and material way. *Id.* at 664, 114 S. Ct. at 2470. Furthermore, the individual who

donates as little as $100 incurs the same burdens on his First Amendment rights as the donor who has given $10,000. *Compare* John Doe Decl. #54 (professor received harassing email and letter regarding donation in the $100 to $1,000 range) *with* John Doe Decl. #6 (received harassing post card for donation of more than $10,000). At some point, the marginal informational gain that results from the disclosure of small donors is insufficient to overcome the substantial burdens on First Amendment rights. *Canyon Ferry Road*, 556 F.3d at 1034 ("at some point enough must be enough"). This Court need not set the lower limit, but a disclosure threshold that requires an organization to disclose the name, occupation, and employer of every individual that contributes as little as $100 on the Internet is so widely overinclusive and far removed from the State's interest in providing voters with information as to the major donors supporting or opposing a particular ballot measure that it cannot survive strict scrutiny.

**3. The PRA's failure to account for inflation must factor into the strict-scrutiny analysis.**

As the Supreme Court noted in *Randall v. Sorrell*, 548 U.S. 230, 261, 126 S. Ct. 2479, 2499 (2006), limits that are not adjusted for inflation decline in real value each year.[43] California's disclosure threshold is already far lower than necessary to serve the state's potential interest of identifying major donors and it grows even farther from that interest each year as a result of inflation.

---

[43] In *Randall*, the Court considered the constitutionality of expenditure limits and contribution limits in a Vermont campaign finance statute, and found that both were unconstitutional under the First Amendment. 548 U.S. at 236, 126 S. Ct. at 2485. The Court quickly dispatched the expenditure limits as unconstitutional before proceeding to an in-depth discussion of the contribution limits. *Id*. at 246, 126 S. Ct. at 2490-91. The Court reviewed the contribution limits under a standard requiring them to be "closely drawn to match a sufficiently important interest." *Id*. at 247, 126 S. Ct. at 2491 (citation omitted). This standard is much more relaxed than the strict scrutiny standard that applies here, and gave the state more leeway in *Randall* than they have here to show the Constitutionality of the statute.

The *Randall* Court analyzed five factors that led them to the decision that the contribution limits at issue were not closely drawn to meet the statute's objectives. *Id*. at 253, 126 S. Ct. at 2495. Although the *Randall* Court does consider the effect of the contribution limits on the ability of a person to effectively advocate for election, *id*. at 253-54, 126 S. Ct. at 2495, this is not one of the factors considered in *Buckley* regarding compelled disclosure—a case decided under the higher strict scrutiny standard that applies here.

**Plaintiffs' Memorandum in Support of Motion for Summary Judgment**

The current disclosure threshold found in the PRA was set in 1980,[44] when it was increased from $50 to $100.[45] 1980 Cal. Stat. 611, § 31. If this amount is adjusted to account for inflation, the current threshold would be $258. Bureau of Labor Statistics, CPI Inflation Calculator, (*available at* http://www.bls.gov/data/inflation_calculator.htm). But it is probably more helpful to perform the calculation in the other direction—$100 today is the equivalent of approximately

---

[44] The failure to re-evaluate and adjust campaign disclosure thresholds for inflation is not limited to California. For example, of the states included in Dr. Carpenter's studies, the thresholds were last adjusted as follows:

| | |
|---|---|
| 1931 | Ohio ($0). 1931 Ohio Laws 114 v. 712; 1931 Ohio Laws 113 v. 307 § 186, eff. June 30, 1931. |
| 1979 | Florida ($0). Laws 1979, c. 79-400. |
| 1986 | Massachusetts ($50). Mass. Gen. Laws ch. 345, §§ 3, 4 (1986). |
| 1991 | Washington ($100). Wash. Rev. Code Ann. § 42.17.090(1)(b) (1991). |
| 1996 | Colorado ($20). Fair Campaign Practices Act, eff. Jan. 15, 1997 (The citizens of Colorado repealed and reenacted the entire campaign finance act in 1996. The disclosure threshold did not change as a result of the re-enactment.). |

The same can be said about the disclosure thresholds in virtually every other state.

