1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10

11  PROTECTMARRIAGE.COM, et al.,        No. 2:09-cv-00058-MCE-DAD

12            Plaintiffs,

13       v.                             MEMORANDUM AND ORDER

14  DEBRA BOWEN, et al.,

15            Defendants.

16

17                          ----oo0oo----

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

Presently before the Court are Plaintiffs'[1] Motion for Summary Judgment ("Plaintiffs' Motion"), Defendants'[2] Motion for Summary Judgment ("Defendants' Motion") and Defendants' Motion to Strike ("Motion to Strike").  These matters came on for hearing before the Court at 2:00 p.m. on Thursday, October 20, 2011.  For the following reasons, Plaintiffs' Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is GRANTED. Defendants' Motion to Strike is DENIED as moot.

**BACKGROUND**

**A.   Factual History**

On November 4, 2008, the citizens of California adopted a ballot measure, Proposition 8, that changed the California Constitution such that marriage would thereafter exist only "between a man and a woman."  Plaintiffs' Separate Statement of Undisputed Facts ("SSUF"), ¶ 29; Cal. Const. art. 1, § 7.5.

---

[1] Plaintiffs are ProtectMarriage.com - Yes on 8, a Project of California Renewal ("ProtectMarriage"); National Organization for Marriage California - Yes on 8, Sponsored by National Organization for Marriage ("NOM-California"); John Doe #1, an individual, and as a representative of the proposed Class of Major Donors; and National Organization for Marriage California PAC ("NOM-California PAC").

[2] Moving Defendants are Debra Bowen, Secretary of State for the State of California, in her official capacity; Kamala D. Harris, Attorney General for the State of California, in his official capacity; Department of Elections - City and County of San Francisco; Dennis J. Herrera, City Attorney for the City and County of San Francisco, California, in his official capacity and as a representative of the Class of Elected City Attorneys in the State of California; and Ann Ravel, Sean Eskovitz, Elizabeth Garrett, Lynn Montgomery and Ronald Rotunda, members of the California Fair Political Practices Commission, in their official capacities.

Plaintiffs ProtectMarriage and NOM-California were primarily formed ballot committees established under California's Political Reform Act of 1974, Cal. Gov. Code § 81000 et seq. ("PRA"). Their specific purpose was to specifically support the passage of Proposition 8.  SSUF, ¶¶ 1-2.

Plaintiff John Doe #1 supported Proposition 8 and is considered a "committee" under the PRA because he contributed in excess of $10,000 to a committee that itself supported Proposition 8.  Id., ¶ 3.  In support of the Proposition 8 campaign, such committees raised in excess of $42 million from more than 46,000 individual contributors.  See Declaration of Lynda Cassady, ¶ 15 and its attached chart.  Plaintiff National Organization for Marriage California PAC ("NOM-California PAC"), to the contrary, was formed post-election to raise and spend money on ballot initiatives and candidates relating to the issue of marriage.  SSUF, ¶ 4.

California's PRA requires committees such as Plaintiffs to report certain information regarding their contributors. Specifically, Plaintiffs are required to file semiannual reports including the name, street address, occupation, name of employer, (if self-employed, the name of the business), as well as the date and amount received during the period covered by the statement of anyone who contributes more than $100 to them, both during and after active campaigns.  Cal. Gov. Code §§ 84200, 84211(f).  This information is then available, inter alia, on the website of the California Secretary of State.

///

///

3

Plaintiffs allege that, as a consequence of their support of Proposition 8, their contributors have been subjected to threats of violence, harassment and reprisals.  Plaintiffs further allege that the PRA's $100 reporting threshold is unconstitutional, both facially and as applied to Plaintiffs.  Plaintiffs further maintain that the PRA's post-election reporting requirements and the failure to purge reports post-election are facially unconstitutional as well.

In support of their first claim, Plaintiffs submitted 58 John Doe Declarations (Plaintiffs' Exhibit 1).  The first nine of those declarations were drafted in January 2009, and the rest were prepared prior to June 3, 2009.  Plaintiffs have further provided a variety of media accounts, videos and articles pulled from various internet sources (Plaintiffs' Exhibits 3-4).

Plaintiffs' John Doe declarations document the following incidents that Plaintiffs allege constitute "threats, harassments and reprisals" sufficient to warrant exempting from disclosure the names of Plaintiffs' contributors:

- Establishments owned by or employing persons who contributed to or otherwise publicly supported Proposition 8 were the subjects of proposed boycotts. Declarations of John Doe #1, #53.

- Establishments whose owners supported or contributed to Proposition 8 were subject to picketing or protests. Declaration of John Doe #1.

- A protest took place at a declarant's in-home Proposition 8 political rally.  Declaration of John Doe #4.

- Unsolicited phone calls, emails and letters voicing disagreement with the positions of those contributing to or supporting Proposition 8 were received by supporters of Proposition 8.  Declarations of John Doe #1, #4-10, #17, #19, #22-23, #28-30, #51-54, #56.

4

- Flyers were circulated denouncing contributors' support of Proposition 8.  Declaration of John Doe #2.

- "Yes on 8" bumper stickers and yard signs were vandalized or stolen.  In at least one instance, a sign was used to break a church window.  Declarations of John Does #3, #7-8, #13-14, #16, #18, #22, #24, #26, #31, #33-48, #50, #55-58.

- Cars of "Yes on 8" supporters were keyed or vandalized (i.e., windows were smashed or vehicles were egged and floured) and at least one supporter's home was egged and floured.  Declarations of John Doe, #11-14.

- Individuals at "Yes on 8" sign waving events, protests or flyer distribution events encountered negative responses (including individuals shouting obscenities and arguing with sign-waivers, individuals blocking "Yes on 8" signs with "No on 8" signs, and in one instance, an individual throwing an object at a sign waver).  Declarations of John Doe #13, #16, #25, #26.

- Conflicts arose with friends, family or neighbors. Declarations of John Doe #13, #15, #18, #20-21, #49.

- Individuals or businesses supporting Proposition 8 had negative reviews posted on a variety of websites. Declarations of John Doe #20, #27, #32, #51.

Most of the incidents alleged above were responses to public shows of support the declarants had made in favor of Proposition 8.  See, e.g., Decl. of John Doe #4 (protest held outside the entrance to declarant's gated community when declarant held a fundraiser in support of Proposition 8 at his home); Decl. of John Doe #8 (declarant "attended numerous rallies, three press conferences, and spoke at a number of churches...[,] also participated on panel discussions" and "attended an election night gathering at a hotel...with other supporters of Proposition 8" where the supporter's picture was taken and eventually published); Decl. Of John Doe #9 (photograph of individual at election night gathering prompted receipt of unsolicited messages on MySpace and Facebook accounts, emails and phone calls);

5

Decl. of John Doe #20 (after seeing a yard sign supporting Proposition 8 in the yard of a shop owner, two neighbors advised declarant they would no longer frequent his store).

Although immaterial to the Court's decision, it is not at all clear from some of the declarations whether the alleged incidents were actually connected to a particular declarant's support of Proposition 8.  See, e.g., Decl. Of John Doe #11 (individual maintaining "Yes on 8" yard signs on her lawn and a bumper sticker on her car had her car window smashed); Decl. of John Doe #13 (believes car was keyed in retaliation for posting "Yes on 8" bumper stickers); Decl. of John Doe #23 (believes the statue of Mary, Mother of Jesus, at his church was painted orange in connection with Proposition 8).

Plaintiffs' remaining evidence, Exhibits 3 and 4, is comprised of a collection of online media, including YouTube videos, blogs, court filings in other cases, and numerous articles.[3]

///

///

///

///

///

---

[3] Defendants have moved to strike all evidence included in these Exhibits on the grounds that the contents: 1) are inadmissible hearsay; 2) exceed the scope of a stipulation entered into by the parties; 3) were not disclosed during discovery; or 4) were not properly authenticated.  The Court is inclined to grant Defendants' Motion for a variety of reasons, not the least of which is that most of the exhibits are indeed hearsay.  However, because consideration of the evidence included in these Exhibits does not alter the Court's decision, Defendants' Motion to Strike is instead DENIED as moot.

Because the incidents reported within these Exhibits are highly repetitive, and perhaps deceptively overwhelming, they are catalogued by type of occurrence, rather than by exhibit number, here.[4]

- **Yard sign theft and vandalism.** First, as with their Doe declarations, Plaintiffs' evidence recounts a variety of incidences of yard-sign theft and vandalism. In some instances church windows were broken or churches were spray-painted with "No on 8" messages. One church was egged and toilet-papered. Another had adhesive poured on a doormat, keypad and window. A neighborhood in San Bernardino was targeted by vandals who spray-painted cars, fences, garages and "Yes on 8" signs. Vandals also spray-painted residential and commercial buildings in Fullerton, and a church in San Francisco was spray-painted with swastikas and angry Proposition 8 messages. Likewise, in October, 2008, someone spray-painted "No on 8" on a San Jose couple's car and garage and on their neighbor's garage. Also in San Jose, someone painted an SUV with "Bigots Live Here" and an arrow pointing to a house that had a "Yes on 8" sign on the lawn. Some of the articles make mention that law enforcement responded and, in some instances, was even able to make arrests. Exhs. 4-7, 4-29, 4-30, 4-31, 4-32, 4-33, 4-34, 4-36, 4-37, 4-38, 4-39, 4-40, 4-41, 4-45, 4-46, 4-50.

///

///

///

---

[4] The Court has referenced each exhibit in which the following facts are alleged to show, in part, that while Plaintiffs may characterize their evidence as "voluminous" or "overwhelming," in many instances the same events are reported repeatedly in multiple articles, creating the false impression that there is more here than closer inspection reveals. The Court notes also that, given the anonymous nature of the John Doe declarations, it is not clear whether any of the incidents alleged in those documents may overlap with any of the incidents documented in Exhibits 3 and 4. Based on the factual descriptions in some of the John Doe declarations, it is entirely possible that some of the above declarants are reporting incidences also reported below. Compare, e.g., Decl. of John Doe #29 with Exh. 4-96. Any potential unidentified overlap is immaterial, however, and thus will be ignored.

- **Disclosure lists.**  Plaintiffs also provide documentation of a number of websites that, in approximately November 2008, began publishing the names of individuals and businesses that contributed to Proposition 8.  Some of Plaintiffs's evidence extends beyond Proposition 8 to websites reporting the names of supporters of similar issues in other states.  Exhs. 4-10, 4-11, 4-12, 4-21, 4-28, 4-83, 4-84, 4-98, 4-99, 4-103, 4-105, 4-106, 4-108, 4-109, 4-110, 4-113, 4-114, 4-128, 4-138, 4-139, 4-142, 4-152, 4-153, 4-154.

- **Protests and rallies.**  In addition, Plaintiffs provide evidence of protests and rallies undertaken in approximately November 2008.  For example, a small group staged a peaceful "kiss-in" near the Mormon temple in Salt Lake City.  Other protests had to be broken up by law enforcement and some protesters were arrested.  Exh. 3-3, 3-8, 3-9, 4-64, 4-65, 4-66, 4-68, 4-69, 4-70, 4-71, 4-120.

- **Death threats.**  Plaintiffs allege that, after participating in a rally in favor of Proposition 8 in front of City Hall, Fresno, California mayor Alan Autry and a local pastor received death threats.  The pastor's church and house were also purportedly egged.  According to Plaintiffs's evidence, police promptly investigated those threats and the pastor acknowledged he was confident in the investigation.  Mayor Autry made clear that supporters of Proposition 8 should not "blame the gay and lesbian community" and that he believed "[m]ost of the opponents of Prop 8 and the vast, vast, majority of the gay community would condemn this type of thing."  See, Exhs. 4-2, 4-3, 4-4, 4-5, 4-6, 4-34, 4-44.

- **Bash Back.**  Plaintiffs' evidence also repeatedly documents the actions taken by radical gay activist group "Bash Back."  That organization allegedly interrupted services at a Michigan church and, among other things, arranged for two women to kiss in front of the pastor.  The incident was investigated and the offenders later agreed in federal court to entry of a permanent injunction preventing them from invading churches anywhere in the country.  Violators of that injunction could be held in contempt of court and be subject to a $10,000 fine.  In addition, a Washington Bash Back chapter also purportedly glued door locks and spray-painted messages on a Mormon church.  Finally, the same group appears to have targeted a conference in Washington via an anonymous online post. Exhs. 3-5, 3-6, 4-7, 4-13, 4-16, 4-17, 4-34, 4-42, 4-43, 4-53, 4-54, 4-82.

///

8

- **Disruption of a prayer walk.**  In addition, Plaintiffs include several reports of a prayer walk by a group that met every Friday night in San Francisco's Castro District, which has a large gay community, to try to convert gay and lesbian individuals to a "straight lifestyle."  During a November protest, a crowd convened and began shouting lewd remarks at the marchers, pushing them and throwing hot coffee, soda and alcohol at them.  One man is alleged to have hit a marcher on the head with her own Bible before pushing her to the ground and kicking her.  Another marcher reported that someone tried to pull his pants down.  Law enforcement intervened and escorted the marchers back to their van.  Exhs. 3-1, 4-7, 4-8, 4-9, 4-34.

- **Physical assaults.**  A sixty-nine year old woman at a November 2008 Proposition 8 rally in Palm Springs, California was pushed and spit on.  Law enforcement convinced her to press charges against the attackers.  Likewise, a supporter of Proposition 8 was waiting to distribute yard signs outside of a Modesto church when someone absconded with approximately 75 signs.  The Proposition 8 supporter gave chase, was allegedly punched in the face and received 16 stitches.  Detectives responded and investigated the incident.  Exhs. 4-7, 4-22, 4-23, 4-24, 4-25, 4-34.

Much of Plaintiffs' remaining evidence goes to alleged boycotts and "economic reprisals."  By way of example:

- The chair of the 2012 U.S. Olympic team allegedly stepped down after controversy emerged over his opposition to gay marriage.  Exhs. 4-18, 4-144, 4-145, 4-146.