Furthermore, the disclosure statutes in states with no threshold (Alaska, Florida, Louisiana, Maryland, Michigan, and New Mexico) are suspect in light of *Canyon Ferry*, 556 F.3d 1021, 1021. *See* (Mem. & Order, p. 49, Jan. 30, 2009.)

[45] Plaintiffs acknowledge that the Supreme Court upheld a $100 disclosure threshold in *Buckley*. 424 U.S. at 82-85. However, the decision is not controlling for several reasons.

First, the Supreme Court expressly reserved judgment on whether "information concerning gifts [of less than $100] can be made available to the public without trespassing impermissibly on First Amendment rights." *Id.* at 84. When this value is adjusted for inflation, as the Court's decision in *Randall* suggests that it must, it can be said that the Supreme Court has reserved judgment on disclosure of amounts less than $371.08 in 2009 dollars. Bureau of Labor Statistics, CPI Inflation Calculator, *available at* http://www.bls.gov/data/inflation_calculator.htm. California's disclosure threshold thus falls below the level at which the Supreme Court has reserved judgment.

Second, *Buckley* involved candidate elections. As discussed above, there are different interests at stake in candidate elections than in ballot-measure elections. *See supra* n. 37. Because the state has fewer interests with respect to ballot-measure elections, *Buckley*'s approval of $100 disclosure thresholds is not controlling.

Third, the technological differences between 1974 and today are vast, as set forth above, and these differences have resulted in a compelled public disclosure system that is vastly different than that which existed at the time of *Buckley*. *See supra* Part II.A. While we cannot know how the *Buckley* court would have decided *Buckley* in light of these technological advances, a re-examination of the threshold set in *Buckley* is appropriate in light of those advances.

**Plaintiffs' Memorandum in Support of Motion for Summary Judgment**

$39.00 in 1980 dollars.[46] *Id.* Yet the state's disclosure threshold remains at $100. By failing to account for inflation, California's disclosure threshold is quickly approaching the *de minimis* levels struck down in *Canyon Ferry Road*, 556 F.3d at 1034 ("at some point enough must be enough").

This problem is exacerbated by the fact that the $100 threshold applies equally to candidate and ballot-measure elections. This places the burden of adjusting the thresholds "upon incumbent legislators who may not diligently police the need for changes in limit levels." *See Randall*, 548 U.S. at 261, 126 S. Ct. at 2499. A legislator, with a sizeable war-chest by virtue of his incumbency, may be less likely to adjust the level, ensuring that he will know the identity of any individual who has contributed to his opponent's campaign. *Id.*

Even if such a cynical view of California legislators is unwarranted, the legislature may have other priorities and cannot continually adjust the disclosure threshold. *See* Bipartisan Commission on the Political Reform Act of 1974, *Overly Complex and Unduly Burdensome: The Critical Need to Simplify the Political Reform Act*, p. 25 (July 2000) ("McPherson Commission"). The McPherson Commission was created to investigate and assess the effects of the PRA. *Id.* at 15. The McPherson Commission's very first recommendation was that the disclosure threshold should be raised immediately, noting that:

> These disclosure thresholds have not been adjusted for many years, and in some instances, much longer. These thresholds should be adjusted *immediately*, as well as periodically thereafter in order to eliminate some of the *burden of unnecessary reporting*.

*Id.* at 25 (emphasis added). Nearly nine years have elapsed since the McPherson Commission issued its report and recommendation that the disclosure threshold should be raised and the legislature has yet to adopt the change. In light of the legislative inaction, the disconnect between the State's informational interest and disclosure beginning at $100, and the First Amendment burdens that result from such a low disclosure threshold, the statute must be found unconstitutional.

//

---

[46] That is, it would take $100 today to purchase an item that cost $39 in 1980.

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

**4.  California cannot support its $100 disclosure provision by arguing that it is necessary to enforce some higher constitutional threshold.**

California lacks a compelling interest sufficient to justify a $100 disclosure threshold, and it cannot create such an interest by arguing that $100 disclosure is necessary to enforce some higher constitutional threshold. The Supreme Court has rejected "such a prophylaxis-upon-prophylaxis approach," *WRTL II*, 127 S. Ct. at 2672. The State must demonstrate a separate, compelling interest for setting its limit at $100, separate and apart from enforcing some higher constitutional limit.