- Negative reviews of a Sacramento ice cream parlor were posted online after it was disclosed that the company supported Proposition 8.  The parlor was later the target of protesters giving out free rainbow sherbert.  Exhs. 4-27, 4-120, 4-130.

- The manager of an El Coyote restaurant, who was also the daughter of the owners, left town after her $100 contribution to Yes on 8 led protesters to target the restaurant.  Protests have since faded and the manager said she has received calls and other shows of support.  Exhs. 4-34, 4-58, 4-77, 4-117, 4-123, 4-124, 4-125, 4-126, 4-127, 4-129, 4-133, 4-139.

///

///

9

- Despite some similar shows of support in his favor, the artistic director of Sacramento's California Musical Theater resigned after opponents to Proposition 8 discovered he had donated $1000 to the Yes on 8 campaign.  Exhs. 4-34, 4-58, 4-77, 4-115, 4-116, 4-117, 4-118, 4-119, 4-120, 4-121, 4-124, 4-129, 4-142, 4-154.

- The director of the Los Angeles Film Festival also resigned under alleged pressure from gay-rights groups after his $1500 contribution to "Yes on 8" was publicized.  Though the festival board initially tried to block his resignation, the director eventually did tender his resignation when pressure continued.  Exhs. 4-34, 4-58, 4-116, 4-117, 4-122.

- A Palo Alto dentist featured on a boycott website as a result of his $1000 contribution to the "Yes on 8" campaign claims he consequently lost two patients. Exhs. 4-67, 4-117, 4-154.

- An artist who had captured images from New York's gay pride parade was the subject of verbal retaliation and an article condemning her contribution to Proposition 8.  Exhs. 4-96.

- A movie theater chain, a Ventura County health food store, a San Diego hotelier, a self-storage company, and a Utah-based car dealer were all boycotted after their or their employees' contributions to Proposition 8 were publicized.  Exhs. 4-111, 4-116, 4-117, 4-123, 4-129, 4-131, 4-132, 4-133, 4-134, 4-136, 4-141.

Plaintiffs also cite to evidence purportedly documenting Proposition 8-related backlash directed at the Mormon church primarily in October and November of 2008.  For example:

- Two Mormon Temples (and a Knights of Columbus printing plant) received envelopes containing a white, powdery substance.  Plaintiffs presume these incidents were connected to Proposition 8, though their evidence does not indicate a connection.  Regardless, the FBI investigated the incidents and determined the powder was not a biological agent or toxin.  Exhs. 4-34, 4-52, 4-67, 4-75, 4-76, 4-79, 4-92.

- Several churches were also spray-painted with graffiti or otherwise vandalized.  Police in at least one town investigated the vandalism as a hate crime potentially linked to Proposition 8, though police in another town refused to characterize the vandalism as the work of opponents to Proposition 8.  Exhs. 4-7, 4-47, 4-48, 4-49, 4-51, 4-52, 4-73, 4-90, 4-91.

- Other groups or individuals reported the Mormon church to California's Fair Elections Commission for failing to report contributions to the "Yes on 8" campaign. Similarly, websites were initiated encouraging people to petition to have the tax exempt status of the Mormon church revoked. Exhs. 4-14, 4-15, 4-19, 4-61, 4-62, 4-107.

- During the campaign, same-sex marriage advocates also allegedly produced a commercial depicting Mormon missionaries destroying the marriage license of a gay couple. Exhs. 3-7, 4-59, 4-63.

- Fires were set at Mormon churches in Washington, Utah and Colorado, and a man was prevented from starting a fire at a Los Angeles Temple. Some of the articles speculatively linked the acts or arson to Proposition 8, and in each of instance, authorities undertook an investigation into the crimes. Exhs. 4-79, 4-80, 4-85, 4-86, 4-87, 4-88, 4-89.

- Some protests were directed specifically at the Mormon church. Exhs. 3-8, 3-9, 4-60, 4-68, 4-73, 4-75, 4-80, 4-120.

- Comedian Margaret Cho wrote and performed a song called "Fuck You Mormons" directed at the Mormon Church and its support of Proposition 8. Exh. 3-12.

Finally, Plaintiffs catalog a variety of other miscellaneous events they believe are relevant as well. For example:

- Miss California suffered backlash after stating at the Miss USA pageant that she believed marriage should exist between a man and a woman. Exh. 4-112, 4-147, 4-148, 4-149, 4-150, 4-151.

- A law firm entertaining an agreement with Republicans to defend the federal same-sex marriage ban, withdrew from the agreement after drawing fire from gay-rights groups. Exhs. 4-18, 4-135, 4-155, 4-156, 4-157.

- A New York state senator purportedly received death threats due to his opposition to same-sex marriage. Exh. 18.

- Apple, Inc., allegedly withdrew two iPhone apps from its app Store after receiving complaints from gay-rights supporters. Exh. 18.

- Neighbors engaged in a fist-fight when one attempted to steal and replace the other's yard sign. Exh. 4-34.

11

- A man was attacked and bitten by a dog while trying to prevent theft of a "Yes on 8" sign.  Exh. 4-34.

- Cars bearing "Yes on 8" bumper stickers were keyed. Exh. 4-35.

- A "Yes on 8" table set up in the quad at the University of California, Davis, was hit with water balloons, and students yelled "you teach hate" at those manning the table.  Exh. 4-35.

- Individuals left comments, sometimes characterized as "inciting and directly threatening violence" against supporters of Proposition 8 on a variety of blogs and websites.  Exh. 4-56, 4-57.

- The parent of a Galt High School student alleges his son was harassed by a teacher for his stance supporting Proposition 8.  Exh. 4-102.

## B.   Procedural History

In light of the above alleged acts, and because they were statutorily required to file semiannual reports on January 31, 2009, Plaintiffs initiated this action against Defendants on January 7, 2009.  Plaintiffs have amended their Complaint several times, resulting in the now operative Third Amended Complaint.

On January 9, 2009, Plaintiffs filed a Motion for Preliminary Injunction, raising essentially the same arguments they raise in their current Motion, which this Court denied by formal order on January 30, 2009.  At the same time, Plaintiffs also requested a Protective Order, which the Court granted.  That Protective Order remains in place to date and permits the parties to redact personal information from filings not under seal.  The Protective Order also grants the parties leave to file reference lists pursuant to FRCP 5.2(g).

///

Plaintiffs did not appeal this Court's Order Denying Preliminary Injunction, nor did they seek, from either this Court or from the Ninth Circuit, a stay of that decision.

On August 25, 2011, Plaintiffs moved for summary judgment. Defendants, with two exceptions, filed a Cross-Motion and Opposition to Plaintiffs' Motion on September 15, 2011.[5]  At the same time, Defendants moved to strike a large portion of Plaintiffs' evidence.  Plaintiffs filed a Reply as to their own Motion and Oppositions to Defendants' Motions on September 29, 2011.  Defendants filed a Reply to both their Motion for Summary Judgment ("Defendants' Reply") and their Motion to Strike on October 13, 2011.

///

///

///

///

///

///

///

///

---

[5] Defendant Jan Scully, on behalf of herself and as representative of the designated Class of District Attorneys in the State of California, submitted a position statement indicating that the Defendant Scully and the District Attorney Class "are, at best, peripheral Defendants in this case." Position Statement, 2:6-7.  This class thereby states their position as follows: "[T]o the extent that the Court determines that the Motion for Summary Judgment filed by Plaintiffs is not well-taken, then Defendant Scully and the District Attorney Class oppose that motion; however, to the extent that the Court determines that any Cross-Motions filed by any other party in this case are not well-taken, Defendants herein oppose those motions."  Id., 2:18-3:4.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations..., admissions interrogatory answers, or other materials" "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-324 (1986).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense. <u>See</u> Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense- the part of each claim or defense-on which summary judgment is sought."); <u>see also</u> <u>Allstate Ins. Co. v. Madan</u>, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); <u>France Stone Co., Inc. v. Charter Township of Monroe</u>, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. <u>See</u> Fed. R. Civ. P. 56(a), 56(c)); <u>Mora v. ChemTronics</u>, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

> A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex</u>, 477 U.S. at 323 (quoting Rule 56(c)).

14

1    If the moving party meets its initial responsibility, the
2  burden then shifts to the opposing party to establish that a
3  genuine issue as to any material fact actually does exist.
4  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
5  585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.
6  253, 288-89 (1968).

7    In attempting to establish the existence of this factual
8  dispute, the opposing party must tender evidence of specific
9  facts in the form of affidavits, and/or admissible discovery
10 material, in support of its contention that the dispute exists.
11 Fed. R. Civ. P. 56(c)).   The opposing party must demonstrate
12 that the fact in contention is material, i.e., a fact that might
13 affect the outcome of the suit under the governing law, and that
14 the dispute is genuine, i.e., the evidence is such that a
15 reasonable jury could return a verdict for the nonmoving party.
16 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52
17 (1986); Owens v. Local No. 169, Assoc. of Western Pulp and Paper
18 Workers, 971 F.2d 347, 355 (9th Cir. 1987).   Stated another way,
19 "before the evidence is left to the jury, there is a preliminary
20 question for the judge, not whether there is literally no
21 evidence, but whether there is any upon which a jury could
22 properly proceed to find a verdict for the party producing it,
23 upon whom the onus of proof is imposed."   Anderson, 477 U.S. at
24 251 (quoting Schuylkill and Dauphin Improvement Co. v. Munson,
25 81 U.S. 442, 448 (1871)).
26 ///
27 ///
28 ///

15

1  As the Supreme Court explained, "[w]hen the moving party has
2  carried its burden under Rule 56(c)), its opponent must do more
3  than simply show that there is some metaphysical doubt as to the
4  material facts .... Where the record taken as a whole could not
5  lead a rational trier of fact to find for the nonmoving party,
6  there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at
7  586-87.

8       In resolving a summary judgment motion, the evidence of the
9  opposing party is to be believed, and all reasonable inferences
10 that may be drawn from the facts placed before the court must be
11 drawn in favor of the opposing party. Anderson, 477 U.S. at 255.
12 Nevertheless, inferences are not drawn out of the air, and it is
13 the opposing party's obligation to produce a factual predicate
14 from which the inference may be drawn. Richards v. Nielsen
15 Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),
16 aff'd, 810 F.2d 898 (9th Cir. 1987).

17
18                              **ANALYSIS**
19
20      Plaintiffs' basic arguments in support of their Motion are
21 as follows: 1) California's campaign contribution disclosure
22 requirements are unconstitutional as applied to Plaintiffs
23 because there is a reasonable probability that such exposure will
24 lead to threats, harassment and reprisals; 2) the $100 reporting
25 threshold is unconstitutional, both facially and as applied to
26 Plaintiffs, because the threshold cannot survive the requisite
27 scrutiny and because disclosure will result in the above-
28 described threats; and

3) post-election public ballot-measure reporting and the failure
to purge public disclosures post-election are unconstitutional.
Defendants counter that: 1) Plaintiffs have not shown a
reasonable probability that an ordinary contributor to
Plaintiffs' will face threats, harassment or reprisals; 2) the
State has an important interest in disclosure that outweighs the
minimal burden imposed on Plaintiffs; and 3) post-election
disclosure requirements and the $100 threshold survive exacting
scrutiny.

    These are essentially the same arguments first brought
before the Court almost three years ago on Plaintiffs' Motion for
Preliminary Injunction.  There, the Court held that: 1) the State
had a compelling informational interest in the disclosure of
contributors to ballot-initiative campaigns; 2) the $100
reporting threshold was narrowly tailored to that informational
interest; 3) the post-election reporting requirement was directly
related to the State's informational interest and burdened no
more speech than was required; and 4) Plaintiffs were unlikely to
show a reasonable probability that disclosure of the identities
of Proposition 8 contributors would result in threats, harassment
and reprisals, and thus Plaintiffs were unlikely to show an
exemption from the disclosure requirements was warranted.

///
///
///
///
///
///

17

1    Very little has changed in this case since the Court

2  originally addressed the parties' arguments in the context of

3  Plaintiffs' original Motion.  Even with what new evidence

4  Plaintiffs have provided at this juncture, however, they have

5  failed to convince this Court that its prior reasoning was

6  unsound or that any shift in the Court's position is justified

7  now.  Accordingly, for the following reasons, Defendants, not

8  Plaintiffs, are entitled to summary judgment.

9

10   **A.    Whether Plaintiffs Have Shown a Reasonable Probability**

11   **that Disclosure of their Contributors' Identities will**

     **Result in Threats, Harassment or Reprisals**

12

13   According to Plaintiffs, disclosure of the identities of

14  their contributors must be barred because they have demonstrated

15  a reasonable probability that such disclosure will lead to

16  threats, harassment or reprisals.  Plaintiffs' Motion, 5:16-22

17  (citing Citizens United v. FEC, ___ U.S. ___, 130 S. Ct. 876, 914

18  (2010) (internal quotations omitted); Buckley v. Valeo, 424 U.S.

19  1, 74 (1976)).  This Court rejected this same argument in its

20  Order Denying Preliminary Injunction explaining the rule as

21  follows[6]:

22  ///

23  ///

24  ///

25  _____

26   [6] At times the Court has chosen to quote extensively from
    its prior Order Denying Preliminary Injunction because the issues
27  facing the Court today are largely unchanged from those facing
    the Court then and because the Court's prior analysis is still
28  highly relevant and directly applicable to the current facts
    before it today.

18

The test applicable to Plaintiffs' First Cause of
Action was initially formulated in <u>Buckley</u> when the
Supreme Court rejected an overbreadth challenge to all
reporting requirements imposed on minor parties.  424
U.S. 1.  Despite its rejection of a blanket disclosure
exemption for all such groups, the Court left open the
possibility that similar minor parties in the future
might be able to seek such immunity if they could show
that there was a reasonable probability their
contributors would suffer from harassment, threats, or
reprisals as a result of such revelation.