Furthermore, public disclosure is not the least restrictive means of policing and enforcing some much higher constitutional limit. The PRA already requires Committee Plaintiffs to keep detailed records of contributions exceeding twenty-five dollars and imposes substantial civil and criminal penalties for non-compliance with the record-keeping and reporting provisions. Cal. Gov't Code 84200 *et seq*. (reporting provisions); Cal. Gov't Code § 91000 *et seq*. (enforcement provisions). As the Supreme Court said in *Buckley*, "[t]here is no indication that the substantial criminal penalties for violating the [Act] combined with the political repercussions of such violations will be insufficient to police the contribution provisions." 424 U.S. at 56 96 S. Ct. at 652. California simply cannot impose the substantial burdens on First Amendment rights that occur from $100 disclosure merely to enforce a higher disclosure threshold that passes constitutional muster.

**C.  The threshold is unconstitutional as-applied to Plaintiffs because there is a reasonable probability of threats, harassment, and reprisals.**

In Part II.C, *supra*, as well as the declarations accompanying this Motion for Summary Judgment and Plaintiffs' Motion for Preliminary Injunction, Plaintiffs set forth the very real danger of threats, harassment, and reprisals that accompany a person's support for Proposition 8**.** The State must narrowly tailor its threshold for disclosure because of the First Amendment rights at stake for contributors to ballot measures. As-applied to Plaintiffs, the PRA does not survive strict scrutiny. Contributors to Plaintiffs—even contributors at the $100 threshold—have been singled out for harassment, threats, and reprisals. The burden here is on the State to demonstrate

that the PRA is narrowly tailored to meet some compelling state interest. *See CPLC II*, 507 F.3d at 1178 (*citing White*, 536 U.S. at 774-75, 122 S. Ct. at 2534).

## V. Post-election public ballot-measure reporting and the failure to purge public reports after the election are unconstitutional.

Counts three and four of Plaintiffs' Third Amended Complaint address the related issues of post-election public disclosure and the purging of reports filed pre-election, which remain publicly available after the election. As set forth in detail above, California has but one possible interest sufficient to justify the compelled public disclosure of donors in the context of a ballot measure—a limited informational interest designed to combat the problem of voter ignorance. Furthermore, this interest has a temporal component—it is limited to alleviating voter ignorance with respect to the particular ballot measure to which the disclosure relates.[47] Public ballot-measure disclosure does not address the problem of voter ignorance, and must therefore be found unconstitutional because the State lacks a compelling interest sufficient to justify the burdens on Plaintiffs' First Amendment rights.

### A. California does not have a compelling state interest in the *public* disclosure of donors to a ballot measure *after* the election.

The only possible state interest sufficient to justify compelled public disclosure of contributors to a ballot measure, whether pre- or post-election, is a limited informational interest designed to combat the problem of voter ignorance. *See Canyon Ferry Road*, 556 F.3d at 1032-33; *CPLC I*, 328 F.3d at 1105 n. 23 (*quoting Bellotti*, 435 U.S. at 789-90, 98 S. Ct. at 1422-23); *supra* Part IV.A. But the problem of voter ignorance is, by definition, a pre-election concern. Compelled public-disclosure provisions are designed to address the pre-election problem of voter ignorance by making citizens more informed voters, providing them with voting cues to

---

[47] In the context of candidate elections, this temporal element is relaxed because the state has an additional interest in preventing *quid pro quo* corruption that simply does not exist in ballot measure elections, where the only possible interest is informational. *Bellotti*, 435 U.S. at 789-90, 98 S. Ct. at 1422-23 (holding that the state lacked a compelling interest in combating corruption in the context of a ballot measure election because there is no risk of *quid pro quo* corruption).

determine "who [is] really behind [a] proposition," *CPLC II*, 507 F.3d at 1179, and to prevent "the wolf from masquerading in sheep's clothing." *CPLC I*, 328 F.3d at 1106 n.24.