The <u>Buckley</u> Court began its discussion by noting that
the "governmental interest in disclosure is diminished
when the contribution in question is made to a minor
party with little chance of winning an election.  As
minor parties usually represent definite and publicized
viewpoints, there may be less need to inform the voters
of the interests that specific candidates represent.
Major parties encompass candidates of greater
diversity.  In many situations the label 'Republican'
or Democrat' tells a voter little.  The candidate who
bears it may be supported by funds from the far right,
the far left, or any place in between on the political
spectrum.  It is less likely that a candidate of, say,
the Socialist Labor Party will represent interests that
cannot be discerned from the party's ideological
position." <u>Id.</u> at 70.

Additionally, that Court was cognizant that "the damage
done by disclosure to the associational interests of
the minor parties and their members and to supporters
of independents could be significant.  These movements
are less likely to have a sound financial base and thus
are more vulnerable to falloffs in contributions.  In
some instances fears of reprisal may deter
contributions to the point where the movement cannot
survive.  The public interest also suffers if that
result comes to pass, for there is a consequent
reduction in the free circulation of ideas both within
and without the political arena."  <u>Id.</u> at 71.

Accordingly, the <u>Buckley</u> Court determined that, though
such facts were not before it, "[t]here could well be a
case...where the threat to the exercise of First
Amendment rights is so serious and the state interest
furthered by disclosure so insubstantial that the Act's
requirements [could not] be constitutionally applied."
<u>Id.</u>  That Court further observed "that unduly strict
requirements of proof could impose a heavy burden, but
it does not follow that a blanket exemption for minor
parties is necessary.  Minor parties must be allowed
sufficient flexibility in the proof of injury to assure
a fair consideration of their claim.

The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisal from either Government officials or private parties.  The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself.  A pattern of threats or specific manifestations of public hostility may be sufficient."  Id. at 74.

[FN #7] The Buckley Court noted that the facts in NAACP v. Alabama could possibly have warranted sustaining an as-applied challenge to Alabama's compelled disclosure requirements. Id. at 71. The NAACP v. Alabama Court stated, "We think that the production order, in the respects here drawn in question, must be regarded as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association.  Petitioner has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility.  Under these circumstances, we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure."  NAACP v. Alabama, 357 U.S. at 462-463.

The Supreme Court later had occasion to apply the Buckley test in Brown. The Brown Court addressed the issue of "[w]hether certain disclosure requirements of the Ohio Campaign Expense Reporting Law...[could] be constitutionally applied to the Socialist Workers Party ["SWP"], a minor political party which historically ha[d] been the object of harassment by government officials and private parties."  Brown [v. Socialist workers, '74 Campaign Committee], [459 U.S. 87, 88 (1982)].  That Court emphasized several points raised in Buckley reiterating that "[t]he government's interests in compelling disclosures are 'diminished' in the case of minor parties...[and at] the same time, the potential for impairing First Amendment interests is substantially greater."  Id. at 92 (quoting Buckley, 424 U.S. at 70).

20

In <u>Brown</u>, the Court had before it "'substantial
evidence of both governmental and private hostility
toward and harassment of SWP members and supporters.'
Appellees introduced proof of specific incidents of
private and government hostility toward the SWP and its
members within the four years preceding the trial.
These incidents, many of which occurred in Ohio and
neighboring states, included threatening phone calls
and hate mail, the burning of SWP literature, the
destruction of SWP members' property, police harassment
of a party candidate, and the firing of shots at an SWP
office.  There was also evidence that in the 12-month
period before trial, 22 SWP members, including four in
Ohio, were fired because of their party membership.
The evidence amply support[ed] the District Court's
conclusion that 'private hostility and harassment
toward SWP members make it difficult for them to
maintain employment.'"  <u>Brown</u> at 98-99.

Moreover, "[t]he District Court also found a past
history of government harassment of the SWP.  FBI
surveillance of the SWP was 'massive' and continued
until at least 1976.  The FBI also conducted a
counterintelligence program against the SWP and the
Young Socialist Alliance, the SWP's youth organization.
One of the aims of the 'SWP Disruption Program' was the
dissemination of information designed to impair the
ability of the SWP and the YSA to function.  This
program included 'disclosing to the press the criminal
records of SWP candidates, and sending anonymous
letters to SWP members, supporters, spouses, and
employers.'  Until at least 1976, the FBI employed
various covert techniques to obtain information about
the SWP, including information concerning the source of
its funds and the nature of its expenditures.  The
District Court specifically found that the FBI had
conducted surveillance of the Ohio SWP and had
interfered with its activities within the State.
Government surveillance was not limited to the FBI.
The United States Civil Service Commission also
gathered information on the SWP, the YSA, and their
supporters, and the FBI routinely distributed its
reports to Army, Navy, and Air Force Intelligence, the
United States Secret Service, and the Immigration and
Naturalization Service." <u>Id.</u> at 99-100.

Finally, "the Government possesse[d] about 8,000,000
documents relating to the SWP, YSA...and their
members...Since 1960, the FBI ha[d] had about 300
informants who were members of the SWP and/or YSA and
1,000 non-member informants. Both the Cleveland and
Cincinnati FBI field offices had one or more SWP or YSA
member informants. Approximately 2 of the SWP member
informants held local branch offices.  Three informants
even ran for elective office as SWP candidates.

1   The 18 informants whose files were disclosed to [the
2   Special Master] received total payments of $358,648.38
    for their services and expenses."  Id. at 100 n.18.

3   The Brown Court determined that "the evidence of
    private and government hostility toward the SWP and its
4   members establishe[d] a reasonable probability that
    disclosing the names of contributors and recipients
5   [would] subject them to threats, harassment, and
    reprisals."  Id. at 100.
6

7   Protectmarriage.com v. Bowen, 599 F. Supp. 2d 1197, 1212-1214

8   (E.D. Cal. 2009).

9       Based on the same above authorities, Plaintiffs now ask this

10  Court to issue a similar decision and to exempt those

11  contributing to Plaintiffs' cause from the disclosure

12  requirements of the PRA.  In support of their argument,

13  Plaintiffs point to the incidents described by the Court above.

14  Those incidents are characterized by PlaintiffS as including

15  death threats, physical assaults and threats of violence,

16  vandalism and threats of destruction of property, arson and

17  threats of arson, angry protests, lewd demonstrations,

18  intimidating emails and phone calls, hate mail, mailed envelopes

19  containing white suspicious powder, blacklisting, loss of

20  employment and job opportunities, intimidation and reprisals on

21  campus and the classroom, acts of intimidation through

22  photography, economic reprisals and demands for hush money, and

23  gross expressions of anti-religious bigotry.  Plaintiffs' Motion,

24  7:14-8:2.  For their part, Defendants disagree with Plaintiffs'

25  characterization of the evidence.  Before turning to the

26  sufficiency of Plaintiffs' evidence, however, there is one core

27  point pertaining to the Buckley test itself that necessitates

28  initial consideration.

1    First and foremost, the parties hotly contest whether

2    Plaintiffs are entitled to seek refuge under the exemption

3    provided by Buckley and its progeny because that exemption was

4    created for, and historically has been applied only to, "minor

5    parties" or small, persecuted groups whose very existence

6    depended on some manner of anonymity.  Despite their ongoing

7    contention that anyone making the requisite showing of threats,

8    harassment and reprisals is entitled to the exemption,

9    Plaintiffs' Reply, 3:14-4:3, Plaintiffs did acknowledge at oral

10   argument that the "minor party" element is a relevant

11   consideration before the Court.  This Court previously addressed

12   the same issue in its Order Denying Preliminary Injunction

13   finding that:

14        Both Buckley and Brown addressed the need to balance
          the government's diminished interest in the disclosure
15        of contributors to minor parties against the burden
          imposed on those small groups by requiring such
16        disclosure.  In light of clearly established precedent,
          this Court is unable to say that the State's interest
17        here is similarly diminished or that the Plaintiffs'
          potential burden is even remotely comparable.
18
          Unlike the facts in Brown, the proponents of
19        Proposition 8 succeeded in persuading over seven
          million voters to support their cause.  They were
20        successful in their endeavor to pass the ballot
          initiative and raised millions of dollars in the
21        process.  This set of circumstances is a far cry from
          the sixty-member SWP party, repeatedly unsuccessful at
22        the polls, and incapable of raising sufficient funds.
          Indeed, it became abundantly clear during oral argument
23        that Plaintiffs could not in good conscience analogize
          their current circumstances to those of either the SWP
24        or the Alabama NAACP circa 1950.

25   ///

26   ///

27   ///

28   ///

23

Additionally, the Court has already extensively evaluated the nature of the State's interest[7] and, in light of the marked differences between this and every other case in which an exemption has been allowed, simply cannot by any stretch of the imagination say that the Government's interest "is so insubstantial that the Act's requirements cannot be constitutionally applied" to Plaintiffs.  To the contrary, as applied to the massive movement waged by Plaintiffs, the State's interest in disclosure is at full force.

Similarly, the greater burden alleged to be imposed on Plaintiffs also necessarily derives from their minority status.  The Second Circuit stated in <u>Federal Election Commission v. Hall- Tyner Election Campaign Committee</u> that "[a]cknowledging the importance of fostering the existence of minority political parties, we must also recognize that such groups rarely have a firm financial foundation. If apprehension is bred in the minds of contributors to fringe organizations by fear that their support of an unpopular ideology will be revealed, they may cease to provide financial assistance.  The resulting decrease in contributions may threaten the minority party's very existence.  Society suffers from such a consequence because the free flow of ideas, the lifeblood of the body politic, is necessarily reduced. Accordingly, a nation dedicated to free thought and free expression cannot ignore the grave results of facially innocuous election requirements." 678 F.2d 416, 420 (2d Cir. 1982).

Moreover, "[t]he power of a government to repress dissent is substantial and can be exercised in a myriad of subtle ways.  Privacy is an essential element of the right of association and the ability to express dissent effectively...[F]orced revelations would likely lead to 'vexatious inquiries' which consequently could instill in the public an unremitting fear of becoming linked with the unpopular or unorthodox." <u>Id.</u>

Notably absent from this case is any evidence that those burdens hypothesized by the Supreme Court would befall the current Plaintiffs.  There is no evidence that their financial backing is so tenuous as to render them susceptible to a relatively minor and entirely speculative fall-off in contributions.

---

[7] In its Order Denying Preliminary Injunction, the Court began by analyzing the applicable standard of review and the State's interest in compelled disclosure.  These issues are discussed in the current context below.

There is surely no evidence that the seven million individuals who voted in favor of Proposition 8 can be considered a "fringe organization" or that their beliefs would be considered unpopular or unorthodox. Finally, there is no evidence that any of Plaintiffs' contributors intend to retreat from the marketplace of ideas such that available discourse will be materially diminished.

Finally, it would appear that, while minor status is a necessary element of a successful as-applied claim, even minor status alone could not independently sustain Plaintiffs' current cause of action. Brown and its progeny each involved groups seeking to further ideas historically and pervasively rejected and vilified by both this country's government and its citizens. In dicta, the Ninth Circuit addressed this pattern when it rejected a plea for exemption waged by a contributor to a minor party that "was not promoting a reviled cause or candidate." Goland v. U.S., 903 F.2d 1247, 1260 (9th Cir. 1990).

The facts in the current case could not be more distinguishable from those in which successful challenges have been brought. Here, Plaintiffs orchestrated a massive movement to amend the California Constitution. Proponents of the initiative were successful in their endeavor, raising nearly $30 million, securing 52.3% of the vote and convincing over seven million voters to support Proposition 8. Plaintiffs did not seek to promote a "reviled cause," and instead sought to legislate a concept steeped in tradition and history. Accordingly, in light of Plaintiffs' success at the polls and the State's... informational interest, the Court cannot say that the Government's interest in this case is so insubstantial or the burden on Plaintiffs so great as to warrant an exemption from disclosure.

Plaintiffs nonetheless would have the Court find these comparisons irrelevant. Plaintiffs contend that the Buckley Court's reference to "minor" parties is applicable only in the context of its rejection of the request before it for a blanket exemption. See Motion for Preliminary Injunction, 13:19-24. According to Plaintiffs, the Supreme Court determined in Buckley that if a group could prove there was a reasonable probability that disclosure would lead to harassment, threats, and reprisals, an exemption was required. However, Plaintiffs' interpretation renders superfluous the Buckley Court's analysis of the relative governmental interest and individual burdens in the context of minor parties.

Neither did the <u>Brown</u> Court so broadly interpret <u>Buckley</u> when it repeated, "The First Amendment prohibits a state from compelling disclosures by a minor party that will subject those persons identified to the reasonable probability of threats, harassment or reprisals." <u>Brown</u>, 459 U.S. at 101-102 (emphasis added).

Since <u>Buckley</u>, as-applied challenges have been successfully raised only by minor parties, specifically those parties, as discussed, having small constituencies and promoting historically unpopular and almost universally-rejected ideas.  As stated, in <u>Brown</u>, the SWP consisted of only sixty members in Ohio. <u>Id.</u> at 88.  The parties' "aim was the abolition of capitalism and the establishment of a workers' government to achieve socialism."  The party was historically unsuccessful at the polls though its members regularly ran for public office.  <u>Id.</u> Additionally, campaign contributions and expenditures...averaged approximately $15,000 annually."  <u>Id.</u> at 89.

Similarly, in <u>Hall-Tyner</u>, a committee supporting the Communist Party successfully sought exemption from state disclosure laws.  678 F.2d 416.  Later, in <u>McArthur v. Smith</u>, members of the SWP, described as a "small and unpopular political party," again successfully challenged state disclosure requirements. 716 F. Supp. 592, 593 (S.D. Fla. 1989).  There is simply no plausible analogy to be had in this case.