Accordingly, no later than twelve days before the election, Plaintiffs are required to file public reports that contain the name, address, occupation, and employer of every individual that had contributed a combined $100 or more to the committee up until seventeen days before the election. Cal. Gov't Code § 82000.7. Furthermore, during the 90-day election cycle, i.e., the 90 days prior to the election, Plaintiffs are also required to file reports within 24 hours for any individual who, in a single contribution, contributes $1,000 or more to the campaign. Cal. Gov't Code § 82003. During approximately the last two weeks of the election, Plaintiffs must file reports within 24 hours for any individual who contributes a total of $1,000 or more to the campaign, even if those contributions are made in smaller single donations. *Id*.

The public disclosure of the names and personal information of a donor to a ballot measure *after* the election has occurred does not, and indeed cannot, serve California's interest in combating voter ignorance. The moment the vote is cast—whether the voter casts his or her vote ignorantly, or with full knowledge of the issues involved—voter ignorance is no longer a concern. *See Bellotti*, 435 U.S. at 791, 98 S. Ct. 1423-24 ("[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. . . . But if there be any danger that the people cannot evaluate the information and arguments advanced by appellants, it is a danger contemplated by the Framers of the First Amendment."). Additional information after the election cannot alter an individual's vote on the particular ballot measure at issue.[48] The ability to access donor information after an election has occurred—be it one day or nine years later—does nothing to decrease voter ignorance.

Moreover, public disclosure after the election, or the continued availability of reports filed pre-election, are not narrowly tailored to serve other lesser interests. As set forth above, California cannot create an interest in its public disclosure provisions by asserting that post-

---

[48] Plaintiffs will address the concerns about voters who may have been misled, and the State's lack of a "speculative" interest in allowing voters to use the information to determine how a person may act in the future in turn, below.

election public reporting provisions are necessary to enforce other provisions of the PRA (e.g., pre-election public disclosure). *See supra* Part IV.A.4.; *see also WRTL II*, 127 S. Ct. 2672 (rejecting prophylactic upon prophylactic approach). The post-election public disclosure provisions, as well as the continued public availability of pre-election reports, must be supported by their own compelling governmental interest. *See WRTL II*, 127 S. Ct. 2652, 2672. *See also Heller*, 378 F.3d at 991 ("[I]t is not just *that* a speaker's identity is revealed, but how and when that identity is revealed, that matters in a First Amendment analysis of a state's regulation of political speech."). Because post-election reporting cannot address the problem of voter ignorance, California lacks a compelling interest sufficient to justify the substantial First Amendment burdens and privacy concerns that compelled-public-disclosure statutes impose.

**B.** **Post-election public disclosure is not the least restrictive means of addressing the potential interests of the State.**

Although Plaintiffs challenge the constitutionality of the compelled *public* disclosure of donors to ballot measures, Plaintiffs do not mean to suggest that California does not have an interest in enforcing the unchallenged provisions of the PRA or some limited form of disclosure. In order for the PRA to be effective, pre-election reports must be both timely and accurate. Post-election reports play a vital role in this process because they allow the State to assess the accuracy of the pre-election reports. For obvious administrative reasons, the final accounting must occur at some point after the election. But having this *private* interest in disclosure is not the same as having a compelling interest in the *public* disclosure of post-election reports. Post-election *public* disclosure is not the least restrictive means of addressing compliance, and must therefore be found unconstitutional.

First, the prevention of violations of the PRA begins before an election. California has enacted numerous provisions designed to prevent voters from being "tricked" into supporting a ballot measure by a donor attempting to conceal his or her identity. *See*, *e.g.*, Cal. Gov't Code § 84102(d) (committee name must indicate whether the committee supports or opposes the measure); Cal. Gov't Code § 84106 (committee must identify any sponsoring organization in the committee name); Cal. Gov't Code § 84504, Cal. Code Regs. tit. 2, § 18402(c)(3)(A) (the

committee name must include a name or phrase that clearly "identifies the economic or other special interest of its major donors of fifty thousand dollars ($50,000) or more"); Cal. Code Reg. tit. 2, § 18402(c)(3)(B) (if any of the Major Donors share a common employer, the identity of the employer must also be included in the committee name); Cal. Gov't Code § 84503 (committees must include a disclaimer on *every* advertisement which, in addition to disclosing information about the committee, must also identify the two highest donors who have contributed $50,000 or more to committee); Cal. Gov't Code § 84302 (prohibition on contributions by intermediaries, i.e., individual who collects contributions on behalf of another, who then makes a contribution to a committee without disclosing the name of the original donor). To require compelled public disclosure of donors of as little as $100 because the State is failing to do its job of enforcing its laws would be a backward system.