Finally, this Court is confident that the Supreme Court's decisions in <u>Buckley</u> and <u>Brown</u>, both of which narrowly articulated the instant exception to disclosure laws, were not made without great consideration.  Prior courts surely were aware that members of major parties might potentially, on some future occasion, become the target of threats or harassment at the hands of extremist members of an opposing group.  Despite that possibility, the Supreme Court created an exception not for the majority, but for those groups in which the government has a diminished interest.

/// 

/// 

/// 

/// 

///

Protectmarriage.com, 599 F. Supp. 2d at 1214-1216.  Nothing

before the Court today renders its above analysis inapplicable.

To the contrary, the Court stands by its prior conclusion from

almost three years ago and finds that Plaintiffs' inability to

make a principled analogy to the parties in the above cases is

fatal to their current claim.

Plaintiffs' reliance on dicta in Doe v. Reed, ___ U.S. ___,

130 S. Ct. 2811 (2010) ("Reed"), for the proposition that the

Supreme Court has already determined Plaintiffs are privy to the

exemption does nothing to change this Court's opinion.  Reed

concerned a challenge, by groups and individuals similar to

Plaintiffs, to Washington's compelled disclosure requirement

insofar as those requirements pertained to referendum

signatories.  According to Plaintiffs, "the [Reed] Court never so

much as hinted that the exposure exemption would not be available

to the group.  To the contrary, a clear majority of the Court

agreed that an exemption was indeed available to the group

(although the Justices differed widely as to the threshold

showing of threats, harassment, or reprisals that would be

required to grant an exemption)."  Plaintiffs' Reply, 4:5-9.

Plaintiffs overstate their case.

The issue before the Reed Court was "not whether disclosure

of [a] particular petition would violate the First Amendment, but

whether disclosure of referendum petitions in general would do

so."  130 S. Ct. at 2815.  Accordingly, Reed "[left] it to the

lower courts to consider in the first instance the signors' more

focused claim concerning disclosure of the information on [that]

particular petition."  Id.

27

1  Plaintiffs thus appear to argue that, by remanding for the lower

2  courts to consider Plaintiffs' as-applied challenge based on any

3  potential threats, harassment or reprisals contributors might

4  suffer upon disclosure, the Supreme Court somehow sanctioned

5  application of the <u>Buckley</u> exemption to major parties.  However,

6  Justice Alito was the only Justice that even alluded to the

7  possibility that the Washington plaintiffs might succeed in their

8  as-applied challenge, and his sweeping assertions as to the

9  strength of Plaintiffs' case are premature given the posture of

10 the case before that Court.[8]  <u>See</u> <u>id.</u> at 2823-3827.  Accordingly,

11 nothing in <u>Doe v. Reed</u>, at least at this juncture, overrides the

12 clear statements made in past Supreme Court cases indicating that

13 disclosure exemptions were primarily intended to combat harms

14 suffered by small, persecuted groups.

15      Even if Plaintiffs could overcome the above hurdle, however,

16 their evidence is still insufficient to warrant an exemption.

17 Indeed, in its Order Denying Preliminary Injunction, this Court

18 found Plaintiffs unlikely to succeed on the merits of their claim

19 for the reasons reiterated below, and nothing Plaintiffs have

20 currently presented has convinced this Court departure from its

21 former logic is now warranted on summary judgment.  In its prior

22 Order, this Court stated:

23 ///

24 ///

25 ///

26 _____

27     [8] Notably, on remand, the Washington District Court rejected
those plaintiffs' arguments that they were entitled to the same
type of exemption sought here.  <u>See</u> <u>Doe v. Reed</u>, 2011 WL 4943952
28 (W.D. Wash. October 17, 2011).

Unlike prior cases, in which plaintiffs alleged to have suffered mistreatment over extended periods of time, the alleged harassment directed at Proposition 8 supporters occurred over the course of a few months during the heat of an election battle surrounding a hotly contested ballot initiative. Only random acts of violence directed at a very small segment of the supporters of the initiative are alleged.

Moreover, while Plaintiffs are quite correct that under <u>Buckley</u> evidence of harassment "from either Government officials or private parties" could suffice to establish the requisite proof of reprisals, the facts of subsequent cases evidence not only the existence of some governmental hostility, but quite pervasive governmental hostility at that.  <u>Buckley</u>, 424 U.S. at 74 (emphasis added); <u>see also</u> <u>McArthur</u>, 716 F. Supp. at 594 ("[H]arassment, reprisals or threats from private persons are sufficient to allow [the] court to enforce the plaintiff's first amendment rights by cloaking the contributors and recipients' names in secrecy.").

Indeed, the <u>Brown</u> Court was confronted with countless acts of government harassment and retribution against members of the SWP, which are detailed above. Furthermore, in <u>Hall-Tyner</u>, the Second Circuit stated, "[t]he evidence relied on by the district judge included the extensive body of state and federal legislation subjecting Communist Party members to civil disability and criminal liability, reports and affidavits documenting the history of governmental surveillance and harassment of Communist Party members, as well as affidavits indicating the desire of contributors to the Committee to remain anonymous." 678 F.2d at 419.

Plaintiffs do not, indeed cannot, allege that the movement to recognize marriage in California as existing only between a man and a woman is vulnerable to the same threats as were socialist and communist groups, or, for that matter, the NAACP.  Proposition 8 supporters promoted a concept entirely devoid of governmental hostility. Plaintiffs' belief in the traditional concept of marriage, to disagreement, have not historically invited animosity. The Court is at a loss to find any principled analogy between two such greatly diverging sets of circumstances.

Finally, Plaintiffs' exemption argument appears to be premised, in large part, on the concept that individuals should be free from even legal consequences of their speech. That is simply not the nature of their right.

29

Just as contributors to Proposition 8 are free to speak
in favor of the initiative, so are opponents free to
express their disagreement through proper legal means.

While the Court is cognizant of the deplorable nature
of many of acts alleged by Plaintiffs, the Court also
must reiterate that the legality or morality of any
specific acts is not before it. Thus, as much as the
Court strongly condemns the behavior of those who
resort to violence, and/or other illegal behavior, the
Court need not, indeed cannot, evaluate the proper
legal consequences of those actions today.

By the same token, nothing in the Court's decision
immunizes or excuses those who have engaged in illegal
acts from the consequences of their conduct. Those
responsible for threatening the lives of supporters of
Proposition 8 are subject to criminal liability. See
Troupis Decl, Exh. C (noting that the Fresno chief of
police stated the department was "close to making an
arrest" in the case of the death threats delivered to
the mayor and a local pastor.) Those choosing to
vandalize the property of individuals or the public are
likewise liable. Those mailing white powder to
organizations are subject to federal prosecution.
In each case, there are appropriate legal channels
through which to rectify and deter the reoccurrence of
such reprehensible behavior.

As much as those channels are available today, it is
unlikely that groups previously successful in seeking
exemptions were privy to the same opportunities.
Again, Plaintiffs have shown no societal or
governmental hostility to their cause.  Contrary to
groups such as the SWP, Plaintiffs can seek adequate
relief from law enforcement and the legal system.  Such
was not the case for those thought to be supporting the
SWP or communist groups, those subject to actual
criminal liability based on their beliefs and their
associations.

Protectmarriage.com, 599 F. Supp. 2d at 1217-1218.

Despite Plaintiffs attempt now to put forth additional

evidence of threats, harassment and reprisals, the Court's

findings remain the same.  More specifically, despite the

additional declarations and exhibits that are now before the

Court, Plaintiffs still run into problems of proportionality and

magnitude.

1     First, while Plaintiffs characterize their evidence as
2  voluminous and comprised of "virtually countless reports of
3  threats, harassment, and reprisals," Plaintiffs' Motion, 4:14-15,
4  they have pointed to relatively few incidents allegedly suffered
5  by persons located across the entire country who had somehow
6  manifested their support for traditional marriage.  In addition,
7  while the evidence before this Court indicates that at least 7
8  million voters showed up at the California polls alone to support
9  the passage of Proposition 8, this number, though large, still
10 deceptively underestimates the number of supporters for
11 Plaintiffs' cause.  Indeed, this figure does not capture all
12 individuals supporting Proposition 8 on a national scale, nor
13 does it capture those individuals who may have no connection to
14 California's campaign, but have supported the same cause in other
15 regions.  Plaintiffs' evidence of harassment, nonetheless extends
16 much farther than California's borders and includes incidents
17 that arose in other states and that were directed at the much
18 broader social issue of gay marriage in general.

19     Accordingly, even assuming Plaintiffs could, under some set
20 of circumstances, prove an entitlement to an exemption, they
21 would need evidence of thousands of acts of reprisals, threats or
22 harassment, spanning much more than the short period of time
23 covering California's ballot-initiative process to prove
24 contributors to such a massive group are entitled to anonymity of
25 the type justified years ago for the individuals in Brown and
26 NAACP.

27 ///

28 ///

31

1  The declarations of 58 individuals signed in the months just

2  following the election, along with Plaintiffs' anecdotal evidence

3  from the same time period as documented in Exhibits 3 and 4, is

4  simply insufficient on the facts of this case to convince this

5  Court an ordinary contributor to Proposition 8 would have faced

6  any backlash worthy of quashing the names of all contributors.[9]

7  See, e.g., Doe v. Reed, 130 S. Ct. at 2829 (taking the position

8  exemptions may be permitted "in the rare circumstance in which

9  disclosure poses a reasonable probability of serious and

10 widespread harassment") (Sotomayor, J., concurring - joined by

11 Stevens and Ginsburg).

12     Moreover, as the Court previously observed, notably absent

13 from the record here are any instances in which Plaintiffs have

14 suffered any sort of governmental backlash.  While, based on the

15 language derived from Buckley, governmental harassment is not

16 necessarily a required showing, it is a factor for this Court to

17 consider.  Indeed, some governmental animosity has been present

18 in all other cases in which an exemption has been permitted.

19 ///

20 ///

21 ///

22 ///

23 ///

24

25     [9] Plaintiffs even acknowledge in their papers that only a
   minority of individuals on the other side of the campaign
26 resorted to the complained of tactics that are cause for concern.
   Plaintiffs' Motion, 1:10-12 ("Some groups and individuals,
27 certainly a minority, have resorted to advancing their cause, not
   by debating the merits of the issue, but by discouraging
28 participation in the democratic process through acts calculated
   to intimidate.") (emphasis added).

32

1 Perhaps recognizing this, Plaintiffs argue "[t]here can be no
2 question that in many areas in California, and around the
3 country, views against same-sex marriage...are extremely
4 unpopular" and "[e]ven our courts of law have characterized those
5 who fight against such laws as advocates of hate and bigotry who
6 act 'without reason.'"  Plaintiffs' Motion, 12:15-18.
7 Nonetheless, any attempt by Plaintiffs to show governmental
8 animosity here is half-hearted at best.  As described above,
9 parties entitled to an as-applied exemption (namely the NAACP and
10 the SWP) in the past had suffered from systematic governmental
11 discrimination, persecution and abuse.  Those plaintiffs were not
12 only directly victimized by the government, they consequently
13 lacked adequate recourse to pursue means short of non-disclosure
14 to protect against private violence.  In this case, Plaintiffs
15 cannot assert that there is some sort of governmental hostility
16 to their cause, nor can they in good conscience argue that law
17 enforcement was or would be non-responsive to any illegal acts
18 directed at Plaintiffs contributors.[10]

19     To the contrary, Plaintiffs' own evidence indicates law
20 enforcement was not only responsive, but diligent in undertaking
21 investigations into some of the more heinous acts alleged here.
22 ///

23

24     [10] Plaintiffs do argue that their contributors were
25 victimized despite existing laws criminalizing the underlying
   conduct.  Essentially, Plaintiffs argue those laws did nothing to
26 deter criminal behavior.  However, Plaintiffs have not alleged
   that any law enforcement response was insufficient, that law
27 enforcement has somehow turned a blind eye to any criminal
   conduct, or that criminal sanctions will not be imposed if
28 appropriate.  That is a critical distinction between the instant
   case and past cases such as Brown and NAACP.

This factor is critical in light of the comments made by several
concurring Justices in <u>Doe v. Reed</u>, indicating the ability of law
enforcement to deal with threats, harassment and reprisals would
weigh heavily against a need for an exemption.  <u>See</u>, <u>e.g.</u>, <u>Doe</u>,
130 S. Ct. at 2829 (exemption may be warranted "in the rare
circumstance in which disclosure poses a reasonable probability
of serious and widespread harassment that the State is unwilling
or unable to control") (Sotomayor, J., concurring, joined by
Stevens and Ginsburg); <u>id.</u> at 2831 ("From time to time throughout
history, persecuted groups have been able to criticize oppressive
practices and laws either anonymously or not at all...In my view,
this is unlikely to occur in cases involving the PRA.  Any burden
on speech that petitioners posit is speculative as well as
indirect.  For an as-applied challenge to a law such as the PRA
to succeed, there would have to be a significant threat of
harassment directed at those who sign the petition that cannot be
mitigated by law enforcement measures.") (Stevens and Breyer,
JJ., concurring); <u>id.</u> at 2837 ("There are laws against threats
and intimidation; and harsh criticism, short of unlawful action,
is a price our people have traditionally been willing to pay for
self-governance.") (Scalia, J., concurring).

     In addition, the vast majority of the incidents cited by
Plaintiffs are arguably, as characterized by Defendants, typical
of any controversial campaign.  For example, picketing,
protesting, boycotting, distributing flyers, destroying yard
signs and voicing dissent do not necessarily rise to the level of
"harassment" or "reprisals," especially in comparison to acts
directed at groups in the past.