Second, the possibility that voters may have been "tricked" into supporting a ballot measure that they would not otherwise support by an organization that failed to comply with the provisions of the PRA also provides little justification for post-election public disclosure. This argument presupposes that voters would have voted differently had the organization filed reports in compliance with the PRA—an assumption that is speculative at best.[49] In the event that the voters are misled in a material way, they have remedies to redress their grievances, and none of the remedies require the public disclosure of campaign finance reports.[50]

---

[49] For example, the Church of Latter Day Saints has been accused of providing substantial in-kind support to organizations that supported Proposition 8 that went un-reported in official campaign reports. Aurelio Rojas, *State to Probe Allegation of Mormon Church Role in Prop. 8*, Sacramento Bee (Nov. 25, 2008) Because this support was made public through other channels before the election, one would be hard pressed to find a voter before the election that did not understand that the Church of Latter Day Saints supported Proposition 8, even if their name did not appear on an official government report. Thus, the alleged violation is more of a technical violation than one that substantively misled the voters.

[50] For example, voters could bring a post-election challenge in the courts alleging "deficiencies [that] affected the ability of the voters to make an informed choice." *See People v. Scott*, 119 Cal. Rptr. 2d 797, 800 (2002). To the extent that violations do not rise to the level necessary to overturn the ballot measure through a post-election challenge, voters can attempt to convince the electorate to repeal, or in the case of a ballot measure that failed, enact, the ballot measure in a

(continued...)

Third, the PRA requires organizations to maintain detailed records of contributions and expenditures, Cal. Gov't Code § 84200 *et seq*., and imposes substantial civil and criminal penalties for non-compliance. Cal. Gov't Code § 91000 *et seq*, to ensure that the PRA is properly enforced. These provisions represent a more direct method of ensuring that voters are provided with the most accurate and reliable pre-election information. The State remains free to review the final reports, and to the extent that it finds a violation, it can, and will, impose substantial civil and criminal penalties. As the State pointed out in their preliminary injunction briefing, Defendant Fair Political Practices Commission has imposed substantial penalties for non-compliance on many occasions in the past. (State Defs.'Opp. to Pls.' Mot. for Prelim. Inj., p. 19.) This evidence suggests that the administrative-review process, coupled with the substantial civil and criminal penalties, are an adequate method of ensuring that pre-election reports are accurate. As the Supreme Court said in *Buckley*, there is no indication that the "political repercussion of such violations will be insufficient to police" the relevant provisions. *Buckley*, 424 U.S. at 56, 96 S. Ct. at 652.

Fourth, while pre-election reporting is meant to provide voters with the information necessary to cast an informed ballot, post-election reporting can only be used by the electorate to "evaluate the appropriateness of its decision." (Mem. & Order, p. 56, Jan. 30, 2009.) However, this is *not* the limited informational interest directed at voter ignorance that the Supreme Court found sufficient in *Buckley* to justify compelled public disclosure. The voter cannot go back and get a "do-over" of his or her vote. Gaining this knowledge after the election is only helpful in the event of some future—and wholly hypothetical—election, where absolutely everything about this hypothetical future election, from the wording of the ballot measure, to the donors, remains exactly the same as the election to which the disclosure relates. Assuming the marketplace of ideas works as it should, one would expect at least some individuals to change their positions, making the dated campaign finance reports misleading in and of themselves.

---

[50] (...continued)
future election. *See*, *e.g.*, Website of the Secretary of State of California, http://www.sos.ca.gov/ elections/elections_j.htm#circ (Ballot measure titled "Reinstates Right of Same-Sex Couples to Marry" currently in circulation; another ballot measure titled "Substitutes Domestic Partnership for Marriage in California Law" also currently in circulation).