34

Moreover, a good portion of these actions are themselves forms of speech protected by the United States Constitution.  Indeed this Court previously held that:

> [T]he Court simply cannot ignore the fact that numerous of the acts about which Plaintiffs complain are mechanisms relied upon, both historically and lawfully, to voice dissent.  The decision and ability to patronize a particular establishment or business is an inherent right of the American people, and the public has historically remained free to choose where to, or not to, allocate its economic resources.  As such, individuals have repeatedly resorted to boycotts as a form of civil protest intended to convey a powerful message without resort to non-violent means. The Supreme Court has acknowledged these rights on many an occasion:
>
> > In Thornhill v. Alabama, 310 U.S. 88 (1940), the Court held that peaceful picketing was entitled to constitutional protection, even though, in that case, the purpose of the picketing "was concededly to advise customers and prospective customers of the relationship existing between the employer and its employees and thereby to induce such customers not to patronize the employer." Id. at 99. Cf. Chauffeurs v. Newell, 356 U.S. 341. In Edwards v. South Carolina, 372 U.S. 229, we held that a peaceful march and demonstration was protected by the rights of free speech, free assembly, and freedom to petition for a redress of grievances.
>
> NAACP v. Claiborne Hardware Co., 458 U.S. 886, 909 (1982).  Notably, "[s]peech does not lose its protected character...simply because it may embarrass others or coerce them into action." Id. at 910.

Protectmarriage.com, 599 F. Supp. 2d at 1218.

    As to Plaintiffs' allegations of "economic reprisals" in the form of voluntary or forced resignations, as opposed to cases in which a relatively high percentage of small groups seeking an exemption were actually fired from their places of employment, Plaintiffs here have documented no terminations.  See, e.g., SWP. ///

35

1  Rather, Plaintiffs point only to instances of several individuals
2  who allegedly resigned amidst controversy over their
3  contributions to or support of Proposition 8, but even those
4  individuals had their own supporters and nonetheless made the
5  affirmative and individual decision to resign.

6      More troubling here are the few instances of violence or
7  criminal activity that do not fall within the realm of protected
8  speech.  The Court does not take lightly the use of the mail to
9  terrorize people with counterfeit biological agents or to
10 threaten the lives of individuals taking a stand for their
11 particular beliefs, nor does the Court condone the use of force
12 or the escalation of peaceful protests to violence to make one's
13 position known.[11]  However, Plaintiffs have produced insufficient
14 evidence that the more incendiary events on which they rely were
15 connected to Proposition 8 or to gay marriage at all.  Rather, a
16 number of these incidents were directed at the Mormon church,
17 which, though a backer of California's proposition, may also have
18 been a target for any of a number of other reasons.  In addition,
19 as stated above, law enforcement appears to have responded
20 swiftly and adequately in each of the instances Plaintiffs
21 allege, rendering this case distinguishable from all cases in the
22 past where exemptions have been granted.

23 ///

24 ///

25 ///

26

27     [11] To the contrary, those resorting to these sorts of
28 tactics do more to undermine their cause than to further any
   civilized and productive discourse.

36

1  And, perhaps more importantly, the Supreme Court has never

2  indicated that even a few acts of violence, when directed at a

3  target as massive as the groups supporting Plaintiffs, would

4  suffice to shield those groups from the scrutinizing light of the

5  political process.

6      This Court also observes that, even assuming there is no

7  "strict" requirement that Plaintiffs prove a chilling effect on

8  anticipated speech, any such effect is notably absent here.

9  Plaintiffs appear to have had no problem collecting contributions

10 and those contributions continued to increase even during the most

11 heated portions of the Proposition 8 campaign.  Cassady Decl.,

12 ¶¶ 24-25.  A few John Doe declarants mentioned they may be wary of

13 donating in the future, but those relatively few individual

14 statements are unpersuasive to the Court given Plaintiffs'

15 enormous multi-state backing.  Plaintiffs have therefore simply

16 not shown any real chill, nor have they shown, as feared by

17 Buckley, that Plaintiffs' movement was at all susceptible to a

18 fall-off in contributions or that, absent an exemption, the

19 movement might not survive.  Buckley, 424 U.S. at 71.

20     Finally, this case is unique because Plaintiffs' contributors'

21 names were actually disclosed years ago and yet Plaintiffs have

22 produced almost no evidence of any ramifications suffered in the

23 almost three years post-disclosure.  While the evidence contained

24 in Plaintiffs' Exhibits 3 and 4 contain a few instances of

25 vandalism that have occurred more recently than during the height

26 of the Proposition 8 campaign and its aftermath, none of those

27 articles draw any real connection between the incidents alleged

28 and the victims' support of traditional marriage.

See, e.g., Plaintiffs' Exhs. 4-89, 4-90, 4-91, 4-93. Even
Plaintiffs' counsel at oral argument in 2011 admitted he was only
aware of one instance of harassment that had occurred post-
election. Accordingly, from a practical perspective, it makes no
sense to buy in to the argument that disclosure may result in
repercussions when there is simply no real evidence in the record
that such repercussions actually did occur in the past three
years. Plaintiffs' evidence is, quite simply, stale. See Doe v.
Reed, 2011 WL 4943952 at *10 n.3.

Accordingly, while Plaintiffs can point to a relatively few
unsavory acts committed by extremists or criminals, these acts
are so small in number, and in some instances their connection to
Plaintiffs' supporters so attenuated, that they do not show a
reasonable probability Plaintiffs' contributors will suffer the
same fate. Given the grand scale of Plaintiffs' campaign and the
massive (and national) support they garnered for their cause,
Plaintiffs' limited evidence is simply insufficient to support a
finding that disclosure of contributors' names will lead to
threats, harassment or reprisals.[12] Plaintiffs' Motion for
Summary Judgment as to this claim is DENIED and Defendants'
Motion for Summary Judgment is GRANTED.

///

///

///

---

[12] It bears mention that if the Court were to find an
exemption warranted here, it is likely a similar exemption would
prove warranted in any election concerning a controversial ballot
measure. As a result, those issues in which the public shows the
greatest interest would be subject to the least transparency.

**B.   Whether California's $100 Reporting Threshold is Unconstitutional[13]**

**1.   Standard of review.**

In their papers, Plaintiffs argue that the disclosure provisions in this case are subject to strict scrutiny such that those requirements must be narrowly tailored to a compelling state interest.  Defendants adamantly contend that only "exacting scrutiny" is required.  While the issue of the appropriate standard of review has previously been muddled, the Supreme Court recently clarified that exacting scrutiny applies here.  See Reed, 130 S. Ct. at 2818 ("We have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context.  These precedents have reviewed such challenges under what has been termed 'exacting scrutiny.'") (internal quotations omitted); see also Human Life of Washington Inc. v. Brumsickle, 624 F.3d 990, 1003-1005 (9th Cir. 2010). Despite their disagreement with the underlying authorities, Plaintiffs thus conceded at oral argument in 2011 that this Court is bound to apply that less stringent standard of review. Accordingly, this Court must now determine whether California's specific disclosure requirements "are substantially related to a sufficiently important governmental interest."  Id. at 1005.

///

///

_____

[13] Plaintiffs challenge the State's reporting threshold both facially and as-applied.  Since Plaintiffs' as-applied challenge is based on the same arguments already disposed of by the Court above, only Plaintiffs' facial challenge will be addressed here.

1                    **2.    The State's informational interest.**

2

3        Plaintiffs assert here that the State has no interest

4   sufficiently compelling or substantial to justify compelled

5   disclosure.  While Plaintiffs assert that a number of cases have

6   "suggested" that the State's "informational interest may be

7   sufficient to justify compelled ballot-measure disclosure,"

8   Plaintiffs further contend any such finding is based on a

9   misreading of Buckley.  Plaintiffs' Motion, 20:22-21:1.  More

10  specifically, Plaintiffs argue this informational interest is

11  only implicated in candidate elections and is of minimal import

12  when it comes to ballot-initiative campaigns.  Id., 21:6-12.

13  Plaintiffs believe voters can derive all necessary information

14  pertaining to ballot measures from the text of an initiative

15  itself.  Id., 21:13-14.

16       Defendants counter that Plaintiffs' assertion that the State

17  lacks a compelling informational interest in requiring disclosure

18  "flies in the face of every relevant decision from the United

19  States Supreme Court and the Ninth Circuit Court of Appeals over

20  the last four decades."  Defendants' Motion, 26:22-24.

21  Defendants point to authority this Court cited in its Order

22  Denying Preliminary Injunction for the proposition that "[c]ourts

23  have repeatedly held that California's informational interests in

24  requiring disclosure by ballot measure committees" is

25  sufficiently important.  Id., 26:25-26.

26       Indeed, in its Order Denying Preliminary Injunction, this

27  Court found the State's informational interest not only

28  substantial, but compelling:

                                   40

According to Buckley, California's interests in its current compelled disclosure regime potentially fall into three categories.  424 U.S. at 66.  "First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office...Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity...Third,...recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations."  Id. at 66-68.

However, unlike the election before the Buckley Court, which concerned candidates, the instant case bears on a recent ballot initiative measure.  Since Buckley, the Ninth Circuit has determined that "[o]nly the informational interest applies in the ballot-measure context."  See Getman I, 328 F.3d at 1105 n.23. Nevertheless, the Supreme Court has repeatedly emphasized the importance of disclosure as it relates to the passage of initiatives.  See CPLC v. Getman, No. 00-1698, slip op. at 15:9-11 (E.D. Cal. February 25, 2005) ("Getman II").

Such import derives, in no small part, from the fact that "[e]very other year, California voters decide the fate of complex policy proposals of supreme public significance...California voters have passed propositions increasing the sentences for 'third strike' criminal offenders, rendering illegal aliens ineligible for public services, banning affirmative action, mandating that public education be conducted in English, and imposing contribution limits for political campaigns."  Getman I, 328 F.3d at 1105.  In 1974, California voters even passed the initiative necessary to establish the PRA and its disclosure requirements. See Cal. Gov't code § 81000.

"California's high stakes form of direct democracy is not cheap.  Interest groups pour millions of dollars into campaigns to pass or defeat ballot measures. Nearly $200 million was spent to influence voter decisions on the 12 propositions on the 1998 ballot. Of that total, $92 million was spent on one gaming initiative.  The total amount spent by proponents and opponents of ballot measures has even outpaced spending by California's legislative candidates."  Getman I, 328 F.3d at 1105.

41

Despite the fact that powerful issues are presented to the California voters and that the economic support for state initiatives is staggering, Plaintiffs argue that the public's "general want of knowledge" is insufficient to sustain the burden disclosure imposes on contributors' First Amendment liberties. Motion, 28:11-13. However, the Government's interest before the Court cannot be diminished by characterization as a general want of knowledge. The influx of money referenced above "produces a cacaphony of political communications through which California voters must pick out meaningful and accurate messages. Given the complexity of the issues and the unwillingness of much of the electorate to independently study the propriety of individual ballot measures,... being able to evaluate who is doing the talking is of great importance." Getman I, 328 F.3d at 1105.

"Voters rely on information regarding the identity of the speaker to sort through this 'cacophony,' particularly where the effect of the ballot measure is not readily apparent. While the ballot pamphlet sent to voters by the state contains the text and a summary of ballot measure initiatives, many voters do not have the time or ability to study the full text and make an informed decision.  Since voters might not understand in detail the policy content of a particular measure, they often base their decisions to vote for or against it on cognitive cues such as the names of individuals supporting or opposing a measure, as listed in the ballot pamphlet, or the identity of those who make contributions or expenditures for or against the measure, which is often disclosed by the media or in campaign advertising.  Such cues play a larger role in the ballot measure context, where traditional cues, such as party affiliation and voting record, are absent." Getman II, No. 00-1698 at 17:12-28.

Moreover, this Court cannot ignore the fact that, "[v]oters act as legislators in the ballot-measure context, and interest groups and individuals advocating a measure's defeat or passage act as lobbyists; both groups aim at pressuring the public to pass or defeat legislation.... Californians, as lawmakers, have an interest in knowing who is lobbying for their vote, just as members of Congress may require lobbyists to disclose who is paying for the lobbyists' services and how much."  Getman I, 328 F.3d at 1106.  It follows that "[i]f our Congress 'cannot be expected to explore the myriad pressures to which they are regularly subjected,' then certainly neither can the general public. People have jobs, families, and other distractions.

While we would hope that California voters will independently consider the policy ramifications of their vote, and not render a decision based upon a thirty-second sound bite they hear the day before the election, we are not that idealistic nor that naive. By requiring disclosure of the source and amount of funds spent for express ballot-measure advocacy, California -at a minimum- provides its voters with a useful shorthand for evaluating the speaker behind the sound bite." Id.

That shorthand is arguably even more necessary to the evaluation of ballot initiatives than it is in the scrutiny of candidates for political office. "'Even more than candidate elections, initiative campaigns have become a money game, where average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their self-interest.' Knowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown. At least by knowing who supports or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation." Getman I, 328 F.3d at 1105-1106.

More to the point, "[d]isclosure...prevents the wolf from masquerading in sheep's clothing.  Proposition 199, which was on the March 1996 Primary Election ballot, provides such an example.  That initiative was entitled the 'Mobile Home Fairness and Rental Assistance Act,' but the proposed law was hardly the result of a grassroots effort by mobile home park residents wanting 'fairness' or 'rental assistance.' Two mobile home park owners principally backed the measure.  After the real interests behind the measure were exposed, various newspaper editorials decried the initiative's 'subtly misleading name' and explained that the initiative's real purpose was to eliminate local rent control for mobile home parks. The measure was soundly defeated, though proponents outspent opponents $3.2 million to $884,000." Getman I, 328 F.3d at 1106 n.24 (emphasis in original).

The Ninth Circuit made similar statements in CPLC v. Randolph, 507 F.3d 1172. In that case the appellate court stated, "[I]n the context of disclosure requirements, the government's interest in providing the electorate with information related to election and ballot issues is well established." Id. 1179 n.8.

43

As here, that plaintiff conceded the state's interest was compelling, but the court nevertheless engaged in an extensive discussion of why that the government's informational interest is not only compelling, but of the highest order.