**Plaintiffs' Memorandum in Support of Motion for Summary Judgment**

Fifth, when it comes to maintaining donors information online after the election, the evidence in the wake of Proposition 8 demonstrates an alternative, more likely, use of donor information. Individuals, upset with the results at the ballot box, can use it to harass and intimidate any individual that can be identified as supporting a traditional definition of marriage in an attempt to discourage them from supporting a similar cause in the future.

Finally, the urgency that exists pre-election for disclosure is virtually non-existent after an election. As discussed above, voters will learn about violations through the State's enforcement process, and even then, the violations may do little to undermine the electorate's confidence in its decision. *See supra* n. 49 (discussing allegations that the Church of Latter Day Saints did not properly report in-kind contributions and how few were misled by such a technical violation). And, the PRA is fatally over-inclusive because it requires countless organizations that are in fullcompliance with the PRA to publicly disclose information after the election that will have little or no effect on any voter's perceptions while imposing substantial First Amendment burdens.

The substantial First Amendment burdens imposed by compelled public disclosure provisions require the State's compelling interest to address a real problem in a direct and material way. *Turner Broad. Sys.*, 512 U.S. at 664, 114 S. Ct. at 2470. Here, the State's interest in reassuring voters that they made the "right" choice, or in providing the electorate with information necessary to determine who might support a similar measure in the future is merely speculative and not directed at a real problem that necessitates the substantial First Amendment burdens that occur as a result of compelled public disclosure. California's post-election interest is one of enforcement, and as this Court recognized, committees must be given sufficient time to wind down their operations. However, this interest only extends as far as necessary to determine compliance with legal reporting requirements. Determining compliance does not require disclosure to the public at large, because it is not the job of the public to determine whether compliance has occurred, and therefore the statute is not narrowly tailored.

//

//

# CONCLUSION

Plaintiffs have met their burden for finding in their favor on summary judgment. Therefore, this Court should grant Plaintiffs summary judgment on all the counts in their Third Amended Complaint.


Dated this 3rd day of June, 2009.

Respectfully submitted,


_/s/ Scott F. Bieniek_____

Benjamin W. Bull (Ariz. State Bar No. 009940)
ALLIANCE DEFENSE FUND
15100 North 90th Street
Scottsdale, Arizona  85260
Counsel for All Plaintiffs

Timothy D. Chandler (Cal. Bar No. 234325)
ALLIANCE DEFENSE FUND
101 Parkshore Drive, Suite 100
Folsom, CA 95630
Counsel for All Plaintiffs
Designated Counsel for Service

James Bopp, Jr. (Ind. Bar No. 2838-84)
Barry A. Bostrom (Ind. Bar No.11912-84)
Sarah E. Troupis (Wis. Bar No. 1061515)
Scott F. Bieniek (Ill. Bar No. 6295901)
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
Counsel for All Plaintiffs

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**

# CERTIFICATE OF SERVICE

I, Scott F. Bieniek, am over the age of 18 years and not a party to the within action. My business address is 1 South Sixth Street, Terre Haute, Indiana 47807.

On June 3, 2009, I electronically filed the foregoing document described as Plaintiffs' Memorandum in Support of Motion for Summary Judgment, with the Clerk of Court using the CM/ECF system which will send notification of such filing to:

Zackery P. Morazzini
zackery.morazzini @doj.ca.gov
*Attorney for Defendants Debra Bowen and Edmund G. Brown, Jr.*

Judy W. Whitehurst
jwhitehurst@counsel.lacounty.gov
*Attorney for Defendant Dean C. Logan*

Terence J. Cassidy
tcassidy@porterscott.com
*Attorney for Defendant Jan Scully*

Mollie M, Lee
mollie.lee@sfgov.org
*Attorney for Defendants Dennis J. Herrera and
Department of Elections - City and Count of San Francisco*

Lawrence T. Woodlock
lwoodlock@fppc.ca.gov
*Attorney for Defendant Members of the Fair
Political Practices Commission*

I declare under the penalty of perjury under the laws of the State of Indiana that the above is true and correct. Executed this 3rd day of June, 2009.


  /s/ Scott F. Bieniek
Scott F. Bieniek (Ill. Bar No. 6295901)
Counsel for All Plaintiffs

**Plaintiffs' Memorandum in Support
of Motion for Summary Judgment**