[FN #5]   That court stated:

Despite the fact that CPLC conceded that California has a compelling informational interest, California also presented persuasive evidence demonstrating the importance of providing the electorate with pertinent information. Researcher David Binder conducted a telephone survey from June 23-26, 2001. "The goals of this project were to determine objectively, using established methods of scientific public opinion research, what sources of information regarding candidates and ballot measures are important to California voters." According to Binder's findings, "[m]ore than seven of ten California voters (71%) state that it is important to know the identity of the source and amount of campaign contributions to the ballot measure by both supporters and opponents, including unions, businesses or other interest groups."  "Fifty seven percent (57%) of California voters state that endorsements by interest groups, politicians or celebrities are important in helping them make up their mind [sic] on how to vote on ballot measures." "A majority of California voters (57%) state they would be less likely to vote for a proposition to build senior citizen housing if the proposition was supported by a well-known and respected senior activist who was discovered to have been paid by developers to promote the proposition. Only one-third (34%) stated that this information would not make any difference in their vote."

Professor Bruce Cain, a Professor of Political Science at the University of California, Berkeley, and Director of the Institute of Governmental Studies, added that "there are several compelling reasons for such a requirement. Foremost among them is the fact that the names groups give themselves for disclosure purposes can be, and frequently are, ambiguous or misleading."

Sandy Harrison, a former journalist for radio stations and newspapers and since 1995, a press secretary and communications director for the president pro tem of the state Senate, the state Department of Finance, and the state Controller, emphasizes this point in her affidavit:

> A prime example of this was Proposition 188 on the November 1994 ballot, an effort to overturn California's recently enacted workplace smoking ban. Supporters falsely portrayed the measure as a grassroots effort by small businesses. By reviewing the campaign finance report, I was able to report to readers that it was not the work of small businesses, but actually giant tobacco companies.... If the campaign finance report had not been public, I could not have substantiated or conveyed this important information to the readers, and they may never have learned the truth about who was really behind this proposition.
>
> According to Stephen K. Hopcraft, the President and co-owner of "a full-service public relations firm specializing in grass roots and public education campaigns[,]" "the information gleaned from ... disclosure reports is absolutely critical to assist news media and voters in ballot measure campaign.... With all the hyperbole in campaigning, the financial backing of each side gives voters a yardstick to measure the truth of the assertions." Indeed, CPLC admitted that "[b]ecause political operators in many states are able to avoid campaign finance disclosure requirements, citizens are likely to be uninformed and unaware of the tens of millions of dollars that are spent on ballot measure campaigns by veiled political actors ..."
>
> Randolph, 507 F.3d at 1179 n.8 (emphasis in original)

Thus, "because groups supporting and opposing ballot measures frequently give themselves ambiguous or misleading names, reliance on the group, without disclosure of its source of funds, can be a trap for unwary voters. For example, a tobacco manufacturing group that opposes regulations on smoking might call itself 'Citizens for Consumer Protection.' This name might mislead voters into thinking that Citizens for Consumer Protection is a consumer advocacy group when, in fact, it protects the commercial interest of the tobacco industry. If the organization's donor information is disclosed and opposing groups and the press publicize the information, voters have a better chance of discerning the organization's true interest." Getman II, No. 00-1698 at 18:1-12.

45

[FN #6]  See also McConnell v. Fed. Election
Comm'n, 540 U.S. 93, 128 (2003) ("Because FECA's
disclosure requirements did not apply to so-called
issue ads, sponsors of such ads often used
misleading names to conceal their identity.
'Citizens for Better Medicare,' for instance, was
not a grassroots organization of citizens, as its
name might suggest, but was instead a platform for
an association of drug manufacturers. And
'Republicans for Clean Air,' which ran ads in the
2000 Republican Presidential primary, was actually
an organization consisting of just two
individuals-brothers who together spent $25
million on ads supporting their favored
candidate."); id. at 128 n.23 ("Other examples of
mysterious groups included 'Voters for Campaign
Truth,' 'Aretino Industries,' 'Montanans for
Common Sense Mining Laws,' 'American Seniors,
Inc.' 'American Family Voices,' and the 'Coalition
to Make our Voices Heard.'") (internal citations
omitted).

"Interest groups also seek to conceal their political
involvement by availing themselves of complicated
arrangements consisting of nonprofit corporations,
unregulated entities and unincorporated entities.
Without disclosure requirements, citizens are likely to
be uninformed and unaware that tens of millions of
dollars are spent on ballot measure campaigns by such
veiled political actors." Id. at 18:14-20. Of
particular relevance in this case is the number of out-
of-state individuals and corporations contributing to
the passage of a California referendum. Surely
California voters are entitled to information as to
whether it is even citizens of their own republic who
are supporting or opposing a California ballot measure.

Moreover, "[w]hen asked, voters have indicated that
information regarding the source and amount of campaign
contributions to ballot measures plays an important
role in their decision-making. Voters rate such
information as more valuable than newspaper
endorsements, campaign mailings, TV and radio
advertisements, and endorsements by interest groups,
politicians or celebrities." Id. at 18:21-19:2.

"In light of the number and complexity of ballot
measures confronted by California voters, the
staggering sums expending to influence their passage or
defeat, the very real potential for deception through
the information of advocacy groups with appealing but
misleading names, and voters' heavy reliance on funding
source information when deciding to support or oppose
ballot measures,...

46

California has a compelling informational interest in
providing the electorate with information regarding
contributors and expenditures made to pass or defeat
ballot measure initiatives." Id. at 19:3-12.

The disclosure requirements provide some of the only
truly objective information on which the electorate can
rely to make an informed decision, and the state surely
has the utmost justification for requiring the
disclosure of information likely to ensure that its
electorate is informed and able to effectively evaluate
ballot measures. If ever disclosure was important,
indeed vital, to fuel the public discourse, it is in
the case of ballot measures.

Thus, even if, as Plaintiffs argue, individual voters
will not be "clamoring" to know the name and other
pertinent information of every contributor of over $100
to every initiative, the cumulative effect of
disclosure ensures that the electorate will have access
to information regarding the driving forces backing and
opposing each bill. Accordingly, the Government's
interest is not only compelling, but critical to the
proper functioning of the State's system of direct
democracy.

Protectmarriage.com, 599 F. Supp. 2d at 1207-1211.

In the face of the above analysis, Plaintiffs have not in

their current Motion convinced the Court the State's interest

here is anything other than sufficient.  In fact, since the Court

issued its above Order, the Ninth Circuit has affirmed that the

State's informational interest is "important":

Providing information to the electorate is vital to the
efficient functioning of the marketplace of ideas, and
thus to advancing the democratic objectives underlying
the First Amendment...Thus, by revealing information
about the contributors to and participants in public
discourse and debate, disclosure laws help ensure that
voters have the facts they need to evaluate the various
messages competing for their attention.

This vital provision of information repeatedly has been
recognized as a sufficiently important, if not
compelling governmental interest.

///

///

47

1    Human Life, 624 F.3d 990, 1005-1006; see also Canyon Ferry Road

2    Baptist Church v. Unsworth, 556 F.3d 1021, 1033 (9th Cir. 2009)

3    ("[I]t is well established that, in the ordinary case, a state

4    informational interest is sufficient to justify the mandatory

5    reporting of expenditures and contributions in the context of

6    ballot initiatives.").  That court also reiterated that "these

7    considerations 'apply just as forcefully, if not more so, for

8    voter-decided ballot measures.'" Human Life, 624 F.3d at 1006

9    (quoting Getman I, 328 F.3d at 1105).  Moreover, the court noted

10   that "[a]ccess to reliable information becomes even more

11   important as more speakers, more speech-and thus more spending-

12   enter the marketplace, which is precisely what has occurred in

13   recent years."  Human Life, 624 F.3d at 1007.  The Human Life

14   court therefore concluded that "[c]ampaign finance disclosure

15   requirements thus advance the important and well-recognized

16   governmental interest of providing the voting public with the

17   information with which to assess the various messages vying for

18   their attention in the marketplace of ideas."  Id. at 1008.[14]

19   ///

20   ///

21   ///

22   ///

23   ///

24

25        [14] Plaintiffs contend the Human Life court's "informational
     interest" discussion is dicta and is not relevant here, in part
26   because that court was asked to evaluate only political committee
     definitions, not disclosure requirements.  Plaintiffs' Motion, 21
27   n.19.  Plaintiffs do not articulate, however, how the court's
     inquiry into the state's interest there was any less relevant to
28   the issue before it, or how the analysis would differ here.

1        In addition, the Supreme Court in <u>Citizens United</u>, also

2   recently spoke favorably of disclosure provisions.  130 S. Ct. at

3   914 ("In <u>Buckley</u>, the Court explained that disclosure could be

4   justified based on a governmental interest in providing the

5   electorate with information about the sources of election-related

6   spending.") (internal citations and quotation omitted); <u>id.</u> at

7   915 ("The disclaimers required...provide the electorate with

8   information, and insure that the voters are fully informed about

9   the person or group who is speaking.") (internal quotations and

10  citations omitted).  Plaintiffs, nonetheless argue that <u>Citizens</u>

11  <u>United</u> should be ignored because that case involved candidate

12  campaigns as opposed to ballot measure initiatives.  Plaintiffs'

13  Motion, 22 n.20.  In light of the Ninth Circuit's prior

14  recognition, however, that a State's informational interest can

15  be even more powerful in the ballot measure elections than in

16  candidate races, the Supreme Court's discussion in <u>Citizens</u>

17  <u>United</u> cannot be ignored.

18       Plaintiffs nonetheless ask this Court to ignore the great

19  weight of the above authorities and to rely instead on the Tenth

20  Circuit decision in <u>Sampson v. Buescher</u>, 625 F.3d 1247 (10th Cir.

21  2010), a case in which that circuit reached a different

22  conclusion than the above courts with respect to a ballot measure

23  campaign.  According to Plaintiffs, the Tenth Circuit was correct

24  in finding that "the justifications for requiring disclosures in

25  a candidate election may not apply, or may not apply with as much

26  force, to a ballot initiative."  Plaintiffs' Motion, 22:19-22

27  (<u>quoting</u> <u>Sampson</u>, 625 F.3d at 1249).

28  ///

Plaintiffs thus ask this Court to adopt the Tenth Circuit's reasoning that "[t]he [Supreme] Court has never upheld a disclosure provision for ballot-issue campaigns that has been presented to it for review," and that "the statements by the Supreme Court supporting disclosures in ballot-issue campaigns were dicta."  Id., 22:22-26 (quoting Sampson, 625 F.3d at 1258).

When comparing ballot initiatives to candidate campaigns, the Sampson court reasoned:

> At issue on this appeal is a different type of campaign committee, not one seeking to elect or defeat a candidate, but one seeking to prevail on a ballot initiative.  A citizen voting on a ballot initiative is not concerned with the merit, including the corruptibility, of a person running for office, but with the merit of a proposed law or expenditure, such as a bond issue.  As a result, the justifications for requiring disclosures in a candidate election may not apply, or may not apply with as much force to a ballot initiative.  Disclosure may facilitate ad hominem arguments-for whatever they are worth-on the merits of the ballot initiative; but there is no need for concern that contributors can change a law enacted through a ballot initiative as they can influence a person elected to office.

625 F.3d at 1249.[15]  That court later elaborated:

> When analyzing the governmental interest in disclosure requirements, it is essential to keep in mind that our concern is with ballot issues, not candidates.  The legitimate reasons for regulating candidate campaigns apply only partially (or perhaps not at all) to ballot-issue campaigns.
>
> ...
>
> We must therefore analyze the public interest in knowing who is spending and receiving money to support or oppose a ballot issue.  It is not obvious that there is such a public interest.  Candidate elections are, by definition, ad hominem affairs.

---

[15] Notably, the court's latter point appears to go to the State's inapplicable "Corruption Interest" rather than to its "Informational Interest."

1   The voter must evaluate a human being, deciding what
2   the candidate's personal beliefs are and what
    influences are likely to be brought to bear when he or
    she must decide on the advisability of future
3   governmental action.  The identities of those with
    strong financial ties to the candidate are important
4   data in that evaluation.  In contrast, when a ballot
    issue is before the voter, the choice is whether to
5   approve or disapprove of discrete governmental action,
    such as annexing territory, floating a bond, or
6   amending a statute.  No human being is being evaluated.
    When many complain about the deterioration of public
7   discourse-in particular, the inability or unwillingness
    of citizens to listen to proposals made by particular
8   people or by members of particular groups-one could
    wonder about the utility of ad hominem arguments in
9   evaluating ballot issues.  Nondisclosure could require
    the debate to actually be about the merits of the
10  proposition on the ballot.

11  Id. at 1255-1257.

12      The Sampson court ultimately rejected Supreme Court

13  precedent indicating to the contrary by arguing that the high

14  court's message regarding the value of financial disclosure in

15  the ballot-measure context is "mixed." Id. at 1257.  According

16  to the Tenth Circuit, while the Supreme Court has previously

17  spoken favorably of disclosure requirements pertaining to ballot

18  initiatives, that Court has never rejected a challenge to such

19  disclosures.  Id.  Accordingly, the Tenth Circuit believes those

20  favorable discussions should be ignored as dicta.  Id. at 1258.

21  That appellate court thus concluded that "while assuming that

22  there is a legitimate public interest in financial disclosure

23  from campaign organizations, we also recognize that this interest

24  is significantly attenuated when the organization is concerned

25  with only a single ballot issue and when the contributions and

26  expenditures are slight." Id. at 1259.

27  ///

28  ///

51

1    The Tenth Circuit's analysis regarding a state's
2 informational interest in ballot initiative campaigns is
3 unpersuasive.  First, that court rejected the reasoning in
4 several critical Supreme Court cases by categorizing those
5 discussions as dicta.  In addition, the <u>Sampson</u> decision is
6 contrary to Ninth Circuit precedent that relies on the same
7 Supreme Court authorities rejected by the Tenth Circuit to find
8 that the State's interest in ballot initiatives is important, and
9 even compelling.  In light of the contrary Supreme Court and
10 Ninth Circuit authority already presented to this Court, this
11 Court declines Plaintiffs' invitation to rely on <u>Sampson</u>.

12    Moreover, even if this Court was persuaded by the Tenth
13 Circuit's analysis, that case is distinguishable from the instant
14 case on its facts.  More specifically, in <u>Sampson</u> the Tenth
15 Circuit was confronted with a challenge to a state requirement
16 that a small group raising less than $800 register as a campaign
17 committee in an election of just a few hundred voters.  <u>Id.</u> at
18 1249, 1251-52.  The <u>Sampson</u> court reasoned that an average
19 citizen could not be expected to master campaign finance laws and
20 to determine which ones apply in a given election.  <u>Id.</u> at 1259-
21 60.  Accordingly, even small groups, such as the plaintiffs in
22 that case, would have been required to hire counsel to do so.
23 <u>Id.</u> at 1260.  Obtaining legal counsel to support such a small
24 campaign was itself a substantial burden, which was then
25 compounded by the time plaintiffs themselves were required to
26 expend on the subject.  <u>Id.</u>  Moreover, the public interest in
27 disclosure is minimal when the value of the financial information
28 is so small.  <u>Id.</u>

("We agree with the Ninth Circuit that '[a]s a matter of common sense, the value of this financial information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level.'") (citing Canyon Ferry Road, 556 F.3d at 1033).  Accordingly, Sampson held that, on the facts before it, the burden on plaintiffs in compelled disclosure of their financial information, outweighed any benefit to the State.  The Court did include the following important caveat in its decision:

> We do not attempt to draw a bright line below which a ballot-issue committee cannot be required to report contributions and expenditures.  The case before us is quite unlike ones involving the expenditure of tens of millions of dollars on ballot issues presenting "complex policy proposals."  Cal. Pro-Life Council, Inc. v. Getman, 328 F.3d 1088, 1105 (9th Cir. 2003). We say only that Plaintiffs contributions and expenditures are well below the line.

Id. at 1261.  Given the limited application of the Tenth Circuit decision, its non-binding nature, and its rejection of Supreme Court precedent, Sampson is not controlling, and, in this Court's opinion, the better line of reasoning is that generated out of this Circuit.  Accordingly, this Court now finds the State's informational interest well-established and substantial.

### 3.    Relationship between the $100 reporting threshold and the State's interest.

Plaintiffs next contend that, even assuming the State's informational interest is important, the State's disclosure requirements are not appropriately tailored to that interest. Plaintiffs' Motion, 28:4-6.

///

1  According to Plaintiffs, "common sense dictates–and the Ninth

2  Circuit has found–that the 'value of this financial information

3  to the voters declines drastically as the value of the

4  expenditure or contribution sinks to a negligible level.'"  Id.,

5  28:8-10 (quoting Canyon Ferry Road, 556 F.3d at 1033)).

6  Plaintiffs also argue the failure to account for inflation

7  undermines any connection between the disclosure requirements and

8  the State's interest.  Id., 29:14.  Contrary to Plaintiffs'

9  assertions, Defendants contend the $100 threshold is

10 constitutional unless it is "wholly without rationality."

11 Defendants' Motion, 34:25-28.  Defendants further argue that the

12 threshold is the result of "considered legislative judgment,"

13 id., 36:6, and that the threshold need not be indexed for

14 inflation, id., 36:23.

15      This Court addressed the parties' arguments in its Order

16 Denying Preliminary Injunction, as follows:

17      Plaintiffs argue that the Government's interest in the
         compelled disclosure of those who contributed amounts
18      as low as $100 to support Proposition 8 is negligible.
         Specifically, Plaintiffs express disbelief that "the
19      public is clamoring for the knowledge of the name,
         address, occupation, and employer of every person who
20      contributed one hundred dollars or more to a ballot
         measure." Id., 21-23. According to Plaintiffs, the
21      State's threshold is therefore set too low and must
         fail for lack of adjustment for inflation.  This Court
22      disagrees and holds that the legislative line drawn is
         narrowly tailored to the State's compelling
23      informational interest, that the threshold need not be
         indexed for inflation, and that a contrary holding
24      would call into question scores of statutes in which
         the legislature or the people have sought to draw
25      similar lines.

26

27

28

54

In <u>Buckley</u>, as here, the appellants argued "that the monetary thresholds in the record-keeping and reporting provisions lack[ed] a substantial nexus with the claimed governmental interests, for the amounts involved [were] too low even to attract the attention of the candidate, much less have a corrupting influence." <u>Buckley</u>, 424 U.S. at 82. There, the Act "required political committees to keep detailed records of both contributions and expenditures. <u>Id.</u> at 63. As in the instant case, "[e]ach committee...[was] required to file quarterly reports. The reports [were] to contain detailed financial information, including the full name, mailing address, occupation, and principal place of business of each person who had contributed over $100 in a calendar year, as well as the amount and date of those contributions." <u>Id.</u> (internal citations omitted). On facts remarkably similar to those before this court, the Supreme Court held that "the $100 threshold was...within the 'reasonable latitude' given the legislature 'as to where to draw the line.'" <u>Id.</u> at 83.

The Court elaborated on its decision stating, "The $10 and $100 thresholds are indeed low. Contributors of relatively small amounts are likely to be especially sensitive to recording or disclosure of their political preferences.  These strict requirements may well discourage participation by some citizens in the political process, a result that Congress hardly could have intended. Indeed, there is little in the legislative history to indicate that Congress focused carefully on the appropriate level at which to require recording and disclosure. Rather it seems merely to have adopted the thresholds existing in similar disclosure laws since 1910. But we cannot require Congress to establish that it has chosen the highest reasonable threshold. The line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion. We cannot say on this bare record that the limits are wholly without rationality." <u>Id.</u>

> [FN #9]  The parties dispute the level of scrutiny actually applied in <u>Buckley</u>.  However labeled, the <u>Buckley</u> Court clearly determined that the $100 threshold passed constitutional muster and this Court is bound by that decision.

The Eastern District later stated that "as a general matter, the court will not second guess a legislative determination as to where the line for contribution limits should be drawn." <u>CPLC v. Scully</u>, 989 F. Supp. 1282, 1293 (E.D. Cal. 1998). The same holds true on the facts before this Court.

First, this Court finds the disclosure thresholds set in other states to be instructive. California's current $100 threshold falls well within spectrum of those mandated by its sister states, which range from no threshold requirement to $300.  In fact, only six states in the United States have higher threshold requirements.

[FN #10 Omitted.]

The Supreme Court has previously made similar comparisons.  Randall v. Sorrell, 548 U.S. 230 (2006). That Court stated, "As compared with the contribution limits upheld by the Court in the past, and with those in force in other States, [the Act's] limits are sufficiently low as to generate suspicion that they are not closely drawn." Id. at 249.  That Court went on to point out that "[t]hese limits are well below the limits this Court upheld in Buckley. Indeed, in terms of real dollars (i.e., adjusting for inflation), the Act's $200 per election limit on individual contributions to a campaign for governor is slightly more than one-twentieth of the limit on contributions to campaigns for federal office before the Court in Buckley. Adjusted to reflect its value in 1976, Vermont's contribution limit on campaigns for statewide office (including governor) amounts to $113.91 per 2-year election cycle, or roughly $57 per election, as compared to the $1,000 per election limit on individual contributions at issue in Buckley." Id. at 250.

However, the Randall Court also determined that the lower contributions limits constituted only a danger sign that the "contribution limits may fall outside tolerable First Amendment limits." Id. at 253. Since the actual dollar amount of the statutory threshold was not dispositive, the Court also looked at the Act's substantial restrictions on the ability of candidates to raise the funds necessary to run a competitive election, the ability of political parties to help their candidates get elected, and the ability of individual citizens to volunteer their time to campaigns. Id.

Accordingly, even if this Court were inclined to make the determination, which it is not, that California's $100 disclosure threshold was too low, such a determination alone would be insufficient to warrant award of a preliminary injunction.

Nevertheless, in keeping with the Randall Court's foray into the hypothecated effects of inflation, Plaintiffs assert that California's disclosure regime is constitutionally suspect based, in part, on its failure to account for such economic conditions.

56

According to Plaintiffs, the $100 disclosure threshold approved of in Buckley would equate to approximately $38.79 today.  Motion, 24:6-8.  Therefore, Plaintiffs contend that Buckley establishes the benchmark below which disclosure thresholds should not be permitted to fall.

Such a conclusion runs contrary to both logic and the law.  "In Buckley, [the Court] specifically rejected the contention that $1,000, or any other amount, was a constitutional minimum below which legislatures could not regulate...[The Court] referred instead to the outer limits of contribution regulation by asking whether there was any showing that the limits were so low as to impede the ability of candidates to 'amas[s] the resources necessary for effective advocacy,' 424 U.S., at 21.  [The court] asked, in other words, whether the contribution limitation was so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless.  Such being the test, the issue in later cases cannot be truncated to a narrow question about the power of the dollar, but must go to the power to mount a campaign with all the dollars likely to be forthcoming...[T]he dictates of the First Amendment are not mere functions of the Consumer Price Index. 161 F.3d at 525 (dissenting opinion)." Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 397 (2000).  Neither can the constitutional principles at issue in the current case be construed solely in terms of the rate of inflation, and the Court finds that the disclosure threshold negligibly affects, if it affects at all, Plaintiffs' ability to amass resources or to advocate their cause.

The Court also finds it relevant that numerous existing statutes contain reference to dollar values beyond which certain rights or benefits may be taken away or become unavailable. For example, California Penal Code § 487 states that when "money, labor, or real or personal property taken is of a value exceeding four hundred dollars ($400)" such a taking constitutes grand theft. Cal. Pen. Code § 487(a). Additionally, grand theft is also found "[w]hen domestic fowls, avocados, olives, citrus or deciduous fruits, other fruits, vegetables, nuts, artichokes, or other farm crops are taken of a value exceeding one hundred dollars ($100)." Id., § 487(1)(A). These dollar values were set by the legislature in 1982. See 1982 Cal. Stat. 1693. Were the Court to accept Plaintiffs' current argument, it would call into question this and every other statutory provision in which the legislature thought to classify by dollar amount without tying that amount to some articulated rate of inflation.

The Court is unwilling to render a decision that would create such a striking precedent.

Finally, in <u>Buckley</u>, the Supreme Court stated that "disclosure requirements, as a general matter, directly serve substantial governmental interests.  In determining whether these interests are sufficient to justify the requirements we must look to the extent of the burden that they place on individual rights." <u>Buckley</u>, 424 U.S. at 68. To reiterate, "[i]t is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute. In some instances, disclosure may even expose contributors to harassment or retaliation. These are not insignificant burdens on individual rights, and they must be weighed carefully against the interests which Congress has sought to promote by this legislation. In this process we note and agree...that disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption." <u>Id.</u>

Thus, disclosure requirements, by their very nature, are the least restrictive means through which to educate the electorate.  The requirements do not limit the amount of contributions or expenditures by the entity or the contributor. They do not limit the entity's ability to raise funds, nor do they impose burdensome structural requirements on Plaintiffs. <u>See Alaska Right to Life Committee v. Miles</u>, 441 F.3d 773, 791 (9th Cir. 2006). Moreover, Plaintiffs point to no threshold that would be more narrowly tailored to serve the State's interest. The Court simply cannot say that the cumulative effect of the disclosure of the contributors of $100 is not narrowly tailored to the Government's compelling informational interest.[16]

> [FN #11]  As an example, the public could very well be swayed by the fact that numerous donations to Plaintiffs, and likely to others, came from out of state.

---

[16] As an example, the public could very well be swayed by the fact that numerous donations to Plaintiffs, and likely to others, came from out of state. It appears very probable to this Court that the California electorate would be interested in knowing if a California initiative was funded by the citizens it is intended to affect or by out-of-state interest groups and individuals. In order to properly capture the number of non-California donors, it is quite logical to require a lower, rather than a higher, reporting threshold.

> It appears very probable to this Court that the California electorate would be interested in knowing if a California initiative was funded by the citizens it is intended to affect or by out-of-state interest groups and individuals. In order to properly capture the number of non-California donors, it is quite logical to require a lower, rather than a higher, reporting threshold.
>
> Accordingly, the Court finds that California's disclosure threshold is properly drawn. California's decision to compel disclosure of those who contribute in excess of $100 to groups such as Plaintiffs is narrowly tailored to the State's compelling informational interest and Plaintiffs' likelihood of success on the merits is minimal.

Protectmarriage.com, 599 F. Supp. 2d at 1220-1224.  The Court's prior analysis still stands.

Plaintiffs nonetheless contend now that the $100 reporting threshold does nothing to combat the State's informational interest, which it attempts to define more narrowly as an interest in combating "voter ignorance."  Plaintiffs' Motion, 24:12-14.  Plaintiffs primarily believe that disclosure of large special interest groups will promote any such interest and that the identity of small donors, such as those contributing less than $100, is irrelevant.  Id., 26:1-9.  Plaintiffs also argue there are other legislative actions that can be taken to combat voter ignorance (e.g., making measures simpler and clearer for voters).  Id., 25:1-12.  Plaintiffs thus conclude that the only justification for disclosure requirements that could actually alleviate voter ignorance is the need to prevent the "wolf from masquerading in sheep's clothing."  Id., 27:6-18 (quoting Getman I, 328 F.3d at 1106 n.24).  Plaintiffs then go on to argue that this final justification cannot be met when the amount of contributions to be disclosed "sinks to a negligible level."

1    Id., 28:4-10 (quoting Canyon Ferry Road, 556 F.3d at 1033).

2    First and foremost, Plaintiffs' citation to Canyon Ferry Road

3    does little to further their argument.

4        In Canyon Ferry Road, plaintiff Canyon Ferry Road Baptist

5    Church challenged Montana's campaign finance laws, including its

6    disclosure requirements.  556 F.3d at 1023.  In that case, the

7    Church's Pastor became interested in supporting a Montana

8    initiative amending the state constitution, as here, to define

9    marriage as between a man and a woman.  Id. at 1024.  With the

10   hope of having the initiative placed on the ballot, a member of

11   the church printed out a petition and used the Church's copy

12   machine and her own paper to print less than fifty copies of the

13   document.  Id.  With the Pastor's approval, the member placed

14   approximately twenty copies of the petition in the Church's

15   foyer.  Id.  At roughly the same time, the Pastor also arranged

16   for a simulcast entitled "Battle for Marriage," which did not

17   expressly support or oppose any Montana initiative or candidate,

18   to be shown at the Church.  Id.  The Church did not charge for

19   attendance and utilized unpaid public service radio announcements

20   to advertise the event.  Id.  The Church also printed flyers,

21   which did not mention the state initiative, publicizing the

22   broadcast.  Id.  After the simulcast, the Pastor did speak in

23   support of the Montana initiative.  Id. at 1024-25.  The Pastor

24   then circulated the petition and indicated that petitions were

25   available in the lobby.  Id. at 1025.

26   ///

27   ///

28   ///

60

1     The Montana initiative was successfully passed, after which
2  groups opposing the ballot measure filed suit against the Church
3  alleging it had created an "incidental political committee" and
4  had failed to file the requisite disclosure forms.  Id.  The
5  Church countered that it could not "constitutionally be subjected
6  to the disclosure and reporting requirements applicable to
7  'incidental political committees' under Montana law on the sole
8  basis of its activities of de minimis economic effect in
9  connection with the 'Battle for Marriage' event and related
10  petition-signing efforts in support of CI-96."  Id. at 1028.  It
11  further argued that the Montana state law was unconstitutionally
12  vague as applied to the Church.  Id.  The Ninth Circuit agreed,
13  holding that "as applied to (1) the placement of the petition in
14  its foyer and (2) [the Pastor's] exhortation to sign the petition
15  in support of [the initiative] during a regularly scheduled
16  Sunday service, the...interpretation of 'in-kind expenditures' is
17  unconstitutionally vague."  Id.  That court also agreed "that the
18  designation of the Church as an 'incidental committee' because of
19  its one-time, in kind 'expenditures' of de minimis economic
20  effect violates the Church's First Amendment free speech rights."
21  Id.

22     More specifically, the Church argued that Montana's
23  disclosure requirements were unconstitutional as applied to it.
24  Id. at 1030-1031.  While acknowledging that the State had a
25  sufficiently important informational interest in disclosure, the
26  court noted that the information needed "is the identity of
27  persons financially supporting or opposing a candidate or ballot
28  proposition."  Id. at 1032 (emphasis in original).

That court observed that "[t]he disclosure requirements are not designed to advise the public generally what groups may be in favor of, or opposed to, a particular candidate or ballot issue; they are designed to inform the public what groups have demonstrated an interest in the passage or defeat of a candidate or ballot issue by their contributions or expenditures directed to that result." Id. at 1032-33.

Looking to Buckley, the Ninth Circuit then asked "whether Montana's 'zero dollar' threshold for disclosure is 'wholly without rationality.'" Id. at 1033.  The court concluded that it could not "say that the informational value derived by the citizenry is the same across expenditures of all sizes." Id. Moreover, "[a]s a matter of common sense, the value of this financial information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level.  As the monetary value of an expenditure in support of a ballot issue approaches zero, financial sponsorship fades into support and then into mere sympathy." Id. (emphasis in original).  The court also noted that the burden of reporting remains unchanged despite the minimal nature of any expenditures. Id. at 1034.  Accordingly, the Ninth Circuit concluded that "if the Supreme Court's 'rationality' test for threshold disclosure levels has any force at all, there must be a level below which mandatory disclosure of campaign expenditures by 'incidental committees' runs afoul of the First Amendment." Id.  On the facts before it, the Canyon Ferry Road court therefore held that:

///

///

1          Applying the disclosure provisions to the Church's <u>de</u>
2     <u>minimis in-kind</u> expenditures lies beyond [the point
where compelled disclosure runs afoul of the First
3     Amendment].  Expending a few moments of a pastor's
time, or a marginal additional space in the Church for
4     petitions, is so lacking in economic substance that we
have already held that requiring their reporting
5     creates fatal problems of unconstitutional vagueness.
Similarly, the value of public knowledge that the
6     Church permitted a single likeminded person to use its
copy machine on a single occasion to make a few dozen
7     copies on her own paper-as the Church did in this case-
does not justify the burden imposed by Montana's
disclosure requirements.

8

9   <u>Id.</u>  The court specifically limited its holding, however, to the

10  above formulation and declined to express any views regarding the

11  constitutionality of the state's disclosure requirements

12  pertaining to either candidate elections or to <u>monetary</u>

13  contributions of any size.  <u>Id.</u>  Accordingly, while Plaintiffs

14  attempt to carve out and rely on language that is persuasive to

15  their position, that language is simply not on point.  In

16  addition, that case is factually distinguishable since it dealt

17  with in-kind contributions that were entirely negligible, not

18  monetary contributions in excess of a threshold rationally set by

19  the state legislature.  Moreover, while the in-kind contributions

20  in that case were of no real consequence there, the totality of

21  small contributions in this case were very consequential because

22  a review of those contributions in the aggregate demonstrated,

23  for example, just how much money supporting Proposition 8 was

24  coming in to California from out of state.  This Court finds it

25  highly relevant to a California voter's decision making process

26  whether a ballot measure amending California's Constitution is

27  being supported by fellow Californians or by citizens of

28  neighboring states.  Accordingly, <u>Canyon Ferry Road</u>, has no real

63

1  bearing on this case.

2      A First Circuit decision from just a few months ago is much

3  more on point.  In <u>National Organization for Marriage v. McKee</u>,

4  that court addressed a challenge to Maine's campaign disclosure

5  provisions requiring "anyone spending more than an aggregate of

6  $100 for communications expressly advocating the election or

7  defeat of a candidate to report the expenditure to the

8  Commission."  649 F.3d 34, 59 (1st Cir. 2011).  As here, the

9  plaintiff in that case argued the state lacked a sufficiently

10 important interest justified by its $100 reporting threshold.

11 <u>Id.</u> at 60.  Also as here, that plaintiff relied on <u>Randall v.</u>

12 <u>Sorrell</u>, 548 U.S. 230, to argue that disclosure thresholds must

13 fail unless indexed to inflation."  <u>Id.</u> at 60-61.  The <u>McKee</u>

14 court rejected both of plaintiff's arguments stating:

15          [I]n <u>Buckley</u>, the Court acknowledged that Congress, in
           setting FECA's $100 reporting threshold, appeared to
16         have simply adopted the threshold used in similar
           disclosure laws since 1910 - <u>i.e.</u>, over the course of
17         more than sixty years, without any adjustment for
           inflation.  424 U.S. at 83.  We thus reject NOM's
18         argument that the $100 threshold is unconstitutional
           simply because it is static.  Moreover, we cannot
19         conclude that Maine's choice of a $100 threshold...is
           wholly without rationality.
20

21 <u>Id.</u> at 61.  The First Circuit's reasoning is consistent with

22 <u>Buckley</u>, with this Court's Order Denying Preliminary Injunction

23 and with the current facts.  Plaintiff has not provided any case

24 law or new factual data indicating that the legislative decision

25 in this case was "wholly without rationality" or that either the

26 <u>McKee</u> court or this Court were incorrect in upholding $100

27 disclosure requirements.

28 ///

1  Accordingly, Plaintiffs' Motion for Summary Judgment as to this

2  claim is DENIED and Defendants' Motion for Summary Judgment is

3  GRANTED.

4

5      **C.   Whether Post-Election Reporting of Contributors or a
            Failure to Purge Reports Post-Election is**

6          **Unconstitutional**

7

8      Finally, Plaintiffs argue that California's only possible

9  interest, its informational interest, is insufficient to justify

10 post-election compelled disclosure or the State's failure to

11 purge reports post-election.[17]  Plaintiffs' Motion, 33:7-8.

12 According to Plaintiffs, "the problem of voter ignorance is, by

13 definition, a pre-election concern." Id., 33: 11-13.  Plaintiffs

14 also contend any post-election State interest could be served

15 solely through non-public, as opposed to public, disclosure.

16 Id., 35:8-12.

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 _____

26     [17] From a practical perspective, Plaintiffs' latter argument
    is somewhat illogical given the fact Plaintiffs acknowledge
    contribution reports are reproduced on the internet and
27  elsewhere.  It is not entirely clear what purpose would be served
    by the State's purging of reports post-election when that
28  information has already entered the public domain.

1    Defendants disagree, arguing that the State's informational
2    interest does not end with an election.  Defendants' Motion,
3    32:6-8.  Citing to this Court's Order Denying Preliminary
4    Injunction, Defendants contend the informational interest
5    continues because, <u>inter alia</u>, legislation is not "carved in
6    stone", disclosure aids future campaigns, scholars rely on
7    disclosure information to understand the influences of campaign
8    contributions, post-election disclosure prevents ballot measure
9    committees from evading disclosure by accepting contributions in
10   the final days of an election, and complete and accurate
11   reporting requires a sufficient amount of time such that final
12   reporting cannot be finalized on or before an election.
13   Defendants reject Plaintiffs' assertion that non-public
14   disclosure would serve the State's needs, arguing that non-public
15   disclosure only would deny voters, future campaigns and scholars
16   useful information.  <u>Id.</u>, 34:14-15.

17   Plaintiffs raised this same argument in their Motion for
18   Preliminary Injunction.  The Court disposed of that argument in
19   its relevant Order as follows:

20       Plaintiffs' Third Cause of Action seeks a holding that
         the PRA disclosure requirements are unconstitutional to
21       the extent they require post-election reporting of
         contributors to ballot initiatives.  Despite the fact
22       that the Court has found no case law supporting the
         proposition, Plaintiffs contend that such reporting
23       cannot be related to the State's informational interest
         because the votes have already been cast, nullifying
24       the electorate's need for disclosure.  While Plaintiffs
         acknowledge that the State maintains an interest in the
25       election of candidates after an election has come and
         gone, they contend that the State's interest in
26       contributors to ballot initiatives "disappears"
         essentially when the deciding vote is cast at the
27       polls.

28

This Court disagrees.  No legislation is carved in stone, incapable of repeal, nor do ballot initiatives, once passed, become a legacy that future generations must endure in silence.  Indeed, it is the initiative process itself that directly allows individuals to affirm or correct prior decisions.  To assume that passage of an election draws a line in the sand past which no issues remain open to public debate is simply not congruent with the form of democracy the people of California have determined to employ.  Thus, it is possible that the post-election light shed on those contributors who donated during the final weeks of the campaign, and who continue to donate today, might reveal information the electorate requires in order to evaluate the appropriateness of its decision.

Indeed, it is unclear how "'uninhibited, robust, and wide-open' speech can occur when organizations hide themselves from scrutiny of the voting public...Plaintiffs' argument for striking down [the] disclosure provisions does not reinforce the precious First Amendment values that Plaintiffs argue are trampled..., but ignores the competing First Amendment interests  individual citizens seeking to make informed choices in the political marketplace." McConnell, 540 U.S. at 198, affirming in part and reversing in part McConnell v. Federal Election Com'n, F. Supp. 2d 176, 237 (D.D.C. 2003).

Thus, the Court simply cannot say that the occurrence of an election moots the electorate's need for relevant information.  Here, the battle over Proposition 8 continues to be waged, both in the state courts and state legislature.  The Government's informational interest cannot be met without requiring the disclosure of all pertinent contribution information such that "uninhibited, robust, and wide-open" speech can continue to be had.

Moreover, Defendants proffer a particularly practical justification for setting a post-election reporting date, namely that it would be impossible for committees to provide final financial information until their operations have wound down.  Under Plaintiffs' argument, in order to obtain disclosure, committees would have to file the names of their contributors on election day. Any later filing deadline cannot, according to Plaintiffs, relate to the State's interest. Nothing short of discontinuing committee operations pre-election would render it possible for a committee to file complete reports at the height of the electoral process. Thus, the State established a future date on which full disclosure of all campaign finances is due.

1   The Court finds analogy to the payment of federal taxes
    instructive. Income is earned and due to the IRS as of
2   the end of each calendar year. Nevertheless, the IRS
    requires filing and payment in April, one would assume
3   to allow, at least in part, for wrapping up the prior
    year's business and for compiling the necessary
4   documentation to render filing proper. It is the
    unlikely individual that would be prepared to file on
5   the final day of the calendar year.

6   Finally, as discussed in the prior section, relying on
    the Buckley Court's directive to examine the burden on
7   Plaintiffs, this Court finds that the burden imposed by
    requiring post-election reporting is minimal.

8
    Thus, as in the case of its established disclosure
9   threshold, the Government drew a line. This time the
    line chosen was a particular date rather than a dollar
10  value. Nevertheless, that line does not burden any more
    speech than would any other chosen date. Accordingly,
11  even under a strict scrutiny analysis, this Court finds
    that the post-reporting requirement is directly related
12  to the  State's informational interest and that it
    burdens no more speech than necessary to further that
13  interest.

14  Protectmarriage.com, 599 F. Supp. 2d at 1224-1225.

15       Plaintiffs raise no new legal arguments and present no

16  material facts not already addressed by this Court.  Because

17  Plaintiffs remaining arguments are based on their unsupported

18  assertion that California's informational interest cannot be

19  served by post-election reporting, Plaintiffs' arguments are

20  rejected and their Motion for Summary Judgment is DENIED.

21  Defendants' Motion for Summary Judgment, therefore, is GRANTED.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

68

**CONCLUSION**

    For the reasons set forth in this Memorandum and Order, Plaintiffs' Motion for Summary Judgment (ECF No. 245) is DENIED, Defendants' Motion for Summary Judgment (ECF No. 259) is GRANTED, and Defendants' Motion to Strike (ECF N. 271) is DENIED as moot. The Clerk of the Court is directed to close this case.

    IT IS SO ORDERED.

Dated: November 4, 2011

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE